# Exhibit

# A

```
WILLIAMS ROY                    JUVENILE COURT SYSTEM - JUVENILE NAME INQUIRY
                                                                    PAGE 01
------------------------------------------------------------------------
        JUVENILE NAME              P.P.# J-NUMBER  BIRTH DT.  ADDRESS
1.
2. WILLIAMS       ROY          L      216843-01  12/26/64  450 S 13TH ST
```

```
                                            202 01  09/08/73


                                                           P/N
*** PRESS ENTER FOR NEXT PAGE
```

```
FAMILY NO. 216843                   JUVENILE COURT SYSTEM - FAMILY NO. INQUIRY
------------------------------------------------------------------------
        WILLIAMS       ROY     L   12/26/64   01
   RECH  PETITION NO.  D.C. NUMBER  FILE DATE  HRG.  DATE   JUDGE DSP. STA.
1. 01   D00515 79-04   AFFIDAVIT   05/03/79   REV  11/10/81  205  792  DSP
2. 02    10892 81-12   COMPLAINT   12/05/81   ADM  02/28/83  136  917  DSP
```




*** PRESS ENTER FOR FIRST PAGE                    P/1

PET. NO.  00515 79-04    DEPENDENT        CASE STAT. DISPOSED    STAT.DT. 11/10/81
DEP.NAME  WILLIAMS       ROY             L FAMILY NO. 216843 01 01
     ADDR. 450 S 13TH ST
           PHILA      PA  19146          MENTAL/PHYSICAL HEALTH PROBLEM
                                         FILE DATE  05/03/79
                        PROB.DIST.        PET.PREP.  05/03/79
PHONE NO.                                PETITIONER COURT
BIRTH DT. 12/26/64                       GOAL+DATE
SEX       MALE                           ATTY:
RACE      BLACK                          LAST HEAR. REV 111081      DANDRIDGE    *
RELIGION  PROTESTANT                          NEXT COURT HEARING
RESIDENCE MOTHER ONLY                    TYPE              ROOM
SCHOOL    NOT REPORTED                   DATE              TIME
MAR STAT. SEPARATED                      JUDGE

MOTHER                                   PAR./GRD.  WILLIAMS      BARBARA
   ADDR.                                      ADDR.  450 S 13TH ST
                                                     PHILA      PA  19146


*** PRESS ENTER FOR GUARDIAN/PETITIONER/HEARING ALIAS DATA P/N

                        H E A R I N G   A C T I V I T Y
                                      RESULT/AGENCY/INST./REASON FOR REOPENING
   NO. TYPE   DATE        JUDGE

   1. ADJ   051079    DANDRIDGE     ** 783 COMMIT TO PARENT
   2. REV   062879    DANDRIDGE     ** 781 COMMIT TO D.H.S.
                                       REPORTS
   3. REV   100479    DANDRIDGE     ** 792 REMAIN AS PLACED/COMMITMENT TO STAND
                                       REPORTS
   4. REV   041080    DANDRIDGE     ** 792 REMAIN AS PLACED/COMMITMENT TO STAND
                                       REPORTS
   5. REV   061280    DANDRIDGE     ** 781 COMMIT TO D.H.S.
                                       REPORTS
   6. REV   011981    DANDRIDGE     ** 792 REMAIN AS PLACED/COMMITMENT TO STAND
                                       REPORTS
   7. REV   040281    DANDRIDGE     ** 792 REMAIN AS PLACED/COMMITMENT TO STAND
                                       REPORTS
   8. REV   050781    DANDRIDGE     ** 792 REMAIN AS PLACED/COMMITMENT TO STAND
                                       REPORTS
   9. REV   060881    DANDRIDGE     ** 715 DISCHARGED FROM COMMITMENT
                                       REPORTS
  10. REV   063081    DANDRIDGE     ** 792 REMAIN AS PLACED/COMMITMENT TO STAND

*** PRESS ENTER FOR CONTINUED HEARING ACTIVITY/ALIAS DATA  P/N        PAGE 03
                        H E A R I N G   A C T I V I T Y

```
                                            REPORTS
11. REV    082881    DANDRIDGE    ** 792 REMAIN AS PLACED/COMMITMENT TO STAND
                                            REPORTS
12. REV    110881    DANDRIDGE    ** 792 REMAIN AS PLACED/COMMITMENT TO STAND
                                            REPORTS
```

*** PRESS ENTER FOR PAGE 1 INFORMATION                    P/1
      NO   GRADE   CHG CD       CHARGE DESCRIPTION

```
             1.          36002    SIMPLE ASSAULT
             P           37550    TERRORISTIC THREATS
```

                  H E A R I N G   A C T I V I T Y
                                    RESULT/AGENCY/INST./REASON FOR REOPENING
NO. TYPE   DATE       JUDGE

```
1. PRE   121681    TRANCHITELLA ** 581 TEMPORARY COMMITMENT FOR DIAG STUDIES
2. ADJ   122881    TRANCHITELLA ** 500 PROCEDURAL CONTINUANCE/NO REASON GIVEN
3. ADJ   010682    TRANCHITELLA ** 581 TEMPORARY COMMITMENT FOR DIAG STUDIES
4. ADJ   020582    TRANCHITELLA ** 500 PROCEDURAL CONTINUANCE/NO REASON GIVEN
5. ADJ   021882    TRANCHITELLA ** 500 PROCEDURAL CONTINUANCE/NO REASON GIVEN
6. ADJ   030182    MEADE        ** 537 NON-APPEARANCE PROBATION OFFICER
7. ADJ   031182    TRANCHITELLA ** 985 COMMIT TO DELINQUENT INSTITUTION
                                          SLEIGHTON SCHOOL
8. REV   040882    TRANCHITELLA ** 992 REMAIN AS PLACED/COMMITMENT TO STAND
                                          REPORTS
9. ADM   022883    TRANCHITELLA ** 917 DISCHARGED FR DEL INST NO AFTERCARE
                                          DISCHARGE FROM AGENCY/INST./INDIVIDUAL
```

*** PRESS ENTER FOR PAGE 1 INFORMATION                    P/1

**DEFENDER ASSOCIATION OF PHILADELPHIA**
**FEDERAL COURT DIVISION**
**CAPITAL HABEAS CORPUS UNIT**
437 CHESTNUT STREET, SUITE 501
PHILADELPHIA, PA 19106-2414

(215) 928-0520                    (215) 928-0826 (FAX)

May 13, 1996

Belmont Center
Attn: Health Information Management
4200 Monument Road
Philadelphia, PA 19131

            RE: Roy L. Williams
                DOB: 12\26\64
                SSN: 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

Dear Sir or Madam,

        Please accept this letter as a formal request for any and all records relating to the above mentioned individual. He was seen at your hospital some years ago when it was the Philadelphia Psychiatric Hospital.

        I have enclosed a signed release form authorizing the release of these records to our agency.

        Please notify me as soon as these records are available. If there are any questions or problems, please feel free to call.

                                    Sincerely,

                                    Sarah Butters,
                                    Staff Paralegal



Great Valley Corporate Center
18 Great Valley Parkway, Suite 190
Malvern, PA 19355-1

1-800-525-2922
(610) 640-4600
FAX (610) 640-3844

RECORDEX SERVICES, INC.

Recordex Services, Inc. has been retained by the Medical Record Department of

Belmont Center for Comprehensive Treatment

to fulfill requests for copies of medical records. We wish to emphasize that the increasing
demands for patient data pose a rising threat to the confidentiality of the patient's medical
information. Recordex Services strives to take every opportunity to safeguard patients' right
to privacy as outlined in the AHA's Patient Bill of Rights. Specifically, all patients have the
right "to expect that all communications and records pertaining to their care will be treated as
confidential by the hospital and any other party entitled to review certain information in such
records." As one such party, we ask that all information transmitted herewith be treated
with utmost respect and the dignity such personal medical information warrants.

Enclosed are the reproduced medical documents specifically authorized by the patient or
his/her legal representative. Each medical record was carefully reviewed to assure proper
disclosure to you, the requestor. Any re-disclosure without the express written consent of
the person to whom the information pertains is prohibited. Please be advised that the use of
the information for other than the stated purpose is prohibited. Based upon guidelines
provided by the American Health Information Management Association, the information
should also be destroyed after the stated need has been fulfilled.

If you have any questions, please do not hesitate to contact us at 1-800-525-2922 and one of
our Customer Service Representatives will be happy to assist you.

Thank you for your cooperation in maintaining the patient's right to privacy.

This information has been disclosed to
you from records whose confidentiality
is protected by State Law. State reg-
ulations prohibit you from making any
further disclosure of this information
without the prior written consent of
the person to whom it pertains.

**Philadelphia Psychiatric Center**
Ford Road and Monument Avenue
Philadelphia, Pa. 19131
215-877-2000

| Patient Name | 790596-6 | | | | | | Admitted By | Discharge Date | Disch. Time |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | G. Ross | 6/21/79 | 10.00 AM |

| Admission Date | Adm. Time | | Room No. | Med. Rec. No. | | | Patient Address | | Phone |
|---|---|---|---|---|---|---|---|---|---|
| 04-19-79 | | 11:05 | 27 | MED. 00050-5 | | | | | 289-4920 |

| Patient Name - Last, First, Middle | | | | | | Patient Address | | |
|---|---|---|---|---|---|---|---|---|
| Williams Roy | | | | | | 1606 Howell St., Phila. Pa. 19149 | | |

| Birth Date | Age | Sex | Mar. Stat. | Cde | Religion | Race | Social Security No. | Occupation | Educational Level |
|---|---|---|---|---|---|---|---|---|---|
| 12-26-64 | 14 | M | S | 0 | uk | B | none | student | 8th |

| Notify in Emergency | Relationship | Address | Phone |
|---|---|---|---|
| Barbara Williams | mother | same | same |

| Responsible Party - First, Middle & Last | Address - Street & City - State - Zip | Phone |
|---|---|---|
| Barbara Williams | | |

Responsible Party Employer _____ Address _____

| Medicare | Blue Cross - Group | Certificate | Medical Assistance |
|---|---|---|---|
| | | | 51-073255 TCK-02 |

Other Insurance _____    Social Worker _____

| Admission Type | 304 C | Admission Precautions | | | Prev. PPC Adm. Date | Military Service |
|---|---|---|---|---|---|---|
| ☑ Vol. ☐ Invol. | | Other: | | | | ☐ Yes ☐ No |

Previous Psychiatric Care
☐ PPC  ☐ Pvt. Psy.  ☐ Pvt. Hosp.  ☐ State Hosp.  ☐ Gen. Hosp.  ☐ Out Pt.   Resident Physician

| Referral Source/Attending Physician | Staff Psychiatrist | Resident Physician |
|---|---|---|
| 7A  Dr. Hight | Dr. Hartmann | adm 2 of 2 |
| | | disch 2 of 2 |

Provisional Diagnosis:
Psychiatric    Behavior Adj. Adol.        Medical

| Final Diagnosis:  Do Not Abbreviate | Code |
|---|---|
| Primary Diagnosis (Reason for Hospitalization) | |
| ① Adjustment Reaction of Adolescence | 313.89 |
| Other Diagnosis or Complications | |
| | 94.02 |
| | 94.42 |
| | 94.33 |
| | 93.89 |
| | 94.44 |
| | 93.83 |
| | 93.81 |

This information has been disclosed to you from records whose confidentiality is protected by State Law. State regulations prohibit you from making any further disclosure of this information without the prior written consent of the person to whom it pertains.

RESULTS ▶  ○ Recovered   ◉ Improved   ○ Not Improved   ○ Not Treated   ○ Diagnosis Only   ○ Released Against Advice

DISPOSITION ▶  ○ AMA/AWOL   ○ Routine   ○ Expired   ○ Transferred   ○ Boarding Home Placement

| Resident Signature | Date | Approved By | Date |
|---|---|---|---|
| Paul Hartmann MD | 6/28/79 | | |

MEDICAL RECORDS    H.U.P. COMPLETED

## CONSENT FOR ADMISSION

### CONSENT FOR DIAGNOSIS AND TREATMENT

I, _Roy Williams_, _____ person by or on whose behalf an application for admission and treatment has been made to the Philadelphia Psychiatric Center, do hereby voluntarily consent to, such hospital care including; routine diagnostic procedures, I and/or medical/surgical treatment and emergency treatment by Dr. _Hillman_ his/her assistants or designees, as is necessary in his/her professional judgment.

This consent includes dental examination and/or extraction and participation in the total treatment program; including ground privileges, therapeutic home visits, and recreational trips off the hospital grounds.

### ASSIGNMENT OF HOSPITAL INSURANCE BENEFITS

I hereby authorize payment directly to PHILADELPHIA PSYCHIATRIC CENTER of the hospital benefits under the insurance coverages identified on the reverse side and any others which may be payable to me, but not to exceed the hospital's regular charge for all services rendered during this period of hospitalization. I understand I am financially responsible for all charges not paid under this assignment.

### AUTHORIZATION TO RELEASE MEDICAL RECORD INFORMATION

I hereby authorize the hospital to release such information as may be necessary for the completion of insurance or welfare claims, Patients Certification, Authorization to Release Information, and Payment Request. I certify that the information given by me in applying for payment under Title XVIII of the Social Security Act is correct. I authorize any holder of medical or other information about me to release to Social Security Administration or its intermediaries or carriers any information needed for this or a related Medicare claim. I request that payment of authorized benefits be made on my behalf.

### FINANCIAL AGREEMENT

The undersigned agrees, whether he signs as agent or as a patient, that in consideration of the services to be rendered to the patient, he hereby individually obligates himself to:

(a) To pay to CENTER for each two week's period to advance the rate of amount $_____ per week for board, and care so long as said patient shall remain at CENTER.

(b) To pay all usual and customary charges and expenses for such special nurse or nurses as are deemed necessary for said patient and all charges for laundry service furnished said patient and to reimburse CENTER for the cost of any and all supplies, drugs and medicines required for the proper care, maintenance and comfort of said patient.

(c) To indemnify and reimburse CENTER for all damage done by said patient to glass, bedding, furniture or furnishings of CENTER.

It is understood and agreed that CENTER will not be responsible for valuables, money, watches, jewelry, etc., in possession of said patient while in CENTER, and the CENTER reserves the right to discharge said patient in case of non payment of any of the items hereinabove set forth.

This Agreement shall bind the undersigned, their heirs, executors, administrators and assigns.

This form has been fully explained to me, and I certify that I understand its contents.

_4/19/79_
Date

_X Roy Williams_
Patient's Signature

_B. Lee_
(Witness)

Signature of
Staff Member

Patient's Agent or Legal Representative

This information has been disclosed to you from records whose confidentiality is protected by State Law. State regulations prohibit you from making any further disclosure of this information without the prior written consent of the person to whom it pertains.

PHILADELPHIA PSYCHIATRIC CENTER

# DISCHARGE SUMMARY

Patient's Name __Williams, Roy__   Age __14__   Sex __Male__   Case Number __00-48-58__

Address __1606 E. Hovell St., Phila., PA 19149__   Status __Involuntary-304__

__Black__   Religion __Unknown__   Occupation ____

Referring Physician __HS#7A__   Resident Physician __Dr. P.J. Hartmann__

Date of Admission __4/19/79__   Date of Discharge __6/21/79__

**PRESENTING PROBLEM ON ADMISSION AND HISTORY:**

Roy Williams is a 14 year old male with a caucasian mother and black father who was referred on 4/19/79 from 7A on a 304C commitment for a 10 day psychiatric evaluation. The patient had been a chronic behavior problem for his mother, who separated from his father when Roy was 5 for the last several years. However, patient had difficulty in a boarding school which he was attending around Christmas of 1978 and refused to return to this school or attend school in his neighborhood. Between January and the time of admission Roy had secluded himself in the house, refusing to go out and socialize and become increasingly violent and abusive towards his mother and sister. Mrs. Williams, in January of 1979, requested placement by DPW of Roy because she felt unable to handle his temper and abuse. In the months prior to admisssion the patient had threatened his mother with a knife, broken television set and pieces of furniture, punched holes in walls, stabbed the bed in the house with a knife, and acted sadistic toward the family dog. Roy assaulted his sister in March of 79, 3 times, once requiring her to go to the hospital.

**MENTAL STATUS ON ADMISSION:**

Revealed a short, somewhat obese black male with poor eye contact during the interview. His motor behavior was somewhat slowed and his affect sad and anxious. There was no evidence of formal thought disorder. When questioned about many of the specifics of his situation with his mother, Roy would simply respond "I don't know" or "I can't remember". Orientation was entirely normal.

**PHYSICAL EXAMINATION:** within normal limits.

**LABORATORY STUDIES:** Including CBC with differential, chem 24, T4, T3, urinalysis, VDRL, EKG, and chest were within normal limits for his age.

This information has been disclosed to you from records whose confidentiality is protected by State Law. State regulations prohibit you from making any further disclosure of this information without the prior written consent of the person to whom it pertains.

**COURSE IN THE HOSPITAL:**

During the initial 10 day evaluation period, Roy had psychiatric evaluation, psychological evaluation through psychological testing and assessment by social service. Patient was initially admitted to a closed area of the hospital and for the first 2 days was taken off the floor only when accompanied by a staff member. He conformed fairly well to the hospital routine and was gradually allowed off the floor with a group of patients and then transferred onto a open ward. He appeared to be able to control aggressive impulses fairly well although occasionally facial argument and once threw a luncheon tray on the floor. It was quite difficult to tell what provocation there was when Roy would lose his temper as he seemed exceedingly sensitive to any slight or suggestion that he do something he did not wish to do.

Williams, Roy                          -2-                          00-48-58

After 10 days we returned to court and recommended that he be return to the
Philadelphia Psychiatric Center under a Section 305 for further inpatient psycho-
therapy on a trioption basis with the view that if he derived some benefit from the
brief psychotherapy he could be placed in an appropriate group home. Roy was
quite willing to assent to this and he, as well as his mother, commented that he
had felt happier in the hospital then he had in many months.  Initially an attempt
was made to meet with Roy, his sister and his mother together.  The situation however
was quite impossible as Roy could hardly contain his anger at seeing his sister and
his sister was so intimidated by Roy that she was unable to speak freely.  Although
Roy, throughhout his hospitalization, was not a major behavior problem, several
times he showed extremely poor impulse control and tolerance of frustration.  Events
such as staff refusing to do his laundry when he wished twice sent him into a rage
where he once banged a water fountain and would slam doors.  At no time was he
physically violent towards another patient although he was frequently sadistic and
teasing sicker patients.  Roy showed a marked resistence to communicating his
feelings in individual or group therapy.  This was in spite of considerable proding
by all members of the adolescent team and his adolescent peers as well.  Patient
was not treated with any medications during the hospitalization.

                                              Psychological examination
on 4/19/79 revealed Full Scale IQ of 85, placing him in the dull/normal range of
intelligence.  It was felt that he had considerable difficulty in thinking in
catagories and in synthetic thinking, tackling more abstract forms of thinking.
Assessment of his emotional functioning by projective tests indicated, as his clinical
condition did, that his most striking problem was the control of angry feelings.
It was felt that when he becomes angry he tends to over generalize and lash out
indiscriminately at what is going on around him.  He has little ability to reflect
on the causes of h.s angry feelings.  Second major area of difficulty was in the
area of masculin identification in which he seemed to anticipate failure.  It was
felt that he tended to rely on a facade of masculinity but underneath was someone
who was quite frightened, dependent and tending to be rather passive.  The third
major problem was felt to be a significant depression which was revealed in several
of his TAT stories in which he offered suicide as a solution to problems.

                                              It was felt that although
Roy was reluctant to bring up many personal issues in group and individual therapy,
that he did listen closely to the problems of the other adolescents and seemed to
derive some significant benefit vicariously in this process.  His behavior was such
in the hospital that it was felt that in a structured group home he would certainly
be able to manage fairly successfully.  The patient returned to court on the 19th and
Judge Dandriage  of the Family Court terminated his 305 commitment 2 days after that
date, forcing DPW to move quickly on his placement.  On June 21st, he was discharged
in the custody of his mother and DPW social worker and taken to the Youth Services
Home where he was to be evaluated for placement.


TREATMENT:
                                              The patient was treated
                                              with individual, group
and briefly family therapy.  Patient was not treated with psychotropic medications.


DIAGNOSIS:        (PROVISIONAL)                Adjustment Reaction of
                                              Adolescence.

                  (Final)                     Adjustment Reaction of
                                              Adolescence.

PROGNOSIS:                                     Prognosis is considered
                                              fair if the patient can
be placed in a supportive yet fairly highly structured group home in which the patient
can develop appropriate routes of expressing feelings, find appropriate male figures
on which to build a masculine identification.

This information has been disclosed to
you from records whose confidentiality
is protected by State Law. State reg-
ulations prohibit you from making any
further disclosure of this information
without the prior written consent of
the person to whom it pertains.

Williams, Roy

DISPOSITION:

Home.

Patient was discharged
to the Youth Services

Dr. P.J. Hartmann
Resident Physician

Gertrude Hight, M.D.
Unit Director

ew/7/2/79
cc. Admissions

This information has been disclosed to
you from records whose confidentiality
is protected by State Law. State reg-
ulations prohibit you from making any
further disclosure of this information
without the prior written consent of
the person to whom it pertains.

PHILADELPHIA PSYCHIATRIC CENTER
ADMISSION CERTIFICATION

```
WILLIAMS,ROY 790594-6
HS.PA/HARTMANN
04-19-79/BM/WD
14.12-25-64
1606 HOWELL ST
PHILA.PA. 3143 8104 C
MTR BARBARA 249-4320
MA 51-0732055 TC X MTR
CO.48
```

The undersigned is the:

_____ Attending Physician

( ) A member of Hospital Staff
having knowledge of the case.

I hereby certify that the above named patient requires inpatient hospital care, as a medical necessity, for the following reasons:

_____ For the purpose of Diagnostic Study.

_____ For Active Treatment which is expected to improve the patient's mental illness.

(X) The patient is an INVOLUNTARY ADMISSION and is a clear and present danger to self/others/or property.

  ( ) Has inflicted (or attempted/planned to inflict) serious bodily harm on self/others within past 30 days and there is a reasonable probability of repetition.

  _____ Reasonable probability of death/harm within 30 days because patient is unable to care for self regarding: Nourishment _____: Personal Care _____; Shelter _____; Self Protection _____.

( ) The patient is a VOLUNTARY ADMISSION and

  _____ Needs 24 hour observation by skilled personnel to prevent impulsive acting to harm self/others/property.

  _____ Is mentally ill and has failed to respond to outpatient treatment.

  _____ Is Drug/Alcohol dependent and unresponsive to outpatient care.

  _____ Is Drug/Alcohol dependent severe enough to require 24 hour/day medical care for safe withdrawal.

  _____ Is mentally ill and unable to function or care for self with grave potential for medical, personal or social deterioration without 24 hour/day inpatient care.

Estimated Length of Hospitalization _____ 1-3 wks.

Plans for Post-Hospital Care _____ CMHC

_____
4/19/79
DATE

This information has been disclosed to you from records whose confidentiality is protected by State Law. State regulations prohibit you from making any further disclosure of this information without the prior written consent of person to whom it pertains.

_Paul Hartmann M.D._
PHYSICIAN'S SIGNATURE

4/20
OB

UR-79-3

WILLIAM HALL PHILADELPHIA PSYCHIATRIC CENTER

PSYCHIATRIC ADMISSION SUMMARY

The information has been disclosed to you from records whose confidentiality is protected by State Law. State regulations prohibit you from making any further disclosure of this information without the prior written consent of the person to whom it pertains.

PHILADELPHIA PSYCHIATRIC CENTER

PSYCHIATRIC ADMISSION SUMMARY

*(The remainder of this page consists of handwritten clinical notes that are too faded and illegible to transcribe reliably.)*

# PHILADELPHIA PSYCHIATRIC CENTER

## CLINICAL HISTORY

| | |
|---|---|
| Chart No. | 00 48 58 Ward |
| Patient's Name: Williams, Roy | Dictated by: P. Hartmann, M.D. |
| | Date: 4/19/79 |

**IDENTIFICATION OF THE CASE:**

Roy Williams is a 14 year old male with a caucasian mother and a black father who is referred to Philadelphia Psychiatric Center on 4/19/79 from 7A on a 304C commitment for a ten day court ordered psychiatric evaluation.

**GENERAL STATEMENT OF THE PRESENTING PROBLEM:**

The patient is referred for evaluation primarily because of complaints by his mother that she is unable to cope with his frequent angry outbursts and negative behavior. Mrs. Williams first came to the Department of Public Welfare to request placement for Roy on January 18, 1979. The Department of Public Welfare petitioned the court to have Roy committed for inpatient psychiatric evaluation.

**MEDICAL HISTORY:**

Physical examination was within normal limits. There was no history of allergies or unusual childhood illnesses. The patient had a tonsillectomy and adenoidectomy as a young child and broke his left arm once without any complications. The patient is not taking any medications, does not abuse tobacco, alcohol or drugs. There were no dietary restrictions. There are no illnesses which appear to run in the family.

**DEVELOPMENTAL & ADOLESCENT ADJUSTMENT PATTERNS:**

Roy was the product of an apparently normal 9 month pregnancy. There were no initial perinatal medical complications. Roy achieved the normal developmental miles-tones of sitting, walking, talking at approximately the appropriate ages. Roy's father who has been a heavy weight boxing contender of moderate stature left his mother when Roy was age 5. Prior to this time there had been many arguments and physical fights between them which Roy observed getting beaten up. Since that time the father has maintained very little contact with Roy although they occasionally communicate over the telephone. Roy's early school years were described as fairly normal and unremarkable. He has some difficulties in 4th grade and refused to go to school for a period of time and his mother acquiesed on this. At this time his father visited once and beat Roy up because he wasn't attending school. From about that time on Mrs. Williams describes increasing difficulties controlling Roy's anger. He will frequently have temper tantrums in which he would destroy objects, threaten her and refuse to do what was asked of him. His relationships with peers in later years of grammer school were shakey and punctuated with frequent arguments and fights. There has been no evidence of typical disturbance of behavior in adolescence such as runaway behavior, drug use, alcohol, smoking, fire setting or criminal activities.

**SEQUENTIAL ACCOUNT OF THE PRESENT ILLNESS:**

The patient developed significant problems in school in the early 8th grade in St. Joquns. He had fairly good school performance there until he stated he didn't get.

PHILADELPHIA PSYCHIATRIC CENTER

## CLINICAL HISTORY— (Continued)

Patient's Name     Williams, Roy          Chart No. OO 48 58     Dictated by      P. Hartmann, M.D.     Page     -2-

along with a teacher. He was vague about why this was so. He was transferred to Fels
for a short time and made long-standing application to a private school in Hershey, Pa.
where he was accepted. He finished the 8th grade at this school, started 9th but re-
fused to return after the Christmas break. He complained that he was getting teased
and beaten up by the older kids in his dormitory house and he gave this as his only
reason for refusing to go back to school. He stated he had requested transfer to
another house but was refused on this. He described no particular problems relating
to teachers or participations in required activities there. However, in conversation
with Mr. Storm, the Vice President of the Milton Hershey school, Mr. Storm noted that
Roy was extremely disruptive in the class room and quite a behavior problem and he felt
that Roy was not motivated to school work and that he did not do very well. He is not
able to adjust to the rules and regulations of the school and the administrators were
thinking of asking him to leave prior to Roys decisions and they would not consider
taking him back at the school after he is ready for discharge.

Since Christmas Roy has been at home living with his mother and 13 year old sister.
He and his mother described the lack of peers in the neighborhood and he feels that
people pick on him because he is part white and part black. Over the last few months
he h s spent most of his time watching T.V. and weight lifting. He apparently stays
in the house a great majority of the time and refuses to go out. He has had increasingly
great difficulty controlling his temper, particularly at his sister whom he teases
mercilessly. He feels his sister provokes the fights and mother takes sister's side
since Roy is stronger. He tended to minimize the extent of physical fighting and
considers it just the usual arguments between brother and sister. His mother describes
quite a different picture, stating that Roy would throw furniture, broke television
sets and had frequent physical fights with his sister. He would get angry about such
thi ngs as not having what he wanted to eat in the house. He hit his sister's face with
a screw attachment to his weight set which required her to go to the hospital at one
point. At times Roy would turn his anger in on himself and would hold a razor blade to
his wrist and state that he was going to kill himself. He never followed through on
any of these threats and never made a suicide attempt. The mother at this time feels
totally unable to manage Roy at home. Roy at this time feels like he is unwanted at
home and that he doesn't particularly want to return home either and would prefer place-
ment in a residential school setting much like Milton Hershey.


Paul Hartmann, M.D.                           Gertrude Hight, M.D.
Resident Physician                            Staff Psychiatrist


jmc 6/29/79

SP-141-A

PHILADELPHIA PSYCHIATRIC CENTER

# MENTAL STATUS EXAMINATION

Chart No. 00 48 58 Ward

Patient's Name: Williams, Roy

Doctor: Paul Hartmann, M.D.

Date: 4/19/79

**ATTITUDE AND MANNER:**

Roy Williams presented as a young black male, appearing approximately his stated age of 14. He is somewhat obese with fat distribution characteristic of early adolescence. The patient sat quietly during the interview with fair eye contact and a sad facial expression. Motor activity was slightly decreased from normal. He related in a cooperative and friendly manner to the interviewer.

**STREAM OF MENTAL ACTIVITY:**

The patient's associations were tight and goal oriented with the usual tempo of speech. There was no evidence of disturbed reality orientation.

**MOOD AND EMOTIONAL REACTION:**

The patient appeared sad and slightly tense with an inappropriately bland affect when talking about physical fights with his sister and mother.

**GENERAL MENTAL TREND:**

There was little spontaneous history obtained from the patient. His thinking when discussing recent physical fights was primarily consisting of accusations, blaming the other parties involved. He frequently stated he couldn't remember events which were part of the recent history. There was no evidence of delusions, hallucinations, ideas of reference or paranoid ideation.

**SENSORIUM:**

The patient was completely oriented to time, person and place with a normal level of consciousness. His memory for recent and past events was certainly normal for conflict free areas. General fund of information and intelligence seemed average.

**SUMMARY:**

We have a slightly obese, dejected looking black male who was cooperative and friendly with the interviewer, although attributing little spontaneous information. His affect was sad and tense with an inappropriately bland affect when discussing recent physical fights with his family. His thought processes showed no evidence of formal thought disorder. Sensorium was within normal limits.

Paul Hartmann, M.D.
Resident Physician

Gertrude Hight, M.D.
Staff Psychiatrist

jmc 6/29/79

PHILADELPHIA PSYCHIATRIC CENTER

# PSYCHOLOGICAL EXAMINATION

Patient's Name        Williams, Roy                    Age    14

DOB: 12/26/64

File No.
Chart No. 00-48-58 Ward
Examiner K. Byrne, Psy.D.
Date 4/19/79

DATE OF TESTING:        May 2nd, 8th, 1979

REASON FOR TESTING:

Psychological consultation was requested by Dr. Hartmann to evaluate
this patient for family dynamics, impulsivity, defensive structure and
underlying depression.  Additionally this hospitalization is court
ordered, and the psychological testing is one part of an overall
evaluation process.

TESTS ADMINISTERED:

Wechsler Intelligence Scale for Children - Revised Form; Bender Gestalt;
Bender Recall; House-Tree-Person Drawings, Chromatic and Achromatic;
Rorschach; Thematic Apperception Test.

TESTING SITUATION:

Roy was brought to my office by a staff member and waited patiently the
time necessary before I could see him.  Roy was dressed in brown pants,
sneakers and a sport shirt, and was chewing gum.  He shows the hint of
a moustache, and wears glasses.  He is soft-spoken, quiet boy with a
round face and a soft appearance.  When asked about his difficulties
Roy said "I was staying out of school since Christmas and fighting with
my sister."  He was reluctant to elaborate on this and offered no other
complaints.

During the testing Roy frequently ranged from an interested, active
approach to the task, to becoming more detached, withdrawn, and giving
an overt appearance of boredom and disinterest.  This latter behavior
was seen most markedly when he met even the mildest difficulty in tack-
ling the test items.  He was most easily discouraged on verbal tasks.
In fact, on the vocabulary subtest when he was asked to define words,
Roy became markedly depressed, staring at the floor with a sad facial
expression, lowering his eyes, and mumbling one or two inaudible words
in response to my questions.  This quickly was reduced to not cooperating
at all.  He was unable to talk about his feelings or experiences at
this point, and testing was discontinued for the day.

Roy agreed to complete a Sentence Completion Questionnaire on his unit
during the evening, but when we next met he brought the item with only
the first three questions answered, saying that he had forgotten to do it.

PHILADELPHIA PSYCHIATRIC CENTER

## PSYCHOLOGICAL EXAMINATION—*(Continued)*

Patient's Name Williams, Roy          File No. 00-48-58 Ward. K. Byrne, Psy.D. Page 2
Chart No.

INTELLECTUAL FUNCTIONING:

On the WISC-R Roy obtains a Verbal I.Q. of 84, a Performance I.Q. of 90, yielding a Full-Scale I.Q. of 85. This places his current intellectual functioning in the Dull-Normal Range of intelligence. There is significant unevenness and scatter both within and between individual subtests.

In the Verbal area Roy has striking difficulty on a task which requires that he compare the basic similarities between a variety of items. This suggests that he has difficulty in thinking in categories, in synthetic thinking, and in tackling more abstract forms of thinking. Secondly, Roy has difficulty on tests which assess his social judgment, i.e., his intellectual awareness of the appropriate behavior called for in a variety of situations. This suggests that he is not as "tuned in" to social conventions and the appropriate anticipated behavior as would be expected.

Somewhat surprisingly, he shows reasonably strong skills at concentration, and indicates that under certain conditions he is quite able to marshall his intellectual resources toward problem solving activities.

In general, it may be said that Roy is not a youngster who feels comfortable in verbal interactions, and he is a "doer" rather than a "talker".

In the Performance area Roy's work is much more even, and at a slightly higher level. This is true in all of the performance tasks with the exception of a task which requires the assembly of puzzle pieces. Here he approached this in quite a cavalier, almost careless fashion, and on the first and easiest of the tasks he made quite careless errors, costing him points on the subtest. He approached it using only one hand and did not try overtly to plan in advance.

EMOTIONAL FUNCTIONING:

The most striking problem this youngster faces is the control of his angry feelings. Roy is a youngster who is intensely resentful and angry, and these feelings are easily stirred up by events in his environment. When he becomes angry Roy tends to over-generalize, and tends to lash out indiscriminately at what is going on around him. He correctly views certain events, but then draws unwarranted conclusions from the bits of information he accurately views. To his credit, Roy tries to inhibit direct motoric expression of anger, and in fact, if he

PHILADELPHIA PSYCHIATRIC CENTER

## PSYCHOLOGICAL EXAMINATION—(Continued)

Patient's Name ........ Williams, Roy ......... File No. .... 00-48-58 .. Ward .. K. Byrne, Psy.D. .. 3
Chart No. ........... Examiner: ...................... Page

EMOTIONAL FUNCTIONING (Continued):

is in a situation over an extended period of time it is more likely that he will be successful in doing so. In the beginning of things however, he tends to be more impulsive. Roy is someone who is also likely to be quite easily irritable. His response to Rorschach card II provides a good insight into how he sees relationships with others: "It looks like two bears fighting."

