IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Roy Lee Williams,** *pro se,*<br>Plaintiff, | ♦<br>♦<br>♦ | Hon. Richard A. Lloret<br>U.S. Magistrate |
| *v.* | ♦<br>♦ | No. 2:21-CV-01248 |
| **John E. Wetzel,** *et al.,*<br>Defendants. | ♦<br>♦<br>♦ | § 1983 CIVIL ACTION |

## Motion for Partial Summary Judgment

Pursuant to Fed.R.Civ.P. 56, Plaintiff Roy Lee Williams requests the Court to grant him summary judgment as to liability on his § 1983 claim under the Eighth Amendment against Defendant Wetzel in his individual capacity and his claim under Title II of the ADA against Defendant Wetzel and the Pennsylvania Department of Corrections in their official capacities. The reasons therefor are set forth in the Plaintiff's declaration and undisputed facts in support of this motion.

### Declaration in Support of
### Motion for Partial Summary Judgment

Roy Lee Williams declares, subject to penalty of perjury under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the plaintiff in this case. The Complaint alleges that I have a mental health disability and that I was held in permanent, degrading, and inhuman solitary confinement without rationale for 27 years, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment and against Title II of the ADA.

2. In December 1993, I was placed in Maximum Administrative Custody.

3. In 1995, I was placed on the prison's mental health roster after a suicide

attempt. I informed the mental health staff that I was diagnosed with suicidal ideation as a child and placed in a mental hospital as a result.

4. I was confined alone for 23 hours a day in a small cell, the size of a regular parking spot.

5. My cell and cell block were illuminated by artificial light 24 hours a day, interfering with normal sleep.

6. I have experienced ruminations, intrusive thoughts, oversensitivity to external stimuli, irrational anger, irritability, difficulty with attention & memory, and a tendency to socially withdraw.

7. My feelings of depression and sadness have exacerbated by long-term isolation.

8. On weekday mornings, weather permitting, I was allowed to go outside in a small enclosure for no more than one hour.

9. On weekends, I was confined to my cell for as long as 70 consecutive hours between Friday morning and Monday morning; in instances where a holiday abuts a weekend, this period of isolation extended an additional 24 hours.

10. These dehumanizing conditions have been detrimental to my physical and psychological health.

## Statement of Undisputed Facts

11. Defendant Wetzel and the Pennsylvania Department of Corrections knew of the constitutional deficiencies in treatment of mentally ill incarcerated persons.

12. In a 2014 report, the Department of Justice found that the Defendants' use of solitary confinement toward mentally ill incarcerated persons created substantial risks of harm and denied them access to services and programs offered to other persons

(report available at www.justice.gov and at exhibit C in the complaint).

13. Following the success of the reforms implemented by the Defendants as a result of the investigation conducted by the DOJ as well as the changes made as a result of the settlement agreement, *Disability Rights Network of Pennsylvania v. Wetzel*, 1:13-cv-00635 (M.D. Pa., Jan. 9, 2015) (available at www.clearinghouse.net).

14. Several attorneys from the ACLU of Pennsylvania sent a letter to the Defendants. *See* letter from Witold Walczak to John E. Wetzel, Sec'y, Pa. Dep't of Corr., dated Feb. 13 2017 (attached as exhibit A).

15. In that letter, the ACLU outlined for the Defendants the reforms it must use to safely classify death-sentenced prisoners using procedures similar to its existing policy for non-capital prisoners with mental health disabilities. *Id.* at 1-3.

16. The Defendants rejected those proposals and "determined to continue to administer its current capital case housing policy." *See* letter from Theron R. Perez, Chief Counsel, Dep't of Corr. to Witold Walczak, June 9, 2017 (attached as exhibit B).

