IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LEE WILLIAMS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| JOHN E. WETZEL, | : | |
| Defendant. | : | NO. 21-1248 |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant John Wetzel, Secretary of the Pennsylvania Department of Corrections ("DOC or the "Department"), by and through counsel, submits the following statement of undisputed material facts in support of his Motion for Summary Judgment:

**Plaintiff's Claims and Capital Case Housing Unit Conditions**

1. On March 3, 2021, Plaintiff Roy Lee Williams, an inmate with the Pennsylvania Department of Corrections, filed this lawsuit alleging that, due to his mental illness, the restrictive conditions of the Capital Case Housing Unit ("CCU") before December 3, 2019 violated his rights under the Eighth Amendment, Fourteenth Amendment, and Americans with Disabilities Act ("ADA"). *See* Compl. (ECF No. 2). *See also* Deposition of Roy Lee Williams, December 9, 2021, attached hereto as Exhibit A, Tr. at 12:12-13:1.

2. Plaintiff was convicted of murder and sentenced to death in or around 1992. *See* Ex. A, Williams Dep. Tr. at 9:10-9:16; 11:4-11:6. Since his conviction, Plaintiff has filed various appeals and forms of post-conviction relief seeking to overturn his conviction and/or relief from his death sentence, none of which has been successful and he remains with an active capital

sentence. *See In re Williams*, 782 Fed. Appx. 136 (3d Cir. 2019) (providing summary of Plaintiff's conviction and attempts at post-conviction relief), attached as Exhibit B hereto.

3. Plaintiff first started in custody with the Department around December 1993 at the State Corrections Institution Graterford ("SCI-Graterford") and then transferred to the State Corrections Institution Greene ("SCI-Greene") in July of 1996 or 1997, where he resided until he transferred to SCI-Phoenix in July 2020, where he currently resides. *See* Ex. A, Williams Dep. Tr. at 10:7-11:12.

4. During the time that Plaintiff resided at SCI-Graterford and SCI-Greene, he was housed on the CCU. *See* Ex. A, Williams Dep. Tr. at 11:18-11:22; 13:2-13:8.

5. Prior to 2018, Plaintiff's placement and treatment in the CCU were subject to the conditions outlined in the Department's policy concerning Capital Case Administration. *See* DOC Policy No. 6.5.8, "Capital Case Administration" (hereafter, "Capital Case Policy"), dated August 12, 2012, attached as Ex. 2 to Declaration of William Zakian, dated January 28, 2022, attached as Exhibit C hereto.

6. On January 25, 2018, a class action lawsuit was filed in the United States District Court for the Middle District of Pennsylvania on behalf of all capital case inmates in the Department's custody, alleging that the conditions of the CCU amounted to "solitary confinement" and violated the 8th and 14th Amendments of the Constitution. *See Reid, et al., v. Wetzel, et al.*, 18-CV-0176 (M.D. Pa.).

7. On November 18, 2019, the Department and class counsel in the *Reid* case executed a settlement agreement wherein the Department agreed to loosen the restrictions conditions of the CCU and create a more socialization opportunities. *See Reid, et al., v. Wetzel, et*

*al.*, 18-CV-0176 (M.D. Pa.), Doc. 46-2 (hereafter, "*Reid* Settlement Agreement"), attached hereto as Exhibit D.

8. Pursuant to the *Reid* Settlement Agreement, on December 3, 2019, DOC issued a final policy statement reflecting the new conditions of the CCU. *See* DOC Policy No. 7.5.1, "Administration of Specialized Inmate Housing," dated of December 3, 2019 (hereafter "Final CCU Policy"), attached hereto as Exhibit E.

9. Although the Final CCU Policy was issued on December 3, 2019, the Department had already started instituting the changes outlined in the policy. *See* Ex. D, *Reid* Settlement Agreement, ¶ (I)(E) ("The Parties acknowledge that the DOC and Defendants have implemented and continue to implement improvements and that these improvements have been ongoing through the litigation.")

10. Officials at SCI-Greene began the planning process to institute the changes to the CCU as early as January of 2018. *See* Ex. C, Zakian Decl. at ¶ 2-3.

11. SCI-Greene instituted the first wave of those changes on March 12, 2018, allowing increased out-of-cell time (at least 20 hours per week) and significant socialization opportunities for capital case inmates. *See* SCI-Greene Policy No. 6.5.8 GRN 01, effective date of March 12, 2018 (hereafter, "Greene CCU Policy"), attached as Ex. 1 to Zakian Decl.