A second major area of difficulty for Roy is in the task of masculine identification. There are many signs that Roy is striving toward being manly, but unfortunately he seems to anticipate failure in this area. He gives an intimate look at his ego ideal in his comments about a drawn person: "He plays for the 76'ers basketball team and he's the best one on the team. They just won the championship and he's getting congratulated and everybody's shaking his hand." This is in striking contrast to another view Roy provides of his future, in responding to a TAT card which shows a young man standing with a motherly looking figure: "It's a guy and his mother. He wants to leave the house but mother doesn't want him to. Eventually he finds an apartment and meets a lady, but now he's coming home and living with mother again. Things didn't work out with the girl, so he's disgusted and mad as he goes back home. He feels like he is being treated like a child and he is a man. He's hoping mother will take him back and she does." This story suggests that despite his strivings Roy is having difficulty psychologically beginning to separate from his mother, and a lot of his anger seems to be deriving from this situation. It is particularly difficult for him because at a conscious level he seems to see his mother as somebody who is quite reasonable, who has his best interest at heart, and who is open to logical discussions. This makes it even more frustrating because he finds it difficult to explain his anger towards her. He also can be anticipated to rely on a facade of masculinity, but underneath this Roy is somebody who is quite frightened, dependent, and tending to be rather passive.

A third problem for this youngster is a significant masked depression. While Roy is unlikely to offer verbal complaints of a depression, he is significantly sad, unhappy, and forlorn. This is likely to be presented by him as complaints of boredom or restlessness. In several of his TAT storieshhe offers suicide as solutions to problems, and some self-destructive behavior should not be ruled out with this youngster.

PHILADELPHIA PSYCHIATRIC CENTER

## PSYCHOLOGICAL EXAMINATION—(Continued)

Patient's Name    Williams, Roy    File No. _____ Chart No. 00-48-58 Ward. K. Byrne, Psy.D. 4

### EMOTIONAL FUNCTIONING (Continued):

Roy does have a number of significant strengths which should not be overlooked. At times he is capable of repression and inhibition, though in general it must be said that in controlling aggression these defenses are likely to fail him. He is capable of relating positively to others, and he definitely wants to be liked and wants to enjoy the positive aspects of inter-personal relationships. This youngster is a good candidate for intensive psychotherapy. The initial resistances will probably be around his reluctance to talk about his feelings, or to engage in any intensive verbal interactions, and the therapist may anticipate a difficult beginning. If Roy can get past this opening phase of psychotherapy it is likely that he has sufficient resources to profit from the experience.

Kenneth Byrne, Psy.D.
Clinical Psychologist

cc: Dr. Hartmann
KB:mu 5/29/79

This information has been disclosed to you from records whose confidentiality is protected by State Law. State regulations prohibit you from making any further disclosure of this information without the prior written consent of the person to whom it pertains.

PSYCHIATRIC EVALUATION
May 10, 1979

Roy Williams
1606 E. Howell St.
Phila., Pa. 19149
D.O.B. 12/26/64

Roy Williams is a 14-year-old adolescent of mixed racial heritage who was admitted to Philadelphia Psychiatric Center on April 19, 1979 under Section 304C of the Mental Health Procedures Act for psychiatric evaluation and recommendations.

According to the history furnished, there have been difficulties in Roy's family since January 18, 1979 when Mrs. Williams, Roy's mother, came to the Department of Public Welfare to request placement for Roy. She stated she was unable to cope with his behavior, which she described as having a low frustration point, frequent temper tantrums in which he broke and threw things and of being generally destructive, as well as assaultive toward her and his 12½-year-old sister. Roy's father has been out of the home since Roy was 5½-years-old and Roy has lived with his mother since then except for a period in 1978 when he was a resident at the Hershey School. Roy left the school at the Christmas vacation of 1979 because he was not able to get along with peers at the school and the school was not willing, according to the record, to transfer him to another area of the facility.

The Department of Public Welfare petitioned the court to have Roy Williams committed for inpatient psychiatric treatment under Section 304C of the Mental Health Procedures Act.

MENTAL STATUS ON ADMISSION:

Roy presented as a slightly obese, stocky, well built black youngster who appeared his stated age. He sat quietly with fair eye contact and with a sad facial expression. He was cooperative and friendly. Speech was spontaneous and goal-directed, with normal volume and flow. Affect was sad, slightly tense and somewhat bland when talking about his fights with his sister and mother and his own suicide and homicide threats. Mood appeared to be depressed. There was no evidence of a break with reality, hallucinations, delusions or ideas of reference. He denied suicidal ideation. He was oriented in three spheres. Memory, recent and past, appeared to be intact. Intelligence was estimated as within normal limits. Insight appeared to be impaired and judgment was considered only fair.

COURSE IN THE HOSPITAL:

The patient was admitted to a closed area of the hospital and for the first two days was taken off the floor only when accompanied by a staff member. He conformed to hospital routine and on April 21 was given privileges wherein he went off the floor with a group of patients supervised by one staff member. He was given full privileges within the hospital grounds on April 24 and was transferred to an open ward on May 3. In general, he was able to control any aggressive impulses quite well, although on occasion he showed facial anger and

Roy Williams                                                              Page -2-

once during an argument with another patient threw a luncheon tray on the floor. He apologized for this incident and it was not repeated. It was difficult to tell what provocation there was in this incident.

During hospitalization an awake electroencephalogram was read as within normal limits; skull x-rays were within normal limits; chest x-ray was within normal limits as was the electrocardiogram. Laboratory studies were also within normal limits with the exception of one enzyme which was minimally and probably not significantly above normal limits. Psychological testing was also performed.

Roy impresses as a youngster who currently is moderately depressed and trying to work through several areas of conflict; dependency needs versus a need to achieve independence from his mother; possible perceived rejection by his father; identity difficulties as regard to race; and a rather low self-esteem which he tries to deny to himself. There appears to be much anger and resentment because of his felt dependency on his mother. He has difficulty with impulse control and control of his aggressive impulses. His strengths are his normal intelligence and absence of any psychotic process at present. His defenses at present appear to be primarily denial and projection with difficulty in assuming responsibility for his own actions and impulsive acting-out when frustrated in an aggressive way.

It is noteworthy that most of, if not all, Roy's aggressive behavior has been in the home rather than on the streets and in school.

RECOMMENDATIONS:

In my judgment the tensions in Roy's own home at present would continue to provoke assaultive acting-out behavior on Roy's part and perhaps some self-destructive behavior. I believe that Roy could benefit greatly by brief intensive in-patient psychotherapy to help him work through some of his inner conflicts. It is my recommendation that he be returned to Philadelphia Psychiatric Center under Section 305 for further in-patient psychotherapy on a tri-option basis, with the view that if he derives some benefit from this brief psychotherapy he would then be placed in an appropriate group home until and if his relations with his mother and sister improve to the point that he can return to his mother's home.

Gertrude Hight, M.D.
Director, Adolescent Unit
Philadelphia Psychiatric Center


Paul Hartmann, M.D.
Resident Physician


GH/jmc

**PHILADELPHIA PSYCHIATRIC CENTER**

**PHYSICAL EXAMINATION**

DATE _____

**GENERAL APPEARANCE:**

P _66_   R _72_   B.P. _____ (Supine or Sitting) _____   Standing _____

**SKIN:**   N=normal   Abn=abnormal.   If Abnormal describe.

| | N | Abn |
|---|---|---|
| Turgor | | |
| Hair | | |
| Nails | | |

A = Absent   P = Present   If Present describe.

| | A | P |
|---|---|---|
| Cyanosis | | |
| Abnormal Pigmentation | | |
| Lesions | | |

**HEAD:**   N = normal   Abn = abnormal.   If Abnormal describe.

| | N | Abn |
|---|---|---|
| Skull -trauma- | | |
| Scalp | | |

**Eyes**
EOM _Full_
Conjunctivae _Clear_
Sclera _Clear_
Pupils _ERRL_
Optic Discs _Poorly visualized, poor cooperation_
Retina _____

**Ears**

| | N | Abn |
|---|---|---|
| Hearing | | |
| External Canal | | |
| Tympanic Membranes | | |

If Abnormal describe.

**Nose**
External _____ JNL
Mucosa _____

**Mouth**

| | N | Abn |
|---|---|---|
| Odor | | |
| Lips | | |
| Tongue | | |
| Mucosa | | |

If Abnormal describe.

**Throat**
Pharynx   JNL
Tonsils

**Neck**

| | N | Abn |
|---|---|---|
| Motion | | |
| Trachea | | |
| Masses | | |
| Thyroid | | |
| Vessels | | |

If Abnormal describe.

**LYMPH NODES:** (Cervical - Axillary)

**CHEST:**
External - Normal _____ Abnormal _____ (If abnormal describe)

Heart    Rate _____ Rhythm _____

Heart Tones _____

**Lungs**    Breath Sounds - Normal _____ Abnormal _____ (If abnormal describe)

**Breasts**    _____

**ABDOMEN:** N = normal   Abn = abnormal. If Abnormal describe.

| | N | Abn |
|---|---|---|
| Distention | | |
| Tenderness | | |
| Visceromegaly | | |
| Bowel Sounds | | |

**BACK AND SPINE:**

| | N | Abn |
|---|---|---|
| Configuration | | |
| Mobility | | |
| Tenderness | | |

**EXTREMITIES:**

| | N | Abn |
|---|---|---|
| Appearance | | |
| Peripheral pulses | | |
| Joints | | |
| Muscles | | |

**GENITALIA:**   External - Normal _____ Abnormal _____ (If abnormal describe.)

Deformed

**NEUROLOGICAL:**
Station & Gait
Cerebellar
Cranial Nerves
Motor
Sensory

**Reflexes:**   (0 = absent, +1, +2, etc.)

Biceps _1+_    Patellar _1+_

Triceps _1+_    Achilles _1+_

Pathological Reflexes - Present _____ Absent _____ If present describe.

**IMPRESSIONS:**

① N.R. P.E.

PHYSICIAN SIGNATURE

# PHILADELPHIA PSYCHIATRIC CENTER

WILLIAM ROY 780544-6
HS 747HARTMANN
04-19-79 8H WD
14 12-26-64
1606 HOWELL ST
PHILA PA 19149 #304 C
MTR BARBARA 289-4920
HA SI-V732055 IC X MTR
00-48-58

## REVIEW OF SYSTEMS

DATE 4/17/79

NAME _____ AGE _____ CASE # _____

1. HEAD: (e.g. headaches, dizziness) _____ Neg

2. EYES: (e.g. visual disturbances) _Sees well & glasses, no diplopia_

3. NOSE: (e.g. sinusitis, epistaxis) _____ Neg

4. EARS: (e.g. hearing, tinnitus) _____ Neg

5. TEETH: (e.g. general condition, dentures) _____ Neg

6. THROAT: (e.g. soreness, hoarseness, difficulty swallowing) _____ Neg

7. GLANDS AND NODES: (e.g. enlargements or tenderness) _____ Neg

8. RESPIRATORY: (e.g. cough, dyspnea, hemoptysis) _____ Neg

9. CARDIOVASCULAR: (e.g. chest pain, prior heart condition, palpitations, cyanosis, edema) _____ Neg

10. GASTRO-INTESTINAL: (e.g. stomach or bowel complaints) _____ Neg

11. GENITO-URINARY: (e.g. kidney or bladder complaints, V.D.) _____ Neg

     Males—hesitancy _____ Neg

     Females—menstrual irregularities _____

12. NEUROMUSCULAR: (e.g. convulsions, weakness, paralysis) _____ Neg

13. SKELETAL: (e.g. pain, swelling, disc) _____ Neg

14. ENDOCRINE: (e.g. diabetes, thyroid, other) _____ Neg

15. SKIN: (e.g. rash, allergy) _____ Neg

_Paul Hartmann M.D._

PHYSICIAN'S SIGNATURE

BP-305

```
WILLIAMS ROY  795314
HS 7A HARTMANN
04-19-79 BM MD
14-12-26-84
1606 HOWELL ST
PHILA PA 19149 #304 C
MTR BARBARA 289-4920
MA 51-3732055 TC X MTR
UJ-48*88
```

**PHILADELPHIA PSYCHIATRIC CENTER**
**PAST MEDICAL HISTORY**

1. **ALLERGIES:** None

2. **OPERATIONS & INJURIES:** ① T + A  ② Broken ⊙ arm (Probable roller Fx) no prob now

3. **CHILDHOOD DISEASES:** Usual

4. **MEDICATIONS (Including non-prescription):** ① None  ② (No drugs)

5. **ALCOHOL AND TOBACCO — Coffee, Tea,:** Tobacco — None  Alcohol — None  B

6. **SPECIAL DIETARY RESTRICTIONS:** None

7. **PREVIOUS HOSPITALIZATIONS (List each, indicating: date, place (last hospital) reason for hospitalization and diagnosis):** ① Only for T + A  ② No # hospitalizations

8. **FAMILY HISTORY:**

|  | AGE Current or At Death | Cardio-Vascular Disease | T.B. | DIABETES | CANCER | NEURO-LOGIC | PSYCHIATRIC | OTHER |
|---|---|---|---|---|---|---|---|---|
| MOTHER | ↑ 33-34 |  |  |  |  |  | Uncle |  |
| FATHER | ↑ 30's |  |  |  |  |  |  | Goiter |
| SIBLINGS | ↑♀ 13 |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

Paul Hartmann M.D.  4/19/79
**Physician Signature**        **Date**

TREATMENT PLAN PROBLEM LIST

| DATE IDENTIFIED | PROBLEM AND PROBLEM NUMBER | ST/LT TIME | DATE OF REMISSION |
|---|---|---|---|
| 4/19 | ① Poor relationship é mother é wife | LT | |
| | ② Poor control of aggressive impulses é family | ST | |
| | ③ _____ anxiety, depression, loneliness | LT | 4/22/79 |
| | ④ suicidal gesture, preoccupation é suicide | PT | 5/18/79 |

## LIST OF STRENGTHS

LIST STRENGTHS (Personality Assets):

① Good Reality Testing

② Intelligent é fairly good actual performance

③ Capable of good relationships

Donnie L. Rosen RN    Paul Bachmann M.D.
Team Coordinator (and Title)    Physician MD/DO

TREATMENT PLAN IMPLEMENTATION AND REVIEW

MULTIDISCIPLINARY TREATMENT PLAN

WILLIAMS, ROY
MHS-74 HARTMANN
04-13-79 TEAM M VB
14-12-26-88
1606 HOWELL ST
PHILA PA 19149 6104 C

DATE: 5/18/79

| PROBLEM NUMBER | GOALS AND TREATMENT | ASSIGNED TEAM MEMBER |
|---|---|---|
| ① | Evaluate family setting + interaction | Social Work |
| ⑤ | Poor Encourage understanding + verbal expression of feelings | Staff |
| ⑦ | Encourage group participation | Soc. Svc. |
| ⑧ | Evaluate school report + encourage school participation | Teacher |
| | | |
| | | |
| | | |
| | | |
| | | |

**PRIVATE PHYSICIAN OR REFERRAL SOURCE:**

J. Paul Hoffman DP Baruch L. Rosen MD DO

Roy L. Williams

**PATIENTS SIGNATURE (or reason why not signed)**

Patricia Troutman RN
TEAM COORDINATOR'S SIGNATURE

DATE: 5/18/79

**TREATMENT PLAN REVIEW:** Required every 15 days (or more if needed)

| PROBLEM NUMBER | GOALS AND TREATMENT | ASSIGNED TEAM MEMBER |
|---|---|---|
| 1. | Evaluation - sporadic behavior indicates chronic lack of trust, testing + insistence on "getting his way" in dealing with juveniles. Currently, patient would repeat if sent home | Staff |
| 2 | Continue | Svcy |
| 3 | Improving | Staff |
| 4 | Attending Hosp. school | Teacher |

Patricia Troutman RN
Team Coordinator

Gertrude Highfield
Physician MD/DO

(You may use reverse side if more space is needed)

# TREATMENT PLAN

**TREATMENT PLAN REVIEW:** (Required every 15 days (or more if needed)

DATE: 6/20/79

| PROBLEM NUMBER | PRELIMINARY TREATMENT/GOALS AND TREATMENT | ASSIGNED TEAM MEMBER |
|---|---|---|
| 1 | Improved relationship *(illegible)* | Staff |
| 2 | Continue *(illegible)* | Staff |
| 3 | Improving | |
| 4 | Improving good *(illegible)* work | Decker |
| | | |
| | | |
| | | |
| | | |

Team Coordinator: Patricia Trautman *(illegible)* RN

Physician MD/DO: *(signature)* MD

---

**TREATMENT PLAN REVIEW:** (Required every 15 days (or more if needed)

DATE: _____

| PROBLEM NUMBER | GOALS AND TREATMENT | ASSIGNED TEAM MEMBER |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Team Coordinator: _____

Physician MD/DO: _____

## PHILADELPHIA PSYCHIATRIC CENTER
### NURSES ADMISSION RECORD

UNIT: _____ 3008 _____
DATE: _____ 4/19/79 _____
TIME: _____ 2 PM _____

PATIENT INFORMATION:   COLOR OF HAIR: _Black_   EYES: _Brown_
HEIGHT: _5'6_   WEIGHT: _140_   PROSTHESIS: _____
GLASSES: _✓_   CONTACT LENSES: _NONE_   DENTURES: _____
TEMPERATURE: _97.6_   PULSE: _780_   RESPIRATION: _16_   BLOOD PRES. _120/80_
ALLERGIES: _None known_
DISPOSITION OF VALUABLES: _____
DISPOSITION OF MEDICINE: _None_
ACCOMPANIED BY: _mcd_
AMBULATORY: _✓_   WHEELCHAIR: ___   STRETCHER: ___   OTHER: ___
PHYSICIAN NOTIFIED: _Norman_   TIME: _2:30PM_
PATIENT'S GENERAL APPEARANCE:(cleanliness, nutrition, ability to walk, etc.)
_PT looks well nourished & well groomed_

CONDITION OF SKIN: (marks, bruises, scars, eruptions, injuries, deformaties, etc.)
_PT has known skin conditions_

BEHAVIOR AND CONVERSATION: _PT appear to be scared and confused PT couldn't understand why he was here._

SERVICES PROVIDED: (orientation, bath, etc.) _PT orient to floor_

PATIENT'S CLOTHES EXAMINED BY: _Gregory Washington PT._
ADMISSION ROUTINE COMPLETED BY: _Gregory Washington PT_
NURSING SUPERVISOR: _Patricia Troutmann RN_

SM-408

Short Term Goal *Court evaluation; & apprehension*

| BEHAVIOR | NEEDS | NURSING APPROACH |
|---|---|---|
| 1/14 Quiet, cooperative and apprehensive. | Orientation, Apprehension, To verbalize, To trust | Orient to unit. Explain what will be expected from him. Spend time 1:1 with him to help develop a trusting relationship & decrease his apprehension. Encourage him to talk about his feelings and problems. *Patricia Trautmann RN* |
| 4/21 Given group privileges, attending well to peers. Cooperative. 4/23 Given hall privileges. Continues quiet, cooperative & agreeable. Still does not talk about problems. Time leading up to hospitalization. | Group activities, Self esteem | Encourage him to participate in OT, RT & unit activities. Continue to spend time with him 1:1. Praise positive & appropriate behavior. *Patricia Trautmann RN* |
| 4/? A is pleasant, cooperative, interacts well, participates in unit activities. Avoids talking about family but does talk about school. | Trust, Verbalization | Establish supportive and trusting relationship with pt, encourage verbalization about recent situation prior to admission. |
| 4/29 Angry outburst because TV was turned off & he was reminded of limits. Threatened staff. Slammed doors, but did go to bed. | Limits | Patricia Trautmann RN. Be firm, consistent but caring. Must abide by unit rules. |
| 4/30 Cooperative today but still denies having any problems underlying suspected anxiety. | To verbalize, To learn appropriate ways to handle anger | Continue to encourage him to talk about his feelings. Suggest use of punching bag. *Patricia Trautmann RN* |
| 5/1 Pt transferred to Extension | Orientation | Orient to unit. Explain differences between closed and open units, and what will be expected from him. *Patricia Trautmann RN* |

NAME _Miller_

Short Term Goal

| BEHAVIOR | NEEDS | NURSING APPROACH |
|---|---|---|
| 5/1/79 Tests limits, usually cooperative, still seems retarded and denies having problems, except at home. To go to court on 5/10/79.<br><br>5/10 Committed on a 305, evaluating his option. May be very pleased w/ decision.<br><br>5/15 Continues to test limits — wanting his demands met instantly.<br><br>5/15 Pt became increasingly angry after being told by staff he was unable to have laundry done (because of his angry behavior concerning this previously). It was explained that laundry was to be sent home & to be done only in emergency by staff, also that his laundry was done Thurs. He began kicking lockers, throwing small things, punched and broke unit wall, threw unit water fountain. He disregarded staff's attempts to discuss this problem, said "Take me upstairs" also, threatened to leave hospital.<br><br>5/20/79 Patient appears pleasant since he was transferred here. He is cooperative, his hygiene is normal and he is using his group privileges very well. The only problem with patient is that he does not seem to want to discuss his problem with staff. He seems to laugh much when approached by staff. He appears to believe that he has no problem at all. | Limits<br>Monitoring<br><br>Self esteem<br><br>Limits<br><br>Limits<br><br>Patient needs to be set a limit to some of his activities and at the same time monitored more in enforcement from staff. | Must abide by unit rules. Encourage him to talk about his feelings. Praise positive and appropriate behavior.<br>Patricia Trautmann, RN<br>Do not bend rules for pay at time mother always goes on — do not repeat that pattern here.<br>Patricia Trautmann, RN<br><br>Laundry procedures explained, the decision to not do his laundry was explained. Staff attempted to engage him in other topics of conversation. He was transferred to U II because of inability to control impulses.<br>(9:30 p.) Dance Anderson RN<br>Patricia Trautmann RN<br>Staff will continue to help patient establish his own self image. He shall be helped to learn how to face reality. More patient-patient communication will be developed to help patient learn to be independent (group).<br>Peter Darby PT<br>Patricia Trautmann RN |

NAME:

Short Term Goal

| BEHAVIOR | NEEDS | NURSING APPROACH |
|---|---|---|
| 5/25 - ① testing limits and overly playful at times, still guarded, refuses to admit to any problems, always superficially smiling | ① limits ② To talk ③ reality testing | confront Roy c negative behavior - Do not allow him to manipulate. Encourage him to talk about current feeling. Provide reality orientation. talk to him about progress (which did he feel) which led to him being hospitalized. _Joyce Brazwell SW_ _Patricia Trautmann RN_ |
| 5/25 Having difficulty c peer relationships. Very much a follower. In competition c male adolescent on unit, trys to outdo each other. | Observe To verbalize | Observe his behavior closely and see what make this relationship disruptive. Anger. Try to help him not be a follower - help him see his behavior but in a non critical way. Encourage him to tell about his feelings _Patricia Trautmann RN_ |
| 6/5/79 - lost control on 6/1, hit a female patient on unit, admitted to inappropriate behavior. Had successful pass on 6/3. c mother. Has been cooperative on unit and following procedures. Still less guarded, interacting c peers. more | Limits To verbalize Patient needs more limits and self control, more interaction between him and staff. | Be consistent and firm c Roy. Do not allow him to manipulate or justify inappropriate act. Set limits. Praise him for his positive efforts in controlling himself and encourage him to talk about feelings. _Joyce Brazwell SW_ _Patricia Trautmann RN_ |
| 6/11/79 Patient has not created any management problem at the end of the week. He appeared to be improving even though he need more of staff guidance on the unit. He sometimes agitate elder patients. | | Whenever he displayed such behavior, staff try to spend few minutes with him to get him to realize his wrong doing. There has been a staff-patient communication to help patient deal with others. _Patricia Trautmann RN_ |

| NAME | Physio MD | Date of Admission | Hospital |
|---|---|---|---|
| William Roy | | | |

Long Term Goal

Short Term Goal

| BEHAVIOR | NEEDS | NURSING APPROACH |
|---|---|---|
| 6/18/79 *anxious about* *calls leaving tomorrow.* *At times agitated + provoke* *older, disturbed pts.* | *Limits* *Friendships* | *Do not allow him to* *agitate other pts - confine* *to room until his* *behavior is acceptable* *Encourage him to talk* *about his feelings* *[illegible signature]* |
| 6/19. *Out on pass to court* *- stayed in fair control.* | | |
| 6/21 *Pt discharged in* *custody of mother's* *social worker.* *A Doner Rn* | | |

NAME _____   _____MD_____   _____Date of_____

MEDICATION ADMINISTRATION RECORD

SINGLE MEDICATION
DOSAGE & ROUTE OF ADMINISTRATION

PO th phosphate soln.
on Tuesday 5/14

WILLIAMS ROY 2805-64-3
WS 7A/WERTMANN
04-11-29-89M VD
PHILA PA 19149 #304 C
MTR 5110X320SS TC X MTR

NAME: Williams Roy

ALLERGIES: NKA

MEDICATION ADMINISTRATION RECORD

| START DATE | STOP DATE | INITIAL | MEDICATION, DOSAGE, FREQUENCY & ROUTE OF ADMINISTRATION | Hrs. | 8/9 | 8/10 | 8/11 | 8/12 | 8/13 | 8/14 | 8/15 | 8/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-9-18 | | MD | May take Vitamin & mineral Supp. prn brought in by mother | 9A | | | | | | | | |

RO-Right gluteum   RO-Right deltoid   RT-Right thigh   RA-Right abdomen
LG-Left gluteum   LD-Left deltoid   LT-Left thigh   LA-Left abdomen

SINGLE MEDICATION & STATS
DOSAGE & ROUTE OF ADMINSTRATION

| ORDER DATE | INITIAL | SINGLE MEDICATION & STATS DOSAGE & ROUTE OF ADMINSTRATION | ADMINISTER DATE | TIME | |
|---|---|---|---|---|---|

NURSE'S SIGNATURE

| INITIAL | SIGNATURE | INT. | DATE |
|---|---|---|---|
| HR | Bernard Ross | | |
| AI | Bakmirah | | |
| AI | Allhemuy | | |
| Av | Hilverd | | |
| BC | | | |
| BC | | | |

ROOM          NAME                    ALLERGIES                    DIAGNOSIS

## MEDICATION ADMINISTRATION RECORD

WILLIAMS RUF JOHNNIE
HS 7A/HARTMANN
04-19-73 BM WD

PHILADELPHIA PSYCHIATRIC CENTER

INTERPRETATION

Normal EKG

WILLIAMS ROY 790594-6
WS 7A/HARTMANN
C4-19-79 BM WD
14 12-26-64
1606 HOWELL ST
PHILA PA 13149 #304 C
MTR BARBARA 289-4920
MA 51-0732055 TC X MTR
CO-48-58

P: 120/80

Medications: none

omatic Disease: _____     Date: 7/20/79     Signed: _____

A CO. CUSTOM PRINTED 1975 105-12-414.004B

```
WILLIAMS ROY 780534-8
MS 7A/HARTMANN
04-19-79 BM WD
14 12-26-64
1606 HOWELL ST
PHILA PA 19149 #304 C
MTR BARBARA 289-4920
MA 51-0732055 TC X MTR
CJ-48-58
```

# PHILADELPHIA PSYCHIATRIC CENTER

## REQUEST FOR
## ELECTROENCEPHALOGRAM

UNIT  WD

Previous EEG _____ Where _____ Date ____ Report _____

Reason for EEG  Hx of episodic violence _____

_____

Admitting Diagnosis  ① depression.  _____  Date Symptoms Appeared ____

Neuro Consult Opinion _____

**X-RAY AND LAB TESTS**

Arteriogram     Yes ☐  No ☑  Report _____

Brain Scan      Yes ☐  No ☑  Report _____

Chest X-Ray     Yes ☐  No ☑  Report _____

Skull X-Ray     Yes ☐  No ☑  Report _____

Echogram        Yes ☐  No ☑  Report _____

EMI Scan        Yes ☐  No ☑  Report _____

Blood Sugar _____ B.U.N. _____

**PATIENT'S PRESENT CONDITION:**
Alert & Oriented ☐   Disoriented ☐   Confused ☐   Comatose ☐

Paralysis  LA ☐  RA ☐  LL ☐  RL ☐

**SEIZURE HISTORY**
Yes ☐  No ☐  G.M. ☐  P.M. ☐

Last Seizure date _____ Control loss of bladder or bowel?  Yes ☐  No ☐

Unconscious after seizure(s)?  Yes ☐  No ☐  Frequency of seizure _____

Description of seizure _____ Fall during seizure?  Yes ☐  No ☐

COMMENTS  pt does not remember episode of acting out
prior to admis

PHOTIC ACTIVATION? _____       MEDICATIONS:  Thorazine 75 g. 0.8
HYPERVENTILATION? _____                      lofranil 25 g  0.8.

PT. COOPERATIVE? _____

                                    O.J.Williams, M.D.      4-27-79
                                    Physician's Signature        Date

SP277-1            REQUEST FOR ELECTROENCEPHALOGRAM     done 5/1/79

(215) 887-2222

(215) 548-5015

## Neurophysiology Laboratories

### Philadelphia Psychiatric Center

N.M. GERSON, M.D., Director

5/1/79

Roy Williams                           Age: 14 yrs.

EKG lead I is normal in rhythm and pattern.
24 lead EEG is normal in the spontaneous and hyperventilative
state.  Alpha is well developed and normal in distribution and
percent time.  There are no local or focal abnormalities.

Conclusion:    Normal EEG.  (Waking)  Sleep was not obtained
               with 1 gr. Chloral hydrate.  Should be rescheduled.

Irvin M. Gerson, M.D.

IMG:cfm

cc: Dr. Hartman

## Philadelphia Psychiatric Center
### TREATMENT ORDERS

| DATE | ORDERS | PHYSICIAN'S SIGNATURE |
|---|---|---|
| 1/19/79 | ① Admit W II | |
| | ② Prv. 1:1 at staff discretion | |
| | ③ Diet: Regular | |
| | ④ V. Signs — Routine | |
| | ⑤ CBC c̄ diff + platelet | |
| | ⑥ VDRL | |
| | ⑦ U/A | |
| | ⑧ Chest x-Ray | |
| | ⑨ Chem 24 | |
| | ⑩ T₄, T₃ | |
| | ⑪ Psychological Testing — Note 304 C evaluation — please tst I.Q. + projectives c̄ eval. of Impulsivity + family relationships | /Paul Hartmann M.D. |
| 4/21 | ① Group Priv. | /Paul Hartmann M.D. |
| 4/21/79 | ① SGOT, SGPT, LDH, Alkaline Phosphatase, Alkaline Phosphatase Isoenzymes, Leucine Amino Peptidase level. CBC c̄ diff., platelet count retic. count | /Paul Hartmann M.D. |

## Philadelphia Psychiatric Center
### TREATMENT ORDERS

AUTHORIZATION IS HEREBY
GIVEN TO DISPENSE A
CHEMICALLY IDENTICAL
DRUG (AS RECOMMENDED
BY THE PHARMACY COM-
MITTEE)

Name: WILLIAM BON...

Admission No. ...

| DATE | ORDERS | PHYSICIAN'S SIGNATURE |
|------|--------|----------------------|
| 4/24/75 | ① ✓ Full P.R.N. | |
| | Paul Hartman M.D. | |
| | Noted Catherine Harrington Sup) | |
| 4/26/75 | ① Skull film - 4 of sporadic volume | |
| | ② Sleep EEG on Friday | |
| | ③ Chloral Hydrate 1 gm. p.o. | |
| | if prn to sleep EEG | |
| | Paul Hartman M.D. | |
| | Noted M. Dooley RN | |
| 5/3/75 | ① Transfer to extension if approved | |
| | Paul Hartman D.O. | |
| | Noted Helen Kern | |

# Philadelphia Psychiatric Center
## TREATMENT ORDERS

| | Floor | Room |
|---|---|---|

| DATE | ORDER | PHYSICIAN'S SIGNATURE |
|---|---|---|
| 0/79 | 4-hr pass custody sheriff for court appearance | Gertrude High RN |
| | Noted Merrie Jo Abramozyken | |
| 7/15/79 | ① Transfer to W II  ② Confine to unit through breakfast till reevaluated by individual team | |
| | Noted C. Sandu LPN | Paul Hollman M.D. |
| 7/16/79 | ① Group Priv. ✓ | Paul Hollman M.D. |
| 7/22/79 | Full privileges | Gertrude High M.D. |
| 7/27/79 | Pass custody Mother on 5/23/79 for Dis appt | Gertrude High M.D. |
| | noted maintains ✗ | |

## Philadelphia Psychiatric Center
### TREATMENT ORDERS

AUTHORIZATION IS GIVEN BY GIVEN TO DISPENSE A CHEMICALLY IDENTICAL DRUG [AS RECOMMENDED] BY THE PHARMACY COMMITTEE.

WILLIAMS [illegible]
[illegible] TAYLOR
[illegible] PR MD
12-28-59
[illegible] MOHELL ST
[illegible] PA PHILA.
BARBARA [illegible]
[illegible] 73-1955 TO X MIR

| Admission No. | Floor | Room |

| DATE | ORDER | PHYSICIAN'S SIGNATURE |
|---|---|---|
| 4/79 | Med Rewrite No medication | [signature] M.D. Noted [illegible] R.N. |
| 4/79 | ① 6h prn tomorrow c mother as long as behavior is appropriate Noted adeline Diña RN | Paul Hartman M.D. |
| 8/79 | May take Unicap Vitamin mineral Supplement Brought in by mother Noted Martha Dooley RN | [signature] M.D. |
| 14/79 | ① 6h prn today c mother Noted Catherine Henry ShSd | Paul Hartman M.D. |
| 18/79 | ① D/c multivitamin | [signature] M.D. |

118

**Philadelphia Psychiatric Center**

**TREATMENT ORDERS**

AUTHORIZATION IS HEREBY GIVEN TO DISPENSE CHEMICALLY AND IDENTICAL DRUG (AS RECOMMENDED BY THE PHARMACY COMMITTEE)

| DATE | ORDER | PHYSICIAN'S SIGNATURE |
|---|---|---|

Admission No. _____ _____ Floor _____ Room _____

| DATE | ORDER | PHYSICIAN'S SIGNATURE |
|---|---|---|
| 7/12/79 | ① 6 h Pass in custody of staff or mother to court | |
| | Paul Hartmann M.D. | |
| | noted Adeline Doner RN | |
| 6/21 | ① Discharge today in custody of mother & Mr. Voshell | |
| | Paul Hartmann M.D. | |
| | noted A Doner RN | |

# Exhibit

# B

## DECLARATION/AFFIDAVIT OF DR. BARRY CROWN PURSUANT
## TO 28 U.S.C. § 1746 AND 18 Pa.C.S. § 4904

Dr. Barry Crown, pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904, swears, affirms and deposes that the following is true and correct:

1.      My name is Barry Crown. I am a licensed and certified psychologist and neuropsychologist. I have extensive forensic experience. I have been qualified as an expert witness in psychology and neuropsychology on numerous occasions in state and federal court. I have testified as such in both civil and criminal matters, including capital cases. In criminal matters I have testified for both the prosecution and defense. I am familiar with the mitigating circumstances in the Pennsylvania capital sentencing statute. All opinions expressed in this affidavit are stated to a reasonable degree of certainty.

2.      I conducted a clinical examination and tested Roy Williams. I note that the tests I administered to Mr. Williams were available prior to and at the time of the proceedings resulting in his conviction and death sentence. In addition to the clinical interview and testing, I reviewed numerous records regarding Mr. Williams, his background and the capital trial and sentencing proceedings.

3.      Roy Williams suffers from organic brain damage. His cerebral dysfunction has severely impaired his mental state and functioning throughout his life. His impairments adversely affected him prior to the offense and at the time of the offense, and continue to affect him today. His impairments are reflected in his performance on testing.