**Defendants are liable as a matter of law**

17. The Defendants' knew the use of prolonged isolation toward Plaintiff created a substantial risk of harm and denied him access to services and programs offered to other persons. First, the mental health staff were aware of Plaintiff's hospitalization as a child and particular vulnerability to suicide. Second, the Department of Justice Civil Rights Division informed the Defendants in 2014 about the constitutional deficiencies' in their practice of prolonged isolation toward the treatment of mentally ill incarcerated persons. Third, it is clear from the Defendants' letter rejecting the ACLU's proposals, failure to act, is adequately pled.

## Conclusion

"A prisoner's [sentence] does not strip him of his right to reasonable accommodations, and a prison's obligation to comply with the ADA and RA does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there." *Furgess v. Pa. Dep't of Corrs., 933 F. 3d 285, 291-92.*

For the foregoing reasons, the Court should grant partial summary judgmen on liability to the Plaintiff on his Eighth Amendment and Title II claims. The amount of damages due to the Plaintiff must be determined at trial.

Respectfully submitted,

*[signature]*  6/14/21

**Roy Lee Williams**, *pro se*   Date
SCI Phoenix, #CF 4784
1200 Mokychic Drive
Collegeville, PA 19426



IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Roy Lee Williams**, *pro se*, <br> Plaintiff, | : | Hon. Richard A. Lloret <br> U.S. Magistrate |
| *v.* | : | No. 2:21-CV-01248 |
| **John E. Wetzel**, *et al.*, <br> Defendants. | : | § 1983 CIVIL ACTION |

## Certificate of Service

I, the plaintiff, Roy Lee Williams, declare subject to penalty of perjury under 28 U.S.C § 1746, that I have caused a correct copy of the foregoing **Motion for Partial Summary Judgement** to be served on the following party via first-class U.S. Mail (postage pre-paid), on the date indicated:

John E. Wetzel
1920 Technology Parkway
Mechanicsburg, PA 17050

Respectfully submitted,

*[signature]*           6/14/21
**Roy Lee Williams**, *pro se*           **Date**
SCI Phoenix, #CF 4784
1200 Mokychic Drive
Collegeville, PA 19426

# ACLU
# Letter
# Exhibit A



**AMERICAN CIVIL LIBERTIES UNION of PENNSYLVANIA** — FOUNDATION

Eastern Region Office
P.O. Box 60173
Philadelphia, PA 19102
215-592-1513 T
215-592-1343 F

Central Region Office
P.O. Box 11761
Harrisburg, PA 17108
717-238-2258 T
717-236-6895 F

Western Region Office
247 Fort Pitt Blvd
Pittsburgh, PA 15222
412-681-7736 T
412-681-8707 F

February 13, 2017

BY E-MAIL: jowetzel@pa.gov

John E. Wetzel, Secretary
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

RE: Isolation conditions for death-sentenced prisoners

Dear Secretary Wetzel:

We are a coalition of national and state-based civil rights organizations and firms writing to express our concern about the conditions of isolation and solitary confinement imposed on Pennsylvania's death-sentenced prisoners. Over the past year we have investigated those conditions and concluded that the severity and length of isolation imposed on death-sentenced prisoners by the Commonwealth of Pennsylvania raises serious constitutional, human rights, and human dignity questions.

We know that the Department of Corrections (DOC) has taken important steps toward reform of solitary confinement and isolation practices under your leadership. We applaud that leadership and the work of your staff in implementing those reforms. Now we would like to meet with you to discuss the possibility of implementing reforms to the conditions for Pennsylvania's death-sentenced prisoners. We propose a meeting during the week of February 28 through March 3, 2017.