12. The March 12, 2018 changes provided significant improvements in socialization opportunities and relaxed movement restrictions, as follows:

   a. Outdoor exercise increased from two hours five days per week, to two hours seven days per week. The format of this outdoor exercise also changed starting in June of 2018, from each inmate in a solitary enclosure to one open

       exercise area allowing group exercise, sports, and socialization. *See* Ex. C, Zakian Decl. at ¶ 5(a).

    b. Dayroom activity, which was previously prohibited on the CCU, was offered for at least one hour seven days per week, allowing inmates congregate at tables for game playing, television watching, and other socializing. *See* Ex. C, Zakian Decl. at ¶ 5(b).

    c. Law library visitations changed from each inmate sitting in a separate enclosure to allowing up to four inmates from the same pod to congregate together. *See* Ex. C, Zakian Decl. at ¶ 5(c).

    d. Meal time changed from each inmate being served their meal at their cell and then eating alone in their cells, to meals being served outside of cells and inmates allowed to eat together at the dayroom tables. *See* Ex. C, Zakian Decl. at ¶ 5(d).

    e. Out-of-cell movements became less restrictive so that capital case inmates were no longer required to be strip searched, wear restraints, or be escorted by a two-to-one corrections officer ratio. *See* Ex. C, Zakian Decl. at ¶ 5(e).

13. Following the initial changes in March of 2018, SCI-Greene continued to implement more changes to the CCU, such that presently the housing unit for capital case inmates operates comparably to the general population housing units with respect to out-of-cell time and socialization. *See* Ex. C, Zakian Decl. at ¶¶ 6-7.

14. Plaintiff acknowledges that though he continues to reside on the housing unit for capital case inmates at SCI-Phoenix, the unit now has less restrictions. *See* Ex. A, Williams Dep. Tr. at 9:10-9:16.

15. Plaintiff was still at SCI-Greene when the restrictions on the CCU eased, but he does not recall the time frame when that happened and refers to the date the Final CCU Policy was issued on December 3, 2019. *See* Ex. A, Williams Dep. Tr. at 11:23-12:5.

16. Plaintiff is explicit that the claims in his lawsuit are limited to the conditions of the CCU prior to the easing of the restrictions, which he believes occurred around when the Final CCU Policy was issued. *See* Ex. A, Williams Dep. Tr. at 12:12-13:1.

**Mental Health Care in the CCU and Plaintiff's Mental Health Status**

17. Plaintiff's lawsuit does not challenge the prior "solitary confinement" conditions of the CCU inandofitself, instead he brings an "as-applied" challenge, arguing that the application of "solitary confinement" to himself violated the ADA, 8th and 14th Amendments, due to his alleged mental disability. *See* Ex. A, Williams Dep. Tr. at 46:13-47:6; Compl. ¶¶ 19-21, 24-27.

18. Every inmate who enters the Department is given a psychological evaluation that includes testing and inmate interview, to screen for intellectual, personality, and emotional stability. *See* DOC Policy No. 13.81., "Access to Mental Health Care," dated March 2, 2015 (hereafter, "Mental Health Policy"), § (I)(A)(1), attached as Ex. 3 to Ex. C, Zakian Decl.

19. During this initial psychological evaluation, the Department flags any inmate who scores 70 or below in an I.Q. test for additional assessment to rule out intellectual disability or development disabilities. *See* Ex. C-3, Mental Health Policy, § (I)(A)(2)(c).

20. During this initial psychological evaluation, any inmate with evidence of mental illness receives a more comprehensive assessment and a psychology staff member will create an

individualized treatment plan for each inmate who has been diagnosed with a serious mental illness. *See* Ex. C-3, Mental Health Policy, § (I)(A)(2)(d)(1).

21. The Department rates the mental health status of each inmate on a four-point nominal scale system according to the following, *see* Ex. C-3, Mental Health Policy, § (I)(B)(2)(g)(1):

    a. "A" Roster – inmate has no identified psychiatric or intellectual disability needs or history of psychiatric treatment.

    b. "B" Roster – inmate has identified history of psychiatric treatment, but no current need for psychiatric treatment; inmate is placed on inactive mental health/intellectual disability roster.

    c. "C" Roster – inmate is currently receiving psychiatric treatment, but is not currently diagnosed with a serious mental illness or functional impairment, and does not have an intellectual disability.

    d. "D" Roster – inmate is currently diagnosed with a serious mental illness, intellectual disability, credible functional impairment, or is guilty but mentally ill. These inmates must have an individualized treatment/rehabilitation plan created by the mental health staff.

22. Mental health roster status is subject to change based on reevaluations and assessments of the psychiatric review team. § (I)(B)(2)(c)(2)(g)(2).

23. Prior to recent changes providing greater access to mental health care, psychology staff visited all Security Level 5 housing units, including the CCU, five times per week to do routine rounds along the unit that included an assessment with every inmate for suicide risk, and to check on any inmate reporting mental health problems to staff. *See* Ex. A, Williams Dep. Tr.

at 28:1-28:16. *See also*, Ex. C, Zakian Decl. at ¶ 8; Ex. C-3, Mental Health Policy, § (I)(B)(2)(c)(2)(f).