4.      Intelligence testing of Mr. Williams is consistent with his brain damage. For example, Mr. Williams had significant deficits in several subtests of the Wechsler intelligence testing and this testing showed overall deficits consistent with his brain damage.

1

Neuropsychological testing of Mr. Williams demonstrates that he suffers from brain damage with serious left-hemisphere deficiencies.  I administered numerous neuropsychological testing instruments to Mr. Williams.  They were consistent in demonstrating impairments and deficiencies consistent with his brain damage.  My testing and evaluation of Mr. Williams, and his history, also demonstrate that he has suffered and continues to suffer from significant psychological impairments.

5.   Mr. Williams' cerebral dysfunction/brain damage and psychological impairments are consistent with his history of childhood trauma.  Mr. Williams' childhood history includes serious abuse (including beatings), neglect, consistent put-downs and rejection, an inability to function and an inability to reason.  Mr. Williams' history highlights his left-hemisphere dysfunction and inability to comprehend, reason and function.  Mr. Williams' history is also consistent with emotional problems resulting from his traumatic childhood and brain damage.

6.   Mr. Williams was involuntarily committed due to his mental health difficulties while he was still a youngster.  Records from that involuntary commitment and other contacts with mental health professionals preceding the offense are consistent with Mr. Williams' brain damage and psychological impairments, and show that he suffered from these impairments from an early age.  The records also describe some of the abuse and rejection that Mr. Williams suffered as a child.  The records describe a seriously disturbed and impaired youngster.  These records clearly show that a forensic mental health evaluation was necessary during the capital proceedings.

7.   Mr. Williams is a mentally impaired and deficient individual and was so prior to and at the time of the offense.  Due to his neuropsychological dysfunction, he lacks language

2

skills, reasoning capacity and the ability to think rationally. He suffered and suffers from emotional lability, impaired judgment, impaired impulse control and impaired cognition, and is deficient in several areas of functioning. Due to his psychological and neuropsychological deficiencies, Mr. Williams can be easily lead and manipulated by others. He is easily confused due to his mental health problems. Mr. Williams, like other brain damaged individuals, does better in a structured environment, as is reflected in records about Mr. Williams predating the offense. Regrettably, he did not have a structured, or even stable, environment during much of his life, further complicating his mental health deficiencies.

8.      Mr. Williams' neuropsychological and psychological deficiencies, including his emotional problems and cognitive dysfunction, provided several mitigating factors which could have been presented at the capital trial, as does his history of childhood mistreatment. The history and mental health factors outlined in this affidavit also provide defenses which could have been presented at the guilt or innocence phase of the trial. For example, Mr. Williams' brain damage and other mental health problems demonstrate that he suffered from a diminished capacity, as a defense at the guilt or innocence phase. Mr. Williams' brain damage, mental health impairments and cognitive impairments, and the effects of his childhood mistreatment, significantly diminish his capacity to premeditate and form a specific intent to kill.

9.      In addition to the mental health mitigation discussed in the above paragraphs, Mr. Williams' brain damage and other deficiencies establish that at the time of the offense he suffered from a substantially impaired capacity to appreciate the criminality of conduct and conform conduct to the requirements of law, and suffered from extreme mental and emotional disturbances. In addition, Mr. Williams' deficits are such that he functions at a level much below

3

his chronological age, thus making his mental/functional age a mitigating consideration in this case.

10.    I hereby certify that the statements set forth above are true and correct to the best of my personal knowledge, information and belief, pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904.

BARRY CROWN, Ph.D.

Dated: 9/29/96

4

AFFIDAVIT/DECLARATION OF DR. ROBERT A. FOX
PURSUANT TO 28 U.S.C. § 1746 AND 18 P.C.S. § 4904

Robert A. Fox, M.D., pursuant to 28 U.S.C. § 1746 and 18 P.C.S. § 4904, swears,
affirms and deposes that the following is true and correct:

My name is Robert A. Fox. I am a medical doctor and a psychiatrist. I am a
Diplomate of the National Board of Medical Examiners and the American Board of Psychiatry
and Neurology, and a member of several medical and mental health professional organizations. I
have extensive experience in forensic psychiatry, and have served as an expert in numerous cases
involving forensic issues in the state and federal courts. I am familiar with the mitigating
circumstances in Pennsylvania capital cases.

2.      I have reviewed numerous materials about Roy Williams, his history and his case,
and I have met with and evaluated Mr. Williams. The opinions given in this affidavit are given to
a reasonable degree of certainty.

3.      Roy Williams is, and was at the time of the offense, severely psychologically,
cognitively and emotionally impaired.

4.      It is generally accepted among mental health professionals that mental illness is
correlated with both genetic and environmental factors. In Mr. Williams' case, both types of
predictors for mental illness are present -- there is a history of mental illness in Mr. Williams
family, and he has been subjected to the type of environment that is likely to result in mental
illness.

5.      From his earliest infancy, Roy's home life was marked by extraordinary violence
from Roy's father. The father's violence was directed against both Roy and his mother, and was

1

████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ The abused child develops deficits in his self-image and in his relationships with others and the world.  These deficits include low self-esteem; depression; feelings of guilt for failing to protect others (e.g., his mother) from the violence; feelings of anger because others failed to protect him; difficulties in understanding cause and effect; paranoia; fear and distrust of others and their motives; a tendency to misinterpret and misunderstand others and the environment and to attribute malevolence and danger to benign actions or events; hypersensitivity to signs of danger.  These traits begin as coping mechanisms in the violent home, but develop into ingrained psychological and emotional impairments.  That Roy suffered and suffers such impairments is clear from the accounts of those who knew him in his youth, from the mental health records describing his interactions with mental health professionals and from my evaluation of him.

6.      When Roy and his mother fled from the father's violence, and were staying with Roy's grandmother, another traumatic event occurred in Roy's life -- his grandmother fell down a flight of stairs and died, cutting her throat when a glass she was carrying shattered.  Roy's experiencing this sudden, violent and bloody death of a loved one is the type of stressor that produces post-traumatic stress disorder ("PTSD").  The symptoms of PTSD in children often overlap with and are similar to the adverse effects of the type of trauma and violence Roy witnessed and suffered from his father, as described above.

7.      After the traumatic death of Roy's grandmother, the environmental attacks on

2

Roy's mental health continued when Roy moved with his mother into a hostile and racially oppressive neighborhood. Roy's experience of living in this was analogous to the experience of a soldier living in a war zone -- the child never feels safe, is subject to danger and attack at any time. People in stressful situations often cope with the experience by relying upon and bonding with their fellows-in-arms. Roy, however, saw himself as alone in a hostile world. The effects of such an environment on a child like Roy, who was already vulnerable because of his other experiences and deficits, are traumatic. Living in this hostile neighborhood could only enhance Roy's mental problems, by magnifying and reinforcing the deficits created by the violent, abusive childhood -- e.g., insecurity and lack of self esteem; paranoia and suspicion of others; hypersensitivity to signs of aggression or violence from others; misinterpreting ambiguous or benign environmental cues as signs of danger.

     8.    A constant and harmful theme running through Mr. Williams' life is the extreme, unrelenting and irrational rejection by his father. The father's rejection of Roy goes beyond all reason, and suggests, along with other evidence, that the father himself suffered from mental illness. This type of extreme parental rejection was another adverse influence on Roy's development, especially when coupled with the rejection and isolation from Roy's childhood peers and all of Roy's other psychological and emotional problems. The father's rejection, absence and criminal and violent behavior also deprived Roy of a positive male role model.

     9.    It is clear -- and not surprising, given his traumatic life history -- that Roy Williams suffered from severe psychological and emotional problems from a very early age. He was involuntarily committed to a mental hospital at age fourteen, and records indicate that he was suffering from mental health problems for some years before that. The records from Roy's

3

involuntary hospitalization and entire mental health records from Roy's youth, show that Roy has been significantly psychologically and emotionally impaired since long before the offense. Prominent in the records are his lack of appropriate role models, social isolation, low self-esteem, racial and gender identity problems, depression, suicidal ideation, paranoia, lack of insight, problems with self-expression, difficulties with abstract thinking, information processing deficits, emotional lability and impulse control problems.  These records document Mr  Williams' mental illness.

10.    The records also indicate that Mr. Williams does significantly better when he is placed in a structured, supportive environment and is given intensive psychiatric treatment.  It is clear that Roy needed consistent and intensive psychotherapy.  Unfortunately, he was not allowed to remain in the hospital, and did not receive the intensive psychotherapy (including medication) that he desperately needed.

11.    Mr. Williams' mental illness was exacerbated by his mother's behavior toward him. Roy's mother clearly did not know how to cope with her son's serious mental problems.  She was inconsistent in the way she treated Roy; she was resistant to family counseling, which Roy needed; she was slow to seek help for Roy when he needed it, she removed Roy from the supportive and therapeutic environment he needed, against the advice of the mental health professionals who were treating Roy  All of these actions were damaging to a boy who was seriously mentally ill.  Roy needed consistent and intensive psychiatric care.

12.    The mother's use of severe physical punishment -- administered by men, including Roy's violent, disturbed father -- was also very unfortunate and harmful to Roy's mental health. Violent discipline is not an effective way to deal with mental illness.  To the contrary, it is quite

4

harmful and traumatic in the abstract if individual. Roy's behavior is shaped by his mental illness and therefore was often beyond his control his way of relating and reacting to him. Being violently punished for that behavior just added to Roy's confusion, fear and depression, and made him more paranoid and distrustful of others. That this violent punishment was inflicted at his mother's request and by his father -- a man who otherwise ignored and rejected Roy and whose extreme violence Roy's mother feared -- could only intensify its debilitating effects.

13.     Mr. Williams' background is highly significant from a mental health viewpoint. The violence, neglect and complete rejection from Roy's father; the traumatic death of Roy's grandmother; Roy's confusion about his racial identity; the neighborhood rejection, isolation and terror; the ambivalence and inconsistent parenting from Roy's mother; the lack of positive role models in Roy's life; the violent punishments to which Roy was subjected when he was in need of sustained and intense mental health treatment, the history of mental illness in Roy's family; the gunshot wound that Roy suffered less than a year before the offense -- are all psychologically significant. This background and Mr. Williams' mental health impairments had a profound and damaging impact upon his development and provide significant mental health mitigation.

14     Mr. Williams' history -- including the father's violence toward Roy's mother when she was pregnant with Roy, the father's continuing violence after Roy was born, the violent punishment's inflicted on Roy in a misguided attempt to deal with his mental illness, and Roy's youthful boxing injuries -- is also replete with the kind of prenatal and childhood trauma that may give rise to organic brain damage. The mental health records from Roy's youth are consistent with his suffering from brain damage at least by the time that he was fourteen years old. Given Mr. Williams' history, an appropriate mental health evaluation should include testing for brain

5

surpass. The history and records clearly show that there was a need for such testing at the time of trial and sentencing.

15. Dr. Barry Crown, a psychologist and neuropsychologist, has performed such testing. Dr. Crown's testing of Mr. Williams shows that Mr. Williams does suffer from organic brain damage. Brain damage such as that suffered by Mr. Williams creates many serious and debilitating cognitive and psychological impairments, as are described in Dr. Crown's affidavit. Because of his brain damage, Mr. Williams suffers from a lack of language skills; he has an impaired capacity for reasoning; he us unable to think rationally; he is emotionally labile; his judgment and impulse control are impaired; he is easily led and manipulated by others; he is easily confused. From his history, it is clear that he suffered from all of these deficits at the time of the offense.

16. Mr. Williams' impairments are, and were at the time of the offense, extreme mental and emotional disturbances. They substantially impaired his capacity to appreciate the consequences of conduct or to conform conduct to the requirements of law. They provide other substantial mental health mitigation. Moreover, Mr. Williams' brain damage, mental health impairments and cognitive impairments, significantly diminish his capacity to premeditate and form a specific intent to kill.

17. The mental health information discussed herein could have been developed and presented at the time of Mr. Williams' trial and sentencing. Any competent mental health professional would recognize that Mr. Williams' background presents significant indicia of mental illness and organic brain dysfunction, and calls for a complete evaluation of Mr. Williams' mental health.

6

~~I hereby certify that the facts set forth above are true and subject to the best of my~~

~~personal knowledge, information and belief, under 28 U.S.C. § 1746 and 18 U.S.C. § 1001.~~

ROBERT A. FOX, M.D

Dated:  9/24/96

7

# Exhibit

# C



**U.S. Department of Justice**

Civil Rights Division

_____

*Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

FEB 2 4 2014

The Honorable Tom Corbett
Governor's Office
225 Main Capitol Building
Harrisburg, PA 17120

Re:   <u>Investigation of the Pennsylvania Department of Corrections' Use of Solitary</u>
<u>Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities</u>

Dear Governor Corbett:

The Civil Rights Division has completed its investigation of the Pennsylvania
Department of Corrections' ("PDOC") use of solitary confinement on prisoners with serious
mental illness ("SMI") and intellectual disabilities ("ID"). The investigation was conducted
pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.
CRIPA authorizes the Department of Justice to seek equitable relief where conditions in state
correctional facilities violate the rights of prisoners protected by the Constitution or laws of the
United States.

We opened this systemwide investigation after having found that one of Pennsylvania's
prisons—the State Correctional Institution at Cresson—routinely subjected prisoners with
SMI/ID[1] to solitary confinement under conditions that violated their constitutional rights and
their rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C §§ 12131-
12134. We notified you of both our findings concerning Cresson and our decision to conduct a
systemwide investigation in a letter dated May 31, 2013 ("Cresson Findings Letter"). *See*
www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf.

Our systemwide investigation found that the Commonwealth uses solitary confinement in
ways that violate the rights of prisoners with SMI/ID. However, it is important to note that in the
months since we issued our Cresson Findings Letter, the overall number of prisoners with
SMI/ID that PDOC subjects to solitary confinement has gone down. Moreover, PDOC's
leadership has been developing new policies that, if adopted and implemented, would further
reduce the number of prisoners with SMI/ID in solitary and improve mental health services for
prisoners with SMI. Nonetheless, much more needs to be done. Throughout the PDOC system,
hundreds of prisoners with SMI/ID remain in solitary confinement for months and sometimes

_____

[1] We use the shorthand "SMI/ID" in this letter, but note that, while there is some overlap, most prisoners with SMI
do not have ID and vice versa.

years, with devastating consequences to their mental health, in violation of their rights under the Eighth Amendment and the ADA.

In our review, we looked at the totality of the conditions confronting prisoners in solitary and the presence or absence of mechanisms to mitigate harms arising from those conditions. To reach our investigative findings, it was necessary to assess the conditions in which prisoners were held, the practices of PDOC, the duration of confinement, the decisions made relating to security reasons and penological concerns, the available programs and services, and the precise harms found by our expert-consultants. We concluded that these conditions collectively violated the constitutional and statutory rights of prisoners with serious mental illness and intellectual disabilities.[2]

Throughout our investigation, Secretary John Wetzel and his staff have provided us with exceptional cooperation. We look forward to collaborating with them in the coming months to fashion an agreement between the United States and the Commonwealth that effectively addresses our shared concerns.

## I.    SUMMARY OF FINDINGS

PDOC has begun reforming the way in which it uses solitary confinement on prisoners with SMI/ID. In recent months, PDOC has implemented new procedures for the disciplinary process. It has also implemented new protocols for the treatment of prisoners with SMI in certain specialized housing units. These reforms have led to a reduction in the number of prisoners with SMI subjected to solitary confinement. Moreover, PDOC is in the process of drafting policies geared toward further reducing the number of prisoners with SMI/ID housed in isolation units and improving mental health care for prisoners with SMI. While the Commonwealth has made important improvements, much more work needs to be done to ensure sustained compliance with the mandates of the Constitution and the ADA. Below we summarize our factual determinations and our ongoing concerns:

- **The manner in which PDOC subjects prisoners with SMI to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care:** In the one-year period between May 2012 and May 2013, PDOC confined more than 1,000 prisoners on its active mental health roster in solitary confinement for more than 90 days.[3] Nearly 250 of those prisoners were in solitary for more than a year. There are still roughly 115 prisoners PDOC identifies as having SMI who are in solitary. Our expert-consultants have concluded that the 115 number grossly understates the number of prisoners with SMI currently subjected to solitary confinement, estimating that there are hundreds more.[4] The

---

[2] In making these findings, the Department of Justice does not intend to suggest that every use of solitary confinement on persons with SMI/ID is a *per se* violation of the Eighth Amendment or the ADA.

[3] PDOC separates its active mental health roster into two categories: (1) those prisoners designated as having "the most serious need for mental health services;" and (2) those designated as having a "present mental health need."

[4] PDOC has newly revised its active mental health roster. It designates only those in the first category as having SMI. However, after reviewing medical records and interviewing prisoners, we and our expert-consultants in mental health have concluded that a very significant number of the prisoners currently designated as not having SMI

conditions that prisoners with SMI face while in solitary confinement are harsh.  They are routinely confined to their cells for 23 hours a day; denied adequate mental health care; and subjected to punitive behavior modification plans, forced idleness and loneliness, unsettling noise and stench, harassment by correctional officers, and the excessive use of full-body restraints.

- **The manner in which PDOC uses solitary confinement on prisoners with SMI results in serious harm:**  PDOC uses isolation on prisoners with SMI in a way that exacerbates their mental illness and leads to serious psychological and physiological harms.  Indeed, our expert-consultants interviewed and reviewed the records of more than two dozen prisoners whom they concluded were seriously harmed by solitary confinement in various ways, including severe mental deterioration, psychotic decompensation, and acts of self-harm.  For instance, even though only a small fraction of the prisoners at the prisons we toured were housed in solitary confinement units, most of the suicide attempts occurred in those units.  Specifically, more than 70% of the documented suicide attempts between January 1, 2012 and May 31, 2013 occurred in the solitary confinement units.

- **Numerous systemic deficiencies contribute to PDOC's extensive use of solitary confinement on prisoners with SMI:**  PDOC routinely resorts to using prolonged solitary confinement on those with SMI primarily because systemic deficiencies interfere with its ability to provide adequate mental health treatment.  When we initiated our investigation in May, prisoners with SMI were placed in solitary confinement at twice the rate of prisoners without SMI.  Too often, instead of providing appropriate mental health care, PDOC's response to mental illness is to warehouse vulnerable prisoners in solitary confinement cells.

- **The manner in which PDOC uses solitary confinement also harms prisoners with ID:**  PDOC uses solitary confinement on a significant number of prisoners with ID, as defined below.  Prisoners with ID are especially susceptible to the harmful effects of PDOC's use of solitary confinement.  They have limited coping mechanisms and their mental health is prone to deteriorating when subjected to the stressors present in PDOC's solitary confinement units.  We believe PDOC is not adequately addressing such concerns.

- **The manner in which PDOC uses solitary confinement often discriminates against prisoners with SMI/ID:**  PDOC often unnecessarily and inappropriately places prisoners in solitary confinement because they have SMI/ID.  Isolating prisoners on the basis of their SMI/ID without adequate justification constitutes impermissible discrimination and unjustifiably denies them access to services and programs provided to most other prisoners.  PDOC has failed to make reasonable modifications to its policies, procedures, and practices to meet the needs of prisoners with SMI/ID in the most integrated setting appropriate to their needs and consistent with legitimate safety requirements.  Instead, it has routinely elected to segregate these prisoners unnecessarily in its solitary confinement units.

PDOC's solitary confinement practices violate the Eighth Amendment's prohibition against "cruel and unusual punishments."  Embodying "broad and idealistic concepts of dignity,

---

and thus are assigned to PDOC's second category indeed have SMI.  We also identified other prisoners with SMI who are left off PDOC's active mental health roster entirely.

civilized standards, humanity, and decency," *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), the Amendment prohibits officials from disregarding conditions of confinement that subject prisoners to an excessive risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). PDOC's use of a harsh form of solitary confinement for extended periods of time on hundreds of prisoners with SMI/ID constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits.

The practices described in this letter also violate the ADA. The ADA prohibits prisons from discriminating against prisoners with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). It generally obligates prisons to provide qualified prisoners with disabilities the opportunity to participate in and benefit from prison services, programs, and activities, and, absent legitimate justification, to do so in the most integrated setting appropriate to individual prisoners with disabilities. *See* 28 C.F.R. §§ 35.130(a), (d), 35.150, 35.152; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Chisolm v. McManimon*, 275 F.3d 315, 324-25 (3d Cir. 2001). PDOC uses solitary confinement in a way that is at odds with these requirements.

## II.    METHODOLOGY, DEFINITIONS, AND BACKGROUND

### A.    Methodology

In August 2013, we conducted on-site inspections of six PDOC prisons.[5] We conducted the tours with the assistance of two expert-consultants in mental health treatment, suicide prevention, and the effects of solitary confinement. We interviewed PDOC leadership, administrative staff members, security staff members, medical and mental health staff members, and prisoners. We reviewed documents related to the use of solitary confinement at all 26 of the Commonwealth's prisons before, during, and after our site visits. These include policies and procedures, medical and mental health records, cell histories, incident reports, disciplinary reports, suicide reviews, and unit logs. We also observed prisoners in various settings throughout the facilities. Consistent with our commitment to providing technical assistance and conducting a transparent investigation, we conducted exit conferences after each of our on-site inspections.

### B.    Definitions

Terms we use throughout this letter are defined as follows:

- **"Isolation"** or **"solitary confinement"** means the state of being confined to one's cell for approximately 23 hours per day or more.

- **"Solitary confinement unit"** or **"isolation unit"** means a unit where either all or most of those housed in the unit are subjected to solitary confinement.

- **"Serious mental illness"** or **"SMI"** means "a substantial disorder of thought or mood that significantly impairs judgment, behavior, [or] capacity to recognize reality or cope with the ordinary demands of life." Pa. Dep't of Corr., *Access to Mental Health Care*,

---

[5] One of the prisons we toured—SCI Greene—is the facility using solitary confinement on the greatest number of prisoners by far. We also toured SCI-Fayette, SCI-Smithfield, SCI-Rockview, SCI-Muncy, and SCI-Dallas.

*Policy 13.8.1., Section 2-Delivery of Mental Health Services* § A.1.a.(2) (2013) (we note that for this letter we have adopted PDOC's own definition of SMI).

- **"Intellectual disability" or "ID"** means a disability characterized by both a significant impairment in cognitive functioning, and deficits in adaptive functioning, such as communication, reasoning, social skills, personal care, and organizing school or work tasks. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013). An intellectual disability begins before the age of 22 and is chronic. As a substantial number of inmates may have some lesser form of ID, for the purposes of this letter, ID will refer to having a highly significant impairment of functioning, generally indicated by an IQ score of 70 or below, that would be adversely impacted by prolonged placement in a solitary confinement unit.

## C.   Background

PDOC operates 26 facilities, housing approximately 50,000 prisoners. PDOC subjects at least 2,800 of those prisoners—roughly 6% of the system's prisoners—to solitary confinement.

Roughly 2,400 of those in solitary are housed in Restricted Housing Units ("RHU"). Prisoners are housed in RHUs for violating prison rules (disciplinary segregation) or to protect the security of the prison or the individual prisoner (administrative segregation). Prisoners in the RHUs are usually confined to their cells for roughly 23 hours a day.

Another 400 prisoners are housed in one of the following types of solitary confinement units: a unit of Psychiatric Observation Cells ("POC") (for prisoners who are mentally decompensating to the point of being considered a danger to themselves, other prisoners, and/or property); the Capital Case Unit ("CCU") (for prisoners who have been sentenced to death); the Special Management Unit ("SMU") (for prisoners who exhibit behavior that presents a risk to the orderly running of the prison); and the Secure Threat Group Management Unit ("STGMU") (for prisoners who pose a risk to the prison because of their affiliation with, and active involvement in, gangs).[6]

Until recently, PDOC used solitary confinement on many of the approximately 70 prisoners housed in its Secure Special Needs Units ("SSNUs"). The SSNUs were used to house prisoners with SMI who had a history of disciplinary infractions. Within the last couple of months, PDOC has eliminated its SSNUs, replacing them with Secure Residential Treatment Units ("SRTUs"). PDOC has represented to us that it does not intend to use solitary confinement on any of the prisoners housed in its new SRTUs.

---

[6] Until this summer, prisoners in the CCU were confined to their cells for roughly 23 hours a day. In recent months CCU prisoners have been permitted one additional hour of recreation time per day. Prisoners in POC are confined to their cells for approximately 24 hours per day. Most prisoners housed in SMUs and STGMUs spend at least 23 hours a day in their cells. A small minority of the prisoners housed in SMUs and STGMUs are allowed a few additional hours of out-of-cell time per week after progressing to the least-restrictive part of these units' step-down programs.

5

### III.   DISCUSSION

**A.    PDOC has begun to address the way in which it uses solitary confinement on prisoners with SMI and to improve its mental health care practices.**

In recent months, PDOC has been reforming its solitary confinement practices. Currently, PDOC is preparing draft policies that, if correctly implemented, may reduce the number of prisoners with SMI subjected to prolonged isolation and improve the mental health care for this population. Moreover, during the summer, PDOC started to implement changes even though policies have not been finalized or adopted. Those changes include: (1) involving mental health staff members in the disciplinary process when the prisoner has SMI; (2) training a significant number of staff members in crisis intervention; (3) converting SSNUs that functioned like isolation units into SRTUs that provide more treatment, out-of-cell activities, and positive incentives; and (4) training and using peer specialists in some PDOC facilities to provide additional support to prisoners with SMI housed in general population.

These initial reform efforts are already producing positive results. Over a three month period this summer, PDOC reduced the number of prisoners with SMI in solitary confinement by well over 100.[7] Our expert-consultants found that these changes have dramatically improved the mental health of those removed from solitary. For example, one prisoner who had spent many months in an RHU and is now housed in an SRTU told us that "he came to hate himself" when he was in solitary, and that he now feels much better because he can more regularly get out of his cell. He also noted that he has greatly benefited from group therapy in the SRTU, where he can talk to prisoners facing similar difficulties. Line-staff members have also noted the positive changes. For instance, a staff psychologist commented on how she has recently seen a marked reduction in negative behaviors by prisoners as out-of-cell activities have increased.

Although progress has been made, there is still work to be done. Many of our major findings concerning the way in which Cresson misused solitary confinement still apply with equal force to the PDOC system as a whole. In the following sections, we discuss these serious, ongoing problems with the manner in which PDOC uses solitary confinement on prisoners with SMI. We also discuss the systemic failures that remain in place and contribute to PDOC's excessive reliance on solitary confinement as a control tool.[8]

**B.    The manner in which PDOC continues to use solitary confinement on prisoners with SMI violates their rights under the Eighth Amendment to the U.S. Constitution.**

Despite the progress that has been made in recent months, we find that the manner in which PDOC continues to use solitary confinement on prisoners with SMI violates the Eighth Amendment's prohibition against punishments that are "cruel and unusual." There is no static test for determining whether conditions are "cruel and unusual." Instead, the Eighth Amendment

---

[7] As we noted in the Summary of Findings section, PDOC has identified roughly 115 prisoners with SMI presently housed in solitary confinement units. Our expert-consultants have concluded that this number grossly underestimates the actual number of prisoners with SMI/ID still in solitary.

[8] In December 2013, PDOC officials reported to us progress they felt had been made since our August inspections. These efforts included beginning to review serious injurious behaviors, establishing suicide prevention committees at each facility, accelerating crisis intervention training schedules for officers, and drafting a proposal to have an independent organization conduct a segregation reduction project on all prisoners regardless of their vulnerabilities.

6

"must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

By subjecting prisoners with SMI to prolonged periods of solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, PDOC exposes them to an excessive and obvious risk of serious harm. *See Farmer*, 511 U.S. at 828; *Hope v. Pelzer*, 536 U.S. 730, 738-745 (2002) (holding that prison officials show deliberate indifference where they disregard obvious risks to prisoner safety). Moreover, our expert-consultants observed that as a direct result of these practices, prisoners with SMI have suffered serious psychological and physical harms, including psychosis, trauma, severe depression, serious self-injury, and suicide. *Cf. Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("The touchstone is the health of the inmate. While the prison administration may punish, it must not do so in a manner that threatens the physical and mental health of prisoners.").

1. **PDOC subjects prisoners with SMI to prolonged periods of solitary confinement under harsh conditions where they routinely have difficulty obtaining adequate mental health care, which in combination pose an excessive risk to the mental health of prisoners.**

The manner in which PDOC uses solitary confinement involves a number of factors that in combination violate the Eighth Amendment. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1024-25 (3d Cir. 1988) (holding that the district court appropriately considered the "totality of conditions" when assessing the constitutionality of Pennsylvania's death row unit, where prisoners were confined to their cells for approximately 22 hours per day). We did not consider any individual factor to be determinative. Instead, we assessed the constellation of conditions in PDOC's solitary confinement units and the harms found by our expert-consultants that resulted from these conditions and practices.

In reaching our conclusion, we considered the following factors:

(1) the length of time prisoners with SMI spent in solitary confinement;

(2) the extent to which the use of solitary confinement on prisoners with SMI interfered with staff members' ability to provide adequate mental health care; and

3) the unjustifiable harshness of the conditions that attended PDOC's use of solitary confinement on prisoners with SMI.

**First, the manner by which PDOC routinely subjects prisoners with SMI to lengthy periods of solitary confinement involves conditions that our expert-consultants found subjected prisoners to harm or an unreasonable risk of harm and contributes to the Constitutional violation.** As one court noted, long periods of isolation for those with SMI can be "the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995); *see also* Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012) ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."); *Morris v. Travisono*, 499 F. Supp. 149, 160 (D.R.I. 1980) (noting that "[e]ven if a person is confined to an air conditioned suite at the Waldorf Astoria,

denial of meaningful human contact for . . . an extended period of time may very well cause severe psychological injury"); *United States v. Bout*, 860 F. Supp. 2d 303, 308 (S.D.N.Y. 2012) ("It is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee.").

From May 2012 to May 2013, over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary confinement. Nearly 250 of these prisoners have been in solitary confinement for more than a year. Most of these prisoners were held in an RHU or one of the other solitary confinement units.

For many with SMI, PDOC's use of prolonged isolation is mentally taxing because they can see no end point to it. We interviewed many prisoners with SMI who told us they believed they would never get out of solitary. Some told us that they had accumulated years of disciplinary time in the RHU and feared they would never be returned to general population. Others explained that they had lost all faith in their ability to conform their conduct to the prison's rules in a way that would allow them out of their isolation cell.

**Second, the manner in which PDOC uses solitary confinement interferes with its ability to provide adequate mental health treatment to prisoners with SMI and contributes to the Constitutional violation.** *See Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (adopting the magistrate judge's conclusion that "inmates are denied access to necessary mental health care while they are housed in [solitary confinement]"). Appropriate mental health treatment for prisoners with SMI should involve much more than medication. Nat'l Comm'n on Corr. Health Care, *Standards for Mental Health Services in Correctional Facilities*, § MH-G-02 (2008). Prisoners with SMI must also have, among other things, "programming or appropriate therapies (or both) to meet the mental health needs of patients." *Id.*[9] Unfortunately, for much of last year, hundreds of prisoners with SMI spent months in solitary confinement receiving only medication and occasional "cell-side" visits from mental health staff members, even though our expert-consultants found more care was needed for those inmates.[10]

Recently, staff psychologists at many of the prisons have started to conduct at least one out-of-cell therapy session per month for prisoners with SMI currently housed in an isolation unit. This approach constitutes a significant improvement over past practices.

However, PDOC continues to use practices that fail to ensure that prisoners with SMI in solitary confinement receive the mental health treatment they need. *Cf. Casey v. Lewis*, 834 F. Supp. 1477, 1547-49 (D. Ariz. 1993) (describing the inappropriate use of isolation for prisoners

---

[9] According to our consultants, prisoners with SMI may also need regular and meaningful counseling from mental health staff members, peer and other counseling skill building, and structured and unstructured activities. Activities may include eating out of cell, outdoor recreation, and showers. They explain that these types of activities provide opportunities for both socializing and organizing one's life in the facility in a way that is therapeutic and important to the health of prisoners with SMI.

[10] A cell-side visit typically involves a member of the mental health staff standing outside a prisoner's cell, attempting to speak to the prisoner through a food tray slot or cracks in a doorframe amid the commotion on the unit. Such a visit typically lasts for only a few minutes at a time, lacks confidentiality, and cannot be equated with a face-to-face, out-of cell consultation/therapy session. As one staff member explained, "You can't do therapy in a hallway."

with serious mental illness because "[d]uring lockdown, inmates are provided improper mental health care or no mental health care").

PDOC also uses solitary confinement in a way that interferes with staff members' ability to identify prisoners who are mentally deteriorating in their cells. The problem is particularly acute for under-diagnosed prisoners not on the mental health roster. One former staff psychologist explained that he found it difficult to appropriately assess the condition of prisoners in solitary confinement. He emphasized that his manager discouraged him from doing anything other than cursory cell-side assessments of prisoners' mental health. He noted that for inmates who were inactive and in their cells most of the time, it was next to impossible to fully assess the condition of prisoners from cell-side without an out-of-cell visit.

**Third, unjustifiably harsh conditions often attend PDOC's use of prolonged solitary confinement on prisoners with SMI. In combination, these conditions are dehumanizing and cruel and contribute to the Constitutional violation.** *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (holding that when conditions of confinement combine to "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need," they violate the Eighth Amendment); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982) ("[T]he court must consider the effect of each condition in the context of the prison environment, especially when the ill effects of particular conditions are exacerbated by other related conditions."). While conditions for those housed in PDOC's solitary confinement units vary somewhat by prison, there are consistent themes. PDOC's prisons consistently subject prisoners with SMI to not just prolonged isolation, but also unnecessarily harsh and disorienting housing conditions, punitive behavior modification plans, and the excessive use of full-body-restraints. These conditions serve only to exacerbate their mental illness. We discuss these conditions below:

*Harsh conditions*: Although by its nature solitary confinement typically includes aspects that would be considered harsh in the ordinary sense of the word, the particular use of solitary confinement on inmates with SMI in the PDOC system, when examined under the totality of the circumstances, includes unjustifiably harsh conditions, even though some of these conditions, standing alone, might not be inappropriate in other circumstances. Every prisoner placed in solitary confinement must spend almost his entire day confined to a cell that is less than 100 square feet in size—about the size of an average American bathroom. The cell contains a metal bed frame, a thin plastic mattress, metal sink, metal toilet, and metal desk with an attached metal seat, and sometimes a small shelf. At some of the prisons, the cell will also have a small exterior-facing window, but at many of the prisons, the cell has no exterior window and no natural light coming directly into it. Usually, the prisoner is locked in his cell behind a solid metal door. The door has a narrow slot (used for passing food trays and for handcuffing the prisoner before he can leave the cell), and a small plastic window with a view to either a hallway or the housing unit's common area.

The lighting in the cell can be dimmed, but it can never be turned off, even at night. The noise level can be high, even at night, because of the yelling and banging of neighboring prisoners. The prisoner with SMI in solitary confinement in PDOC has limited out-of-cell time. Typically, he is allowed, at most, one hour in an empty and caged outdoor pen, five times a week, and a 15-minute shower three times a week. Recently, conditions for the prisoner PDOC has identified as having SMI also often includes one out-of-cell therapy session per month with a staff psychologist.

9

Before he can leave his cell, a prisoner must first submit to a strip search.  Further, to get from his cell to an out-of-cell activity, the prisoner is at all times escorted by correctional officers and has his arms and legs shackled together.  Many prisoners we spoke to told us that they rarely leave their cells because of these procedures.  They explained that being strip searched, handcuffed, and led by tether by two corrections officers made them feel like animals.  The female prisoners told us that the strip searches remind them of past sexual abuses.