**<u>Conditions for Pennsylvania's Death-Sentenced Prisoners</u>**

As mentioned above, we have been investigating the conditions for death-sentenced prisoners in Pennsylvania for some time. Our investigation found conditions of extreme isolation, including 22 hours of solitary confinement Monday through Friday and 48 consecutive hours every weekend. Death-sentenced prisoners are forced to spend approximately 94% of their lives in a steel and concrete cell that measures 7 by 12 feet. In these tiny cells, prisoners eat, sleep, use the toilet, and spend almost all of their waking hours. Their ability to interact with other human beings is extremely limited; this is exacerbated by the fact that the cell doors are solid steel, increasing isolation because sound cannot easily pass through, making communication

extremely difficult. This means that any limited interactions prisoners have with officers or medical staff are attenuated and not meaningful. There are narrow windows in the cell door that permit only a restricted view onto the cell block, and the cells have only a limited view of the outside world. Prisoners are subject to 24-hour illumination with no period of natural darkness. All meals are eaten in the cell. Visits are all non-contact, behind a glass partition, and death-sentenced prisoners have no physical contact with family or loved ones or even counsel. They are permitted three 15-minute phone calls per week. And they are denied all access to congregate religious services, rehabilitative, vocational, educational, or other programs.

Death-sentenced prisoners are not afforded any opportunity to challenge or alter their conditions of confinement. They are held in automatic solitary confinement based solely upon their sentence. The result of this policy choice by the DOC is that death-sentenced prisoners are subject to these harsh conditions not because of their conduct in prison or any demonstrated dangerousness to staff or other prisoners; they are subject to this extreme isolation due to their sentences alone.

In Pennsylvania, death-sentenced prisoners spend decades in these conditions. This happens for a number of reasons related to the process of judicial review. The delays are unlikely to be shortened in the near future. For death-sentenced prisoners in Pennsylvania this means an average of over fifteen years in extreme isolation.

While Pennsylvania's death-sentenced prisoners pursue their appeals, they are forced to spend many years suffering the devastating effects of solitary confinement. Solitary confinement can cause serious and permanent harm.[1] Research consistently shows that solitary confinement is painful, stressful, and extremely psychologically harmful.[2] Such outcomes are

---

[1] *See generally* Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment* 18-23, INDIANA L.J. (forthcoming), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2411845 (summarizing the research on psychiatric harms of solitary confinement).

[2] For research on the cognitive and mental-health impairments that solitary confinement causes, see Craig Haney, *The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful*, 12 Prison Serv. J., at n. 1 (2009); B. Arrigo & J. Bullock, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change*, 52 INT'L J. OFFENDER THERAPY & COMPARATIVE CRIMINOLOGY 622-40 (2008); Kristin Cloyes et al., *Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample*, 33 CRIMINAL JUSTICE & BEHAVIOR 760-781 (2006); Peter Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441-528 (2006), *available at* http://www.insidetime.org/resources/Publications/Solitary_Confinement_PSJ181.pdf; Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 127 (2003) (finding high psychological trauma rates including more than 80% of prisoners suffering from anxiety, headaches, troubled sleep, or lethargy; 25% reporting suicidal ideation; and over 50% reporting symptoms including heart palpitations, obsessive ruminations, confusion, irrational anger, withdrawal, violent fantasies, chronic depression, hallucinations, perceptual distortions, emotional flatness, and depression); Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450, 1450-54 (1983) (finding "strikingly consistent" symptoms, including massive anxiety, perceptual disturbances such as hallucinations, cognitive difficulties, memory lapses, and thought disturbances

well known to mental health practitioners in corrections. As a prison staff psychiatrist told Human Rights Watch, "[i]t's a standard psychiatric concept, if you put people in isolation, they will go insane... Most people in isolation will fall apart."[3] In Pennsylvania, many men and women will be broken beyond repair due to the years they spend in solitary confinement – their minds irreparably damaged before the Commonwealth executes them or their sentences are overturned. All will suffer needlessly, unsupported by any valid penological justification.