24. All inmates on the A, B, and C Rosters are interviewed and assessed by psychology staff on a monthly basis, and a written report is completed. *See* Ex. C-3, Mental Health Policy, § (I)(B)(2)(c)(2)(f)(v)-(vi).

25. All inmates on the C Roster are additionally offered out-of-cell contacts with mental health staff on the unit at least every ninety days. § (I)(B)(2)(c)(2)(f)(vi).

26. All capital case inmates were able to request an appointment to speak with a mental health professional one-on-one. *See* Ex. A, Williams Dep. Tr. at 34:13-34:18. *See also*, Ex. C, Zakian Decl. at ¶ 8.

27. Any capital case inmate with an active mental health diagnosis were scheduled for treatment as required by the mental health professionals. *See also*, Ex. C, Zakian Decl. at ¶ 8.

28. Any capital case inmate who was observed by a staff member as showing signs of mental decomposition to the point where the inmate might pose a risk to him/herself or others was referred to the mental health department for evaluation. *See* Ex. C-1, Capital Case Policy.

29. During Plaintiff's incarceration with the Department, Plaintiff has never received a diagnosis of serious mental illness by a mental health professional. *See* Ex. A, Williams Dep. Tr. at 36:13-36:16.

30. Plaintiff, while in custody at SCI-Graterford sometime before 1998, attempted to commit suicide and was placed in a psychiatric observation cell ("POC"), during which time he was monitored and evaluated by mental health professionals. *See* Ex. A, Williams Dep. Tr. at 24:19-25:6.

31. On that occasion, Plaintiff was monitored in the POC for forty-eight to seventy-two hours and was released after he told the doctors that he faked the suicide attempt to get out of his cell to make a phone call. *See* Ex. A, Williams Dep. Tr. at 24:24-25:13.

32. Plaintiff wanted to leave the POC cell and was willing to tell the doctors anything to get out, so he told them that there was nothing wrong with him. *See* Ex. A, Williams Dep. Tr. at 25:14-25:24

33. After that incident he never sought mental health treatment again while at SCI-Graterford, and just dealt with everything on his own. *See* Ex. A, Williams Dep. Tr. at 25:14-25:24; 27:15-27:18.

34. At SCI-Greene, Plaintiff interacted with the mental health staff when they came to his cell during their rounds, but he did not seek an appointment. *See* Ex. A, Williams Dep. Tr. at 28:14-28:16; 35:10-35:13.

35. During the times when Plaintiff interacted with the mental health staff on their rounds, he always told them that he was feeling okay and never related any mental health problems. *See* Ex. A, Williams Dep. Tr. at 35:14-35:18.

36. Plaintiff first had an out-of-cell appointment with the mental health staff at SCI-Greene when he was referred to the mental health department following an incident in which he suffered from a minor case of heat exhaustion and subsequently developed headaches. *See* Ex. A, Williams Dep. Tr. at 28:17-29:2.

37. Thereafter, Plaintiff was seen by two separate mental health doctors a total of five to six times. *See* Ex. A, Williams Dep. Tr. at 30:19-31:7.

38. Neither of these mental health doctors diagnosed Plaintiff with any mental health issues. *See* Ex. A, Williams Dep. Tr. at 31:14-31:17.

39. In all the time that Plaintiff was housed at SCI-Greene prior to the relaxing of restrictions, Plaintiff never requested assistance from the mental health unit or expressed to any Department staff member that he was having mental health issues. *See* Ex. A, Williams Dep. Tr. at 35:19-36:4.

40. Before Plaintiff was incarcerated, he had some history of mental health treatment, which began in April of 1979, when Plaintiff, at the age of fourteen, was involuntarily committed to the Philadelphia Psychiatric Center ("PPC") for approximately sixty days, due to suicidal threats and violent and abusive behavior towards his mother and sister. *See* Ex. A, Williams Dep. Tr. at 14:6-14:14. *See also* Philadelphia Psychiatric Center Discharge Summary, dated June 21, 1979 (hereafter, "PPC Discharge Summary"), Section titled "Presenting Problem on Admission and History," attached hereto as Exhibit F.

41. A psychological examination conducted on May 2 and May 8, 1979, during Plaintiff's involuntary commitment at PPC, revealed that Plaintiff's "most striking problem" was with the "control of his angry feelings, " with a secondary area of difficulty in "the task of masculine identification," and a third problem area of "significant masked depression." See PPC Psychological Examination, dated May 2nd, 8th, 1979 (hereafter "PPC Psych Exam"), Section titled "Emotional Function," attached hereto as Exhibit G. *See also,* Ex. A, Williams Dep. Tr. at 14:17-15:2.