Our expert-consultants found that in the solitary confinement units, conditions for the prisoner with SMI also routinely involve unnecessarily forced idleness and loneliness, where the idleness was unjustified by legitimate penological goals and not mitigated.  For instance, looking at the totality of the circumstances, the prisoner with SMI in disciplinary custody at an RHU generally has no access to television or radio; has only limited access to reading materials; cannot make telephone calls (with the exception of emergency calls approved by management); is denied contact visitation privileges; is denied any opportunity to have non-contact visits with friends; and, at most, can only have one non-contact visit per month with an immediate family member, lasting for no longer than an hour.[11]

Living conditions in the RHU routinely involve a mix of disorienting and uncomfortable sensory experiences.  For example, the air quality is often poor because of inadequate sanitation and ventilation.  At one of the solitary confinement units we visited where the sanitation was especially bad, prisoners complained *en masse* to us about the smell of the place.  A prisoner there explained, "The smell is terrible.  When a prisoner smears feces on the walls, it's often left like that for days and the entire pod reeks of shit and makes you want to vomit."

*Punitive responses to symptoms of mental illness*:  In most of the solitary confinement units we toured (which were mainly RHUs), staff members routinely respond to the prisoner exhibiting symptoms of his mental illness by making his living conditions even more inhospitable.  Prisoners with SMI in the solitary confinement units frequently engage in behaviors that may be signals of mental illness instead of intentional misbehavior, such as smearing fecal matter on their cell walls or repeatedly failing to comply with prison rules, including minor infractions like where to stand in the cell when receiving meals.  All too often corrections officers respond to behaviors that signal mental illness not by seeking to ensure that the inmate received adequate mental health treatment, but instead by imposing additional restrictions on the conditions of the prisoners' confinement.  Restrictions can include harsh measures, such as unjustifiably requiring the prisoner to remain confined to his cell 24/7; denying the prisoner bedding material or running water and taking away the prisoner's clothes.  Corrections officers are empowered to impose these restrictions for up to seven days at a time without conferring with mental health staff members and with nothing other than the approval of the unit's shift commander.

Corrections staff members also use housing assignments within the solitary confinement units as a way to punish prisoners for conduct related to their mental illness.  For instance, in one of the RHUs, we found an unusually narrow cell that had no furniture in it other than a bed.  When we asked about the cell, the corrections staff members at the unit assured us that prisoners

---

[11] We do note, however, that it is appropriate for a correctional system to remove privileges as a part of the disciplinary process.

were never assigned to the cell for more than a couple of days at a time, and then only for their own safety. However, our records review confirmed the allegations of the prisoners on the unit who had told us that a prisoner with SMI had been housed in the cell for nearly half a year.

At all of the facilities we toured, prisoners with SMI in the solitary confinement units complained of officers verbally abusing them. Some prisoners alleged that officers had encouraged them to kill themselves. For instance, one prisoner with SMI alleged that as recently as July 2013, when he tied a bedsheet to his vent and stood on his toilet preparing to kill himself, a group of officers encouraged him to go through with it. According to the prisoner, the officers told him that they "wanted to see his feet dangling," and chanted, "1 . . . 2 . . . 3 . . . kill yourself," repeatedly.[12]

Prisoners also alleged that officers working the solitary confinement units intentionally provoke prisoners with SMI into acting out. The prisoners claimed that the officers "push the buttons" of prisoners with SMI so as to have a basis for imposing additional restrictions on their conditions.

*Unnecessary and excessive use of restraints*: Excessive uses of full-body restraints often attend the use of solitary confinement on prisoners with SMI. Full-body restraints are a type of restraint that should only be used in exigent circumstances, and only for the briefest time necessary to ensure the safety of the prisoner or those around him. *See Cresson Findings Letter* at 16-18. According to our consultants, corrections officers should rarely have to use a full-body restraint on a prisoner for anywhere close to seven hours. Nonetheless, of the more than 260 full-body restraint incidents between January 2012 and June 2013, almost 75% lasted longer than 7 hours, and 15% lasted longer than 12 hours. This data, along with our review of the records related to PDOC's uses of restraints, indicate that corrections officers routinely use full-body restraints for far longer than is needed to avoid harm. Instead, they often appear interested in using the restraints as a means to discipline prisoners by causing discomfort or pain.

In sum, we have identified three factors indicating that PDOC uses solitary confinement in a way that poses an excessive and obvious risk of harm to prisoners with SMI. First, PDOC often uses solitary confinement on vulnerable prisoners with SMI for prolonged periods of time. Second, PDOC uses solitary confinement on prisoners with SMI in a way that frequently interferes with its ability to provide them with the mental health care they need. And third, extreme conditions—such as the excessive use of full-body restraints—routinely attend PDOC's use of solitary confinement on prisoners with SMI.

## 2. The way in which PDOC uses solitary confinement on prisoners with SMI has resulted in serious harm.

The way PDOC uses solitary confinement on prisoners with SMI has led to serious harm. At the prisons we visited, a disproportionate amount of the self-harm continues to occur in the isolation units, just as it did in Cresson. Between January 1, 2012 and May 31, 2013, although only a small fraction of PDOC's prisoners were housed in one of the solitary confinement units, 206 of the 288 documented suicide attempts occurred there. Our expert-consultants interviewed and/or reviewed records of more than two dozen prisoners who they have concluded were

---

[12] Prisoners housed in nearby cells provided accounts of the incident that were substantially consistent with what this prisoner had told us.

directly harmed by their conditions in solitary confinement in various ways, including mental deterioration, increased psychosis, and acts of self-harm and suicide.

Below we discuss the experiences of two of the individuals our expert-consultants interviewed in greater detail to illustrate the types of harms prisoners are suffering as a consequence of the way in which PDOC uses solitary. The first case involves a prisoner PDOC initially identified as having SMI, who PDOC held in solitary confinement for roughly ten months. The expert-consultant who interviewed the prisoner and reviewed his records concluded that the way in which solitary confinement was used on him led to a deterioration in his mental health and to suicide attempts.

The second case involves a prisoner who went into solitary confinement without SMI. According to a former staff psychologist we spoke to, PDOC failed to identify him as someone in need of treatment mainly because PDOC uses solitary confinement in a way that interferes with its ability to effectively screen for mental illness. Now, after many years in solitary, this prisoner has schizophrenia and has difficulty speaking in complete sentences. According to the expert-consultant who interviewed this prisoner and reviewed his records, this prisoner's decompensated state is principally attributable to his experiences in solitary confinement.

### Example 1 – Prisoner AA[13]

In February 2013, Prisoner AA—who has a mood disorder, an IQ of 66, and is on PDOC's mental health roster—attempted to hang himself after more than five months in solitary confinement in the facility's RHU. After his suicide attempt, staff moved him to a POC for one day, and then returned him to the RHU. After another roughly five months in solitary confinement in the RHU, Prisoner AA again attempted to hang himself. Fortunately, a week before we toured the facility, Prisoner AA was transferred to the SRTU. Conditions there are markedly better. Prisoner AA is no longer subjected to solitary confinement. He receives much more mental health care treatment, and his mental health has improved considerably.

According to one of our expert-consultants who interviewed Prisoner AA and reviewed his medical records, at the time of his suicide attempts, Prisoner AA exhibited symptoms consistent with a type of delirium that can result from subjecting a prisoner with SMI to prolonged isolation under certain conditions. Prisoner AA had told our consultant that while in the RHU, he became hypersensitive to sights and sounds. He also experienced visual hallucinations. For instance, he recalled sometimes seeing his deceased brother encouraging him to cut himself and "come join me." Prisoner AA also told our expert-consultant that when he experienced visual hallucinations of his brother, guards laughed at him and walked away, instead of referring him to psychology. He explained that in the RHU he became really depressed, and that his feelings of hopelessness made him want to kill himself and act out against the guards.

Finally, while Prisoner AA was in solitary, staff failed to pay sufficient attention when Prisoner AA expressed his intent to kill himself. For instance, records establish that before his second suicide attempt, Prisoner AA told staff he wanted to kill himself because they were ignoring his requests for a change in medication. The record also shows that just prior to his suicide attempt, Prisoner AA also "asked to see Psychiatry for a week and a half and . . . was

---

[13] To protect the identity of prisoners, we use coded initials.

tired of waiting to be seen." Notably, the facility did not have a full-time psychiatrist at the time.

Example 2 – Prisoner BB

Prisoner BB has been imprisoned in PDOC for approximately 25 years. For almost all of that time he has been housed in solitary confinement. BB had no mental illness when he entered the prison system. On his initial evaluation, he was described as friendly, motivated to engage in educational activities (he was functionally illiterate), and unlikely to be a problem while incarcerated. After spending years in solitary, his mental health has badly deteriorated. Prisoner BB is floridly psychotic, disorganized, and unable to take care of his own personal hygiene and nutrition. He is locked in a cycle of chaotic behavior, mental deterioration, and disciplinary infractions.

According to our expert-consultant who interviewed Prisoner BB and reviewed his medical records, he has received virtually no mental health treatment while in solitary. Twice (in 2008 and 2012) his condition so deteriorated that he was admitted to an off-site inpatient unit that provides intensive mental health treatment. On admission, the records reflected that he had bizarre speech, disorganized behavior, extremely poor hygiene, and was responding to hallucinations. On both occasions, he improved dramatically while receiving the intensive care at the off-site inpatient unit. Instead of recognizing that his improvement confirmed that solitary confinement was harming his mental functioning, PDOC viewed it as evidence that he had faked or "malingered" mental illness while in solitary. After each of his brief stays at the off-site inpatient unit, Prisoner BB was returned to solitary.

As recently as April 2013, Prisoner BB was not on PDOC's active mental health roster and remained in solitary confinement. Fortunately, a week prior to our tour he was placed on the roster and recommended for admission to a psychiatric unit "to gain a better understanding of what mental illness, if any, is present."

When we first encountered Prisoner BB in the RHU, we noted that the floor of his cell was covered in food. When our expert-consultant interviewed him, he mumbled that he was fine. Yet quite clearly he was not. He appeared disheveled and confused, trembled in fear, and was almost incoherent.

To compound matters, we were told by multiple prisoners that BB is often harassed by corrections officers because of his delusions and incoherence. According to our consultant, an environment such as this makes it more difficult to develop an alliance for medication compliance.

One psychologist we spoke to told us that when he had earlier raised the issue of BB's mental instability with his supervisor, the supervisor had "turned a blind eye" to the situation. The psychologist told us that he was very concerned about Prisoner BB's mental deterioration, but that his supervisor was of the view that the monthly cell-side check-in psychologists provided to all prisoners in Prisoner BB's solitary confinement unit would constitute adequate mental health care for this prisoner.

13

These examples speak to the harm that has been directly caused by the specific manner in which PDOC uses solitary confinement on prisoners with SMI.

Though many of the prisoners with SMI have become too ill to describe their mental suffering while in solitary, many others were eager to tell us how solitary had harmed them. One prisoner told us, "I feel like it's hard for me to breathe here. I feel claustrophobic . . . I feel trapped . . . I feel angry inside . . . I feel like giving up. I'm helpless behind the door." Another simply told us, "It's just a black hole. They put you back here and leave you." A prisoner with SMI who is now doing well in general population told us that in solitary he used to think a lot about "pounding [his] head against the wall." Another prisoner with SMI still in solitary told us, "The only way you can talk to someone or get something done is if you try to kill yourself."

**C.  Systemic deficiencies undermining PDOC's mental health program pose an excessive risk of harm to prisoners and contribute to PDOC's overreliance on solitary confinement as a means of controlling prisoners with SMI.**

Instead of having systems in place to ensure adequate mental health care throughout its facilities, PDOC uses isolation to control prisoners with mental illness as they become more ill and less stable. The structural deficiencies plaguing PDOC's mental health care system include inadequate: (1) continuity and coordination of care; (2) standing for mental health staff members; (3) criteria for assessing mental illness; (4) treatment capacity; and (5) oversight tools. These deficiencies lead to the unconstitutional use of isolation on prisoners with SMI, and pose a serious and obvious risk of harm to prisoners. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny County v. Pierce*, 612 F.2d 754, 761-63 (3d.Cir. 1979) (holding that the Eighth Amendment prohibits deliberate indifference to prisoners' serious mental health care needs).

**1.  Poor coordination and continuity of care leads to inadequate mental health care treatment and the use of solitary confinement on prisoners with SMI.**

Systemwide problems concerning coordination and continuity of care among staff members have impeded PDOC's ability to provide adequate mental health care. Poor continuity of care leads to more prisoners becoming mentally unstable. It also means that PDOC staff members are less able to identify how mental instability contributes to prisoners' conduct and more likely to resort to the use of solitary confinement as a control tool.

PDOC's mental health staff members routinely fail to coordinate with each other. This can result in confusion over diagnoses and a failure to follow treatment plans. For example, in one record we reviewed, a psychiatrist prescribed a medication for a prisoner only to have a different psychiatrist discontinue it at the next meeting and prescribe another medication with no explanation for the abrupt change. On at least one occasion, when we asked staff members about a treatment mistake that had led to harm, they each disavowed responsibility and blamed one another.

Poor recordkeeping also hampers continuity and coordination of mental health care. Prisoner records are regularly missing vital mental health information, including information concerning diagnoses, prior treatment, medications, and family history of psychiatric disorders. Moreover, the mental health information PDOC does have is routinely scattered in different places not readily accessible to mental health staff members.

14

Our consultants identified many instances where inadequate continuity of care resulted in harm to prisoners. In one example, a staff member's failure to consider medications that had worked in the past for a prisoner led to the prisoner acting out in ways characteristic of bipolar disorder. PDOC staff members responded to the prisoner's behavior by disciplining him with time in the RHU. In solitary, he decompensated badly and attempted suicide.

2. **Inadequate consideration given to the views of mental health staff members often leads to assignment of prisoners with SMI to solitary confinement units.**

Systemwide, PDOC must do more to expand the role of mental health staff members in determining the conditions of confinement for prisoners with SMI. For instance, while we applaud PDOC's recent effort to enhance mental health staff members' role in the disciplinary process, that role is limited and not always credited in determining whether to house prisoners with SMI in solitary confinement units. For prisoners with SMI, mental health clinicians should have a large role in housing decisions because they have the clearest sense of how such prisoners will be affected by a particular housing placement.

Some mental health staff members we interviewed expressed frustration and resentment at the lack of respect shown to them by security staff members. They complained about the extent to which security staff members feel at liberty to ignore their recommendations.

3. **Difficulties in recognizing how mental illness may cause maladaptive behaviors leads to the inappropriate use of solitary confinement on prisoners with SMI.**

If PDOC is to avoid subjecting prisoners to solitary confinement for engaging in conduct related to their illness, it will have to ensure that its staff members, especially mental health staff members, can recognize the effects of mental illness when they see them. Our review of mental health records reveals a disturbing tendency by many of PDOC's clinicians to describe almost all disruptive conduct as purely willful and behavioral, and to overlook the role of the prisoner's mental instability in causing the conduct. Our consultants found cases of maladaptive behavior rooted in mental instability that PDOC's mental health staff members incorrectly characterized as "manipulative" or "malingering" behavior.

4. **PDOC needs to commit more resources to mental health services in both general population and its specialized housing units to avoid warehousing prisoners with SMI in solitary.**

PDOC holds large numbers of prisoners with SMI in solitary, in part, because it devotes insufficient resources to mental health care. If PDOC had more staff members to provide adequate care in general population, fewer prisoners would deteriorate to the point of having to be placed in isolation. PDOC must have an adequate number of mental health staff members and therapeutic beds to provide prisoners with the care they need.

Inadequate staffing is a problem throughout PDOC's mental health system. Our mental health expert-consultants found that at each of the facilities they visited, clinicians had large, unmanageable caseloads due to understaffing. For example, one facility we toured is supposed

15

to have seven full-time psychologists, but has only four.[14]  An experienced psychologist we interviewed there expressed the belief that, even if the facility filled all seven slots, at least three more staff members would be needed to provide adequate care given the needs at this particular facility.

Resource constraints also prevent prisons from transferring prisoners to settings with more intensive mental health treatment.  Mental health staff members we spoke to told us that they sometimes hold back on recommending transfers to such units because of a perception that bed space is limited.  Further, delays occur because already-stretched mental health staff members must complete lengthy referrals for PDOC's review before transfers to therapeutic units can occur.  If approved, prisoners must then wait for a bed to become available.  Each delay adds to the time prisoners wait in solitary confinement without the mental health care they need. *Cf. Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (recognizing that prolonged isolation may result in inappropriate delays in the provision of mental health care).

The need for more mental health staff members will only increase if PDOC follows through with its plans to have mental health staff members conduct more out-of-cell sessions in the solitary confinement units.  Plans to expand the amount of mental health services provided in the new SRTUs will also require more staff.

### 5.  PDOC lacks essential oversight tools to identify harms caused by inadequate mental health care and its overreliance on solitary confinement.

PDOC continues to lack key oversight mechanisms that would identify and address the harmful effects of solitary confinement and ensure the provision of adequate mental health care. We detailed at length in our Cresson Findings Letter how these essential oversight mechanisms did not exist and how this contributes to the system's dangerous use of solitary confinement.  *See Cresson Findings Letter* at 26-31.  PDOC's plans to begin tracking and analyzing mental health-related information remain aspirational.  Currently, PDOC does not track the number of prisoners with SMI in solitary confinement units; does not examine the role of solitary confinement in causing suicides; does not track self-injurious behavior; does not critically review serious self-injuries; and does not track or analyze the additional punitive responses that prisoners with SMI experience in solitary confinement units, including, for example, use of force, food loaf, and hardened cells.  This flawed oversight system prevents PDOC from identifying and correcting harms to prisoners.

### D.   PDOC's use of solitary confinement also poses an excessive risk of serious harm to prisoners with ID.

In the course of our investigation, we encountered prisoners with ID housed in PDOC's solitary confinement units.  Most of these prisoners also have SMI.  According to our expert-consultants, some of these prisoners are especially susceptible, because of their limited coping mechanisms, to the harsh conditions of solitary confinement at PDOC.  For example, we spoke to a prisoner who felt especially empty and lonely while in solitary because reading was the only

---

[14]  In the past year, this same facility went eight months without a full-time psychiatrist.  During that time, a part-time psychiatrist and two part-time psychiatric nurse practitioners tried to piece together enough hours to meet prisoners' psychiatry needs.

distraction he was allowed, and his intellectual disability had rendered him functionally illiterate. Prisoners with ID also consistently described the solitary confinement units as places where the officers were more hostile than in the other units, and complained about the officers taunting them and calling them names, such as "retards."

PDOC should have better systems in place to assess whether prisoners with ID who are held in solitary confinement for extended periods have limited coping mechanisms that must be addressed to ensure proper mental health care. For instance, PDOC does not screen for ID. Instead, it screens for prisoners with low IQs—a flawed proxy for ID, as it is only one of several factors used in making a diagnosis of ID. Until PDOC fixes this problem, it will have difficulty keeping prisoners with ID out of solitary.

E.   **The way in which PDOC uses solitary confinement on prisoners with SMI/ID also violates Title II of the ADA.**[15]

PDOC's solitary confinement practices also violate Title II in a variety of ways. *See* 42 U.S.C. § 12132. PDOC unjustifiably denies many of its prisoners with disabilities, including those with SMI and/or ID, the opportunity to participate in and benefit from correctional services and activities, such as classification, security, housing, and mental health services, or unnecessarily provides prisoners with psychiatric and intellectual disabilities unequal, ineffective, and different or separate opportunities to participate in or benefit from PDOC's classification, security, housing, and mental health services. *See* 28 C.F.R. § 35.130(b)(1)(i)-(iv). PDOC unlawfully segregates and warehouses prisoners with SMI and/or ID in isolation units, without either individually assessing each such prisoner concerning the risk the prisoner may actually and objectively pose to others, 28 C.F.R. §§ 35.130(d); 35.139, or otherwise justifying the need for segregation, *id.* §§ 35.130(b)(8), (h). PDOC also fails to reasonably modify policies, practices, and procedures where necessary for PDOC to avoid discrimination on the basis of disability. *Id.* § 35.130(b)(7).

As discussed above, our factual determinations concerning PDOC's misuse of solitary confinement on those with SMI/ID largely mirror the determinations we made in the Cresson investigation. Systemwide, PDOC's practices violate Title II because the prison: (1) unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices; (2) fails to either properly assess prisoners on an individual basis to determine whether segregation in an isolation unit is appropriate housing or otherwise justify their segregation; and (3) unnecessarily denies opportunities to participate in and benefit from services, programs, or activities to prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.

---

[15] The Department of Justice is charged with enforcing and implementing Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134. The Department may conduct investigations and compliance reviews of public entities, enter into voluntary compliance agreements, and enforce compliance through litigation. *See* 28 C.F.R. pt. 35, subpt. F.

17

1. **PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices.**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II extends to all of the prison's services, programs, and activities, including classification, housing, recreation, and medical and mental health treatment, among others, for which prisoners are otherwise qualified. *See Pa. Dep't of Corr.*, 524 U.S. at 209-10, 213 (finding, without exception, that Title II "unmistakably includes State prisons and prisoners within its coverage" and discussing "recreational activities" and "medical services" as covered under Title II to find a motivational boot camp to be a covered entity).

Both serious mental illness and intellectual disabilities, as defined here, qualify as disabilities under the ADA. 42 U.S.C § 12102 (including "mental" impairments under definition of "disability" where they substantially limit major life activities).

The regulation implementing Title II of the ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *see also Olmstead v. L.C.*, 527 U.S. 581, 592, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability."). The Justice Department explained in the 1991 Preamble to the Title II regulation: "Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status." 28 C.F.R. pt. 35, App. B. Moreover, a covered entity, such as PDOC, may not provide unequal services to qualified individuals with disabilities, *id.* § 35.130(b)(1)(ii), and may not provide different or separate services to qualified individuals with disabilities unless the different or separate services are necessary to provide benefits that are as effective as those provided to others. *Id.* § 35.130(b)(1)(iv). A covered entity also may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability. *Id.* § 35.130(b)(3)(i).

Under the ADA, a prison must "take certain proactive measures to avoid discrimination." *Chisolm*, 275 F.3d at 324-26 (holding that facility may have violated the ADA and discriminated against a deaf prisoner when it gave the prisoner pencil and paper instead of an American Sign Language interpreter, and failed to provide the prisoner a device to allow him to place telephone calls in private). The Title II regulation requires the Prison to reasonably modify its policies, practices, and procedures when necessary, as here, to avoid discrimination against prisoners with serious mental illness and intellectual disabilities. 28 C.F.R. § 35.130(b)(7). Prisoners with disabilities thus cannot be automatically placed in restrictive housing for mere convenience. If prisoners with SMI/ID can be housed in general population by being provided adequate care, the prison may not house such prisoners in segregated housing without showing that it is necessary to make an exception. *See id.* § 35.130(b)(3)(i)-(ii) (prohibiting the prison from utilizing "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or] have the purpose

18

or effect of defeating or substantially impairing accomplishments of the entity's program with respect to individuals with disabilities").

PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies, practices, and procedures where necessary to avoid discrimination on the basis of disability.  We found that PDOC is twice as likely to use solitary on prisoners with SMI and that over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary from May 2012 to May 2013.  What we have learned from our tours of the facilities, our prisoner interviews, and our record reviews is that there is an overreliance at PDOC on isolation of prisoners with SMI (many of whom also have ID), and that PDOC has a practice of routinely warehousing prisoners with SMI/ID in solitary on account of their disabilities.

The practice of segregating prisoners in solitary confinement units where reasonable modifications would permit those with disabilities to remain integrated in the prison's general population conflicts with the mandates of the ADA.  PDOC typically fails to identify prisoners who have SMI/ID that makes them susceptible to harm in solitary confinement and therefore fails to consider whether reasonable modifications are needed for such prisoners before deciding to house them in solitary confinement.  Even when PDOC has identified that a prisoner's behavior is caused by SMI, it fails to consider reasonable modifications to either avoid confining the prisoner to solitary confinement, or if solitary confinement is necessary, to adjust the conditions of the solitary confinement to avoid harm to the prisoner.  As described above, PDOC could enable many more of its prisoners with SMI/ID to remain in general population by increasing coordination and continuity of care, expanding the roles of mental health staff in determining the conditions of confinement, providing more resources to mental health services in general population, and improving its screening mechanisms for identifying prisoners with ID. *See supra* pp. 14-16.  Because PDOC fails to do so, prisoners with SMI/ID are unnecessarily and impermissibly segregated and isolated.

PDOC must ensure that qualified prisoners with SMI/ID have as equal an opportunity as other prisoners to participate in and benefit from its housing and classification services, programs, and activities, and the benefits that flow from them, such as out of cell time, interaction with other prisoners, and movement outside of confined environments, consistent with legitimate safety and security concerns.[16]

---

[16] The American Correctional Association Standards similarly provide:

> The institution may be required to take remedial action, when necessary, to afford program beneficiaries and participants with disabilities an opportunity to participate in and enjoy the benefit of services, programs, or activities.  Remedial action may include, but is not limited to: . . . making reasonable modifications to policies, practices, or procedures.

ACA, Standards for Adult Correctional Institutions § 4-4429 (4th ed. 2003 and Supp. 2010).

2. **PDOC fails to properly assess prisoners on an individual basis to determine whether segregation is appropriate housing.**

PDOC may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities, including classification, housing, and mental health services. 28 C.F.R. § 35.130(h). But PDOC "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*; *cf. Defreitas v. Montgomery Cnty. Corr. Facility*, 525 Fed. App'x 170, 179 (3d Cir. 2013) (holding that "courts should ordinarily defer to [a prison's] judgment" so long as the "officials have [not] exaggerated their response to these considerations"). Similarly, PDOC may only impose or apply eligibility criteria that screen out or tend to screen out individuals with disabilities or any class or individuals with disabilities from fully and equally enjoying any service, program, or activity if such criteria are necessary for the provision of the service, program, or activity being offered. 28 C.F.R. § 35.130(b)(8). Based on information available to us during the investigation, PDOC's practices do not qualify under either of these standards.

Finally, Title II does not require a public entity "to permit an individual to participate in or benefit from . . . services, programs, or activities . . . when the individual poses a direct threat to the health and safety of others." 28 C.F.R. § 35.139; *see Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 278-88 (1987) (finding direct threat under Section 504, which was codified at 28 C.F.R. § 35.139 for Title II, requires a showing of a "significant risk" to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the public entity's modification of its policies, practices, or procedures).

PDOC cannot categorically deny qualified prisoners with SMI/ID the opportunity to participate in and benefit from housing, classification, and mental health services. In order to establish direct threat, Title II requires PDOC to make individualized assessments of prisoners with SMI/ID, and their conduct, relying on current medical or best available objective evidence, to assess: (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures will mitigate or eliminate the risk. 56 Fed. Reg. 35,694, 35,701 (July 26, 1991); 75 Fed. Reg. 56,180 (Sept. 15, 2010); *Arline*, 480 U.S. at 287-88. The Department explained in the preamble to the original Title II regulation in 1991 that "[s]ources for medical knowledge include guidance from public health authorities." 56 Fed. Reg. 35,701; *see also Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) (explaining that, while not necessarily conclusive in all circumstances, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and National Institutes of Health, are of special weight and authority").

Applying the *Arline* factors, the individualized assessment should, at minimum, include a determination of whether the individual with a disability continues to pose a risk, whether any risk is eliminated after mental health treatment (e.g., whether the individual was denied medications, which resulted in the threat in the first place), and whether the segregation is medically indicated.[17]

---

[17] *See, e.g.*, Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), http://www.psychiatry.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf ("Placement of inmates with a serious mental illness in these settings can be contraindicated because of

Fundamentally, the individualized assessment should consider the views of mental health providers as to the prisoners' mental health needs and the appropriateness of the placement. *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ."); *cf. Purcell v. Pa. Dep't of Corr.*, No. 50-181J, 2006 WL 891449, at *13 (W.D. Pa. Mar. 31, 2006) (finding that a genuine issue of material fact existed as to whether a "reasonable accommodation" was denied when the DOC refused to circulate a memo to the staff concerning a prisoner's disability (Tourette's Syndrome) that explained that some of his behaviors were related to his condition, not intentional violations of prison rules).

To be sure, a public entity may, however, impose neutral rules or criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program, provided that safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities.

PDOC has recently begun to include mental health staff members when making individual assessments of prisoners with SMI during disciplinary proceedings. However, the policy requiring participation of mental health staff members in disciplinary proceedings is currently only in draft form, and is not being consistently applied throughout PDOC's facilities. Further, mental health staff members are not involved in a review of prisoners who received disciplinary time *before* these policy changes occurred. These prisoners continue to remain in solitary. Also, at present, mental health staff members are not involved in administrative segregation decisions. For this reason, prisoners with SMI/ID are still being automatically placed in RHUs without an individualized assessment. Finally, PDOC does not and cannot conduct an individualized assessment of prisoners with ID when placing them into isolation, because it does not screen prisoners properly, as described above. *See supra* p.19.

Accordingly, PDOC must continue to modify its policies and practices to ensure it is not unjustifiably and automatically placing prisoners with SMI/ID in segregation. Unfortunately, at present, PDOC often fails to meet the requirements of the ADA. Pursuant to the direct threat defense, each individualized analysis must evaluate whether the prisoner poses a health or safety risk to others, based on objective and medical evidence, including treating mental health professionals, and whether modifications that do not result in automatic segregation will eliminate or reduce the risk to an acceptable level.

3. **PDOC denies participation in and benefit from services, programs, or activities to qualified prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.**

PDOC fails to ensure that prisoners placed in segregated housing for legitimate nondiscriminatory reasons can participate in and benefit from prison activities, programs, and services. For those prisoners with SMI/ID who cannot be integrated into the general population, the Facility still has an obligation to provide qualified prisoners with the opportunity to

---

the potential for the psychiatric conditions to clinically deteriorate or not improve. Inmates with a serious mental illness who are a high suicide risk or demonstrating active psychotic symptoms should not be placed in segregation housing as previously defined and instead should be transferred to an acute psychiatric setting for stabilization.").

21

participate in and benefit from mental health services and activities, and other services, programs, and activities to which prisoners without disabilities have access. *See* 28 C.F.R. § 35.130(b). While we applaud PDOC's efforts to provide prisoners with SMI/ID housed in its new SRTUs with access to equivalent activities, services, and programs, those who remain in the solitary confinement units do not have access to anything remotely equivalent to what is provided to prisoners in the general population. *See supra* pp. 8-11.

## IV. MINIMUM REMEDIAL MEASURES

To remedy PDOC's unconstitutional and unlawful use of solitary confinement on prisoners with SMI/ID, its failure to provide constitutionally adequate mental health care to prisoners, and the violations of Title II and its implementing regulation, the Commonwealth should promptly implement the minimum remedial measures set forth below.

The remedies proposed in this letter are narrowly tailored to remedy the conditions that we found throughout the Pennsylvania prison system and are closely tied to our factual and legal conclusions. These proposals are remedial in nature, and seek to address the policies, practices, training, supervision and accountability systems changes necessary for Pennsylvania to overcome existing deficiencies and to come into compliance with the Constitution and the ADA. We note there may be different remedial approaches that would be adequate to address these types of issues.

### A. Prolonged Isolation

PDOC shall ensure that:

1. PDOC's policies, practices, and procedures are reasonably modified and maintained so prisoners with SMI/ID are not unnecessarily segregated and/or isolated.

2. If a prisoner shows credible signs of decompensation in isolation, the prisoner's mental health needs are addressed promptly, and if the prisoner shows credible signs of decompensation and the possibility of removing the prisoner from isolation is considered. Whenever a prisoner manifests signs of decompensating, a mental health professional shall assess the prisoner's credibility.

3. PDOC properly assesses prisoners with SMI/ID on an individualized basis to determine appropriate housing.

4. The disciplinary or administrative segregation placement process accounts for the risk of self-harm from placement into isolation. Specifically, PDOC shall ensure that prisoners with SMI/ID can effectively participate in disciplinary proceedings, including the provision of appropriate auxiliary aids and services where necessary for effective communication and reasonable modifications where necessary to ensure a prisoner's meaningful participation in disciplinary proceedings. PDOC shall also develop and implement policies and procedures to assess whether to divert from isolation those prisoners whose SMI/ID contributed to their misconduct.

5. PDOC reports and reviews data regarding lengths of stay in isolation, particularly with respect to prisoners with SMI/ID, and shall take appropriate corrective action.

6. For inmates with SMI/ID who have to be segregated from general population, that such prisoners have the opportunity to participate in and benefit from services, programs, and activities available to prisoners without disabilities consistent with legitimate safety and security concerns.

## B. Suicide Prevention and Protection from Harm

PDOC shall ensure that:

1. Prisoners are protected from suicide, suicide attempts, and self-harm.

2. Placement into the POC is short-term with intensive treatment and that prisoners are not discharged from POC to the RHU or other isolation without accounting for the risk of self-harm from such isolation.

3. All staff members are properly trained regarding appropriate responses to suicide attempts or self-harm, are trained on de-escalation techniques, notify mental health staff when time permits, and do not resort to force prematurely.

4. Staff members are properly trained and supervised regarding rounds in the isolation units; that rounds entail a meaningful observation of each prisoner's condition; and that signs of decompensation, risk of self-harm, or suicidal ideation are immediately addressed.

5. Suicides, suicide attempts, and self-injurious behavior are thoroughly documented and reviewed for implications to both security operations and mental health treatment, especially regarding the impact of isolation, and appropriate corrective action is taken.

6. PDOC shall develop an effective risk management system that adequately screens for suicidal or self-injurious behavior and monitors prisoners at risk for these types of harm.

## C. Mental Health Treatment

PDOC shall ensure that:

1. Prisoners with SMI receive adequate mental health treatment and that such treatment is provided in a manner that ensures confidentiality.

2. Prisoners are properly screened and assessed for potential mental illness upon intake into the prison. All reasonable efforts to obtain a prisoner's prior mental health records are taken and that this information, along with all screenings, is incorporated into a prisoner's charts.

3. Prisoners on the mental health caseload receive a timely treatment plan that is periodically reviewed and updated.

4. Prisoners with SMI in segregated placements are offered adequate therapeutic and recreational out-of-cell treatment, consistent with their security levels and treatment needs, which is appropriately documented.

23

5. Prisoners with SMI have adequate access to more intensive mental health care units.

6. There are sufficient mental health staffing levels, taking into consideration the concentration of specialized units and the mental health population at the prison.

7. All staffing components coordinate with each other to ensure that prisoners have access to necessary mental health care and are informed of the practices and procedures on other units.

8. Mental health staff members have sufficient standing at PDOC facilities, especially with regard to housing determinations.

9. Staff members assigned to the specialized units are trained regarding the needs of, and appropriate responses to, the mental health population and prisoners with intellectual disabilities.

10. Documentation of prisoners' mental health contacts and treatment is uniform, comprehensive, organized, and legible.

11. A meaningful quality assurance system for the mental health treatment program is in place and a range of data is collected, aggregated, and reviewed for appropriate corrective action.

### D. Use of Force

PDOC shall ensure that:

1. The restraint chair, and other uses of force are not used as punishment or as a substitute for mental health interventions and are instead used only in instances where a prisoner poses a physical threat.

2. Staff members are trained on crisis intervention and de-escalation techniques and that mental health staff members are called in the case of a mental health-related crisis or a planned use of force for a prisoner with mental illness or an intellectual disability.

3. Data is provided and reviewed to assess whether the restraint chair is being overused and as part of an early warning system to identify staff members in need of additional training.