**Building a Better System**

Across the country, numerous states and the federal government have initiated policies to investigate, monitor, and reduce the use of solitary confinement, building on a growing recognition that long-term isolation is dangerous, counterproductive, and costly. Pennsylvania has been part of this trend for prisoners held in the Restrictive Housing Units (RHUs). We are aware of the enormous work done as a result of the investigation conducted by the Department of Justice[4] as well as the changes made as a result of *Disability Rights Network of Pennsylvania v. Wetzel*.[5]

Following the success of these reforms, the DOC must start reforming its isolation practices for death-sentenced prisoners. Pennsylvania can manage these prisoners without automatic, indefinite solitary confinement. Instead, the state can safely classify death-sentenced prisoners using classification procedures similar to its existing policy for non-capital prisoners. This is not surprising; modern correctional classification uses individualized risk assessments based on objective factors, resulting in safer prisoner management. Factors such as age and disciplinary history are far more predictive for security purposes than the conviction status Pennsylvania currently uses to automatically and permanently isolate all death-sentenced prisoners.[6]

Correctional best practices would classify death-sentenced prisoners using the same objective system used for other prisoners. The U.S. Department of Justice's National Institute of Corrections has established that the essential elements of safe and secure facilities include

---

such as paranoia, aggressive fantasies and impulse-control problems among Massachusetts prisoners in isolation).
[3] HUMAN RIGHTS WATCH, ILL-EQUIPPED: U.S. PRISONS AND OFFENDERS WITH MENTAL ILLNESS 149 n. 513 (2003), *available at* http://www.hrw.org/reports/2003/usa1003/usa1003.pdf.
[4] *See* Letter from Jocelyn Samuels, Acting Asst. Att'y Gen., & David J. Hickton, U.S. Att'y, to Tom Corbett, Gov. of Pa., Re: Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities (Feb. 24, 2014), available at http://www.justice.gov/crt/about/spl/documents/pdoc_finding_2-24-14.pdf.
[5] See Settlement Agreement, Disability Rights Network of Pennsylvania v. Wetzel, 1:13-CV-00635 (M.D. Pa. Jan. 9, 2015), *available at* http://www.clearinghouse.net/chDocs/public/PC-PA-0031-0003.pdf.
[6] *See* JAMES AUSTIN, FINDINGS IN PRISON CLASSIFICATION AND RISK ASSESSMENT, NATIONAL INSTITUTE OF CORRECTIONS 5 (2003), *available at* http://www.jfa-associates.com/publications/pcras/10_Findings_2003.pdf; *see also* JAMES AUSTIN & KENNETH MCGINNIS, CLASSIFICATION OF HIGH-RISK AND SPECIAL MANAGEMENT PRISONERS, NATIONAL INSTITUTE OF CORRECTIONS (2004), available at http://static.nicic.gov/Library/019468.pdf; D.J. Simourd, *Use of Dynamic Risk/Need Assessment Instruments Among Long-Term Incarcerate Offenders*, 3 CRIM JUSTICE & BEHAVIOR 31, 306-323.

3

defining and conveying expectations for behavior, including positive-behavior incentives.[7] Staff should "demonstrate that they expect inmates to behave well by interacting extensively with them, treating them with respect and consideration, and ensuring that inmate living areas are maintained in good order."[8] Nothing about death-sentenced prisoners excludes them from this widely accepted theory of management. And the DOJ recognizes that prisoner risk-assessment classification is an important part of management. But the severity of a prisoner's commitment offense does not predict violence in prison.

A comprehensive 2002 literature review concluded that "the majority of death row inmates do not exhibit serious violence within the structured context of institutional confinement."[9] Analyzing more than ten years of data from Missouri, where death-sentenced prisoners are classified the same way as other prisoners and may be integrated into the general population, the study found that death-sentenced prisoners had lower rates of institutional violence than the general population of parole-eligible prisoners and that the State's classification system worked appropriately for this subset of prisoners.[10]

Similarly, persons convicted of murder are not more violent in prison than those convicted of other crimes. In one study, researchers found that "relative to the other groups of inmates, murderers convicted of various degrees of homicide were not overly involved . . . in violent or assaultive rule infractions . . . . The frequency and prevalence of their involvement in institutional violence was below or near the mean for the entire inmate cohort on all of these measures."[11] This study supports the conclusion that prison officials should not assume that homicide offenses are predictors of "future dangerousness;" classification systems based solely on a prisoner's commitment offense do not correlate with improved institutional security.[12]