42. This Psychological Examination also concluded that Plaintiff had a full-scale I.Q. score of 85, which placed him in the "dull-normal" range of intelligence. *See id.* at Section titled "Intellectual Functioning."

43. Within three to six months after he was released from PPC from his involuntary commitment, he returned to PPC and voluntarily admitted himself for ninety days. *See* Ex. A, Williams Dep. Tr. at 21:6-22:5.

44. Around the same general time frame, Plaintiff attended family therapy sessions for several months at an outpatient facility called "Friends." *See* Ex. A, Williams Dep. Tr. at 17:23- 20:8.

45. In 1996, to support Plaintiff's efforts to seek relief from his conviction under the Post Conviction Relief Act ("PCRA"), Plaintiff's counsel arranged for Plaintiff to be evaluated by two mental health professionals outside of the Department. *See* Ex. A, Williams Dep. Tr. at 15:3-15:20.

**Plaintiff's Grievances**

46. Plaintiff filed three grievances in connection with his complaints about the condition of the Capital Case Housing Unit. *See* Declaration of Keri Moore, dated January 12, 2022, attached hereto as Exhibit F, ¶ 4. *See also* Ex. A, Williams Dep. Tr. at 47:20-49:12[1] (Plaintiff recalled filing two grievances).

47. On or about November 13, 2020, Plaintiff filed the first grievance, stating that he has a mental disability that has been exacerbated due to the effects of prolonged isolation from his time in the Capital Case Housing Unit. *See* Grievance No. 898857, attached as Ex. 1 to Ex. F,

---

[1] Plaintiff's testimony recalled that he filed only two grievances. Although this is a discrepancy with DOC's records, DOC's records are objective evidence, and the discrepancy is in Plaintiff's favor.

Moore Decl. *See also* Ex. A, Williams Dep. Tr. at 48:22-49:8 (Plaintiff recalled filing his first grievance in December of 2020).[2]

48. On or about November 30, 2020, Plaintiff filed a second grievance, making the same claims and adding information about his mental health. *See* Grievance No. 902000, attached as Ex. 2 to Ex. F, Moore Decl.

49. On or about February 24, 2020, Plaintiff filed a third grievance relating to the same claims and adding more information about his mental health. *See* Grievance No. 916331, attached as Ex. 3 to Ex. F, Moore Decl.

50. DOC has a detailed inmate grievance process, which is governed by DOC policy number DC-ADM 804, titled "Inmate Grievance System". *See* Ex. F, Moore Decl. ¶ 2; DC-ADM 804, attached hereto as Exhibit G.

51. Under DOC's grievance policy, an inmate must file a grievance "within 15 working days after the event upon which the claim is based." *See* Ex. G, DC-ADM 804 § 1.A.8.

52. Under the DOC's grievance policy, following the inmate's receipt of the initial review response, the inmate may file an appeal within 15 working days to the Facility Manager. *See* Ex. G, DC-ADM 804 § 2.A.1.

53. Under the DOC's inmate grievance policy, following receipt of the Facility Manager's decision on the appeal, the inmate may file a final review appeal, within 15 working days, to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). *See* Ex F, Moore Decl. ¶ 2; Ex. G, DC-ADM 804§ 2.B.

54. Under the DOC's inmate grievance policy, an inmate appealing a grievance to final review "is responsible for providing the SOIGA with all required documentation relevant to

---

[2] Plaintiff's testimony recalled that he filed the first grievance on December 21, 2020. Although this is a discrepancy with DOC's records, DOC's records are objective evidence, and the discrepancy is in Plaintiff's favor.

the appeal," which includes, *inter alia*, a copy of the inmate's appeal to the Facility Manager. *See* Ex. G, DC-ADM 804 § 2.B.j.

55. On or about February 17, 2021, the SOIGA issued a Final Appeal Decision Dismissal notice with regards to Grievance No. 898857, which dismissed the grievance due to Plaintiff's failure to provide the Office with the required documentation pursuant to DC-ADM 804. *See* Grievance No. 898857, attached as Ex. 1 to Ex. F, Moore Decl.

56. On or about March 15, 2021, the SOIGA issued a Final Appeal Decision Dismissal notice with regards to Grievance No. 902000, which dismissed the grievance due to Plaintiff's untimely filing of the grievance beyond the fifteen-day deadline set forth in DC-ADM 804. *See* Grievance No. 902000, attached as Ex. 2 to Ex. F, Moore Decl.

57. On or about April 20, 2021, the SOIGA issued a notice with regards to Grievance No. 916331, which stated that the correspondence was filed without further action due to Plaintiff's failure to submit an appeal to final review or any indication of what action plaintiff sought from SOIGA. *See* Grievance No. 916331, attached as Ex. 3 to Ex. F, Moore Decl.