## V. CONCLUSION

Like other state correctional systems, PDOC increasingly has been called upon to take on the task of serving as the state's primary caregiver for those with SMI. Many of these prisoners also have significant intellectual disabilities. However, PDOC's unenviable burden of having to take care of these prisoners cannot excuse its all too routine practice of using a harsh form of solitary confinement to control those with SMI and/or ID instead of providing them with the mental health care treatment they need.

Now is the time to put a stop to these harmful solitary confinement practices and to meaningfully improve the mental health services PDOC provides. We look forward to working

24

collaboratively with Secretary Wetzel and his staff to address the violations of law we have identified in the context of settlement discussions.

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. The lawyers assigned to this investigation will be contacting PDOC counsel to discuss this matter in further detail. If you have any questions, please feel free to contact Jonathan Smith, the Chief of the Special Litigation Section, at (202) 514-6255, Special Litigation Counsel Avner Shapiro, at (202) 305-1840, or the lead attorney on the matter, Kyle Smiddie, at (202) 305-6581.

Sincerely,

Jocelyn Samuels
Acting Assistant Attorney General
United States Department of Justice
Civil Rights Division

David J. Hickton
United States Attorney
United States Attorney's Office
Western District of Pennsylvania

cc:     John E. Wetzel
        Secretary
        Pennsylvania Department of Corrections

        Nancy Giroux
        Superintendent
        State Correctional Institution at Albion

        David Pitkins
        Acting Superintendent
        State Correctional Institution at Benner Township

Joyce Wilkes
Superintendent
State Correctional Institution at Cambridge Springs

Laurel Harry
Superintendent
State Correctional Institution at Camp Hill

John C. Thomas
Superintendent
State Correctional Institution at Chester

Vincent Mooney
Superintendent
State Correctional Institution at Coal Township

Jerome Walsh
Superintendent
State Correctional Institution at Dallas

Brian Coleman
Superintendent
State Correctional Institution at Fayette

Michael Overmyer
Superintendent
State Correctional Institution at Forest

Brenda Tritt
Superintendent
State Correctional Institution at Frackville

Michael Wenerowicz
Superintendent
State Correctional Institution at Graterford

Louis Folino
Superintendent
State Correctional Institution at Greene

Kenneth Cameron
Superintendent
State Correctional Institution at Houtzdale

Tabb Bickell
Superintendent
State Correctional Institution at Huntingdon

Trevor Wingard
Superintendent
State Correctional Institution at Laurel Highlands

John Kerestes
Superintendent
State Correctional Institution at Mahanoy

Brian Thompson
Superintendent
State Correctional Institution at Mercer

Robert Smith
Superintendent
State Correctional Institution at Muncy

Eric Bush
Superintendent
State Correctional Institution at Pine Grove

Mark Capozza
Superintendent
State Correctional Institution at Pittsburgh

Kenneth Cameron
Superintendent
Quehanna Boot Camp

Theresa DelBalso
Superintendent
State Correctional Institution at Retreat

Steve Glunt
Superintendent
State Correctional Institution at Rockview

Jon Fisher
Superintendent
State Correctional Institution at Smithfield

27

Gerald Rozum
Superintendent
State Correctional Institution at Somerset

Wayne Gavin
Superintendent
State Correctional Institution at Waymart

Theron Perez
Chief Counsel
Governor's Office of General Counsel

# Exhibit

# D

Exhibit 8 - Expert Report of Juan Mendez

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUSSELL SHOATZ, a/k/a RUSSELL SHOATS | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. |
| v. | : | |
| | : | |
| JOHN E. WETZEL, in his individual and official capacity as Secretary of the Pennsylvania Department of Corrections; LOUIS S. FOLINO, in his individual and official capacity as Superintendent of the State Correctional Institution at Greene; and JOHN KERESTES, in his individual and official capacity as Superintendent of the State Correctional Institution at Mahanoy. | : | **ELECTRONICALLY FILED** |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendants. | | |

### Expert Testimony of Juan E. Mendez

### I. Introduction

I respectfully submit this testimony in my capacity as expert witness designated in this case, in order to assist the Court's deliberations from the perspective of the international law applicable to the prolonged solitary confinement of Plaintiff Russell Shoatz.

### II. Credentials

I am qualified to render this analysis of international standards, as I am currently the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, a position that I have held as an independent expert since November 1, 2010, after being appointed to it by the Human Rights Council of the United Nations. My mandate was renewed in October 2013.[1] The Special Rapporteurship is one of more than fifty "Special Procedures" of the United Nations, and one of its most long-standing: it was first created in 1985. Mandate-holders are appointed to it to serve for up to two consecutive three-year terms, on the basis of their expertise in the respective subject matter covered by the mandate.

---

[1] U.N. Human Rights Council Resolution 16/23 (A/HRC/RES/16/23).

1

I wish to state, in any event, that I do not appear before the Honorable Court in my capacity as Special Rapporteur but instead as an expert witness. In addition, my appearance should not be interpreted in any way as waiving, limiting or having any other effect on the immunities enjoyed by the United Nations before United States courts.

In the capacity of Special Rapporteur on Torture, I visit countries that invite me in order to advise them on how to meet their obligation to observe the absolute prohibition in international law of both torture and cruel, inhuman or degrading treatment or punishment (CIDT). In such missions, I always include visits to prisons, detention centers and other places where persons are deprived of freedom and I eventually make recommendations on how to bring them up to international standards. I also write thematic reports on various aspects of the international law regarding torture with recommendations to the international community and to all member States of the UN on how to fulfill the various obligations that are derived from the absolute prohibition on torture and CIDT. In October 2011 I made a report to the UN General Assembly on the use of solitary confinement and the ways in which, depending on circumstances, it may constitute either torture or CIDT. That report is attached to this.

My appointment as Special Rapporteur is the result of a long career dedicated to the promotion and protection of human rights and particularly in regards to torture. I have been a Special Advisor to the Prosecutor of the International Criminal Court on prevention of the crimes under that tribunal's jurisdiction, and co-chair of the Human Rights Institute of the International Bar Association. Previously (2004-2007) I was Special Advisor to the UN Secretary General on the Prevention of Genocide. As a member of the Inter-American Commission on Human Rights of the Organization of American States (2000-2003) and as its President in 2002, I also visited prisons in the western hemisphere and authored reports on visits and case complaints about them. Earlier, as a researcher and manager for Human Rights Watch (1982-1994) and later as HRW General Counsel (1994-96) I had occasion to visit detention centers in many countries as well, and to write reports on their compliance or non-compliance with international standards.

I teach in the area of International Law at U.S. and foreign law schools, also on the basis of those experiences. I am currently Professor of Human Rights Law in Residence at the Washington College of Law, American University in Washington, DC, where I have been since the Fall of 2009, and where I teach courses on International Law and on International Human Rights Law. I have previously taught at Notre Dame Law School (1999-2004), Georgetown University (1990-93) and the Johns Hopkins' School of Advanced International Studies (1994). Since 1997 I have taught regularly at summer sessions of the Oxford University (UK) Masters Program on International Human Rights Law, and I occasionally lecture or teach short courses at other universities around the world.

### III.Methodology

For the purpose of rendering this expert testimony, I have received and read materials provided by the plaintiff's legal team. I also visited Mr. Shoatz on January 9 at his current place of detention in SCI Graterford, Pennsylvania. He gave me detailed explanations of the conditions of his detention and prolonged solitary confinement in different Pennsylvania correctional institutions. I will base my conclusions on the facts as I have learned them through these

sources, but it should be understood that I am making no factual determinations – which I understand are to be made by the Court.

I also wish to state that, as the Special Rapporteur on Torture, I had occasion to engage the US government in the case of Mr. Russell Shoatz. My communication to the government and the latter's response, dated September 28, 2012, are attached to this report. Similarly, my views of the case in my annual report to the Human Rights Council published in March 2013, are also attached.

### IV. Solitary Confinement in International Law

The treatment of prisoners and detained persons is profusely covered by international law standards. There is an emerging consensus that, under certain circumstances, solitary confinement violates international obligations with respect to treatment of offenders. Those circumstances depend on whether they cross a threshold into becoming cruel, inhuman or degrading treatment or punishment or even torture. An important consideration of those circumstances is the length of the period that an inmate spends in isolation, because solitary confinement under proper conditions does not violate an international standard. Those proper conditions include: a) a reasonable motive or purpose in isolating the inmate; b) due process in the determination of its imposition, including a meaningful opportunity to challenge it; c) adequate medical examination to prevent isolation from affecting the inmate's health; d) an absolute prohibition of its use, for any length of time, against children, persons with mental disabilities, and pregnant women; d) that the length of time spent in isolation should be limited so that it does not inflict severe pain or suffering on the inmate; and e) that for the same reason there is an absolute ban on "indefinite" or "indeterminate" periods of isolation.[2]

International law establishes an absolute and inderogable prohibition on torture as well as on cruel, inhuman or degrading treatment or punishment. This prohibition is *jus cogens*, meaning that it is an imperative norm of international law that binds all States and that admits no repeal or exception by another treaty or custom emerging later. The prohibition likewise does not recognize any emergency or other circumstance that could warrant a suspension. The United States is bound in all its governmental functions to abide by this prohibition, as a matter of *jus cogens* obligation, of customary international law and of treaty law, since the United States is a party to the UN Convention Against Torture (CAT), an instrument that codifies this and several other customary international law norms. The US is a party to this multilateral treaty since 1994, after signature and ratification by the US Senate on April 18, 1988 and October 21, 1994, respectively.[3] The US did include several declarations, reservations and understandings (DRUs) but none of them relevant to the absolute nature of the prohibition on either torture or CIDT.

One of the DRUs inserted in the ratification by the US of the CAT is relevant to this court's deliberation: The United States declared that, for purposes of its obligations acquired in signing

---

[2] Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Report of Juan E. Mendez, U.N. Doc. A/66/268 (Aug. 5, 2011).
[3] United Nations Human Rights, Treaty Body Reporting Status for the United States of America, available at http://tbinternet.ohchr.org/_layouts/TreatyBodyExternal/Countries.aspx?CountryCode=USA&Lang=EN

the treaty, the US understood the notion of "cruel, inhuman or degrading treatment or punishment" to be equivalent to the constitutional prohibition of "cruel and unusual punishment."  Note that this is not a reservation excluding US obligations with respect to "inhuman or degrading treatment" but only a clarification that the words "cruel and unusual punishment" are meant to convey the same meaning as CIDT.  Therefore, any finding of fact that a policy or practice constitutes CIDT as applied to the plaintiffs would *ipso jure* breach the constitutional prohibition, and vice-versa.

Under international law, torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."[4]  CIDT are " other acts . . . which do not amount to torture as defined in article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. "(Art. 16, CAT)[5].  Both definitions require the action of a State agent, a requirement that is amply satisfied in the facts subject to these proceedings.  In both torture and CIDT, the pain and suffering involved can be either physical or mental; in other words, a person can be the victim of torture or CIDT even if no physical assault takes place.  "Mental" pain and suffering is what more appropriately should be called "psychological" or "emotional" adverse effects on a person's mind.

For purposes of a more clear understanding of when a certain behavior constitutes torture and when it is CIDT, the Office of the UN High Commissioner for Human Rights has stated that: "Torture and cruel, inhuman and degrading treatment are concepts that might be difficult to distinguish . . . Torture is a severe form of inhuman treatment, but there is no objective element of distinction between the two categories. Acts at stake are usually identical and only the level of intensity/severity of the ill-treatment, taking into account the vulnerability of the victim, may vary."[6]

The International Committee of the Red Cross (ICRC), considered an authoritative interpreter of the Geneva Conventions and uses and customs of war, as well as on prison conditions for all categories of persons deprived of freedom, adds that "[t]he element that distinguishes inhuman treatment from torture is the absence of the requirement that the treatment be inflicted for a specific purpose . . . In their case-law [on inhuman treatment] human rights bodies stress[] the severity of the physical or mental pain or suffering. They

---

[4] Art. 1, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85.

[5] Ibid, Art. 16
[6] http://www.ohchr.org/Documents/Issues/Torture/UNVFVT/Interpretation_torture_2011_E N.pdf

4

have found violations of the prohibition of inhuman treatment in cases of active maltreatment but also in cases of very poor conditions of detention, as well as in cases of solitary confinement. Lack of adequate food, water or medical treatment for detained persons has also been found to amount to inhuman treatment.[7]

There are two important differences between torture and CIDT. One is that torture is always intentional, while CIDT can be inflicted by negligence or also intentionally. The other difference is a difference in degree of pain and suffering; torture is a more severe form of CIDT when inflicted intentionally. CIDT certainly requires a certain intensity of pain and suffering, but of a lesser severity than torture. The threshold of severity that transforms CIDT into torture is not well defined because it depends on both objective and subjective circumstances; the same treatment can be CIDT when inflicted on a sane and healthy adult, and torture when the victim is infirm, under age or for other reasons more vulnerable to pain and suffering. There is no requirement in international law that either CIDT or torture must have lasting, diagnosable effects in order to be so classified, just like there is no need for permanent scars to decide that deliberate electrocution constitutes physical torture. Subjective considerations may be important to determine whether a certain episode constitutes CIDT or torture; but the objective test of both is the infliction of pain and suffering -- negligent or intentional -- regardless of the ultimate way in which the victim experiences it.

It is very well established that CIDT and torture can result from subjecting persons to certain conditions of detention. In addition to the severity requirement, CIDT is the result of negligence on the part of prison authorities that, for example, results in overcrowding, unsanitary conditions, insufficiency of food or medical care, etc. Certain conditions of detention can be categorized as torture if they are intentionally imposed and reach a higher degree of severity; examples are sleep deprivation, denial of medical services and excessive use of force as a disciplinary measure to keep order in the facility. Even if standards in treaties are general, they are not necessarily vague in a manner that would preclude a court from determining that pain and suffering (depending on its intensity and on its intentional or negligent character) constitutes: a) treatment incidental to a regularly imposed penalty, in which case it is neither CIDT nor torture; b) CIDT; or c) torture.

In addition to the clear language of CAT, international standards of a "soft law" or non-binding nature come to the aid of the decision-maker, in particular the UN Standard Minimum Rules for the Treatment of Prisoners (SMR)[8]. The SMR is a document drafted in the 1950 by the then Crime Prevention Branch of the United Nations, today called UN Organization on Drugs and Crime (UNODC), an independent organization of the UN "family" based in Vienna, Austria, and where all member States of the UN are represented. The SMR has long been considered an authoritative guide to the interpretation of customary and treaty standards that prohibit mistreatment of persons deprived of freedom, either as a result of a criminal investigation, or imposition of a sentence, or for any other reason.

---

[7] ICRC, *Customary IHL Rules,* https://www.icrc.org/customary-ihl/eng/docs/v1_cha_chapter32_rule90#Fn_95_26)
[8] United Nations Standard Minimum Rules for Treatment of Prisoners, E.S.C. Res. 663 C (XXIV), P 19, U.N. Doc. E/3048 (Jul. 31, 1957) (amended May 13, 1977). (Hereinafter "SMR")

The SMR in its present language contains only a passing reference to solitary confinement, mandating that persons to be put in solitary confinement must be first subjected to medical examination (understood to include a psychiatric/psychological determination of good mental health).[9]. SMR also states that "[t]he medical officer shall visit daily prisoners undergoing such punishments and shall advise the director if he considers the termination or alteration of the punishment necessary on grounds of physical or mental health."[10]

It must be noted that the international community, under the auspices of UNODC, is in the process of a substantial review of the SMRs with the assistance of criminological and correctional experts from around the world and participation of many States and civil society organizations. This expert expects the revised SMRs to include more explicit rules dealing with solitary confinement and, specifically regulating its duration and a ban on its use for certain categories of prisoners.

A separate instrument of international law, elaborated by well-known experts in the early years of the millennium, does refer explicitly with solitary confinement: the Istanbul Statement on the Use and Effects of Solitary Confinement.[11] Like the SMRs, the Istanbul Statement has, in only a few years, attained the status of an authoritative guidance to policy-makers, prison authorities and adjudicators. In particular, it constitutes the generally recognized normative instrument to establish what are legitimate and illegitimate uses of isolation and segregation of persons under any form of detention, and on the procedures and limits that are required to keep solitary confinement within legality and legitimacy. In addition, Principle 7 of the UN Basic Principles for the Treatment of Prisoners states that 'Efforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged.' [12]

International adjudicatory bodies have ruled on solitary confinement in specific cases as well as in thematic and country-specific reports, and their judgments help determine the limits of legitimate uses of isolation.[13]   Pronouncements of these organs have been made necessary because of a perceived expansion of the use of solitary confinement throughout the world in

---

[9] SMR, Article 32(1) "Punishment by close confinement or reduction of diet shall never be inflicted unless the medical officer has examined the prisoner and certified in writing that he is fit to sustain it."

[10] Ibid., Article 32(3)

[11] Istanbul Statement on the Use and Effects of Solitary Confinement, Adopted on 9 December 2009 at the International Psychological Trauma Symposium, Istanbul (hereinafter "Istanbul Statement) available at: http://solitaryconfinement.org/uploads/Istanbul_expert_statement_on_sc.pdf.

[12] (http://www.ohchr.org/EN/ProfessionalInterest/Pages/BasicPrinciplesTreatmentOfPrisoners.aspx

[13] IACHR, Rapporteurship on the Rights of Persons Deprived of Liberty, *Report on the Use of Pretrial Detention in the Americas*, OEA/Ser.L/V/II (Dec. 30, 2013), available at http://oas.org/en/iachr/pdl/reports/pdfs/Report-PD-2013-en.pdf.; *Vela zguez-Rodri guez v. Honduras*, Inter-American Court of Human Rights, Series C, No. 4, para. 156 (1988) (finding that "prolonged isolation and deprivation of communication are in themselves cruel and inhuman treatment, harmful to the psychological and moral integrity of the person and a violation of the right of any detainee to respect for his inherent dignity as a human being."); *Gómez de Voituret v. Uruguay* and *Espinoza de Polay v. Peru,* Human Rights Committee (HRC); European Committee for the Prevention of Torture, Second General Report (*ibid.*, § 1346); Inter-American Court of Human Rights, *Castillo Petruzzi and Others case.*

recent years. That expanded use, not only in numbers of inmates affected, but also in the various situations for which solitary confinement is applied, prompted this expert -- in his capacity as UN Special Rapporteur on Torture -- to issue his October 2011 thematic report to the General Assembly, attached to this expert opinion. Almost simultaneously, the Committee for the Prevention of Torture of the Council of Europe (CPT) also called to the attention of that body its concerns as to the expanded use of solitary confinement in many of its 47 member States.[14] Like the Special Rapporteur, the CPT also called for specific regulation of solitary confinement to avoid its use in manners that breach the prohibition on torture or CIDT.

The Inter-American Commission on Human Rights of the Organization of American States (IACHR) is a treaty body of the American Convention of Human Rights and a "principal organ" established by the Charter of the OAS (a regional organization of which the US is a member). It is considered a highly authoritative organ of interpretation of both treaty and customary norms in our hemisphere and it has had occasion to deal with prison conditions often since its creation in 1959. In a document called "Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas," approved by the Commission during its 131st regular period of sessions, the IACHR states:

> "Solitary confinement shall only be permitted as a disposition of last resort and for a strictly limited time, when it is evident that it is necessary to ensure legitimate interests relating to the institution's internal security, and to protect fundamental rights, such as the right to life and integrity of persons deprived of liberty or the personnel.

> In all cases, the disposition of solitary confinement shall be authorized by the competent authority and shall be subject to judicial control, since its prolonged, inappropriate or unnecessary use would amount to acts of torture, or cruel, inhuman, or degrading treatment or punishment." [15]

As is well known, solitary confinement in the United States has also been the subject of concern to legislators, prison administrators, courts and civil society, a concern that is clearly on the increase. Some States have closed down facilities designed to isolate inmates, other States have prohibited solitary confinement of persons with mental disabilities, of children and of young inmates under 21 and replaced it with a more moderate form of segregation. In many States there are ongoing judicial challenges to the indefinite or prolonged imposition of solitary confinement.

State practice in this regard signals the emergence of a customary international law norm if it gathers momentum in the direction of reform and if such reform is instituted because of a sense of legal obligation (*opinio juris*). It is difficult to say whether such a process is under way, mostly

---

European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT), *21st General Report of the CPT* (Nov. 10, 2011), CPT/Inf (2011) 28, available at: http://www.cpt.coe.int/en/annual/rep-21.pdf.

[15] OEA/Ser.L/V/II.121, Doc. 38, Mar. 13 2008. I cited this report also in my brief *amicus curiae ("parecer")* to the Supreme Court of Brazil in a constitutional challenge to prison regulations that allow for solitary confinement, see http://antitorture.org/wp-content/uploads/2013/07/Parecer-J-Mendez_ENG-1.pdf

because there is a dire lack of information or statistics on the use of solitary confinement around the world. State practice seems to indicate a growing use of solitary confinement for a variety of purposes in many countries. At the same time, however, there is ample state practice that restricts its use, on the one hand by prohibiting it for some categories of inmates, and on the other hand to limit its duration even for those inmates for whom some isolation is legitimate and warranted.

In that sense, it is safe to say that *indefinite* solitary confinement and *prolonged* solitary confinement are prohibited by customary international law standards binding on all States. Also prohibited is the application of solitary confinement without due process of law guarantees, or on the basis of "status" or other considerations not related to specific behavior by the inmate. The soft-law instruments, the judicial decisions and the pronouncements of authoritative treaty bodies that I have cited above, do represent a clear trend towards to the need to regulate solitary confinement, to restrict its uses, to surround it by due process guarantees and, principally, to prohibit its use for indefinite or prolonged durations.

The precedents referred to above point to a consensus that solitary confinement must never cross the threshold of the prohibition of CIDT or of torture, and that -- for that purpose -- it must be subject to the following conditions:
- For definitional purposes, solitary confinement is any condition of detention in which an inmate is deprived of any meaningful social contact for 22 to 24 hours each day;[16] regardless of other conditions such as availability of radio, television, reading or writing material;
- It should never be imposed, for any duration, on children, pregnant women, or persons with a psycho-social disability;
- It should not be imposed as a means or modality of execution of a sentence, as in that case it would constitute cruel and inhuman (or unusual) punishment;
- It may legitimately be used as a disciplinary sanction for the more serious breaches of prison discipline, and then for a definite term and after a hearing with meaningful opportunity to challenge the decision;
- It may not be imposed on the basis of an administrative determination of status of the inmate as dangerous in the absence of specific behavior on the inmate's part that breaches prison regulations;
- It must be subject to controls, especially of a medical nature, that are frequent, impartial, independent and professional enough to prevent serious mental or physical pain and suffering;
- It must never be imposed for an indefinite or indeterminate period;
- It must never be imposed for prolonged periods.

Although the determination of a period beyond which solitary confinement becomes prolonged is subject to debate, it is clear that it should be counted in days or weeks, not in months or years. This expert proposed a maximum of 15 days, not immediately renewed, at least for those regimes of solitary confinement that consist of complete 24-hour isolation without access to any amenities such as radio, television or reading or writing materials. The medical literature suggests that maximum term because the human mind starts working differently after 15 days of

---

[16] Istanbul Statement, p. 1.

8

total isolation, and in many cases the damage can be irreversible.[17]  It follows that for a regimen of isolation surrounded by some mitigation -- as is the one applied to the plaintiff in the special housing units of the Pennsylvania correctional institutions -- the maximum term could be slightly longer, although it must not exceed an established number of days and should not be renewed without a break in between terms.

As stated earlier, solitary confinement can legitimately be used to prevent harm to the security of the institution, to its staff or to other inmates.  It may also be used to protect inmates who would be at risk of predators if left in the general population.  It is also a legitimate sanction for a well-established and proven breach of prison discipline.  In all of these cases, it should be for a previously established short term and applied with due process of law requirements.

Under international law it is impermissible to impose it as a prolonged measure or indefinitely, or on the basis of a "status" assigned to an inmate that does not depend on an objectively determined illegal behavior on his part.

## V. Actual Conditions of Mr. Shoatz's Detention

According to the facts as I understand them, Russell "Maroon" Shoatz is in the general population at Graterford since February of 2014.  Prior to that date, he had been in solitary confinement between 1983 and 1989 and from June 1991 to February 2014, for a total of 29 years in isolation.  For 18 months between 1989 and 1991 he was in general population at a federal facility in Leavenworth, Kansas, where he exhibited good behavior and was taking classes, benefits that were terminated when he was transferred back to Pennsylvania in 1991.

In the periods between 1983 and 1989 and 1991 to 1995, he was held at SCI Dallas, an older prison with very bad living conditions.  The cellblock was unsanitary and populated with insects and rodents.  There were no lights in the cells and no windows; the only light came from outside the cell and shone in through bars.  The cell was so small that standing up he could touch opposing walls; he estimated the size to be about 5 ft by 7.  The cell had a toilet/sink combination and a cement slab for a bed, and nothing else (except provided bedding).  There he stayed 23 hours a day.  The one hour of exercise was spent in a cage, 24x36 ft., with five other inmates, often being placed deliberately with inmates with whom he had problems.  To avoid fights, he and others would frequently refuse to go out.  Later on the prison built individual exercise yards, called "dog cages," about 5 ft by 18, with walls and ceiling made of wires; the fighting across the wire separations continued.

In SCI Dallas there was some natural lighting a few yards away from each cell.  No radio or television was allowed.  Reading and writing materials were allowed although subject to censorship for content.  Food was inadequate in both quantity and quality; at first he and other inmates were allowed food supplements provided by family or purchased in the canteen, but after 1989 they were not allowed at all; families could only provide writing materials.

In January 1995 he was transferred to SCI Greene, a brand-new facility.  From that year until 2014 Mr Shoatz was always alone in a cell, never housed with any other inmate.  The physical

---

[17] I refer the Court to the medical literature cited in my 2011 thematic report to the UN General Assembly, attached to this testimony.

conditions at Greene were good, especially sanitation. There was central air conditioning and heating, and Mr. Shoatz says that it was always too cold all year round. The only write up he got in this period was when he attempted to cover the unit. There are lights inside the cell, the night light remaining on all night and too bright to sleep; covering it would also carry a disciplinary sanction. Despite the cold, inmates were not allowed to buy additional clothing or underwear, at least in the first ten years. When he turned 60, Shoatz was allowed an extra blanket. Around 2005 he was allowed to purchase thermal underwear. Between 1995 and 2013 he was allowed to have radio and television in his cell. He was allowed weekly visits, although his family did not always come due to distance and cost. He was allowed visits by prison advocates and lawyers, although he has had lawyers only in the last two years.

His most important complaint is about strip searched to which he was subject every time he left the cell for visits, for medical appointments or for transfers. The searches are demeaning because they include spreading buttocks for cavity exposure and they are repeated often, starting all over again at the whim of the guard. There are no contact visits, and inmates are taken from their cells hand-cuffed to their waists and in leg irons; at the return they go through the same procedure. The demeaning nature of these searches means that often the inmate declines to leave the cell, even for medical or dental appointments.

In terms of the reasons for subjecting Mr. Shoatz to this regimen, the authorities have consistently claimed that he is an escape risk and a potential leader of other inmates. He did attempt an escape in 1975 and succeeded in escaping twice, first in 1977 and then in 1980, the latter time from a mental hospital. Since 1980 there have only been allegations, never proven, that he was planning escapes. In sum, Mr. Shoatz was held in solitary confinement for most of those 29 years on the basis of a "status" determination (that he was a flight risk) and that status was determined by his conduct that had effectively ended by 1980. It must be emphasized that nothing in his record as an inmate of the Pennsylvania corrections system since then shows behavior on his part that would merit disciplinary sanctions. Even if it did, a sanction of indefinite or prolonged solitary confinement would be excessive and disproportionate to any such behavior.

Over the years, his status was subjected to reviews by a "Program Review Committee" (PRC). Initially those reviews took place every 30 days, then every 90 days. At each appearance Mr. Shoatz asked to be sent to general population and at every turn the answer was "no" and for the reason already mentioned: that we was a flight risk. The proceedings themselves were not only meaningless given the results: Mr. Shoatz also felt that they were an opportunity to be provoked into outbursts of anger (between 1983 and 1989 he was written up often when he lashed out in response to the PRC refusal to consider his requests). After 1991 he stopped reacting but also stopped seeking reviews. Finally, in 2014, through an "Inmate Tracking System Agreement" he was allowed to leave solitary confinement. He is now placed in the highest security category for general population. The result is that, although he is no longer isolated, he has inordinate delays in getting medical attention for his prostate cancer and cataracts, for both of which he needs to be taken to outside hospitals.

## VI. Conclusions

It is my considered opinion that the conditions of detention of Mr. Russell Shoatz, in particular his indefinite solitary confinement eventually lasting 29 years, constituted cruel, inhuman or

degrading punishment under customary international law standards.  They violate solemn commitments of the United States under customary law and also as a party to the UN Convention Against Torture.

The conditions violated also the practices of all civilized Nations.  As stated earlier, even if isolation of inmates is not *per se* contrary to those practices, indefinite or excessively prolonged regimes of solitary confinement like the one suffered by Mr. Shoatz certainly do.  In addition to the excessive duration and indefinite nature, his isolation contradicts the trend of all civilized Nations in that it was imposed on the basis of status determinations unrelated to any conduct in his part, and through a meaningless procedure that did not afford him a serious chance to challenge the outcome.

Respectfully submitted,

| | |
|---|---|
| **NATIONS UNIES**<br>HAUT COMMISSARIAT DES NATIONS UNIES<br>**AUX DROITS DE L'HOMME** | **UNITED NATIONS**<br>OFFICE OF THE UNITED NATIONS<br>HIGH COMMISSIONER FOR HUMAN RIGHTS |
| **PROCEDURES SPECIALES DU**<br>**CONSEIL DES DROITS DE L'HOMME** | SPECIAL PROCEDURES OF THE<br>HUMAN RIGHTS COUNCIL |

Mandate of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment,

Téléfax: (41-22) 917 9006
Télégrammes: UNATIONS, GENEVE
Télex: 41 29 62
Téléphone: (41-22) 917 9359
Internet www.ohchr.org
E-mail: urgent-action@ohchr.org

Address:
Palais des Nations
CH-1211 GENEVE 10

REFERENCE: AL G/SO 214 (53-24)
USA 8/2012

21 June 2012

Excellency,

I have the honour to address you in my capacity as Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment pursuant to Human Rights Council resolution 16/23.

In this connection, I would like to draw the attention of your Excellency's Government to information I have received regarding the alleged prolonged solitary confinement of Mr. Russel Maroon Shoats, currently held at the State Correctional Institution (SCI) in Greene, Pennsylvania.

According to information received:

Mr. Russel Maroon Shoats, a 68-year old inmate, has spent the last twenty-one years in solitary confinement within the Pennsylvania Department of Corrections (DOC). It is reported that during this time he has not violated prison rules, and has not been issued any misconduct citations in more than two decades. Despite his impeccable record, prison authorities continue to hold him in 23-24 hour lockdown at the State Correctional Institution (SCI) Greene based on acts that occurred more than thirty years ago.

It is reported that during the 1960s and early 1970s, Mr. Shoats had been a dedicated human rights activist and community organizer in Philadelphia with the Black Unity Council and the Black Panther Party. In 1970, he and five others were accused of an attack on a police station that resulted in the death of a police officer. Mr. Shoats was captured in 1972 and subsequently convicted to serve multiple sentences of life without the possibility of parole.

It is also reported that after his conviction, Mr. Shoats was frequently placed in solitary confinement. In 1989, after a prisoner uprising at SCI Camp Hill in central Pennsylvania, Mr. Shoats was temporarily transferred to the federal penitentiary in Leavenworth, Kansas. During his eighteen months in federal

custody, Mr. Shoats was held in the prison's general population reportedly without incident. Upon his return to Pennsylvania, he was immediately placed in solitary confinement again, where he has remained to this moment.

It is reported that prisoners in the Pennsylvania Department of Corrections' Restricted Housing Units (RHUs), are held in tiny, windowless concrete cells that are approximately 64 square feet. The cells contain a concrete slab for a bed, and a thin foam mattress is provided to sleep on. The cells also come equipped with a sink and toilet. The cell remains constantly illuminated, twenty-four hours per day.

It is also reported that prisoners in the RHU are deprived all meaningful social interaction, deprived of environmental stimulation, and severely restricted in the forms of intellectual activity that they can engage in. There is no educational, vocational, therapeutic or other programming in the unit. Reading material is often censored. Prisoners in solitary confinement have substantial limits on the amount of property they are allowed to possess. All visits are non-contact, conducted through a thick pane of glass, during which the prisoner is handcuffed. Exercise is permitted for one hour five days per week in a caged area not much larger than the solitary confinement cell itself. There is no exercise equipment or recreational items available to RHU prisoners. Showers occur three times per week. During escort to showers and yard, a prisoner may be subject to a visual strip search, and will be handcuffed prior to leaving the cell. Often, prisoners are placed in leg shackles as well.

During his time in solitary confinement, Mr. Russell Shoats has  experienced several serious health problems that have been exacerbated by the intense stress of the RHU, and the allegedly inadequate health care provided to prisoners in solitary units in Pennsylvania. These conditions have reportedly included hypertension, prostrate infection, damage to his muscles based on his being provided inappropriate medication, and development of cataracts in both eyes. Although he received surgery for one of his cataracts, he is currently in need of surgery to remove the other.

It is reported that the rationale for the continued administrative placement in solitary confinement for more than twenty years of Mr. Russel Maroon Shoats is that he poses an escape risk if removed from solitary units, known as Restricted Housing Units (RHUs). Mr. Shoats reportedly escaped from prison on two occasions, once in 1977 and once in 1980.

In addition it is reported that the PA DOC has placed Mr. Shoats on the Restricted Release List (RRL), which is said to be a list of approximately 85 prisoners (as of August 2010) who may not be placed into general population at any prison without the express authorization of the Secretary of the PA DOC. In order to be removed from solitary confinement, Mr. Shoats must first be granted authorization by the prison at which he is held, in this case SCI Greene, then by

the Regional Deputy Secretary, and the Secretary. His classification status is nominally reviewed every 90 days, although he is always given the same rationale (escape risk) and never told what is necessary to be released.

Without in any way implying any conclusion as to the facts of the case, I should like to appeal to your Excellency's Government to seek clarification of the circumstances regarding the case(s) of the person(s) named above. I would like to stress that each Government has the obligation to protect the right to physical and mental integrity of all persons. This right is set forth inter alia in the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

I would like to draw the attention of your Excellency's Government to paragraph 6 of General Comment No. 20 of the Human Rights Committee. It states that prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by article 7 [on the prohibition of torture and other cruel, inhuman or degrading treatment or punishment] of the International Covenant on Civil and Political Rights (adopted at the 44th session of the Human Rights Committee, 1992). In this regard, I would also like to draw your attention to article 7 of the Basic Principles for the Treatment of Prisoners, which provides that "efforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged" (adopted by the General Assembly by resolution 45/111 of 14 December 1990).

In this context, I would like to draw the attention of your Excellency's Government to paragraph 1 of Human Rights Council Resolution 16/23 which "Condemns all forms of torture and other cruel, inhuman or degrading treatment or punishment, including through intimidation, which are and shall remain prohibited at any time and in any place whatsoever and can thus never be justified, and calls upon all States to implement fully the absolute and non-derogable prohibition of torture and other cruel, inhuman or degrading treatment or punishment."