Several states have successfully mainstreamed death-sentenced prisoners or eliminated automatic solitary confinement. As mentioned above, in Missouri, prisoners sentenced to death have been classified according to the same criteria as all other prisoners since 1991, with many death-sentenced prisoners mainstreamed into general population.[13] Between 1991 and 2002, Missouri's death-sentenced prisoners in general population neither committed nor attempted any inmate or staff homicides, and had institutional violence rates similar to those of life-without-parole prisoners, and well below those of parole-eligible prisoners.[14] Because

---

[7] VIRGINIA HUTCHINSON ET AL., INMATE BEHAVIOR MANAGEMENT: THE KEY TO A SAFE AND SECURE JAIL 8-9, U.S. DEPARTMENT OF JUSTICE NATIONAL INSTITUTE OF CORRECTIONS (2009), available at https://s3.amazonaws.com/static.nicic.gov /Library/023882.pdf.
[8] *Id.* at 9.
[9] Mark D. Cunningham & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment, and Confinement: A Critical Review of the Literature*, 20 Behav. Sci. Law 191, 202-03 (2002), available at http://www.deathpenaltyinfo.org /documents/CunninghamDeathRowReview.pdf.
[10] Mark D. Cunningham et al., *Is Death Row Obsolete? A Decade of Mainstreaming Death-Sentenced Inmates in Missouri*, 23 Behav. Sci. Law 307, 316-19 (2005).
[11] Jon Sorensen & Mark D. Cunningham, *Conviction Offense and Prison Violence: A Comparative Study of Murderers and Other Offenders*, 56 Crime & Delinquency 103, 114 (2008).
[12] *Id.*
[13] *See* Cunningham et al., *Is Death Row Obsolete?*, *supra* note 10, at 307.
[14] *See id.*

4

Missouri's death-sentenced population's characteristics are comparable to those of other states, and the architecture and security procedures of its prisons are similar to most systems, scholars believe that Missouri's successful mainstreaming is highly replicable.[15]

Other states are also mainstreaming death-sentenced prisoners. Delaware recently announced that it is disbanding death row and transferring those prisoners to other housing units where they have much more out-of-cell time and may be housed with non-death-sentenced prisoners.[16] Secretary Coupe stated that the reasons for the change included not only the new American Correctional Association (ACA) standards related to restrictive housing but also that the change is "humane" and beneficial to both prisoners and prisons.[17] In California, a two-track system allows for behavior-based classification for death-sentenced prisoners, pursuant to which many live in conditions much less restrictive than solitary confinement.[18] California has maintained the two-track approach even after the consent decree mandating it expired.[19] North Carolina and Colorado have also abandoned automatic solitary confinement for death-sentenced prisoners. North Carolina prisoners sentenced to death are not automatically placed in conditions of solitary confinement, receiving out-of-cell and group time and opportunities for work assignments, programming, and group exercise.[20] Colorado reformed its housing policies for death-sentenced prisoners in 2014 as part of its general reforms to reduce the use of solitary confinement, isolation, and administrative segregation in the entire system.[21] Colorado announced that it would no longer automatically place death-sentenced prisoners in solitary confinement; part of the impetus for these reforms was the long period that death-sentenced prisoners would likely spend in Colorado prisons.[22] As of spring 2015, death-sentenced prisoners in the state were classified to the lower security level of close custody and mainstreamed with non-death-sentenced prisoners.[23] Other states have moved away from automatic solitary confinement after facing litigation on the issue. For example, Virginia recently announced that it made substantial changes to the conditions for