Moreover, it is my responsibility under the mandates provided to me by the Human Rights Council, to seek to clarify all cases brought to my attention. Since I am expected to report on these cases to the Human Rights Council, I would be grateful for your cooperation and your observations on the following matters:

1.  Are the facts alleged in the above summaries accurate?

2.  Please provide information concerning the reasons and the legal grounds for the placement of Mr. Shoats in solitary confinement for the last twenty-one years and how such a prolonged application of solitary confinement is compatible with international norms and standards, inter alia, the International Covenant on Civil and Political Rights and the Convention against torture and other Cruel, Inhuman or Degrading Treatment or Punishment.

3

3.  Please provide the details, and where available the results, of any investigation, medical examinations, and judicial or other inquiries carried out in relation to this case. If no inquiries have taken place, or if they have been inconclusive, please explain why.

4.  Please indicate to what extent the age (68 years old) of Mr. Shoats and the fact that his last escape has been more than thirty years ago are taken into consideration in the framework of the periodic review of his classification status.

5.  Please provide information concerning the requirements for a possible release of former escaped convicts into general population and whether or not they apply to Mr. Shoats.

I would appreciate a response within sixty days. Your Excellency's Government's response will be made available in a report to the Human Rights Council for its consideration.

While waiting for your response, I urge your Excellency's Government to take all necessary measures to guarantee that the rights and freedoms of the above mentioned person are respected and, in the event that your investigations support or suggest the above allegations to be correct, the accountability of any person responsible of the alleged violations should be ensured. I also request that your Excellency's Government adopt effective measures to prevent the recurrence of these acts.

Please accept, Excellency, the assurances of my highest consideration.

Juan E. Méndez
Special Rapporteur on torture and other cruel, inhuman or degrading
treatment or punishment

4



UNITED STATES MISSION
TO THE UNITED NATIONS AND OTHER INTERNATIONAL ORGANIZATIONS
IN GENEVA

September 28, 2012

**OHCHR REGISTRY**

– 1 OCT 2012

Recipients :.......... *SPD (B.Cronin)*
................................
................................
................................

Mr. Juan E. Méndez
Special Rapporteur on Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment
Office of the United Nations High Commissioner for Human Rights
c/o Special Procedures Branch
8-14 Avenue de la Paix
1211 Geneva 10

Dear Mr. Méndez,

This letter is submitted in response to your letter dated June 21, 2012 regarding allegations of prolonged solitary confinement of Mr. Russell Shoats during his incarceration by the Pennsylvania Department of Corrections. Mr. Shoats's original prosecution and sentence were handled by the Commonwealth of Pennsylvania, which is also the authority responsible for the State Correctional Institution (SCI) where Mr. Shoats is currently held. Your letter was forwarded by the Department of State to the Office of the Attorney General of the Commonwealth of Pennsylvania. On August 8, 2012, the Department received a response from that office indicating that, since the Department of Corrections is under the jurisdiction of the Governor's Office, the letter had been shared with the Governor's Office of General Counsel. The Department has not received any further information in response to your letter.

The following summary of Mr. Shoats's criminal record is taken from a 2000 decision of the United States Court of Appeals for the Third Circuit, which is attached to this letter:

In 1970, Shoats was convicted of first degree murder for his part in an attack on a Philadelphia police guardhouse. Shoats participated in the attack as a member of a black revolutionary group that sought to eradicate all authority. One police officer was killed and another seriously wounded in the attack. Shoats was sentenced to life imprisonment. Seven years later, in September 1977, Shoats and several other inmates took over a cell block at the Huntingdon State Correctional Institution as part of an attempt to escape. Shoats injured several guards with a knife, and, along with three other prisoners, attempted to escape from the prison as planned. Two of the inmates were captured immediately and a third was killed during the escape. Shoats remained at large until he was captured in October 1977. While Shoats was a fugitive, he entered the home of a prison guard and forced him, his wife, and their five year old son to drive him in their car to a location outside Cokesburg, Pennsylvania. Shoats then ordered the hostages to enter the woods where he left them tied to a tree for almost four hours. Shoats was captured,

Case 2:21-cv-01248-ER   Document 2-1   Filed 03/11/21   Page 106 of 203
Case 2:13-cv-00657-CRE   Document 63-8   Filed 07/15/15   Page 18 of 20

-2-

and convicted of escape, robbery, kidnapping and simple assault. He was later transferred to Fairview State Hospital for the criminally insane. In March 1979, Shoats had guns smuggled in to him and escaped from that maximum security institution, again taking a hostage. In addition to escape and taking hostages, Shoats also has a history of threatening and assaulting his fellow inmates, and of causing disruptions at the institutions in which he is incarcerated. Based on publicly available information, it appears that Mr. Shoats has challenged the conditions of his confinement through administrative and legal avenues. The attached decision details the categories of confinement in Pennsylvania correctional institutions, the administrative procedures available to inmates to challenge those conditions, and the history of Mr. Shoats's use of those measures in the period prior to its issuance in 2000. It also analyzes the merits of a civil rights challenge to his conditions of confinement brought under 42 U.S.C. § 1983, claiming that he has been kept in administrative custody in violation of his Fourteenth Amendment right to procedural due process. The decision concludes that, while Mr. Shoats has a protected liberty interest in being released from administrative confinement, the procedures used to evaluate whether he should remain so confined comport with the requirements of procedural due process.

As you know, the United States firmly condemns all instances of ill-treatment in detention and strongly believes that, as is true for deprivation of liberty more generally, the practice of solitary confinement must be undertaken only in a manner which complies with a state's relevant obligations under the law. In the United States, an individual detained in a federal or state facility may challenge the fact or conditions of his or her confinement through appropriate administrative procedures or through legal action, such as a petition for habeas corpus or a civil rights suit. The Eighth and Fourteenth Amendments to the U.S. Constitution protect the rights of individuals confined in federal and state institutions from "cruel and unusual punishments." As underscored by the United States upon ratification of the Convention Against Torture, the United States understands the prohibition of such "cruel and unusual punishments" to include conduct which would constitute "cruel, inhuman or degrading treatment or punishment" under the Convention. We refer back to our November 30, 2011 letter to you for more information on the use of solitary confinement in the United States.

Sincerely,

Eileen Chamberlain-Donahoe
Ambassador
U.S. Representative to the Human Rights Council


Enclosure

**Special Rapporteur on Torture**
**Observations Report (excerpts)**
**March 2013**

(a) AL 21/06/2012 Case No. <u>USA 8/2012</u> State reply: <u>21/06/2012</u> **Alleged prolonged solitary confinement**

151. The Special Rapporteur thanks the Government of the United States for its reply dated 28 September 2012 to the communication dated 21 June 2012. The communication referred to the alleged prolonged solitary confinement of Mr. Russel Maroon Shoats, an inmate of Pennsylvania's State Correctional Institution (SCI). According to the information we received, Mr. Shoats has spent the last 21 years in solitary confinement, being held in lockdown for 23 to 24 hours each day. The government's response mentions the serious nature of the crimes for which Mr Shoats was convicted and the fact that he twice escaped and was recaptured, one time after holding hostages. According to prison authorities, Mr. Shoats has repeatedly been involved in fights with other inmates. On the other hand, the response does not dispute the facts about the conditions of confinement to which Mr. Shoats is subjected or the long term nature of such conditions. A lawsuit brought by Mr. Shoats before United States courts resulted in a finding that the procedures followed to place them in solitary confinement did not breach his rights under the US Constitution. The Special Rapporteur recalls paragraph 6 of General Comment No. 20 of the Human Rights Committee, which states that prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by article 7 of the International Covenant on Civil and Political Rights, and article 7 of the Basic Principles for the Treatment of Prisoners, which provides that "efforts addressed to the abolition of solitary confinement as a punishment, or to the restriction of its use, should be undertaken and encouraged." In his report a/66/268, the Special Rapporteur states that "solitary confinement is a harsh measure which may cause serious psychological and physiological adverse effects on individuals regardless of their specific conditions." Moreover, "[d]epending on the specific reason for its application, conditions, length, effects and other circumstances, solitary confinement can amount to . . . an act defined in article 1 or article 16 of the Convention against Torture." ( paras. 79 and 80). The Special Rapporteur urges that solitary confinement should be used only in very exceptional circumstances, as a last resort, for as short a time as possible (para. 89). Additionally, the Special Rapporteur also reiterates paragraph 1 of Human Rights Council Resolution 16/23, which "Condemns all forms of torture and other cruel, inhuman or degrading treatment or punishment, including through intimidation, which shall remain prohibited at any time and in any place whatsoever and can thus never be justified, and calls upon all States to implement fully the absolute and non-derogable prohibition of torture and other cruel, inhuman or degrading treatment or punishment." Based on the information received, the Special Rapporteur determines that Mr. Shoat's rights under international standards prohibiting torture and other

cruel, inhuman or degrading treatment or punishment have likely been violated, and calls on the Government to cease the prolonged isolation of Mr. Shoats.

**Exhibit 8 - Expert Report of Juan Mendez**

# Exhibit

# E

IN THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY REID, RICARDO NATIVIDAD, :
MARK NEWTON SPOTZ, RONALD GIBSON, :
and JERMONT COX, on their own behalf :
and on behalf of a class of similarly situated persons, :
 :
       *Plaintiffs,* :
   v.    : CIVIL ACTION NO.
        : 18-CV-00176-JEJ.
 :
JOHN E. WETZEL, Secretary of Corrections :
of the Commonwealth of Pennsylvania, :
ROBERT D. GILMORE, Superintendent of State :
Correctional Institution Greene, and :
TAMMY FERGUSON, Superintendent of State :
Correctional Institution Graterford, : **DECLARATION OF**
        : **CRAIG HANEY, PH.D, J.D.**
      *Defendants.* :

## I. <u>SUMMARY OF EXPERT QUALIFICATIONS</u>

  1. I am a Distinguished Professor of Psychology at the University of California,

Santa Cruz, where I served for the last six years as the Director of the Legal Studies Program.

My area of academic specialization is in what is generally termed "psychology and law," which

is the application of psychological data and principles to legal issues. I teach graduate and

undergraduate courses in social psychology, psychology and law, and research methods. I

received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and

Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of

a number of scholarship, fellowship, and other academic awards.

  2. I have published numerous scholarly articles and book chapters on topics in law

and psychology, including encyclopedia and handbook chapters on the backgrounds and social

histories of persons accused of violent crimes, the psychological effects of imprisonment, and the

nature and consequences of solitary or "supermax"-type confinement. In addition to these

scholarly articles and book chapters, I have published two sole-authored books: <u>Death by</u>

<u>Design: Capital Punishment as a Social Psychological System</u> (Oxford University Press, 2005),

and <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u> (American

Psychological Association Books, 2006).

3.      In the course of my academic work in psychology and law, I have lectured and

given invited addresses throughout the country on the role of social and institutional histories in

explaining criminal violence, the psychological effects of living and working in institutional

settings (typically maximum security prisons), and the psychological consequences of solitary

confinement. I have given these lectures and addresses at various law schools, bar associations,

university campuses, and numerous professional psychology organizations such as the American

Psychological Association.

4.      I also have served as a consultant to numerous governmental, law enforcement,

and legal agencies and organizations, including the Palo Alto Police Department, various

California Legislative Select Committees, the National Science Foundation, the American

Association for the Advancement of Science, and the United States Department of Justice. For

example, in the summer of 2000, I was invited to attend and participated in a White House

Forum on the uses of science and technology to improve crime and prison policy, and in 2001 I

participated in a conference jointly sponsored by the United States Department of Health and

Human Services (DHHS) concerning government policies and programs that could better

address the needs of formerly incarcerated persons as they were reintegrated into their

communities. I continued to work with DHHS on the issue of how best to insure the successful

2

reintegration of prisoners into the communities from which they have come. More recently, I consulted with the Department of Homeland Security and Department of Defense on detention-related issues, served as both a consultant to and an expert witness before the United States Congress and, most recently, I have briefed members of the White House Domestic Policy Advisory Council, representatives of the United States Department of Justice, and members of Congress several times in Washington, DC on prison and isolation reform-related issues in the last several years. I also serve on the National Advisory Board for the Vera Institute's Safe Alternatives to Segregation Initiative.

5.     In 2012, I testified as an invited witness in an historic hearing in the United States Senate in 2012, before Senator Richard Durbin's subcommittee, in the first ever such hearing to address problematic aspects of solitary confinement and prison isolation policies and practices. Also in 2012, I was appointed to a National Academy of Sciences committee addressing the causes and consequences of high rates of incarceration in the United States and, along with my fellow committee members, published a book-length analysis of that issue, which was the culmination of two years of our collective study.[1] In addition, in 2013, I was promoted to Distinguished Professor of Psychology, the highest level of the professoriate in the University of California system, and in 2015 was selected as the Annual Distinguished Faculty Research Lecturer from among the entire UC Santa Cruz faculty, as well as named UC Presidential Chair, 2015-2018. A copy of my curriculum vitae is attached to this Expert Report as Exhibit 1.

6.     My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the

---

[1] National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences.* Committee on Causes and Consequences of High Rates of Incarceration, J. Travis, B. Western, and S. Redburn (Editors). Committee on Law and Justice, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press (2014).

principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field of social psychology, demonstrating the power of institutional settings to change and transform the people who enter them.[2]

7.       Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement).  In the course of that work, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, Mexico, Norway, and Russia.  I also have conducted numerous interviews with correctional officials, guards, and prisoners to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records

---

[2] For example, see Craig Haney, Curtis Banks & Philip Zimbardo, *Interpersonal Dynamics in a Simulated Prison*, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney & Philip Zimbardo, *The Socialization into Criminality: On Becoming a Prisoner and a Guard*, in Law, Justice, and the Individual in Society: Psychological and Legal Issues (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, *Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse*, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

to examine the effects of specific conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.[3]

8.      Over the last several decades, a significant amount of my research and writing about prison-related issues has focused on a specific topic—the psychological effects of isolated, solitary, or "supermax"-type confinement in which prisoners are confined to their cells more or less continuously (typically, on average, 22 hours or more per day).[4]

9.      I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Alabama, Arkansas, California, Georgia, Hawaii, New Mexico, Pennsylvania, South Carolina, Texas, and Washington, and in numerous state courts, including courts in Alabama, Arizona, Colorado, Florida, Montana, New Jersey, New Mexico,

---

[3] For example, Craig Haney & Philip Zimbardo, *The Socialization into Criminality: On Becoming a Prisoner and a Guard*, in Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223) (J. Tapp and F. Levine, eds., 1977); Craig Haney, *Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law*, 3 Psychology, Public Policy, and Law, 499-588 (1997); Craig Haney, *The Consequences of Prison Life: Notes on the New Psychology of Prison Effects*, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, *On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence*, 77 University of Missouri-Kansas City Law Review 911-946 (2009); Craig Haney, *Counting Casualties in the War on Prisoners*, 43 University of San Francisco Law Review 87-138 (2008); Craig Haney, *The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement*, 48 American Criminal Law Review, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; Craig Haney, *Prison Effects in the Age of Mass Imprisonment*, The Prison Journal, 92, 1-24 (2012); and Craig Haney, *Prison Overcrowding*, in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 415-436). Washington, DC: APA Books (2015).

[4] See: Craig Haney, *Infamous Punishment: The Psychological Effects of Isolation*, 8 National Prison Project Journal 3 (1993); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, Crime & Delinquency, 49, 124-156 (2003); Craig Haney, *A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons*, 35 Criminal Justice and Behavior 956-984 (2008); Craig Haney, *The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful*, Prison Service Journal, 12 (January, 2009); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, 23 New York University Review of Law and Social Change 477-570 (1997); and Craig Haney, Joanna Weill, Shirin Bakhshay, and Tiffany Winslow, *Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful,"* 96 The Prison Journal 126-152 (2016).

Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of

Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San

Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo

counties.

10.     My research, writing, and testimony have been cited by state courts, including the

California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the

United States Supreme Court.[5]

11.     A statement of compensation and a list of the cases that I have testified in as an

expert at trial or by deposition during the last four years are included in an attachment to this

Expert Report, as Exhibit 2.

## II.     NATURE AND BASIS OF EXPERT OPINION

12.     I have been retained by counsel for the plaintiffs in *Reid v. Wetzel* to provide

expert opinions on three interrelated topics: a) a summary of what is known about the negative

psychological consequences of confinement in isolation on all individuals, both with and without

previously diagnosed mental illnesses; b) an explanation of whether and how those negative

consequences can be exacerbated for prisoners who are suffering from serious mental illness

("SMI");[6] and, c) based on the case-specific facts that I have been provided and reviewed, the

---

[5] For example, see *Brown v. Plata*, 131 S.Ct. 1910 (2011).
[6] The definition of a serious mental illness or SMI generally includes persons with a current diagnosis or significant recent history of types of DSM-IV-TR Axis I diagnoses (including schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic disorder, psychotic disorder not otherwise specified, major depressive disorders, and bipolar disorder I and II), persons who suffer from other diagnosed Axis I disorders commonly characterized by breaks with reality, or perceptions of reality, or that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health, and persons diagnosed with severe personality disorders that are manifested by episodes of psychosis or depression, and

6

extent to which death-sentenced prisoners housed at SCI Greene and SCI Graterford, including those who suffer from SMI, are subjected to solitary confinement that may place them at a serious risk of psychological harm.

13.    I have requested, been provided, and reviewed a number of documents that pertain directly to this case. They include: the Complaint in *Anthony Reid, et al v. John Wetzel et al.*; Pennsylvania Department of Correction (DOC) Administration of Security Level 5 Housing Units Policy 6.5.1; Pennsylvania DOC Capital Case Unit Policy 6.5.8; and the declarations of Anthony Reid, Ricardo Natividad, Jermont Cox, Mark Spotz, and Ronald Gibson.

14.    I also have some direct knowledge of conditions of confinement in at least some of the Pennsylvania DOC facilities, especially the isolation units. Specifically, I toured and inspected conditions of confinement in SCI Huntingdon in the 1980s, in conjunction with a California capital case on which I served as an expert. In addition, in March, 2013, in conjunction with a federal capital case on which I served as an expert, I toured and inspected the isolation units in SCI Greene and, once again, at SCI Huntingdon. In 2016, I served as an expert witness in *Arthur Johnson v. John Wetzel, et al.*, in which the plaintiff was granted a preliminary injunction and ordered released from his 36 years in solitary confinement. *Johnson v. Wetzel*, 209 F.Supp.3d 766 (M.D.Pa. 2016).

15.    In addition to my own direct experience and the materials and the fact-specific documents provided to me, my opinions are also based on my review of the extensive published literature that addresses the psychological effects of solitary confinement.

---

result in significant impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical heath.

III.    **SUMMARY OF EXPERT OPINIONS**

16.    I have been asked to summarize, generally, the extensive scientific literature that now exists on the psychological effects of solitary confinement as well as the professional, correctional, and human rights consensus that has emerged over the last decade concerning its use. I have reached all of my opinions in this matter to a reasonable degree of scientific certainty. My opinion is based upon a foundation and analytical approach well-accepted within my field of expertise. I summarize these opinions briefly in the few paragraphs that follow and in much more detail in the remainder of this Declaration.

17.    The living conditions to which the Pennsylvania DOC confines death-sentenced individuals, including the named plaintiffs, constitute precisely the kinds of conditions of confinement that scientific theory and a sizable empirical literature have established create grave risks of serious psychological damage and harm. Although that knowledge has existed for quite some time—more than a century—it has been significantly broadened and considerably deepened in recent years.

18.    As I will discuss in detail below, there is also a scientific, correctional, and human rights consensus about the painfulness and harmfulness of punitive isolation that has existed for a number of years. Here, too, that consensus has been significantly broadened and considerably deepened in recent years, especially in the last ten years.

19.    I have conducted research and assessed the effects of isolated confinement since the late 1970s. During that time I have interviewed many hundreds of persons confined in solitary and "supermax"-type confinement. Over those many years, I have encountered only a very small number of people in the United States who have been kept in isolation for the length

of time that the majority of Class Members in this case have endured. Nearly eighty percent of them have been held in solitary confinement for more than a decade. By any measure, sixteen to twenty-seven years in solitary confinement, the extraordinary length of time that the Pennsylvania DOC has held the named plaintiffs in this case—represents an extraordinarily long period of confinement under extremely adverse conditions. Scientific theory and empirical research indicate that such treatment inflicts psychological pain and places these individuals at significant risk of serious psychological harm.

20.    It is my expert opinion that being housed in solitary confinement can produce a number of psychological effects and places prisoners at grave risk of psychological harm. I believe that these effects are now well understood and described in the scientific literature. Scientific knowledge of these effects derives from numerous empirical studies. The findings are "robust"-- that is, they come from studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, were completed and published over a period of many decades, and are empirically very consistent. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm that they confront.

21.    In addition, the empirical conclusions are theoretically sound. That is, there are numerous sound theoretical reasons to expect that long-term isolation, the absence of meaningful social interaction and activity and the other severe deprivations that are common under conditions of isolated or solitary confinement would have harmful psychological consequences. Those conditions and experiences are known to produce adverse psychological effects in contexts other than prison and it makes perfect theoretical sense that they produce similar outcomes in correctional settings.

22.     Additionally, there are sound theoretical reasons to expect that prisoners who suffer from SMI would have a more difficult time tolerating the painful experience of isolation or solitary confinement. This is in part because of the greater vulnerability of the mentally ill, generally, to stressful, traumatic conditions, and in part because some of the extraordinary conditions of isolation adversely impact the particular symptoms from which mentally ill prisoners suffer (such as depression) or directly aggravate aspects of their pre-existing psychiatric conditions.

23.     The documents that I have reviewed suggest that the Pennsylvania DOC is placing death-sentenced prisoners at serious risk of substantial mental and emotional harm by keeping them in indefinite solitary confinement for no penological purpose. Indeed, the Pennsylvania DOC has failed to provide these individuals with any opportunity or pathway to reduce or end their time in solitary confinement. Thus, they continue to be subjected to severe psychological pain and risk of harm without a clear rationale or the means with which to reduce or end their suffering.

24.     I should note that my opinions concerning the use, nature, and effects of solitary confinement in the Pennsylvania DOC are partial and preliminary. It is my understanding that additional information will be forthcoming during the course of the litigation. For example, I have not yet been able to tour SCI Greene or Graterford for this lawsuit; interview staff or prisoners; or review prisoner files and other documents. Despite this, based on the documents and materials that I have reviewed (as listed in paragraph 13 above), I am able to formulate preliminary opinions about the DOC's isolation policies and practices. This is not a complete list of the opinions that I anticipate I will reach in this case and these opinions will be developed and supplemented as more information becomes available.

IV.     **THE SCIENTIFIC, CORRECTIONAL, AND HUMAN RIGHTS CONSENSUS CONCERNING THE ADVERSE PSYCHOLOGICAL EFFECTS OF SOLITARY CONFINEMENT**

25.     The effects of being housed in solitary or isolated confinement—especially over a long period of time—are now well understood and described in the scientific literature. There are numerous empirical studies that report "robust" findings—that is, the findings have been obtained in studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, were completed and published over a period of many decades, and are empirically very consistent.[7] With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm to which they are exposed.

26.     It should be noted, as I will discuss in more detail in several later paragraphs, that "long-term" or "prolonged" exposure to prison isolation is generally used in the literature to refer to durations of solitary confinement that are substantially briefer than the amount of time that the majority of plaintiffs in this case have been subjected to. For example, the American Psychiatric Association (APA) defined "prolonged segregation" as segregation lasting for four weeks or longer (which the APA also said "should be avoided" for the seriously mentally ill).[8] Thus, according to the complaint that I reviewed in this case, the plaintiffs have been subjected to a duration of isolated confinement that far exceeds—by a substantial order of magnitude—the amounts typically reported in the literature, studied by researchers, and considered psychiatrically problematic.

---

[7] See the reviews of this literature summarized in my various publications listed *supra* at note 4.
[8] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), *available at* http://www.psych.org/File%20 Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf

27.     I should also point out that "solitary confinement" and "isolated confinement" are

terms of art in correctional practice and scholarship. For perhaps obvious reasons, total and

absolute solitary confinement—literally complete isolation from any form of human contact—

does not exist in prison and never has. Instead, the term is generally used to refer to conditions of

extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely

consistent with its use in the broader correctional literature, as:

> [S]egregation from the mainstream prisoner population in attached housing units
> or free-standing facilities where prisoners are involuntarily confined in their cells
> for upwards of 23 hours a day or more, given only extremely limited or no
> opportunities for direct and normal social contact with other persons (i.e., contact
> that is not mediated by bars, restraints, security glass or screens, and the like), and
> afforded extremely limited if any access to meaningful programming of any
> kind.[9]

28.     This definition is similar to the one employed by the National Institute of

Corrections (NIC), as cited by Chase Riveland in a standard reference work on solitary-type

confinement that was sponsored and disseminated by the United States Department of Justice.

Riveland noted that the NIC itself had defined solitary or "supermax" housing as occurring in a

"freestanding facility, or a distinct unit within a freestanding facility, that provides for the

management and secure control of inmates" under conditions characterized by "separation,

restricted movement, and limited access to staff and other inmates."[10] More recently, the

Department of Justice employed a similar definition, noting that "the terms 'isolation' or

'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours

---

[9] Haney, *The Social Psychology of Isolation, supra* note 4, at footnote 1.
[10] Chase Riveland, *Supermax Prisons: Overview and General Considerations. National Institute of Corrections.* Washington DC: United States Department of Justice (1999), at p. 3, *available at* http://static.nicic.gov/Library/014937.pdf

per day or more, alone or with other prisoners, that limits contact with others… An isolation unit means a unit where all or most of those housed in the unit are subjected to isolation."[11]

### a. Scientific Research on the Painful and Harmful Effects of Isolated Confinement

29.    In the admitted absence of a single "perfect" study of the phenomenon,[12] there is a substantial body of published literature that clearly documents the distinctive patterns of psychological harm that can and do occur when persons are placed in solitary confinement. These broad patterns have been consistently identified in personal accounts written by persons confined in isolation, in descriptive studies authored by mental health professionals who worked in many such places, and in systematic research conducted on the nature and effects of solitary or "supermax" confinement. The studies have now spanned a period of over four decades, and were

---

[11] United States Department of Justice, Letter to the Honorable Tom Corbett, Re: *Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation*, May 31, 2013, at p. 5 (emphasis in original), *available at* http://www.justice.gov/crt/about/spl/ documents/cresson_findings_5-31-13.pdf, citing also to Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005), where the United States Supreme Court described solitary confinement as limiting human contact for 23 hours per day; and Tillery v. Owens, 907 F.2d 418, 422 (3d Cir. 1990), where the Third Circuit described it as limiting contact for 21 to 22 hours per day.

[12] No more than basic knowledge of research methodology is required to design the "perfect" study of the effects of solitary confinement: dividing a representative sample of prisoners (who had never been in solitary confinement) into two groups by randomly assigning half to either a treatment condition (say, two or more years in solitary confinement) or a control condition (the same length of time residing in a typical prison housing unit), and conducting longitudinal assessments of both groups (i.e., before, during, and after their experiences), by impartial researchers skilled at gaining the trust of prisoners (including ones perceived by the prisoner-participants as having absolutely no connection to the prison administration). Unfortunately, no more than basic knowledge of the realities of prison life and the practicalities of conducting research in prisons is required to understand why such a study would be impossible to ever conduct. Moreover, any prison system that allowed truly independent, experienced researchers to perform even a reasonable approximation of such a study would be, almost by definition, so atypical as to call the generalizability of the results into question. Keep in mind also that the assessment process itself—depending on who carried it out, how often it was done, and in what manner—might well provide the solitary confinement participants with more meaningful social contact than they are currently afforded in a number of such units with which I am familiar, thereby significantly changing (and improving) the conditions of their confinement.

conducted in locations across several continents by researchers with different professional expertise, ranging from psychiatrists to sociologists and architects.

30.     As I noted in passing above, researchers and practitioners know that meaningful social interactions and social connectedness can have a positive effect on people's physical and mental health and, conversely, that social isolation in general is potentially very harmful and can undermine health and psychological well-being.[13] Not surprisingly, there is now a reasonably large and growing literature on the significant risk that solitary or so-called "supermax" confinement poses for the mental health of prisoners. The long-term absence of meaningful human contact and social interaction, the enforced idleness and inactivity, the oppressive security and surveillance procedures, and the accompanying hardware and other paraphernalia that are brought or built into these units combine to create harsh, dehumanizing, and deprived conditions of confinement. These conditions predictably can impair the psychological functioning of the prisoners who are subjected to them.[14] For some prisoners, these impairments can be permanent and life-threatening.

---

[13] For example, see: Brock Bastian & Nick Haslam, *Excluded from Humanity: The Dehumanizing Effects of Social Ostracism*, Journal of Experimental Social Psychology, 46, 107-113 (2010); Stephanie Cacioppo & John Cacioppo, *Decoding the Invisible Forces of Social Connections*, Frontiers in Integrative Neuroscience, 6, 51 (2012); DeWall, et al., *Belongingness as a Core Personality Trait: How Social Exclusion Influences Social Functioning and Personality Expression*, Journal of Personality, 79, 979-1012 (2011); Damiano Fiorillo & Fabio Sabatini, *Quality and Quantity: The Role of Social Interactions in Self-Reported Individual Health*, Social Science & Medicine, 73, 1644-1652 (2011); S. Hafner et al., *Association Between Social Isolation and Inflammatory Markers in Depressed and Non-depressed Individuals: Results from the MONICA/KORA Study*, Brain, Behavior, and Immunity, 25, 1701-1707 (2011); Johan Karremans, et al., *Secure Attachment Partners Attenuate Neural Responses to Social Exclusion: An fMRI Investigation*, International Journal of Psychophysiology, 81, 44-50 (2011); Graham Thornicroft, *Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation*, British Journal of Psychiatry, 158, 475-484 (1991).

[14] For example, see: Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, *Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample*, Criminal Justice and Behavior, 33, 760-781 (2006); Craig Haney, *Mental Health Issues in Long-Term Solitary and*

31.     For example, mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places. The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[15]

32.     A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[16] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[17] Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover,

---

"Supermax" Confinement, supra note 4; and Peter Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[15] Bruno M. Cormier & Paul J. Williams, Excessive Deprivation of Liberty, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, Canadian Psychiatric Association Journal, 12, 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, Effect of Solitary Confinement on Prisoners, American Journal of Psychiatry, 119, 771-773 (1963).

[16] Hans Toch, Men in Crisis: Human Breakdowns in Prisons. Aldine Publishing Co.: Chicago (1975).

[17] Id. at 54.

it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[18]

33.     More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[19]

---

[18] Ibid.

[19] In addition to the numerous studies cited in the articles referenced *supra* at notes 4 and 13, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, *L'Isolement Carceral*, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, *Einzelhaft: Eine Literaturubersicht* (Solitary confinement: A literature survey), Psychologie -Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft* (A controlled investigation on psychopathological effects of solitary confinement), Psychologie -Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung* (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, *Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej* (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the

34.     In addition, a number of correlational studies have been done examining the

relationship between housing type and various kinds of incident reports in prison. They show

that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as

administrative segregation and security housing or SHU, where prisoners are subjected to

solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and

Kerry Hughes attributed higher suicide rates in solitary confinement-type units to the heightened

levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and]

severely restricted living conditions" that exist there.[20] These authors reported that "the

conditions of deprivation in locked units and higher-security housing were a common stressor

shared by many of the prisoners who committed suicide."[21] In addition, signs of deteriorating

mental and physical health (beyond self-injury), other-directed violence, such as stabbings,

---

process of his resocialization"). See, also, Ida Koch, *Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems*, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted— "a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, *Long-Term Mental Sequelae of Political Imprisonment in East Germany*, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[20] Raymond Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004*, Psychiatric Services, 59, 676-682 (2008), at p. 678.

[21] Ibid. See also: Lindsay M. Hayes, *National Study of Jail Suicides: Seven Years Later*. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, *Vulnerability and Prison Suicide*, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, *Prison Suicide and Prisoner Coping*, Crime and Justice, 26, 283-359 (1999).

attacks on staff, property destruction, and collective violence are also more prevalent in these units.[22]

35.    The empirical consensus on the harmfulness of isolated or solitary-type confinement is very broad. I say that despite the fact that there is one study that has been cited for a different conclusion. The so-called "Colorado Study" of one year in "administrative segregation," is sometimes referenced as evidence that isolated confinement does not pose a significant risk to the psychological well-being of inmates. In addition to the fact that the Colorado Study focused on <u>one year</u> in administrative segregation, as opposed to the core issue in the present case—the effects of severe isolation for over a decade—there are several other reasons why the Colorado Study is a singularly inappropriate study on which to rely. They establish the fact that this study should not serve as the basis for minimizing or ignoring the grave risk of "psychological damage to inmates" that occurs in isolation units like those described in the complaint filed in the present case.

36.    For one, the Colorado Study has been roundly criticized by a number of researchers from a variety of disciplines (psychology, psychiatry, anthropology, history, and law) as deeply flawed in its methodology. Many of these experts have published critiques of the study

---

[22] For example, see: Howard Bidna, *Effects of Increased Security on Prison Violence*, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, *Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital*, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, *Felon Self-Mutilation: Correlate of Stress in Prison*, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, *Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators*, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, *The Implications of Research Explaining Prison Violence and Disruption*, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, *A Prison Environment: Its Effect on Health Care Utilization*, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, *Managing Violent Individuals in Correctional Settings*, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence*, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

in which they conclude that its methodological problems are so severe as to render the results

uninterpretable.[23]

37.     These and other kinds of methodological problems led well-known prison

researchers David Lovell and Hans Toch to note in their critique of the study that "[d]espite the

volume of the data, no systematic interpretation of the findings is possible."[24] Many other

published criticisms of the study's methodology reached similar conclusions.[25]

---

[23] The serious methodological problems include: the inappropriate exposure of all groups to the key treatment variable (isolation); the continued cross-contamination of the general population and administrative segregation groups throughout the study (confounding the interpretation of any differences or similarities between them); the use of a convenience and patchwork sample rather than a representative group of participants; the failure to record (and, therefore, the inability to quantify or code) the exact nature of the conditions of confinement (especially, the amount or degree of isolation) to which each participant or group of participants was exposed; employing a single, inexperienced research assistant with only a bachelor's degree (who wore a badge identifying her to the prisoners as a department of corrections employee) to collect *all* of the study data; problematic instances in which the research assistant questioned the truthfulness of the prisoners' responses and required them to "redo" the tests being administered; the total reliance on self-reported rating scales that were created through the disaggregation and reconstruction/recombination of subscales taken from other test batteries that had not been validated with prisoner populations; and the failure to utilize even a basic interview with the study participants or to make use of the behavioral observational data that were collected (that appeared at odds with the prisoner self reports).

[24] David Lovell & Hans Toch, *Some Observations about the Colorado Segregation Study*, Correctional Mental Health Report, May/June 2011, 3-4, 14.