---

[15] *See* Andrea D. Lyon & Mark D. Cunningham, *"Reason Not the Need": Does the Lack of Compelling State Interest in Maintaining a Separate Death Row Make It Unlawful?*, 33 AM. J. CRIM. L. 1, 7 (2005).
[16] Randall Chase, *"Delaware Quietly Disbands Death Row,"* TIMES UNION, December 9, 2016, available at http://www.timesunion.com/news/crime/article/APNewsBreak-Delaware-quietly-disbands-death-row-10786242.php
[17] *Id.*
[18] *See* Condemned Manual 15, § 301 (describing the two-track system), 130, § 825 (p. 130) (describing violations and other instances that may result in Grade B program placement), San Quentin Operational Procedure, No. 608 (2013) (on file with counsel).
[19] *See* Consent Decree at 4, Thompson v. Enomoto, No. 79-1630-SAW (N.D. Cal. Oct. 23, 1990) (describing the two-track classification system to be implemented).
[20] *See, e.g.*, State of North Carolina, Dept. of Correction, Div. of Prisons, Policy & Procedures, Ch. C § .1200 Conditions of Confinement *at* .1216(b) (p. 17), .1218(a) (p.18) (including death-sentenced prisoners in work-assignment policies). (Nov. 1, 2011), *available at* http://www.doc.state.nc.us/dop/policy_procedure_manual/C1200.pdf.
[21] *See Rethinking Death Row: Variations in the Housing of Individuals Sentenced to Death*, Arthur Liman Public Interest Program, Yale Law School, July 2016, at 15.
[22] *Id.*
[23] *Id.* at 16.

5

death-sentenced prisoners, including increased outdoor recreation; contact visits; and congregate group activities.[24]

**Evolving Legal Context**

There is strong new momentum in the United States to reform solitary confinement. This momentum is the product of a broader cultural rethinking of the practice, its impacts, and outcomes. Civil rights litigation is playing an important role in this cultural ferment by simultaneously driving systems reform and exposing the harms solitary confinement wreaks on incarcerated people. Beyond Pennsylvania, recent court decisions and settlements in states like Massachusetts,[25] California,[26] and Arizona[27] are leading to the further development of alternative approaches to the management of seriously mentally ill and cognitively disabled individuals in corrections. Ground-breaking litigation in New York led to the exclusion of youth under 18 and pregnant women from isolation units in the state prisons.[28] In California, the state's use of long-term solitary on thousands of prisoners based solely upon gang affiliation is now being dismantled due to a settlement that has already led to the release of a significant portion of the state's segregation population back to general population.[29] Litigation in Pennsylvania, including *Johnson v. Wetzel*[30] and *Shoatz v. Wetzel*,[31] has demonstrated the courts' increasing reluctance to allow the use of long-term solitary confinement.

This growing momentum for change is best encapsulated by the outspoken criticism of the practice repeatedly voiced by Supreme Court Justice Anthony Kennedy. In *Davis v. Ayala*, a case involving a death-sentenced prisoner, Justice Kennedy took note of the fact that Hector Ayala had resided in solitary confinement for the majority of his time in custody, and acknowledged that while the physical and psychological toll of solitary confinement is well-documented, insufficient public attention has been given to the issue. But Justice Kennedy also noted a "new and growing awareness" about the problems associated with solitary confinement and, most notably, appeared to invite a case to address these problems directly: "In a case that presented the issue, the judiciary may be required, within its proper jurisdiction

---

[24] Frank Green, *Virginia Death Row Conditions Lawsuit to be Argued in Appeals Court Wednesday*, RICHMOND TIMES DISPATCH, January 24, 2017, *available at* http://www.richmond.com/news/article_5ee16952-173c-5b91-bbcc-aac70e558255.html?mode=story

[25] Mem. Op. & Order, *Disability Law Center, Inc. v. Massachusetts Department of Correction, et al.*, No 07-10463 (MLW), (D. Mass. Apr. 12, 2012).

[26] Order, *Coleman v. Brown*, 2014 WL 1400964, No. CIV. S-90-520 LKK/DAD (PC) (E.D. Cal. Apr. 10, 2014).

[27] Order, *Parsons v. Ryan*, Docket No. CV-12-00601-PHX-DJH, Doc 1458 (D. Ariz. Feb 25, 2015).

[28] Stipulation for a Stay with Conditions, *Peoples v. Fischer*, No. 211-CV-02694-SAS (S.D.N.Y. Feb. 19, 2014).