[25] For example, see: Stuart Grassian & Terry Kupers, *The Colorado Study Versus the Reality of Supermax Confinement*, Correctional Mental Health Report, May/June 2011, 1-4; Lorna A. Rhodes & David Lovell, *Is Adaptation the Right Question? Addressing the Larger Context of Administrative Segregation: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Corrections & Mental Health, June 21, 2011, 1-9, *available at* http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components. PostAttachments/00.00.05.95.19/Supermax-_2D00_-T-_2D00_-Rhodes-and-Lovell.pdf; Sharon Shalev & Monica Lloyd, *If This Be Method, Yet There Is Madness in It: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Corrections & Mental Health, June 21, 2011, 1-7, *available at* http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.21/Supermax-_2D00_-T-_2D00_-Shalev-and-Lloyd.pdf; and Peter Scharff Smith, *The Effects of Solitary Confinement: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Corrections & Mental Health, June 21, 2011, 1-11, *available at* http://community.nicic.gov/cfs-

38.     In addition, two of the study's other authors, Jeffrey Metzner and Jamie Fellner, have published an article concluding that "[i]solation can be harmful to any prisoner," that the potentially adverse effects of isolation include "anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis."[26] In fact, their deep concerns over the harmfulness of isolated conditions of confinement led them to recommend that professional organizations "should actively support practitioners who work for changed segregation policies and they should use their institutional authority to press for a nationwide rethinking of the use of isolation" in the name of their "commitment to ethics and human rights."[27]

39.     The study's numerous and serious methodological flaws notwithstanding, the authors of the Colorado Study have themselves repeatedly taken public positions that explicitly acknowledge the potentially harmful effects of prolonged prison isolation; most of them have published articles, forwarded recommendations, and drafted position papers in favor of limiting the use of isolation altogether and, among other things, against housing mentally ill prisoners inside these kinds of units.

---

file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.22/Supermax-_2D00_-T-_2D00_-Smith.pdf.

[26] Jeffrey Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics,* Journal of the Academy of Psychiatry and Law, 38, 104-108 (2010), at p. 104, *available at* http://www.hrw.org/sites/default/files/related_material /Solitary%20Confinement%20and%20Mental%20Illness%20in%20US%20Prisons.pdf.

[27] Id. at p. 107. In addition to the serious methodological flaws that have been identified in the Colorado Study, and the positions that virtually all of its authors have taken acknowledging the harmful effects of isolation and opposing its use with mentally ill prisoners in particular, the Colorado Department of Corrections itself has moved over the last several years to both very significantly reduce the overall number of prisoners who are housed in isolation units (again, termed "administrative segregation" there). Memo to Wardens from Lou Archuleta, Interim Director of Prisons, Colorado DOC, December 10, 2013. See, also: Jennifer Brown, *Colorado Stops Putting Mentally Ill Prisoners in Solitary Confinement,* Denver Post, Dec. 12, 2013, *available at* http://www.denverpost.com/news/ci_24712664/colorado-wont-put-mentally-ill-prisoners-solitary-confinement.

40.    For example, Maureen O'Keefe, a researcher for the Colorado Department of Corrections and the primary author of the study, is on record as favoring significant reductions in the use of prison isolation (or "administrative segregation" as it is known in Colorado). She is also very clear about what she termed a misuse or misinterpretation of the study's results: "[W]e do not believe in any way and we do not promote the study as something to argue for the case of segregation… My interpretation is that people believe that this study sanctions administrative segregation for mentally ill and nonmentally ill alike… I do not believe that the conclusions lend to that and that is not the intended use of our study."[28]

41.    Indeed, the painfulness and damaging potential of solitary confinement is underscored by the fact that it is commonly used in so-called "brainwashing" and certain forms of torture. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture techniques.[29]

---

[28] Deposition of Maureen O'Keefe at 96, 101 (Oct. 25, 2013), Sardakowski v. Clements, No. 1:2012cv01326 (D. Colo. filed May 21, 2012) (Civil Action No. 12-CV-01326-RBJ-KLM).

[29] Solitary confinement is among the most frequently used psychological torture techniques. In D. Foster, *Detention & Torture in South Africa: Psychological, Legal & Historical Studies*, Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at p. 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at p. 136). See also: Matthew Lippman, The *Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 27 Boston College International & Comparative Law Review, 27, 275 (1994); Tim Shallice, *Solitary Confinement—A Torture Revived?* New Scientist, November 28, 1974; F.E. Somnier & I.K. Genefke, *Psychotherapy for Victims of Torture*, British Journal of Psychiatry, 149, 323-329 (1986); and Shaun R. Whittaker, *Counseling Torture Victims*, The Counseling Psychologist, 16, 272-278 (1988).

42.     The prevalence of psychological symptoms (that is, the percentage of prisoners who are placed in these units who suffer from these and related signs of psychological distress) is often very high. For example, in an early study that I conducted at the Security Housing Unit (SHU) at Pelican Bay State Prison in California, I did systematic assessments of a randomly selected sample of 100 prisoners who were housed there. The sample was randomly selected to ensure that it consisted of a representative group of SHU prisoners. The representativeness of the sample allowed me to estimate the prevalence of psychological trauma and isolation-related pathology among the population of PBSHU prisoners. In fact, I found that every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners who were interviewed.[30] Many of the symptoms were reported by two-thirds or more of the prisoners assessed in this isolated housing unit, and some were suffered by nearly everyone. Well over half of the prisoners who were isolated in the Pelican Bay SHU reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that are known to be stress-related.

43.     I also found that almost all of the prisoners whom I evaluated in the SHU reported ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with

_____

[30] See Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement supra* note 4.

22

more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

44.     Although these specific symptoms of psychological stress and the psychopathological reactions to isolation are numerous and well-documented, and provide important indices of the risk of harm to which isolated prisoners are subjected, there are other significant aspects to the psychological pain and dysfunction that solitary confinement can produce, ones that extend beyond these specific and more easily measured symptoms and reactions. Depriving people of normal social contact and meaningful social interaction over long periods of time can damage or distort their social identities, destabilize their sense of self and, for some, destroy their ability to function normally in free society.

45.     Psychological science has long recognized the critical role of social contact in establishing and maintaining emotional health and well-being. As one researcher put it: "Since its inception, the field of psychology emphasized the importance of social connections."[31] For example, the importance of "affiliation"—the opportunity to have meaningful contact with others—in reducing anxiety in the face of uncertain or fear-arousing stimuli is long established in social psychological literature.[32] In addition, one of the ways that people determine the appropriateness of their feelings—indeed, how we establish the very nature and tenor of our emotions—is through contact with others.[33] Prolonged social deprivation is painful and

---

[31] DeWall, C., *Looking Back and Forward: Lessons Learned and Moving Forward*, in C. DeWall (Ed.), The Oxford Handbook of Social Exclusion (pp. 301-303). New York: Oxford University Press (2013), at p. 301.

[32] For example, see: Stanley Schachter, *The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness*. Stanford, CA: Stanford University Press (1959); Irving Sarnoff & Philip Zimbardo, *Anxiety, Fear, and Social Affiliation*, Journal of Abnormal Social Psychology, 62, 356-363 (1961); Philip Zimbardo & Robert Formica, *Emotional Comparison and Self-Esteem as Determinants of Affiliation*, Journal of Personality, 31, 141-162 (1963).

[33] For example, see: A. Fischer, A. Manstead, & R. Zaalberg, *Social Influences on the Emotion Process*, in M. Hewstone & W. Stroebe (Eds.), European Review of Social Psychology (pp. 171-

destabilizing in part because it deprives persons of the opportunity to ground their thoughts and emotions in a meaningful social context—to know what they feel and whether those feelings are appropriate.

46.     Since this early research was conducted on the importance of affiliation, numerous scientific studies have established the psychological significance of social contact, connectedness and belongingness. They have concluded, among other things, that the human brain is literally "wired to connect" to others.[34] Thwarting this "need to connect" not only undermines psychological well-being but increases physical morbidity and mortality.

47.     Indeed, in part out of recognition of the importance of the human need for social contact, connection, and belongingness, social psychologists and others have written extensively about the harmful effects of its deprivation—what happens when people are subjected to social exclusion and isolation. Years ago, Herbert Kelman argued that denying persons of contact with others was a form of dehumanization.[35] More recently, others have documented the ways in which social exclusion is not only "painful in itself," but also "undermines people's sense of belonging, control, self-esteem, and meaningfulness, reduces pro-social behavior, and impairs self-regulation."[36] Indeed, the subjective experience of social exclusion results in what have been

---

202). Volume 14. Wiley Press (2004); C. Saarni, *The Development of Emotional Competence.* New York: Guilford Press (1999); Stanley Schachter & Jerome Singer, *Cognitive, Social, and Physiological Determinants of Emotional State*, Psychological Review, 69, 379-399 (1962); L. Tiedens & C. Leach (Eds.), *The Social Life of Emotions*. New York: Cambridge University Press (2004); and S. Truax, *Determinants of Emotion Attributions: A Unifying View*, Motivation and Emotion, 8, 33-54 (1984).

[34] Lieberman, M., Social: Why Our Brains Are Wired to Connect. New York: Random House (2013).

[35] Kelman, H., *Violence Without Restraint: Reflections on the Dehumanization of Victims and Victimizers*. In G. Kren & L. Rappaport (Eds.), Varieties of Psychohistory (pp. 282-314). New York: Springer (1976).

[36] Bastian & Haslam, *supra* note 12, at p. 107, internal references omitted.

called "cognitive deconstructive states" in which there is emotional numbing, reduced empathy, cognitive inflexibility, lethargy, and an absence of meaningful thought.[37]

48.      In fact, the editor of an authoritative *Oxford Handbook of Social Exclusion* concluded the volume by summarizing the "serious threat" that social exclusion represents to psychological health and well-being, including "increased salivary cortisol levels… and blood flow to brain regions associated with physical pain," "sweeping changes" in attention, memory, thinking, and self-regulation, as well as changes in aggression and prosocial behavior. As he put it: "This dizzying array of responses to social exclusion supports the premise that it strikes at the core of well-being."[38]

49.      In a broader sense, the social deprivation and social exclusion imposed by solitary confinement engenders *social pathology*—necessary adaptations that prisoners must make to live in an environment that is devoid of normal social contact—that is, to exist and function in the absence of meaningful interaction and closeness with others. In this socially pathological environment, prisoners have no choice but to adapt in socially pathological ways. As a result, prisoners gradually change their patterns of thinking, acting and feeling to cope with the profoundly asocial world in which they are forced to live, accommodating to the absence of social support and the routine feedback that comes from normal, meaningful social contact.

50.      There are several problematic features to the social pathologies that isolated prisoners are forced to adopt. The first is that, although these adaptations are functional—even *necessary*—under the isolated conditions in which they live, the fact that prisoners eventually "adjust" to the absence of others does not mean that the experience ceases to be painful. Some

---

[37] Twenge, J., Catanese, K., & Baumeister, R. (2003). *Social Exclusion and the Deconstructed State: Time Perception, Meaninglessness, Lethargy, Lack of Emotion, and Self Awareness.* Journal of Personality and Social Psychology, 85, 409-423 (2003).
[38] DeWall, *supra* note 33, at p. 302.

prisoners have told me that the absence of meaningful contact and the loss of closeness with others are akin to a dull ache or pain that never goes away. Others remain acutely aware of the relationships that have ended and the feelings that can never be rekindled.

51.     Second, some prisoners cope with the painful, asocial nature of their isolated existence by paradoxically creating even more distance between themselves and others. For some, the absence of others becomes so painful that they convince themselves that they do not need social contact of any kind—that people are a "nuisance," after all, and the less contact they have the better. As a result, they socially withdraw further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. Others move from initially being starved for social contact to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence.[39]

52.     Third, and finally, while these social pathological adaptations are functional and even necessary in the short-term, over time they tend to be internalized and persist long after the prisoner's time in isolation has ended. Thus, the adaptations move from being consciously employed survival strategies or noticeable reactions to immediate conditions of confinement to becoming more deeply ingrained ways of being. Prisoners may develop extreme habits, tendencies, perspectives, and beliefs that are difficult or impossible to relinquish once they are released. Although their adaptations may have been functional in isolation (or appeared to be so),

---

[39] For evidence that solitary confinement may lead to a withdrawal from social contact or an increased tendency to find the presence of people increasingly aversive or anxiety arousing, see: Cormier, B., & Williams, supra note 16; Haney, *supra* note 4; H. Miller & G. Young, *Prison Segregation: Administrative Detention Remedy or Mental Health Problem?*, Criminal Behaviour and Mental Health, 7, 85-94 (1997); Scott & Gendreau, *supra* note 16; Toch, *supra* note 17; and Waligora, *supra* note 20.

they are typically acutely dysfunctional in the social world most prisoners are expected to re-enter. In extreme cases, these ways of being are not only dysfunctional but have been internalized so deeply that they become disabling, interfering with the capacity to live a remotely normal or fulfilling social life. These individuals do not present an increased security risk due to these adverse symptoms of long-term solitary confinement. Persons who have been held in long-term solitary confinement are capable of abiding by the rules and regulations of the institution when released to the general prison population. However, their experience in long-term isolation can make their adjustment to general population painful and challenging, especially if the prison administration does not meaningfully assist them in re-socialization.

53.     It is also important to note that, although social deprivation is the source of the greatest psychological pain that prisoners experience in solitary confinement, and places them at the greatest risk of harm, prison isolation units deprive prisoners of many other things as well. Solitary confinement typically includes high levels of repressive control, enforced idleness, reduced environmental stimulation, and physical or material deprivations that also produce psychological distress and can exacerbate the negative consequences of social deprivation. Indeed, most of the things that we know are beneficial to prisoners—such as increased participation in institutional programming, contact visits with persons from outside the prison, opportunities for meaningful physical exercise or recreation, and so on[40]—are either functionally denied or greatly restricted for prisoners who are housed in isolation units. Thus, in addition to the social pathology that is created by the experience of solitary confinement, these other stressors also can produce additional negative psychological effects.

---

[40] J. Wooldredge, *Inmate Experiences and Psychological Well-Being*, Criminal Justice and Behavior, 26, 235-250 (1999).

54.     For example, we know that people in general require a certain level of mental and physical activity in order to remain mentally and physically healthy. Simply put, human beings need movement and exercise to maintain normal functioning. The severe restrictions that are imposed in isolation units—typically no more than an hour or so a day out of their cells—can negatively impact prisoners' well-being. Denying prisoners access to normal and necessary human activity places them at risk of psychological harm.

55.     Similarly, apart from the profound social, mental and physical deprivations that solitary confinement can produce, prisoners housed in these units experience prolonged periods of monotony and idleness. Many of them experience a form of sensory deprivation or "reduced environmental stimulation" —there is an unvarying sameness to the physical stimuli that surround them. These prisoners exist within the same limited spaces and are subjected to the same repetitive routines, day in and day out. There is little or no external variation to the experiences they are permitted to have or can create for themselves. They not only see and experience the same extremely limited physical environment, but also have minimal, routinized, and superficial contacts with the same very small group of people, again and again, for years on end. This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important skills and capacities.[41]

56.     In addition, conditions of solitary confinement in most prison isolation units deprive prisoners of the opportunity to give and receive caring human touch. This is certainly true of the Pennsylvania death row units in which all class plaintiffs are housed, where contact visits are absolutely prohibited. This means that these prisoners have gone decades without ever

---

[41] For examples of this range of symptoms, see: Brodsky & Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, Forensic Reports, 1, 267-280 (1988); Grassian, S., *Psychopathological Effects of Solitary Confinement*, American Journal of Psychiatry, 140, 1450-54 (1983); Haney, *supra* note 4; Miller & Young, *supra* note 41; and Volkart, et al., *supra* note 20.

touching another person with affection. Yet, psychologists have long known that: "Touch is central to human social life. It is the most developed sensory modality at birth, and it contributes to cognitive, brain, and socioemotional development and childhood."[42] The need for caring human touch is so fundamental that early deprivation is a risk factor for neurodevelopmental disorders, depression, suicidality, and other self-destructive behavior.[43] Later deprivation is associated with violent behavior in adolescents.[44] Recent theory and research now indicate that "touch is a primary platform for the development of secure attachments and cooperative relationships," is "intimately involved in patterns of caregiving," is a "powerful means by which individuals reduce the suffering of others," and also "promotes cooperation and reciprocal altruism."[45]

57.     The uniquely prosocial emotion of compassion "is universally signaled through touch," so that persons who live in a world without touch are denied the experience of receiving or expressing compassion in this way.[46] Researchers have found that caring human touch mediates a sense of security and place, a sense of shared companionship, of being and nurturing, feelings of worth and competence, access to reliable alliance and assistance, and guidance and

---

[42] Hertenstein, M., Keltner, D., App, B., Bulleit, B, & Jaskolka, A., *Touch Communicates Distinct Emotions*. Emotion, 6, 528-533 (2006), at p. 528. See, also: Hertenstein, M., & Weiss, S. (Eds.), The Handbook of Touch: Neuroscience, Behavioral, and Health Perspectives. New York: Springer (2011).
[43] For example, see: Cascio, C., *Somatosensory Processes in Neurodevelopmental Disorders*. Journal of Neurodevelopmental Disorders, 2, 62-69 (2010); Field, S., *Touch Deprivation and Aggression Against Self Among Adolescents*, in Stoff, D. & Susman, E. (Ed.), Developmental psychobiology of aggression (117-140). New York: Cambridge (2005).
[44] Field, T., *Violence and Touch Deprivation in Adolescents*, Adolescence, 37, 735-749 (2002)
[45] Goetz, J., Keltner, D., & Simon-Thomas, E., *Compassion: An Evolutionary Analysis and Empirical Review*, Psychological Bulletin, 136, 351-374 (2010), at p. 360.
[46] Stellar, J., & Keltner, D., *Compassion*, in Tugade, M., Shiota, M., & Kirby, L. (Eds.), Handbook of Positive Emotions (pp. 329-341). New York: Guilford (2014)

support in stressful situations.[47] A number of experts have argued that caring human touch is so integral to our well-being that it is actually therapeutic; it has been recommended to treat a host of maladies including depression, suicidality, and learning disabilities.[48]

58.     Not every isolated prisoner will suffer all of the previously described adverse psychological reactions to their severe conditions of confinement. However, the overall nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by others in the literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that it creates. The potentially devastating effects of these conditions are reflected in the characteristically high numbers of suicide deaths, incidents of self-harm and self-mutilation that occur in many of these units.

59.     The years of sustained research on solitary confinement, the negative outcomes that have been documented across time and locality, and the theoretical consistency of these findings with what is known more generally in the psychological literature about the harmful effects of isolation leave little doubt about its negative effects. These effects are not only painful but can do real harm and inflict real damage that is sometimes severe and can be irreversible. Indeed, for some prisoners, the attempt to cope with isolated confinement sets in motion a set of cognitive, emotional, and behavioral changes that are long-lasting. They can persist beyond the time that prisoners are housed in isolation and lead to long-term disability and dysfunction.

---

[47] Weiss, R., *The Attachment Bond in Childhood and Adulthood*, in C. Parkes, J. Stevenson-Hinde, & P. Marris (Eds.), Attachment Across the Life Cycle (66-76). London: Routledge (1995).
[48] For example, see: Dobson, S., Upadhyaya, S., Conyers, I., & Raghavan, R., *Touch in the Care of People with Profound and Complex Needs*, Journal of Learning Disabilities, 6, 351-362 (2002); Field, T., *Deprivation and Aggression Against Self Among Adolescents*. In D. Stoff & E. Susman(Eds.), Developmental Psychobiology of Aggression (pp. 117-140). New York: Cambridge (2005)

60.     Thus, the existing scientific knowledge on the painful and harmful nature of long-term isolated confinement is long-standing, robust, empirically well-documented, and theoretically sound.  In recent years, new insights about the fundamental human need for meaningful social contact and for caring human touch have added theoretical dimensions to the already existing substantial body of empirical data on these issues. These new insights add considerable weight to the long-standing consensus view: the experience of punitive isolation is not only painful but also places prisoners at significant risk of serious psychological harm.

### b.  A Shifting Correctional Consensus on the Painful and Harmful Effects of Isolated Confinement

61.     In addition to the increasingly broad and deep scientific consensus on the painfulness and harmfulness of isolated confinement, a number of state correctional systems have explicitly recognized the psychological risks as well as the added expense and overall ineffectiveness of punitive isolation and taken steps to significantly reduce its use. A New York Times Magazine article published several years ago is instructive on this issue as well. It reported the current views of Colorado officials, including the head of its Department of Corrections: "Gov. John W. Hickenlooper of Colorado signed [a bill banning solitary confinement for anyone under 21] at the urging of the state corrections chief, Rick Raemisch, who spent a night in solitary confinement and wrote about it in a New York Times Op-Ed. concluding that its overuse is 'counterproductive and inhumane.'"[49] In fact, just last year, Director Raemisch announced that he had ended the use of long-term solitary confinement in

---

[49] Binelli, supra note 1, at p. 40. For the Colorado Executive Director of Corrections Op Ed, see Raemisch, R., My Night in Solitary, New York Times, February 20, 2014 [available at: http://www.nytimes.com/2014/02/21/opinion/my-night-in-solitary.html?_r=0]

Colorado's state prisons, so that even prisoners "who commit serious violations like assault will now spend at most 15 days in solitary…"[50]

62.    Indeed, over the last several years, prison systems as diverse as Maine and Mississippi have drastically reduced the number of prisoners housed in solitary or isolated confinement.[51] In addition, several states have closed their primary solitary confinement units altogether. For example, in January, 2013, the Illinois Department of Corrections closed its supermax prison located at the Tamms Correctional Center.[52] In Colorado, in addition to reducing their administrative segregation population by nearly 37%, the Department of Corrections completely shut down a 316-bed administrative segregation facility.[53]

63.    Finally, the Vera Institute of Justice recently received funding from Department of Justice to launch a Safe Alternatives to Segregation Initiative ("SAFE Initiative") with the explicit goal assisting states and counties to reduce their use of segregation and solitary confinement and to develop effective alternatives to its use. The 11-member Vera SAFE

---

[50] Raemisch, R. 2017. Putting an end to long-term solitary. New York Times, October 13. https://www.nytimes.com/2017/10/12/opinion/solitary-confinement-colorado-prison.html

[51] For a discussion of the nature and impact of the reforms to punitive isolation in Mississippi, see Kupers, T., et al., Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Alternative Mental Health Programs, Criminal Justice & Behavior, 36, 1037- (2009); and Buntin, J., Exodus: How America's Reddest State—And Its Most Notorious Prison—Became a Model of Corrections Reform, Governing, 23, 20- (2010). For a discussion of the nature of the reforms to punitive isolation in Maine, see: Heiden, Z., Change Is Possible: A Case Study of Solitary Confinement Reform in Maine, ACLU of Maine, March, 2013 [available at: http://www.aclumaine.org/sites/default/files/uploads/users/admin/ACLU_Solitary_Report_webversion.pdf]; and Tapley, L., Reform Comes to the Supermax, Portland Phoenix, May 25, 2011 [available at: http://portland.thephoenix.com/news/121171-reform-comes-to-the-supermax/].

[52] See Tamms Correctional Center Closing—Fact Sheet, Illinois Department of Corrections. [available at: http://www.ilga.gov/commission.cgfa2006/upload/TammsMeetingTestimony Documents.pdf.]

[53] News Release, Department of Corrections, The Department of Corrections Announces the Closure of Colorado State Penitentiary II (March 19, 2012) [available at: http://www.doc.state.co.us/sites/default/files/Press%20release%20CSP%20II%20close%20%20Feb%201%2020 13.pdf]

Initiative Advisory Board includes several state corrections secretaries and deputy secretaries, including those in Colorado, New Mexico, and Washington, as well as the state in which the class plaintiffs have been kept in isolation for so long, Pennsylvania, who are publicly committed to developing ways of achieving significant reductions in the use of prison isolation.

### c.   Additional Legal and Human Rights Standards Addressing the Painful and Harmful Effects of Isolated Confinement

64.    Largely in response to the scientific evidence that I have summarized above, and out of the recognition that meaningful social contact and interaction is central to psychological health and well-being, the American Bar Association and virtually every major human rights and mental health organization in the United States as well as internationally have taken public stands in favor of significantly limiting solitary or isolated confinement use (if not abandoning it altogether). These organizations include major legal, medical, and health organizations, as well as faith communities and international monitoring bodies.

65.    For example, the United Nations' Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment concluded that solitary confinement for longer than 15 days constitutes torture, and that juveniles and people with mental illness should never be held in solitary confinement.[54] The American Academy of Child and Adolescent Psychiatry issued a statement opposing "the use of solitary confinement in correctional facilities for juveniles," stating that "any youth that is confined for more than 24 hours must be evaluated by a mental health professional," and aligning AACAP with the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which includes among "disciplinary measures

---

[54] Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, <u>Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment</u>, U.N. Doc A/66/268, ¶¶ 76-78 (Aug. 5, 2011).

33

constituting cruel, inhuman or degrading treatment" "closed or solitary confinement or any other

punishment that may compromise the physical or mental health of the juvenile concerned."[55]

American Public Health Association issued a statement in which it detailed the public-health

harms posed by solitary confinement, urged correctional authorities to "eliminate solitary

confinement for security purposes unless no other less restrictive option is available to manage a

current, serious, and ongoing threat to the safety of others," and recommended that "[p]unitive

segregation should be eliminated."[56]

66.     Various faith-based organizations have issued similar policy statements and

recommendations urging significant reductions in the use of solitary confinement and its outright

elimination for some populations. For example, New York State Council of Churches passed a

---

[55] American Academy of Child and Adolescent Psychiatry, Solitary Confinement of Juvenile
Offenders (2012) [available at
http://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of
_Juvenile_Offenders.aspx]. Calls for the prohibition of the use of isolated confinement for
vulnerable populations such as juveniles underscore the widespread recognition that it is a
psychologically painful and potentially very harmful environment. The same message is
conveyed by the numerous calls to significantly limit the duration of solitary confinement or to
eliminate its use altogether with prisoners who are mentally ill. For example, see, e.g., American
Psychiatric Association, Position Statement on Segregation of Prisoners with Mental Illness
(2012), available at http://www.psych.org/File%20Library/Learn/Archives/ps2012
_PrisonerSegregation.pdf ("Prolonged segregation of adult inmates with serious mental illness,
with rare exceptions, should be avoided due to the potential for harm to such inmates."); Mental
Health America, Seclusion and Restraints, Policy Position Statement 24 (2011), available at
http://www.nmha.org/positions/seclusion-restraints ("urg[ing] abolition of the use of seclusion to
control symptoms of mental illnesses"); National Alliance on Mental Illness, Public Policy
Platform Section 9.8, available at http://www.nami.org/Template.cfm?Section=NAMI_
Policy_Platform&Template=/ContentManagement/ContentDisplay.cfm&ContentID=38253
("oppos[ing] the use of solitary confinement and equivalent forms of extended administrative
segregation for persons with mental illnesses"); Society of Correctional Physicians, Position
Statement, Restricted Housing of Mentally Ill Inmates (2013), available at http://societyof
correctionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-
inmates ("acknowledg[ing] that prolonged segregation of inmates with serious mental illness,
with rare exceptions, violates basic tenets of mental health treatment," and recommending
against holding these prisoners in segregated housing for more than four weeks).
[56] American Public Health Association, Solitary Confinement as a Public Health Issue, Policy
No. 201310 (2013), available át http://www.apha.org/advocacy/policy/policysearch/default.
htm?id=1462

resolution in 2012 opposing the use of prison isolation and urging all members of the faith to participate in work to "significantly limit the use of solitary confinement."[57] Similarly, that same year, the Rabbinical Assembly called on prison authorities to end prolonged solitary confinement, and the solitary confinement of juveniles and of people with mental illness.[58]

67.     In fact, in recognition of the adverse mental health effects of segregated, solitary, or isolated confinement, the American Bar Association's Standards for Criminal Justice on the Treatment of Prisoners mandate that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable."[59] Moreover, the ABA requires that the mental health of *all* prisoners in segregated housing "should be monitored" through a process that should include daily correctional staff logs "documenting prisoners' behavior," the presence of a "qualified mental health professional" inside each segregated housing unit "[s]everal times a week," weekly observations and conversations between isolated prisoners and qualified mental health professionals, and "[a]t least every [90 days], a qualified mental health professional should perform a comprehensive mental health assessment of each prisoner in segregated housing" (unless such assessment is specifically deemed unnecessary in light of prior individualized observations).[60] In addition, at intervals "not to exceed [30 days], correctional

---

[57] New York State Council of Churches, Resolution Opposing the Use of Prolonged Solitary Confinement in the Correctional Facilities of New York State and New York City (2012), *available at* https://sites.google.com/site/nyscouncilofchurches /priorities/on-solitary-confinement; Presbyterian Church (USA), Commissioners' Resolution 11-2, On Prolonged Solitary Confinement in U.S. Prisons (2012), *available at* https://pc-biz.org/MeetingPapers/ (S(em2ohnl5h5sdehz2rjteqxtn))/Explorer.aspx?id=4389
[58] Rabbinical Assembly, Resolution on Prison Conditions and Prisoner Isolation (2012), *available at* http://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation?tp=377
[59] American Bar Association, ABA Criminal Justice Standards on the Treatment of Prisoners, Standard 23-2.6(a) (2010), *available at* http://www.americanbar.org /publications/criminal_ justice_section_archive/crimjust_standards_treatmentprisoners.html [hereinafter "ABA Standards"].
[60] ABA Standards, 23-2.8(b).

authorities should meet and document an evaluation of each prisoner's progress" in an evaluation

that explicitly "should also consider the nature of the prisoner's mental health," and at intervals

"not to exceed [90 days], a full classification review" should be conducted that addresses the

prisoner's "individualized plan" in segregation with "a presumption in favor of removing the

prisoner from segregated housing."[61]

68.     Moreover, in 2015 the United Nations Crime Commission approved the <u>Standard</u>

<u>Minimum Rules for the Treatment of Prisoners</u> (known as the "Mandela Rules") that contained

several provisions designed to significantly regulate and limit the use of solitary confinement.

Specifically, Rule 43.1 prohibits the use of "indefinite" and "prolonged" solitary confinement, as

well as the placement of prisoners in dark or constantly lit cells."[62] More generally, Rule 45.1

provides that solitary confinement "shall be used only in exceptional cases as a last resort, for as

short a time as possible…" and Rule 45.2 prohibits its use entirely "in the case of prisoners with

mental or physical disabilities when their conditions would be exacerbated by such measures."[63]

69.     Finally, in addition to prominent human rights, mental health, and legal

organizations, distinguished expert panels that have investigated and analyzed these issues have

reached similar conclusions. For example, in 2006, a landmark report was published that was

based in large part on a series of fact-finding hearings conducted across the United States by the

bipartisan Commission on Safety and Abuse in America's Prisons. In the course of the hearings,

---

[61] <u>ABA Standards</u>, 23-2.9. See, also: New York Bar Association, <u>Committee on Civil Rights</u>
<u>Report to the House of Delegates: Solitary Confinement in New York State 1-2 Resolution</u>
(2013), *available at* http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699, which
called on state officials to significantly limit the use of solitary confinement, and recommended
that solitary confinement for longer than 15 days be proscribed.
[62] Commission on Crime Prevention and Criminal Justice, <u>United Nations Standard Minimum</u>
<u>Rules for the Treatment of Prisoners (the Mandela Rules)</u>, United Nations Economic and Social
Council, May 21, 2015. The Commission defined "solitary confinement" as "confinement of
prisoners for 22 hours or more a day without meaningful human contact." See Rule 44.
[63] <u>Ibid</u>.

diverse groups of nationally recognized experts, stakeholders, and policymakers testified about a wide range of prison-related issues. Among other things, the Commission concluded that solitary and "supermax"-type units were "expensive and soul destroying"[64] and recommended that prison systems "end conditions of isolation."[65]

70.     The next year, in 2007, an international group of prominent mental health and correctional experts meeting on psychological trauma in Istanbul, Turkey issued a joint statement on "the use and effects of solitary confinement." In what has come to be known as the "Istanbul Statement," they acknowledged that the "central harmful feature" of solitary confinement is its reduction of meaningful social contact to a level "insufficient to sustain health and well being."[66] Citing various statements, comments, and principles that had been previously issued by the United Nations—all recommending that the use of solitary confinement be carefully restricted or abolished altogether—the Istanbul group concluded that "[a]s a general principle solitary confinement should only be used in very exceptional cases, for as short a time as possible and only as a last resort." Notably, the specific recommendations they made about how such a regime should be structured and operated would, if adopted, end most forms of long-term isolated confinement.

71.     In summary, the conclusion that long-term solitary or isolated confinement subjects prisoners to grave risk of serious psychological harm continues to be theoretically sound, has widespread and growing empirical support, and now reflects the overwhelming

---

[64] Gibbons, John, and Katzenbach, Nicholas. Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons. New York: Vera Institute of Justice (2006), at p. 59, *available at* http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.
[65] Id. at p. 57.
[66] International Psychological Trauma Symposium, Istanbul Statement on the Use and Effects of Solitary Confinement. Istanbul, Turkey (December 9, 2007), *available at* http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.pdf

consensus view of human rights, mental health, and legal organizations as well as expert groups

that have carefully considered the issue.

### D.  Consensus on Limiting to Very Brief Exposure, Only After a Showing of Absolute Need or Necessity, and the Exclusion of Vulnerable Populations

72.      It is worth emphasizing that the widespread recognition of the painful and harmful

mental and physical effects of prison isolation that I have summarized above has led to a

consensus about three critically important limits that must be applied to such confinement: 1) the

time or duration that a person is exposed to solitary confinement must be minimized, 2) the risks

of harm are so great that solitary confinement should be used only when it is absolutely

necessary and as a last resort, and 3) the added risk of harm to vulnerable groups or individual

prisoners means that they should be exempted entirely from prolonged solitary confinement.

73.      Thus, virtually every mental health, legal, and human rights standard and set of

recommendations concerning solitary confinement acknowledges that the risk of harm from

isolation is time- or dose-dependent—that is, because the risks of psychological and physical

damage increase as a function of the increased length of exposure, the use of solitary

confinement should be limited to the briefest amount of time possible. In addition to those

organizations that call for an outright ban on the use of solitary confinement because of its

recognized harmful effects, below is a summary of just some of the recommendations that have

been issued on time limits—limits that are typically measured in days and weeks (not years or

decades, as in the present case):

> —The United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment wrote in 2011 that in his opinion solitary confinement lasting more than <u>15 days</u> can constitute "torture;"[67]

---

[67] Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, <u>Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment</u>, U.N. Doc A/66/268, ¶¶ 76-78 (Aug. 5, 2011).

——The American Bar Association's 2010 Standards for Criminal Justice hold that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable"[68] and that at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing;"[69]

——The prominent mental health and correctional experts meeting on psychological trauma in 2007 in Istanbul, Turkey who issued the "Istanbul Statement" concluded that "[a]s a general principle solitary confinement should only be used... for as short a time as possible;"[70]

—— The American Academy of Child and Adolescent Psychiatry's 2012 policy statement on the solitary confinement of juveniles states that "any youth that is confined for more than 24 hours must be evaluated by a mental health professional;"[71]

——The New York Bar Association in 2013 called on state officials to significantly limit the use of solitary confinement and recommended that solitary confinement for longer than 15 days be proscribed;[72]

—— The Society of Correctional Physicians concluded that segregating mentally ill prisoners on a "prolonged" basis lasting for more than four weeks should be prohibited;[73]

——The American Psychiatric Association (APA) recommended in 2012 that "prolonged segregation" (which it defined as segregation lasting longer than four weeks) of prisoners

---

[68] American Bar Association, ABA Criminal Justice Standards on the Treatment of Prisoners, Standard 23-2.6(a) (2010), available at http://www.americanbar.org /publications/criminal_ justice_section_archive/crimjust_standards_treatmentprisoners.html [hereinafter "ABA Standards"].

[69] ABA Standards, 23-2.9 (emphases added).

[70] International Psychological Trauma Symposium, Istanbul Statement on the Use and Effects of Solitary Confinement. Istanbul, Turkey (December 9, 2007), available at http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.pdf.