[29] Settlement Agreement, Ashker v. Brown, 2014 WL 2465191, Case No. 4:09-cv-05796-CW (N.D. Cal. Aug. 31, 2015.), *available at* http://ccrjustice.org/sites/default/files/attach/2015/09/2015-09-01-ashker-Settlement_Agreement.pdf

[30] Mem. Op., *Johnson v. Wetzel*, et al. 1:16-cv-00863-CCC-MCC (M.D. Pa. Sept. 20, 2016), *available at* https://abolitionistlawcenter.files.wordpress.com/2016/09/0-pi-ruling-amended-092116.pdf.

[31] Mem. Op. & Order at 12, *Shoatz v. Wetzel, et al.*, No. 13-cv-0657 (W.D. Pa. Feb. 12, 2016), *available at* https://abolitionistlawcenter.files.wordpress.com/2016/02/sj-decision-021216.pdf.

and authority, to determine whether workable alternative systems for long-term confinement exist, and, if so, whether a correctional system should be required to adopt them."[32]

We believe that the DOC can find a "workable alternative system" to automatic, long-term solitary confinement for death-sentenced prisoners without the need for court intervention. As discussed above there are a number of successful approaches used by other states that Pennsylvania can consider. We look forward to discussing these options and other approaches with you. Please let us know if any day from February 29 through March 3, 2017 is an available date to meet or if there is another time that works with your schedule in the next month.

Respectfully,

_Bret Grote / per (signed)_  
Bret Grote  
Abolitionist Law Center  
P.O. Box 8654  
Pittsburgh, PA 15221

_Witold Walczak_ (signed)  
Witold Walczak  
ACLU of Pennsylvania  
247 Fort Pitt Blvd.  
Pittsburgh, PA 15222

Jonathan H. Feinberg  
Susan M. Lin  
Kairys, Rudovsky, Messing & Feinberg LLP  
The Cast Iron Building  
718 Arch Street, Suite 501 South  
Philadelphia, PA 19106

Michael E. Bern  
Latham & Watkins, LLP  
555 Eleventh Street, NW  
Suite 1000  
Washington, DC 20004-1304

Amy Fettig  
ACLU National Prison Project  
915 15th Street, NW  
7th Floor  
Washington, DC 20005

cc:   Theron Perez, Chief Counsel (by email: tperez@pa.gov)  
      Co-counsel

WJW/vw

---

[32] *Davis v. Ayala*, 135 S.Ct. 2187, 2208 (2015) (Kennedy, J., concurring).

7

# Pa. Dep't of Corrs. Letter Exhibit B



COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE OF GENERAL COUNSEL

June 9, 2017

Witold Walczak
ACLU of Pennsylvania
247 Fort Pitt Blvd.
Pittsburgh, PA 15222

**RE:** Capital Case Housing

Dear Mr. Walczak:

Thank you for your letter of February 13, 2017, and for the opportunity to meet with you on April 3, 2017, to discuss your concerns with regard to the housing conditions of capital case inmates. I tremendously appreciated the opportunity to meet with you and your team and review your proposals for the Department of Corrections to modify its housing policy for capital case inmates. After careful review, the Department has determined to continue to administer its current capital case housing policy.

While our clients were unable to reach the resolution you had suggested in this matter, I believe that the review process used by the parties was beneficial. Please do not hesitate to contact me in the future with regard to your concerns.

Sincerely,

Theron R. Perez
Chief Counsel
Department of Corrections

Name: Roy L. Williams
Number: JCF4784
Box 244
Collegeville, PA 19426-0244

Clerk of the Court
**United States District Court**
**for the Eastern District of Pa.**
James A. Byrne Federal Courthouse
601 Market St., Rm. 2609
Philadelphia, PA 19106-1797

U.S.M.S.
X-RAY



PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL



neopost
06/14/2021
US POSTAGE $001.60⁰
FIRST-CLASS MAIL
ZIP 19426
041M12252211