[71] American Academy of Child and Adolescent Psychiatry, Solitary Confinement of Juvenile Offenders (2012) (emphasis added), available at http://www.aacap.org/AACAP/ Policy_Statements/2012/Solitary_Confinement_of _Juvenile_Offenders.aspx

[72] New York Bar Association, Committee on Civil Rights Report to the House of Delegates: Solitary Confinement in New York State 1-2 Resolution (2013), available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699. See also the Rabbinical Assembly, Resolution on Prison Conditions and Prisoner Isolation (2012), available at http://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation?tp=377, which called on prison authorities to end prolonged solitary confinement.

[73] Society of Correctional Physicians, Position Statement, Restricted Housing of Mentally Ill Inmates (2013), available at http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates.

with serious mental illness "with rare exceptions, should be avoided due to the potential for harm to such inmates;"[74]

— And the United Nations Commission on Crime Prevention and Criminal Justice's <u>Standard Minimum Rules for the Treatment of Prisoners</u> passed just last year defined " prolonged solitary confinement" as lasting "for a time period in excess of 15 consecutive days," and mandated that such prolonged confinement "shall be prohibited."[75]

74.　　　Many of these same organizations and agencies similarly emphasized that the grave risk of serious harm from solitary confinement require that it be used only upon a showing of absolute necessity. For example, the authors of the "Istanbul Statement" concluded that "[a]s a general principle solitary confinement should only be used in very exceptional cases… and only as a last resort,"[76] and the United Nations used almost identical language in formulating the "Mandela Rules" for the <u>Treatment of Prisoners</u>, mandating that solitary confinement "shall be used only in exceptional cases as a last resort."[77]

75.　　　Moreover, expert, legal, and human rights organizations also have recommended that, because of the increased grave risk of serious harm to which solitary confinement exposes them, vulnerable prisoners should be *exempted* from any form of prolonged placement. Thus, as I noted earlier, the American Psychiatric Association (APA) has recommended that "prolonged segregation" of prisoners with serious mental illness "with rare exceptions, *should be avoided*

---

[74] American Psychiatric Association, <u>Position Statement on Segregation of Prisoners with Mental Illness</u> (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf.
[75] See Commission on Crime Prevention and Criminal Justice, <u>United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules)</u>, United Nations Economic and Social Council, May 21, 2015, Rule 43.1 and Rule 44.
[76] International Psychological Trauma Symposium, <u>Istanbul Statement on the Use and Effects of Solitary Confinement</u>. Istanbul, Turkey (December 9, 2007), *available at* http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.pdf.
[77] Commission on Crime Prevention and Criminal Justice, <u>United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules)</u>, United Nations Economic and Social Council, May 21, 2015, Rule 45.1.

due to the potential for harm to such inmates,"[78] and United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 45.2, prohibits its use entirely "in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures."[79]

76.    The Pennsylvania DOC's requirement that all death-sentenced prisoners be housed in solitary confinement is inconsistent with the mainstream correctional practice detailed above, and does not promote safety and security. Because the Class Members' placement in solitary confinement is not based on disciplinary violations or individualized considerations of their behavior, there is no penological purpose for this use of isolation. No individualized assessment is conducted and no classification component exists within the Pennsylvania DOC policy on capital case management; Class Members are relegated to solitary confinement based on their conviction alone.

## V.    THE EXACERBATING EFFECTS OF ISOLATION ON MENTAL ILLNESS

77.    Although isolated confinement creates obvious risks of harm for all, most experts acknowledge that the adverse psychological effects of isolated or solitary confinement vary as a function not only of the specific nature and duration of the isolation (such that more deprived

---

[78] American Psychiatric Association, Position Statement on Segregation of Prisoners with Mental Illness (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf.

[79] See Commission on Crime Prevention and Criminal Justice, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules), United Nations Economic and Social Council, May 21, 2015, Rule 45.2. See, also: American Academy of Child and Adolescent Psychiatry, Solitary Confinement of Juvenile Offenders (2012), *available at* http://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of _Juvenile_Offenders.aspx, which opposes "the use of solitary confinement in correctional facilities for juveniles"; Mental Health America, Seclusion and Restraints, Policy Position Statement 24 (2011), *available at* http://www.nmha.org/positions/seclusion-restraints, "urg[ing] abolition of the use of seclusion . . . to control symptoms of mental illnesses"; and the National Alliance on Mental Illness, Public Policy Platform Section 9.8, *available at* http://www.nami.org/Template.cfm?Section=NAMI_Policy_Platform&Template=/ContentMana gement/ContentDisplay.cfm&ContentID=38253, "oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses."

conditions experienced for longer amounts of time are likely to have more detrimental

consequences) but also as a function of the characteristics of the prisoners subjected to it.

Unusually resilient prisoners may be able to withstand even harsh forms of solitary confinement

with few or minor adverse effects. Conversely, some prisoners are especially vulnerable to the

psychological pain and pressure of solitary confinement. Mentally ill prisoners are particularly at

risk in these environments and have been precluded from them precisely because of this. There

are several reasons why this is so.

78.     For one, as I have noted, solitary confinement or isolation is a significantly more

stressful and psychologically painful form of prison confinement for most prisoners. Mentally ill

prisoners are generally more sensitive and reactive to psychological stressors and emotional pain.

In many ways, the harshness and severe levels of deprivation that are imposed on them in

isolation are the antithesis of the benign and socially supportive atmosphere that mental health

clinicians seek to create within therapeutic environments. Not surprisingly, mentally ill prisoners

generally deteriorate and decompensate when they are placed in solitary confinement.

79.     Some of the exacerbation of mental illness that occurs in isolated confinement

comes about as a result of the critically important role that social contact and social interaction

play in maintaining psychological equilibrium. The esteemed psychiatrist Harry Stack Sullivan

once summarized the clinical importance of meaningful social contact by observing that "[w]e

can't be alone in things and be very clear on what happened to us, and we… can't be alone and

be very clear even on what is happening in us very long—excepting that it gets simpler and

simpler, and more primitive and more primitive, and less socially acceptable."[80] Social contact

---

[80] Harry Stack Sullivan, The Illusion of Personal Individuality, *Psychiatry*, 12, 317-332 (1971),
at p. 326.

and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

80.    Thus, one of the most fundamental ways in which isolation psychologically destabilizes prisoners is that it undermines their sense of self or social identity and erodes their connection to a shared reality. Isolated prisoners have few, if any, opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[81]

In extreme cases, a related pattern emerges: solitary confinement becomes so painful, so bizarre, and so impossible to make sense of that some prisoners create their own reality—they live in a world of fantasy instead of the intolerable one that surrounds them.

81.    Finally, many of the direct negative psychological effects of isolation are very similar if not identical to certain symptoms of mental illness. Even though these specific effects are typically thought to be less chronic or persistent when produced by the prisoner's conditions of confinement than those that derive from a diagnosable mental illness, when they occur in combination they are likely to exacerbate not only the outward manifestation of the symptoms but also the internal experience of the disorder. For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depressed mood. For clinically depressed prisoners, these situational effects are likely to exacerbate their pre-existing chronic condition and lead to worsening of their depressed state.

---

[81] Compare, also, Margaret K. Cooke & Jeffrey H. Goldstein, *Social Isolation and Violent Behavior, Forensic Reports, 2,* 287-294 (1980), at p. 288.

Similarly, the mood swings that some prisoners report in isolation would be expected to amplify the emotional instability that prisoners diagnosed with bi-polar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the frustration, irritability, and anger that many isolated prisoners report experiencing. And prisoners prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the stabilizing influence of social feedback.

82.     As a result of the special vulnerability of mentally ill prisoners to the psychological effects of isolated or supermax confinement, corrections officials and courts that have considered the issue have prohibited them from being placed in such units. In addition, mental health staff in most prison systems with which I am familiar are charged with the responsibility not only of screening prisoners in advance of their possibly being placed in isolation (so that the mentally ill can be excluded) but also of monitoring prisoners who are currently housed in solitary confinement for signs of emerging mental illness (so that they, too, can be removed). For example, one court that was presented with systematic evidence of the psychological risk of harm that supermax-type confinement entailed concluded that the seriously mentally ill must be excluded from such environments. Thus, the court noted that those prisoners for whom the psychological risks were "particularly"—and unacceptably—high included anyone suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in [solitary confinement]."[82] The court elaborated on this conclusion by noting that those who should be excluded from isolated, "supermax" confinement included:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates,

---

[82] *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995).

placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[83]

83.     The accumulated weight of the scientific evidence that I have cited to and summarized above demonstrates the negative psychological effects of isolated confinement—what happens to people who are deprived of normal social contact for extended periods of time. This evidence underscores the dangers isolation creates for human beings in the form of mental pain and suffering and increased tendencies towards self-harm and suicide. This evidence further underscores the psychological importance of meaningful social contact and interaction, and in essence establishes these things as identifiable human needs. Over the long-term, they may be essential to a person's psychological well-being as adequate food, clothing, and shelter are to his or her physical well-being.

## VI.    THE USE OF SOLITARY CONFINEMENT IN PENNSYLVANIA DEATH ROW

84.     As I noted above, the adverse psychological effects of solitary confinement are thought to vary as a function of the specific nature and duration of the isolated conditions to which prisoners are exposed. In this regard, there are better and worse isolation or supermax units, including some that seek to ameliorate the harsh conditions that they impose and try to minimize the harm they inflict on prisoners. And, as I also acknowledged, there are more and less resilient prisoners. But neither of these facts challenges the overall consensus that has emerged on the harmful effects of long-term isolation and the serious risk of such harm that this form of confinement poses for all prisoners who are subjected to it.

---

[83] *Ibid.*

85.     As I indicated in my initial summary of my expert opinions, my evaluation of the

exact nature and the effects of the conditions of isolation in the Pennsylvania DOC has just

begun.  I look forward to conducting onsite inspections of conditions of confinement at SCI

Greene and SCI Graterford, interviewing Class Members, and reviewing a substantial amount of

discovery materials.

86.     However, there are several things that I can say at the outset of this analysis. By

policy, death-sentenced prisoners are placed in Security Level 5 Housing Units.[84] Conditions of

confinement in Security Level 5 units—mandated by statewide policy—include continuous

segregation from the general prison population and extremely limited out-of-cell time and

opportunities to interact with other human beings in a meaningful way.[85] Policy allows for up to

ten hours of exercise on weekdays in two hour blocks, which means that prisoners are essentially

confined alone for 22-24 hours daily in a small cell, the size of a regular parking space.[86] Their

"exercise" takes place in a designated exercise yard, which is very small and cage-like.[87] Aside

from showers on three specified weekdays, this is virtually the only out-of-cell time that death-

sentenced prisoners in Pennsylvania receive.[88] On weekends, death-sentenced prisoners are

confined to their cells for 24 hours a day and thus may be denied human interaction for as long

as 70 consecutive hours between Friday morning and Monday morning.[89] Even if allowed a

---

[84] Pa. Dep't of Corrections, Administrative Manual 6.5.8, Capital Case Administration, p. 1.
[85] *See* Pa. Dep't of Corrections, Administrative Manual 6.5.1, Administration of Security Level 5 Housing Units.
[86] Ex. A, Declaration of Anthony Reid, at ¶ 14; Ex. B, Declaration of Ricardo Natividad, at ¶ 14; Ex. D, Declaration of Ronald Gibson, at ¶ 12; Ex. E, Declaration of Jermont Cox, at ¶ 20.
[87] *Ibid*; Pa. Dep't of Corrections, Administrative Manual 6.5.1, Administration of Security Level 5 Housing Units, p. 1-2.
[88] Sometimes there are occasional trips to the library, and sporadic, exclusively non-contact, visits from clergy and family members. (Compl. ¶¶ 29-30).
[89] Compl. ¶ 30.

46

single visitor on a weekend, those visits are mediated between glass, thus foreclosing human touch.[90]

87.     Prisoners who are sentenced to death are denied access to the prison's educational programming.[91] Indeed, access to any programming or activity of any kind appears extremely limited in these units.[92] The stark conditions in isolation are further exacerbated by policies that allow for 24 hour illumination in these cells;[93] the intense, jarring noises of steel slamming against steel every 15 to 30 minutes;[94] limited property, including lack of access to TVs or radios;[95] invasive strip searches each time a prisoner is allowed to leave their cell;[96] and the years and years that the Class Members spend in such conditions.

88.     It is my opinion that the conditions of extreme social isolation and enforced idleness that were described in the documents that I reviewed are very similar, if not virtually identical, to the types of isolation conditions that I have seen and studied in other correctional institutions. Such conditions are harsh and severe and are precisely the kind of circumstances that create a risk of substantial harm for all the prisoners who are subjected to them.

_____

[90] Ex. A, Declaration of Anthony Reid, at ¶ 16-18; Ex. B, Declaration of Ricardo Natividad, at ¶ 15; Ex. C, Declaration of Mark Newton Spotz, at ¶ 18; Ex. D, Declaration of Ronald Gibson, at ¶ 30; Ex. E, Declaration of Jermont Cox, at ¶ 23-24.
[91] Ex. A, Declaration of Anthony Reid, at ¶ 21; Ex. B, Declaration of Ricardo Natividad, at ¶ 20; Ex. C, Declaration of Mark Newton Spotz, at ¶¶ 19-22; Ex. D, Declaration of Ronald Gibson, at ¶ 17; Ex. E, Declaration of Jermont Cox, at ¶ 25.
[92] *Ibid.*
[93] Pa. Dep't of Corrections, Administrative Manual 6.5.1, Administration of Security Level 5 Housing Units, p. 34; Ex. A, Declaration of Anthony Reid, at ¶ 9; Ex. B, Declaration of Ricardo Natividad, at ¶10; Ex. C, Declaration of Mark Newton Spotz, at ¶ 9; Ex. D, Declaration of Ronald Gibson, at ¶¶ 18-19; Ex. E, Declaration of Jermont Cox, at ¶¶ 9-10.
[94] Ex. C, Declaration of Mark Newton Spotz, at ¶ 10; Ex. E, Declaration of Jermont Cox, at ¶ 10.
[95] Pa. Dep't of Corrections, Administrative Manual 6.5.1, Administration of Security Level 5 Housing Units, p. 9-10.
[96] *Ibid.* at 9; Ex. A, Declaration of Anthony Reid, at ¶ 12; Ex. B, Declaration of Ricardo Natividad, at ¶ 13; Ex. C, Declaration of Mark Newton Spotz, at ¶ 15; Ex. D, Declaration of Ronald Gibson, at ¶ 11; Ex. E, Declaration of Jermont Cox, at ¶¶ 18-19.

89.     In addition, the documents that I reviewed indicate that the DOC has no written policy prohibiting death-sentenced prisoners suffering from existing mental illness from being housed in solitary confinement. It is clear that such death-sentenced prisoners are housed in solitary confinement.[97]

90.     While the Pennsylvania DOC addresses mental health services in its policy, requiring mental health staff to visit the Security Level 5 Units five times per week and interview each prisoner monthly, mental health services are seemingly inadequate.[98] The policy only requires an annual psychological or psychiatric exam to prisoners housed in isolated units.[99] However, all of the Named Plaintiffs report ongoing symptoms of mental illness, including heightened anxiety, feelings of social vulnerability, depression, irritability, suicidal thoughts and attempts, self-mutilation, and hallucinations.[100] Mental health assessment, diagnosis, and treatment in these units are severely lacking, considering the symptoms the Named Plaintiffs experience and the lack of meaningful contact with mental health staff reported.[101]

91.     I reviewed the declarations of all named plaintiffs who are currently housed in solitary confinement. These plaintiffs describe symptoms of mental suffering, increased mental illness, suicidal thoughts and acts, and hallucinations.[102] The problems described by the plaintiffs are consistent with the types of symptoms and suffering that I would expect to find in a system

---

[97] Ex. C, Declaration of Mark Newton Spotz, at ¶¶ 28-29.
[98] Pa. Dep't of Corrections, Administrative Manual 6.5.1, Administration of Security Level 5 Housing Units, p. 24-25; Ex. A, Declaration of Anthony Reid, at ¶ 15; Ex. D, Declaration of Ronald Gibson, at ¶ 14.
[99] *Ibid.*
[100] Ex. A, Declaration of Anthony Reid, at ¶¶ 22-30; Ex. B, Declaration of Ricardo Natividad, at ¶¶ 21-23; Ex. C, Declaration of Mark Newton Spotz, at ¶¶ 28-39; Ex. D, Declaration of Ronald Gibson, at ¶¶ 24-30; Ex. E, Declaration of Jermont Cox, at ¶¶ 29-39.
[101] Ex. A, Declaration of Anthony Reid, at ¶ 15; Ex. D, Declaration of Ronald Gibson, at ¶ 14.
[102] Ex. A, Declaration of Anthony Reid, at ¶¶ 22-30; Ex. B, Declaration of Ricardo Natividad, at ¶¶ 21-23; Ex. C, Declaration of Mark Newton Spotz, at ¶¶ 28-39; Ex. D, Declaration of Ronald Gibson, at ¶¶24-30; Ex. C, Declaration of Jermont Cox, at ¶¶ 29-39.

with the isolation policies and practices I have noted in the Pennsylvania Department of Corrections.

## VII.  CONCLUSION: LONG-TERM SOLITARY CONFINEMENT CRUELLY INFLICTS EXTREME PSYCHOLOGICAL PAIN AND LASTING DAMAGE

92.     As I noted repeatedly above, there is a robust scientific literature that establishes the adverse psychological effects of solitary or isolated confinement and the severe risk of harm to which prisoners in these units are exposed.

93.     For a variety of previously stated reasons, mentally ill prisoners are especially vulnerable to the painful stressors of isolated confinement and the risk that they incur from placement in such units are especially high. Indeed, they are so high as to lead correctional officials and courts across the county to exclude them from being placed there.

94.     Based on the documents that I have reviewed, the descriptions of the policies, procedures, and conditions that exist in and apply to Pennsylvania DOC's death row units render these units very similar, if not identical, to the conditions identified in the scientific literature I cited in this declaration.  Likewise, these policies, procedures and conditions are very similar to other solitary or "supermax" units that exist elsewhere in the country in which many of the adverse psychological effects identified in the literature have been repeatedly observed.

95.     Contrary to sound correctional practice and the weight of psychological and psychiatric opinion, the Pennsylvania DOC currently houses all death-sentenced prisoners in solitary confinement units without any rational justification and without affording them any process or mechanism to challenge their confinement or to rectify the harm this placement has inflicted on them.

96.     Pennsylvania DOC also, contrary to sound correctional practice and the weight of psychological and psychiatric opinion, fails to exclude mentally ill death-sentenced prisoners

from solitary confinement units. Its failure to have and implement policy that excludes these prisoners from solitary confinement places these prisoners at an unreasonable risk of harm. In addition, as I have noted, conditions of extreme isolation can create enormous harm in even previously healthy individuals. Pennsylvania DOC's apparent failure to put in place careful mental health monitoring policies for all death-sentenced prisoners places these prisoners at an unreasonable risk of harm due to the extremely isolated conditions of their confinement. These harms are extremely serious and sometimes irreversible, and can result in loss of psychological stability, impaired mental functioning, self-mutilation, and even death.

97.     The principles that are now used to limit the use of solitary confinement—that exposure should be brief, employed only when absolutely necessary and as a last resort, and that vulnerable populations should be entirely excluded from such confinement—are clearly applicable in the present case. As the complaint that I reviewed in this case indicates, the Class Members have been kept in solitary confinement for an extraordinary amount of time. The amount of time that they have been confined under these severe conditions greatly exceeds any of the limits recommended or countenanced by any legal, mental health, or human rights organization of which I am aware.

98.     In my experience working with correctional systems and the federal courts to address these issues in different states across the country, the policies and practices that are now in place in the Pennsylvania DOC system create significant risks of harm for all death-sentenced prisoners who are subjected to solitary confinement, but these risks, policies, and practices can be effectively addressed through system-wide relief that is ordered by the courts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 27th day of March 2018 in Santa Cruz, CA.

_Craig Haney, Ph.D, J.D_

Craig Haney, Ph.D., J.D.

**Exhibit 1**

CURRICULUM VITAE

Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

Co-Director,
UC Consortium on Criminal Justice Healthcare

home address:     317 Ocean View Ave.
                  Santa Cruz, California 95062
phone:            (831) 459-2153
fax:              (831) 425-3664
email:            psylaw@ucsc.edu

## PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

## EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |

1

| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

## HONORS AWARDS GRANTS

2016    Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council.

Psychology Department "Most Inspiring Lecturer"

2015    University of California Presidential Chair (2015-2018 Term)

Martin F. Chemers Award for Outstanding Research in Social Science

Excellence in Teaching Award (Academic Senate Committee on Teaching).

President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen).

Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council.

Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof]

2014    Distinguished Faculty Research Lecturer, University of California, Santa Cruz.

2013    Distinguished Plenary Speaker, American Psychological Association Annual Convention.

2012    Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States.

Invited Expert Witness, United States Senate, Judiciary Committee.

2011        Edward G. Donnelly Memorial Speaker, University of West Virginia
            Law School.

2009        Nominated as American Psychological Foundation William Bevan
            Distinguished Lecturer.

            Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate
            psychology majors).

2006        Herbert Jacobs Prize for Most Outstanding Book published on law
            and society in 2005 (from the Law & Society Association, for <u>Death
            by Design</u>).

            Nominated for National Book Award (by American Psychological
            Association Books, for <u>Reforming Punishment: Psychological Limits
            to the Pains of Imprisonment</u>).

            "Dream course" instructor in psychology and law, University of
            Oklahoma.

2005        Annual Distinguished Faculty Alumni Lecturer, University of
            California, Santa Cruz.

            Arthur C. Helton Human Rights Award from the American
            Immigration Lawyers Association (co-recipient).

            Scholar-in-Residence, Center for Social Justice, Boalt Hall School of
            Law (University of California, Berkeley).

2004        "Golden Apple Award" for Distinguished Teaching, awarded by the
            Social Sciences Division, University of California, Santa Cruz.

            National Science Foundation Grant to Study Capital Jury Decision-
            making

2002        Santa Cruz Alumni Association Distinguished Teaching Award,
            University of California, Santa Cruz.

            United States Department of Health & Human Services/Urban
            Institute, "Effects of Incarceration on Children, Families, and Low-
            Income Communities" Project.

            American Association for the Advancement of Science/American
            Academy of Forensic Science Project: "Scientific Evidence Summit"
            Planning Committee.

            Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

3

| 2000 | Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy. |
| | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
| | Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists. |
| 1999 | American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future") |
| | National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension). |
| 1997 | National Science Foundation Grant to Study Capital Jury Decision-making. |
| 1996 | Teacher of the Year (UC Santa Cruz Re-Entry Students' Award). |
| 1995 | Gordon Allport Intergroup Relations Prize (Honorable Mention) |
| | Excellence in Teaching Convocation, Social Sciences Division |
| 1994 | Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice. |
| 1992 | Psychology Undergraduate Student Association Teaching Award |
| | SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities |
| 1991 | Alumni Association Teaching Award ("Favorite Professor") |
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |

| | |
|---|---|
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree <u>Magna cum laude</u> with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

UNIVERSITY SERVICE AND ADMINISTRATION

| | |
|---|---|
| 2010-2016 | Director, Legal Studies Program |
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

WRITINGS AND OTHER CREATIVE ACTIVITIES <u>IN PROGRESS</u>

Books:

Context and Criminality: Deconstructing the Crime Master Narrative (working title, in preparation for APA Books).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

2014    The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006    Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books.

2005    Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press.

Monographs and Technical Reports

1989    Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

Articles in Professional Journals and Book Chapters

2018    "Restricting the Use of Solitary Confinement," Annual Review of Criminology, 1, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), Law & Policy, in press.

6

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. Journal of General Internal Medicine, in press.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), The Criminalization of Mental Illness, in press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique of Recent Literature Minimizing Its Harms," Crime and Justice, in press.

2017     "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). Analyses of Social Issues and Public Policy, 17, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," Punishment and Society, 19, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), Torture and Its Definition in International Law: An Interdisciplinary Approach (pp.139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, International Journal of Prisoner Health, 13, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), International Journal of Prisoner Health, 13, 41-48.

2016     "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), The Prison Journal, 96, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book Moral Disengagement: How People Do Harm and Live With Themselves, by A. Bandura], PsycCRITIQUES, 61(8).

2015    "When Did Prisons Become Acceptable Mental Healthcare
        Facilities?," Report of the Stanford Law School Three Strikes
        Project (with Michael Romano et al.) [available at:
        http://law.stanford.edu/wp-
        content/uploads/sites/default/files/child-
        page/632655/doc/slspublic/Report_v12.pdf ].

        "Emotion, Authority, and Death: (Raced) Negotiations in Capital
        Jury Negotiations" (with Mona Lynch), <u>Law & Social Inquiry</u>, <u>40</u>,
        377-405.

        "Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), APA
        <u>Handbook of Forensic Psychology</u> (pp. 415-436). Washington, DC:
        APA Books.

        "The Death Penalty" (with Joanna Weill & Mona Lynch), in B.
        Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp.
        451-510). Washington, DC: APA Books.

        "'Prisonization' and Latinas in Alternative High Schools" (with Aida
        Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in
        Education and Neoliberalism: Female Students and Cultures of
        Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal
        Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health
        Affairs</u>, <u>33:3</u> (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through
        Individual Empowerment: Applying Social Psychology in Prisons
        and Policing. Washington, DC: APA Books (in press).

        "Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty
        Mitigation: A Handbook for Mitigation Specialists, Investigators,
        Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight
        the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

        "Prison Effects in the Age of Mass Imprisonment," <u>Prison Journal</u>,
        <u>92</u>, 1-24.

8

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011    "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), <u>Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors</u> (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), <u>Michigan State Law Review</u>, 2011, 573-608.

2010    "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" <u>Connecticut Public Interest Law Review</u>, <u>9</u>, 139-196.

"Hiding From the Death Penalty," <u>Huffington Post</u>, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in <u>Sentencing and Justice Reform Advocate</u>, <u>2</u>, 3 (February, 2011).

2009    "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), <u>Law and Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary

Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>, <u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," <u>University of Missouri-Kansas City Law Review</u>, <u>77</u>, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), <u>Personality and Social Psychology Bulletin</u>, <u>35</u>, 807-814.

2008     "Counting Casualties in the War on Prisoners," <u>University of San Francisco Law Review</u>, <u>43</u>, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," <u>Hofstra Law Review</u>, <u>36</u>, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," <u>Criminal Justice and Behavior</u>, <u>35</u>, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), <u>Psychology and Law: Bridging the Gap</u> (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), <u>Dictionary of Prisons</u> (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006      "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

"Preface," D. Jones (Ed.), Humane Prisons. San Francisco, CA: Radcliffe Medical Press.

2005      "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), The Effects of Imprisonment (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), Harvard Journal of Hispanic Policy, 17, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), Report on Asylum Seekers in Expedited Removal. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004      "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), Psychology, Public Policy, and Law, 10, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), Psychology, Public Policy, and Law, 10, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), Psychology, Public Policy, and Law, 10, 618-621.

11

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," DePaul Law Review, 53, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review.

2002    "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), Taking Psychology and Law into the Twenty-First Century (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001      "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000      "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999      "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998      "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," Hastings Women's Law Journal, 9, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), La Raza Law Journal, 10, 645-690.

1997    "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), New York University Review of Law and Social Change, 23, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," Psychology, Public Policy, and Law, 3, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" Psychology, Public Policy, and Law, 3, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," Stanford Law Review, 49, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), Law and Human Behavior, 21, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" Studies in Law, Politics, and Society, 16, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," Santa Clara Law Review, 35, 547-609. [Reprinted in part in David Papke (Ed.), Law and Popular Culture, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," Indiana Law Journal, 70, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994     "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993     "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," Law and Human Behavior, 17, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). Forum, 19, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. Behavioral Science and Law, 10, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," Law and Human Behavior, 15, 183-204.

1988    "In Defense of the Jury," Contemporary Psychology, 33, 653-655.

1986    "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), Journal of Community Psychology, 14, 267-277.

1984    "Editor's Introduction.  Special Issue on Death Qualification," Law and Human Behavior, 8, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," Law and Human Behavior, 8, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," Law and Human Behavior, 8, 133-151.

"Evolving Standards and the Capital Jury," Law and Human Behavior, 8, 153-158.

"Postscript," Law and Human Behavior, 8, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), Perspectives in Psychology and Law.  New York:  John Wiley, pp. 43-54.

1983    "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982    "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981    "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980    "Juries and the Death Penalty:  Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Loh, Wallace (Ed.), <u>Social Research and the Judicial Process</u>. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979    "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society:  Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings," Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology" (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston. [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, Revisita de Psicologia Social, 1, 95-105 (1986).]

1973   "Social Roles, Role-Playing, and Education" (with P. Zimbardo), The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), International Journal of Criminology and Penology, 1, pp. 69-97. [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) Examining Deviance Experimentally. New York: Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. Justice and Corrections. New York: John Wiley, 1978; Research Methods in Education and Social Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern Sociology. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison. Toronto: Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), Social Science in Law: Cases, Materials, and Problems. Foundation Press, 1985: Siuta, Jerzy (Ed.), The Context of Human Behavior. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield

Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), <u>Menschenversuche (Experiments with Humans)</u>. Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo). <u>Naval Research Reviews</u>, <u>1-17</u>. [Reprinted in Aronson, E. (Ed.) <u>Readings About the Social Animal</u>. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) <u>Key Studies in Psychology</u>. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), <u>Basic Themes in Law and Jurisprudence</u>. Anderson Publishing, 2000.]

## MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

## INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)

2016     "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: <u>Coleman</u> and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015     "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014     "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013    "Isolation and Mental Health," <u>Michigan Journal of Race and Law</u> Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012    "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011    "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address,

Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007    "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006    "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

25

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005   "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004   "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address,

American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003        "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002        "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001        "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000        "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999        "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998        "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997    "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996    "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995    "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994    "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992    "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991        "Capital Jury Decisionmaking," Invited panelist, American
            Psychological Association Annual Convention, Atlanta, GA, August.

1990        "Racial Discrimination in Death Penalty Cases," Invited
            presentation, NAACP Legal Defense Fund Conference on Capital
            Litigation, August, Airlie, VA.

1989        "Psychology and Legal Change: The Impact of a Decade," Invited
            Address to Division 41 (Psychology and Law), American
            Psychological Association Annual Convention, New Orleans, LA.,
            August.

            "Judicial Remedies to Pretrial Prejudice," Law & Society Association
            Annual Meeting, Madison, WI, June.

            "The Social Psychology of Police Interrogation Techniques" (with R.
            Liebowitz), Law & Society Association Annual Meeting, Madison,
            WI, June.

1987        "The Fourteenth Amendment and Symbolic Legality: Let Them Eat
            Due Process," APA Annual Convention, New York, N.Y. August.

            "The Nature and Function of Prison in the United States and
            Mexico: A Preliminary Comparison," InterAmerican Congress of
            Psychology, Havana, Cuba, July.

1986        Chair, Division 41 Invited Address and "Commentary on the
            Execution Ritual," APA Annual Convention, Washington, D.C.,
            August.

            "Capital Punishment," Invited Address, National Association of
            Criminal Defense Lawyers Annual Convention, Monterey, CA,
            August.

1985        "The Role of Law in Graduate Social Science Programs" and
            "Current Directions in Death Qualification Research," American
            Society of Criminology, San Diego, CA, November.

            "The State of the Prisons:  What's Happened to 'Justice' in the '70s
            and '80s?" Invited Address to Division 41 (Psychology and Law);
            APA Annual Convention, Los Angeles, CA, August.

| 1983 | "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September. |
|------|---|
| 1982 | "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July. |
| 1982 | "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March. |
| 1982 | "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April. |
| 1980 | "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September. |
|  | "On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April. |
|  | "Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January. |
| 1975 | "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April. |

## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

| 2016-present | Editorial Consultant, Translational Issues in Psychological Science. |
|------|---|

| | |
|---|---|
| 2015-present | Editorial Consultant, <u>Criminal Justice Review</u>. |
| 2014-present | Editorial Board Member, <u>Law and Social Inquiry</u>. |
| 2013-present | Editorial Consultant, <u>Criminal Justice and Behavior</u>. |
| 2012-present | Editorial Consultant, <u>Law and Society Review</u>. |
| 2011-present | Editorial Consultant, <u>Social Psychological and Personality Science</u>. |
| 2008-present | Editorial Consultant, <u>New England Journal of Medicine</u>. |
| 2007-present | Editorial Board Member, <u>Correctional Mental Health Reporter</u>. |
| 2007-present | Editorial Board Member, <u>Journal of Offender Behavior and Rehabilitation</u>. |
| 2004-present | Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press. |
| 2000-2003 | Reviewer, Society for the Study of Social Issues Grants-in-Aid Program. |
| 2000-present | Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues) |
| 1997-present | Editorial Board Member, <u>Psychology, Public Policy, and Law</u> |
| 1991 | Editorial Consultant, Brooks/Cole Publishing |
| 1989 | Editorial Consultant, <u>Journal of Personality and Social Psychology</u> |
| 1988- | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985 | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |

| | |
|---|---|
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-1985 | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |
| 1993-present | <u>Psychology, Public Policy, and Law</u>, Editorial Consultant |

## GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of
Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs
designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of
legislative and budgetary proposals concerning the detention of undocumented
persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's
Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the
Constitution, Civil Rights, and Property Rights (Senators Brownback and
Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in
the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy
Task Force," member providing written policy recommendations to the
California legislature concerning overcrowding crisis in the California
Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice,
"Correctional Excellence" Program, providing instruction concerning conditions
of confinement and psychological stresses of living and working in correctional
environments to mid-level management corrections professionals, May, 2004-
2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice,
Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of
Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety,
August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint
Working Group with Senator James Webb and Congressional Staffs, 2011
Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special
Rapporteur on Torture Concerning the Overuse of Solitary Confinement,
New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of <u>The Growth of Incarceration in the United States: Exploring the Causes and Consequences</u> (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

## PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION

Hoptowit v. Ray  [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9ᵗʰ Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown  (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy  [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9ᵗʰ Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest  (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle  [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital  (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock  (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey  (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson  (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy  [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya  (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282

(1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding

on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities.

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

Exhibit 2

Professor Craig Haney

Statement of Compensation: My rate of compensation is $250/hour for out-of-court legal consulting, $350/hour for deposition and trial testimony.

Trial and Deposition Testimony Over the Past Four Years
(2014 through 2017)

2014    State v. Kleppinger (federal), hearing testimony.

United States v. Williams (federal), trial testimony.

State v. Carreon (state), hearing testimony.

Sardakowski v. Clements (federal), deposition testimony.

Parsons v. Ryan (federal), deposition testimony.

2015    State v. Lambright (state), trial testimony.

2016    United States v. Fell (federal), hearing testimony.

Johnson v. Wetzel, et al. (federal), trial testimony.

Braggs v. Dunn (federal), deposition testimony.

2017    Braggs v. Dunn (federal), trial testimony.

United States v. Con-Ui (federal), trial testimony.

BCCLA v. Attorney General of Canada (Supreme Court of British Columbia), trial testimony.

PRIORITY MAIL

neopost
03/10/2021
US POSTAGE $009.05

ZIP 19426
041M12252211

U.S.M.S.
X-RAY

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

ROY LEE WILLIAMS
S.C.I. Phoenix, #CF4784
1200 Mokychic Drive
Collegeville, PA 19426

KATE BARKMAN, Clerk
Federal Courthouse,
601 Market Street
Philadelphia, PA 19106-1797



PRIORITY MAIL ★

★★★ TRACKED
★★★ INSURED

UNITED STATES
POSTAL SERVICE®

For Domestic and International Use

Label 107R, May 2014

UNITED STATES
POSTAL SERVICE®

USPS TRACKING #

NEOPOST

Label 888-NP, Nov. 2014

9488 8178 9820 3207 3007 84