
EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LEE WILLIAMS           :
                              :
        vs.              :
                              :
JOHN WETZEL              : NO: 2:21-CV-1248

- - -

Collegeville, Pennsylvania
Thursday, December 9, 2021

- - -

ORAL DEPOSITION of ROY LEE WILLIAMS, taken pursuant to notice, held virtually, commencing at 11:33 a.m., before Angela M. King, RPR, Court Reporter - Notary Public there being present.

- - -

STREHLOW & ASSOCIATES
FULL SERVICE COURT REPORTING AGENCY
54 FRIENDS LANE, SUITE 116
NEWTOWN, PENNSYLVANIA 18940
(215) 504-4622
SERVING NJ, PA, NY & DE

A P P E A R A N C E S

(All Via Video)

OFFICE OF ATTORNEY GENERAL
BY: KATHY A. LE, Esquire
The Phoenix Building
1600 Arch Street
Philadelphia, Pennsylvania 19103
Phone: (215) 560-2141
Email: kle@attorneygeneral.gov
Representing the Defendant

# I N D E X

| WITNESS | PAGE |
|---|---|
| ROY LEE WILLIAMS(Sworn) | 4 |
| | |
| EXAMINATION | |
| BY: MS. LE | 4 |

# E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|

(At this time, no exhibits were marked by the court reporter.)

\- - -

THE STENOGRAPHER: Good morning. My name is Angela King, your court reporter. We are taking this deposition via Zoom with all parties in remote locations.

\- - -

ROY LEE WILLIAMS, having been duly sworn, was examined and testified as follows:

\- - -

THE STENOGRAPHER: Just state your full name for the record, please.

THE WITNESS: Roy Lee Williams.

THE STENOGRAPHER: Thank you.

THE WITNESS: You're welcome.

\- - -

EXAMINATION

\- - -

BY MS. LE:

Q. Mr. Williams, I will introduce myself again on the record. My name is Kathy Le. And I am representing the defendant in this case that you have filed against Secretary Wetzel.

I want to ask you, have you ever been deposed

before?
A. No.
Q. Okay. So, I will give you a few ground rules that will tell you how it's going to go. And hopefully, that will make the morning go a little more smoothly.
So in the deposition, I will ask you a series of questions. And all I ask is that you answer those questions to the best of your memory and your knowledge. If the ask you something and you don't remember, it's okay to tell me you don't remember. Do your best to try to remember. But if the answer is you don't know or you don't remember it, that's fine.
I understand that, you know, you don't have anything in front of you. So again, this is -- it's not a memory test. It's just to the best that you can do, okay?
A. Okay.
Q. And when I ask you a question, please, this is for the sake of the record because there will be a written transcript of this afterwards. Please, answer all of my questions verbally.
So for example, when I ask you a question, if

the answer is yes, instead of just nodding your head or saying uh-huh, actually say yes.
A. Okay.
Q. And the same goes if it's no, don't just shake your head or say uh-uh, say no. And we all do it, so I will remind you if needed.
When I ask you a question, if you don't understand the question or you need me to clarify, you can ask me to do so. But if you answer the question, I will assume that you understood it.
Is that fair?
A. Yes.
Q. During the course of the deposition, I ask that you, please, allow me to completely finish my question, finish talking before you start answering. And I will, likewise, allow you to completely finish saying your answer, completely finish before I ask my next question.
And again, this is for the sake of the record because the court reporter can't write down, you know, two people talking over each other.
Is that fair?
A. Yes. Yes.
Q. Okay. All right. So, let's get started.

Mr. Williams, again, this deposition relates to the case that you have filed in the Eastern District of Pennsylvania, the US Court. I -- the complaint, obviously, I have reviewed.

But if you could, please, explain to me what exactly -- I understand that your lawsuit relates to the confinement of capital case inmates in what you consider a solitary confinement.

What exactly are you looking to be the remedy out of this? What do you want out of this lawsuit that you are filing?

Are you looking for a change in your housing status? Are you looking for a change in some other status? Are you looking for monetary relief?

I am trying to just understand what exactly it is that you are seeking with this lawsuit.

A. Okay. Monetary relief.

Q. Okay. What is your current housing status, Mr. Williams?

Is it accurate for me to represent that you are currently housed at SCI Phoenix?

A. Yes.

Q. Okay. And what is your housing status at SCI

Phoenix?
A. Right now, in terms of like we -- I guess we are still considered Level 5. We are just -- in terms of, like, how much out cell time that we have you mean?
Is that your question?
Q. However you understand --
A. Can you re --
Q. Yes. So you are -- what housing unit are you housed in.
A. Okay.
Q. And then, we will get into the details of that. But just, what is your status?
A. Okay. Okay. We are -- I'm housed in P Unit on the east side.
Q. Did you say P as in Peter?
A. Yes. And Paul, yes, P. PB, that's my pod, B. I'm in cell 1014. And I work for activities, the Activities Department.
In January -- well, now we are allowed out cell time. We're out cell time. In January, they are going to let us out for out -- jobs off the unit. So, I applied for a -- to work in a barber shop to get my barber's license.

So, that's pretty much it as far as --

Q. Okay. And it's my understanding, Mr. Williams, that as of December 3, 2019, that the Department of Corrections altered the administration of the Capital Case Units to allow more -- for it to perform more like a general population unit. That's my understanding.

Is that accurate?

A. Yes.

Q. Okay. And is that the current unit that you are -- your current situation, is that you are housed in this Capital Case Unit but with the additional liberties, I guess, the less restrictive movements?

A. Yes. Yes. The less restrictive movements, exactly.

Q. Okay. So then, I would like to clarify -- well, actually, let me back up.

So prior to this change, this alteration to the Capital Case Unit, were you housed in the Capital Case Unit under the greater restrictions where it operated more like a -- the restricted housing unit?

A. Yes. They call it maximum administrative

custody, yes.
Q. And do you remember -- actually, let me back again. I know that prior to your arrival at SCI Phoenix, you were previously housed at -- you were previously living at SCI Greene; is that right?
A. Yes, ma'am.
Q. When did you transfer from SCI Greene to SCI Phoenix?
A. I believe it was in 1996 or '97. I think July of '97 from Graterford. It was either '96 or '97.
Q. Okay. I'm sorry. Let me clarify my question.
Are you saying that in '96 or '97 you went to Greene from the former SCI Graterford?
A. Yes.
Q. Okay. My -- so you were briefly at SCI Graterford, is my understanding, from when you were still, you know, having your trial and before you were fully sentenced? No?
A. No.
Q. How long were you at SCI Graterford back before you transferred to Greene in '96 or 97?
A. I went to SCI Graterford from the county -- from the county jail in 1993. December of 1993.
Q. Okay.

A. And I stayed there until I was transferred to SCI Greene.
Q. Okay. Thanks.
Do you remember when you were convicted and sentenced? What year?
A. Yes. 199 -- February of 1992.
Q. Okay. And so in roughly '96 or '97, you transferred from SCI Graterford to SCI Greene?
A. Yes.
Q. And then, when did you transfer from SCI Greene to SCI Phoenix?
A. July 2020.
Q. So between the time that you were initially transferred to SCI Greene in roughly '96 or '97 until July of 2020, you were housed at SCI Greene the entire time?
A. Yes, ma'am.
Q. Okay. And during the time that you were at SCI Greene from roughly the time that you started there until the time that you left, were you housed in the Capital Case Unit?
A. Yes. This was L Unit.
Q. And so, you were at Greene until July of 2020 housed in the Capital Case Unit.

At what point, if at all while you were at SCI Greene, did the Capital Case Unit open up the restrictions that we discussed earlier?
A. I'm not -- I would go by the policy. The date of the policy, which would be December 3, 2019.
Q. Yes. That's the date the policy was issued, yes. So roughly, around then?
A. Yes.
Q. So while you were at Greene, you experienced the relaxing of the restrictions?
A. Yes.
Q. So I would like to clarify, Mr. Williams, is your -- my understanding of your complaint is with regard to the -- what you describe as the very restrictive nature of the Capital Case Unit.
Is your -- are your complaints limited to the time before December 2019 when the Capital Case Unit was -- you know, some of the restrictions were lifted? Or are you complaining about the current restrictions on the Capital Case Unit, as well?
A. No. It's not complaining about the current restrictions. It's from -- my initial enter into the Department of Corrections in 1993 until

December 3, 2019.
Q. Okay. When you were at SCI Graterford prior to your transfer to SCI Greene, were you also during that entire period where you were at SCI Graterford, I believe you said, from roughly '93 until '96 or '97, were you also in the Capital Case Unit during that entire time?
A. Yes, J Block.
Q. J Block. So is it accurate for me to say then, Mr. Williams, that the period of time that you are complaining about is from the time that you entered SCI Graterford until, roughly, when the restrictions were lifted in December of 2019?
A. Yes, ma'am.
Q. Okay. All right.
So then we will -- I will try to focus on that time period. Obviously, it's still a very lengthy time period. At least that clarifies for me, that you are not talking about the current situation.
We are --
A. Right.
Q. -- focused on the situation prior to the lifting of the restrictions.
A. Yes. Yes.

Q. Okay. A part of your complaint relates to your -- your contention that you have been diagnosed with severe mental -- mental health issues?

A. Yes.

Q. Okay. And in your complaint, you refer to and attach some documents relating to a -- an episode in 1979 where you were admitted to the Philadelphia Psychiatric Center for suicidal ideations?

A. Yes.

Q. How long were you admitted to the Philadelphia Psychiatric Center on that occasion?

A. For 90 days.

Q. Okay.

A. On that occasion, 90 days.

Q. And did you, to your understanding, receive a diagnosis of a mental health issue during that 90 days?

A. Yes.

Q. And what is your understanding of what your mental health diagnosis was?

A. That I was having -- severe depression and suicidal ideation. And I think it was, also, you

know, placement in the, like, a structured environment would be helpful, too.

Q. You, also, wrote a reference in your complaint as diagnosis or a clinical examination, two as a matter of fact, in September of 1996.

Were those two examinations performed as a result of -- well, let me rephrase.

Were those two examinations from 1996, did those arise out of your criminal proceedings?

A. Yes, ma'am. For my PCRA proceedings.

Q. Your PCRA proceedings?

A. Yes, ma'am.

Q. Were those examinations ordered by your legal counsel? I'm not asking anything about --

A. No, no, no.

Q. -- conversations. Were they ordered by the court?

A. No. I don't believe they were ordered by the Court. I believe my current counsel hired them to do a clinical evaluation.

Q. Okay. Great. Obviously, I don't want to know anything about your conversations with counsel or anything like that. I just wanted to clarify where those exams came from. Okay.

Between the time that you were admitted to the Philadelphia Psychiatric Center in 1979 and the examinations that you had in 1996, did you have any other examinations by psychiatric professionals?
A. Yes.
Q. Okay. Can you list for me, to the best of your ability, your memory, what other psychiatric treatments or examinations you had between 1979 and the 1996 examinations?
A. Sure. I was still a juvenile at the time. It was at Friends -- I believe it was called Friends. It's in Northeast Philadelphia, it's for adolescents. But I don't remember the doctor's name or anything like that. But I know that I went there for treatment. And I guess --
Q. Do you remember -- I'm sorry. I didn't mean to cut you off.
A. That's okay.
Q. Do you remember approximately when -- you know, what year that was?
A. Probably around the same time frame. So what was that, '79. So it probably -- it might even have been before that. It was all around the same

time. It might have been '80. Might have been '78. So, it's all around the same time frame. I would say, maybe, between '77 and '80, maybe.

Q. Okay. And you said it was called Friends?

A. Yes, Friends. It's on Roosevelt Boulevard, like, right around Sears -- Sears and Roebuck on the Roosevelt Boulevard before you get to the Oxford Circle.

Q. Did it have any additional words in the name, like, Friends Institute or something like that?

A. No. But I could -- I could -- I could call up my mom and get that information to you if that's all right.

Q. Okay. Great. That would be great.

A. Actually, I -- I'm sorry. Actually, I could get my lawyer. My lawyers probably have all that information.

Q. Okay.

A. Matter of fact -- okay.

Q. That's fine. I will -- we will get that information, okay?

A. Okay.

Q. All right. So, you said this was probably roughly between '77 and '80 -- it was happening

around the same time as the -- when you were admitted to the Philadelphia Psychiatric Center in April of '79.

Did you -- what type of facility was Friends? Was it a mental health hospital? A juvenile detention center? What was it?

A. It wasn't a juvenile detention center. It wasn't a mental hospital. It was, like, an outpatient. Like, you would just go there for therapy.

My mom would take me there. We would talk to the doctor. Have, like, therapy -- you know, family therapy. Yeah, just like that.

Q. Got it. So when you said it was, you know, maybe roughly between '77 and '80, did you mean that you were routinely going to Friends for therapy?

A. Yes, ma'am.

Q. Okay. And how often were you attending therapy at Friends?

A. That's a good question. That's a good question. I don't remember. I don't know. Maybe -- that's a long time ago. Maybe once a week. I know I went there quite a few times.

Q. Okay. And were you attending therapy, you know, individual therapy? Or I know you mentioned family therapy?
A. Yes, it was family.
Q. Family therapy?
A. I'm sorry. Yes, ma'am.
Q. Okay. So, were you attending with your mom?
A. Yes.
Q. Is it possible -- does this job your memory, let me ask it that way.
If the therapy sessions at Friends resulted from, you know, the doctors' recommendation when your admitted at Philadelphia Psychiatric Center? Because I recall in those records they mention something about family therapy.
Does that ring a bell that maybe that's how that came about? If you don't remember, you don't remember. That's okay. Just trying to see if it jogs any memories.
A. I'm not actually sure --
Q. Okay.
A. -- which came first.
Q. That's fine. So, do you believe that you attended therapy at Friends for -- over the course

of several years?

A. No. It wasn't several years. It wasn't that long I don't think.

Q. Do you remember, roughly, what the time frame might be that you were attending sessions there?

A. I would say maybe a year at the most. One year at the most. I don't remember it being over a year. It couldn't have been over a year.

Q. Okay. And do you remember if you received any actual diagnosis during the time that you were in therapy at Friends?

A. No. No, I don't.

Q. All right. So between the time that you concluded your therapy sessions at Friends and prior to, you know -- between that time which you dated as maybe between '77 and '80 for about a year at most until 1996 when you had those two clinical examinations, can you remember any other, you know, treatment or examinations that you had with a psychiatrist, psychologist, mental health professionals?

A. No.

Q. Okay.

A. No.

Q. So after -- after the therapy at Friends and this 90-days commitment at the Philadelphia Psychiatric Center, nothing -- you don't recall anything else until your two examinations in 1996.
    Is that accurate?
A. No. I went back -- I went back there again.
Q. You went back where again?
A. PPC, Philadelphia Psychiatric Center.
Q. Okay.
A. I went back there for another 90 days on a voluntary.
Q. So the first -- the first visit that you had there was involuntary?
A. Yes.
Q. And is that the one that took place in April of 1979, the records of which you included in your complaint?
A. Yes.
Q. Okay. When -- to the best of your memory, when did you return to PPC?
A. Would have had to have been several months after that. I would say within three to six months after that, that I was -- yeah. Yeah.
Q. Within three to six months of your first

visit?
A. Yes, ma'am.
Q. Okay. And how long did you stay voluntarily at PPC on that second occasion?
A. I believe it was 90 days again.
Q. And do you recall if you received any diagnosis during that time period on your second visit?
A. No. I would have to check --
Q. Um --
A. I'm sorry. Go ahead.
Q. No. I --
A. I was going to say, I have it in -- I have the records. I would have to look at the records to see what the diagnosis was.
Q. That's fine. Do you have the records in your possession? Or would you need to request them?
A. No, I have them.
Q. Okay. Great. So, I will go ahead and say it on the record. But I'll send you -- I will say it now because the mail -- trying to get mail to you back and forth is always so slow.
But if you could, please, send me whatever records you have relating to, you know, your

mental health status.
A. I can send you everything. I can get that right to you.
Q. Great. That would be very helpful. Thank you, sir.
Okay. All right. So, do you recall any other psychiatric treatment you received outside of those two PPC visits and then the therapy at Friends that we just discussed?
A. No.
Q. Okay. After you were admitted -- no, excuse me. After you were entered DOC custody, your first institution was SCI Graterford, I believe, correct?
A. Yes.
Q. Okay. When you were at SCI Graterford -- when you first entered SCI Graterford, excuse me, did you initially see somebody in the mental health unit?
A. In the initial, I don't remember that. I'm quite sure I did, but I don't remember. Like, the first day you go, you talk to a lot of people. But maybe one of them was from the mental health staff, but I don't remember. I talked to a lot of

people the first that I that, you know.

Q. Did you --

A. But after --

Q. I'm sorry. Go ahead.

A. No, go ahead. Go ahead. I'm sorry.

No, I was going to say, afterwards, I did talk to the mental health staff.

Q. Okay. During the time that you were at SCI Graterford, did you routinely get to, you know, speak to the mental health staff?

A. Routinely, no. Routinely, no.

Q. Okay. How frequently were you -- did you speak with the mental health staff when you were at SCI Graterford? I know I'm trying to isolate some period of time.

A. Sure.

Q. It was so long ago. But again, to the best of your memory?

A. Well, there was one occasion that I requested to see the Mental Health Department staff because I was having some bad thoughts. And after that, I had a -- shortly after that I had a suicide attempt.

And they put me in a POC cell, it's like an

isolation cell where they take all your clothes. And for, I forgot how long it was. Either 48 hours or 72 hours. I'm not sure how long it was. Then I got out. And that's when I seen the mental health staff, that I really remember talking to the mental health doctor for the first time.

At that time -- so, I tried to commit suicide. I made a noose out of a sheet. And when the put me in the cell, I told them that I was just faking because I wanted to get out of the cell. That -- not that I was faking, that I was -- I told them that I was trying to get to another unit to make a phone call just to get out the cell.

Basically, I was telling them anything just to get out of the cell, the POC cell. And that I was okay. That it was nothing wrong with me. And then, they put me on DC status for, like, six months for trying to commit suicide for making a noose.

And basically after that, I never really had any contact with the Mental Health Department. After that, I just dealt with everything on my own as far as you know how I was feeling, depression and --

Q. So after -- after your suicide attempt, you said you were placed in a POC cell?
A. Yes, ma'am.
Q. Is that a -- does POC stand for psychiatric observation cell?
A. Yes.
Q. And after that, you said you spoke to staff from the mental health staff. And afterwards, you were placed on DC status?
A. Right. Before that, I told them that nothing was wrong with me. That I was okay. You know, just I wanted to get back to the unit just to get out the cell. That's what I told the doctor.
And he asked me -- I'm sorry. Go ahead.
Oh. And he asked me, did I want to get on Prozac. And I said, no, I didn't want to take any medication. And yeah, that was pretty much it. It was really quick. It wasn't that long of an interview.
And then, yes, I was placed on DC status for making the noose. And DC status is where they take all your property out of your cell, like, your TV and radio. And you only get to go to the yard by yourself. So basically, you're isolated

on top of being isolated. But you are still on the unit with everybody else. You don't go to a separate unit.

That's how Graterford was back then. You still stayed in your cell. They just took all your property out of your cell.

Q. I see. So while you were on -- the time you were on DC status, you were returned to the -- your regular housing unit, but they removed all your possessions out of the cell?

A. Yes, ma'am.

Q. Okay. And that lasted for roughly six months you believe?

A. Yes.

Q. And I believe you said that after that incident, you -- you no longer sought assistance from the mental health staff?

A. Yes.

Q. Okay. So then, the rest of your time at SCI Graterford outside of that incident, you didn't speak to anyone in the mental health staff?

A. Not that I remember, no.

Q. And then, what about when you transferred to SCI Greene in whatever year it was '96/'97?

Did you -- did you at -- during your time at SCI Greene, do you remember speaking to the mental health staff?

A. Yes.

Q. And I know that your time there was long, so I'm asking for a very long period of time.

What do you remember were your interactions with the mental health staff? Did you have, you know, routine checkups with them? Or was it, you know, sporadic based on incidence?

A. So, there was staff that would come around every now and then just -- you know, just doing like a walk by. How you doing? So, that was the mental health staff, I guess, doing their, you know, weekly rounds or something like that. But no out-of-cell interviews or anything like that.

Then I had a case of -- well, during that time, we weren't allowed to bring water out in the yard. You can get misconduct for bringing water out in the yard. I had a minor case of heat exhaustion. And based off of that, they sent me to the Mental Health Department. They referred me to the Mental Health Department.

So, that's when I remember talking to the

mental health staff after my case of heat exhaustion.

Q. Do you remember approximately when that was?

A. Let me think. Took me a year to recover from that. It was really bad. I couldn't -- it was really bad. I had a headache for, like, six months straight. I had to sleep sitting up. I couldn't lay down. I would get real dizzy when I laid down. The sun would make me dizzy if I went out to the sun.

So heat exhaustion, it was -- it affected me. Took me a year to recover from it. So I would say, maybe around 2008 or 9 maybe or maybe even later than that. I'm not sure. It was a while ago. But I could check the records and get that to you.

Q. Okay.

A. I could have my -- I'm sorry.

Q. No. I was just saying okay.

A. Oh, okay.

Q. So that incident with the heat exhaustion, that was the first time you had an actual one-on-one session with mental health staff?

A. Yes.

Q. Okay. And then, what about after that incident?
A. After the restrictions were -- the relaxed restric --
Q. No, I'm sorry. After the incident with the heat exhaustion where they then sent you to -- referred you to mental health staff.
Did you then -- did you only have one session with them? Or did you then, you know, start having routine sessions with them?
What happened after that is what I'm asking?
A. I believe his name is Dr. Khan. He came to see me at least three or four times on the unit.
Q. Could you repeat that name again?
A. I believe it was Dr. Khan. I'm not sure. I know he was Arab and he was Muslim. I'm not -- his name might have been Dr. Khan.
Q. Got it. Okay.
So Dr. Khan -- we will assume that's his name for these purposes -- saw you to the best of your recollection three or four times on the unit following the incident with the heat exhaustion?
A. Yes. And it was one other doctor other than that. I believe he came to see me twice. I don't

remember his name, but he was an Indian doctor. Not Native American, but Indian from India.
Q. Understood.
A. Okay.
Q. And this -- so this second doctor also came to see you, you said, two times on the unit?
A. Yes.
Q. And that was in conjunction with when Dr. Khan was seeing you?
A. Yes, ma'am.
Q. Now, were those two doctors seeing you together, or were they seeing you separately?
A. Separately.
Q. And do you recall if Dr. Khan or this other doctor made any kind of diagnosis with regards to your mental health?
A. No, I do not.
Q. After those visits with Dr. Khan and the Indian doctor, do you remember any other interactions with the mental health staff while you were at Greene?
A. Yes, ma'am. Yes.
Q. Okay. If you can relate those to me to the best of your recollection.

A.  Sure.  After those relaxed restrictions, we had a mental health staff on the unit during the daylight hours.  I forgot his name.  And I talked to him -- you know, I would talk to him when he would do his rounds.  He was a really nice guy.

I would just talk to him.  He helped me get the DSM-5.  That's like a mental health book, the DSM-5.  And I wanted to be in the CPS program, enrolled in the CPS program, but they already had full enrollment at the time.  And you had to be at least a C or a B roster -- on the mental health roster.

And he checked.  And he said, yes, I was a C at one time, but I was downgraded to B roster.  And yeah, that was pretty much -- you know, I would speak to him from time to time.  He was really nice.  But not as far as on therapy, just in general.

Q.  Do you remember that person's name?

A.  No.

Q.  Okay.

A.  No, I don't remember.

Q.  And you mentioned that you were trying to get onto something, but it was full.  What was that

again?
A. CPS.
Q. And what is --
A. Certified peer specialist.
Q. So you were -- you wanted to be, I don't know if qualified is the right word, as a certified peer specialist? Or you wanted to be assigned to a certified peer specialist?
A. No, qualified. To actually be a certified peer specialist.
Q. Got it. And what is a certified peer specialist?
A. I know they have to take a lot of classes. I guess, they usually make rounds, you know, check on the prisoners to make sure they are doing all right. Speak to them, listen to whatever they got going on. You know, just trying to help them out.
Q. Got it. But this all was after you said the restrictions were relaxed?
A. Yes.
Q. Okay. And you said after the restrictions were relaxed, they -- the institution then had mental health staff sitting in the unit every day during the daylight hours?

A. Yes. They had their own office, yes.
Q. Got it. And anybody was able to go and visit them in their office during those hours?
A. Yes. Yes.
Q. And prior to that, the mental health staff would, I believe you said, come on the block and, you know, do a round -- like, walk around the cells and ask you -- maybe poke their head in and ask you how you are feeling. But they didn't have an office on the block.
Is that accurate?
A. Yes, ma'am. Yes.
Q. Prior to DOC relaxing the restrictions and allowing the mental health staff to have an office on the unit, were you able to have a one-on-one session with the mental health staff if you requested it?
A. Yes.
Q. So if they asked you during their rounds, you know, how are you feeling and then you related to them, you know, maybe I'm not feeling so great, you know, could I talk to you one-on-one, would they then sit with you one-on-one or schedule you for an appointment?

How would that work?
A. I believe they would schedule me for an appointment. Or maybe they might just -- I guess, they would schedule me for an appointment. Or maybe they might even -- depending on the seriousness of it, they might even just take you out the cell and put you in an office and maybe, you know, see what's going on depending on what you say, yeah.
Q. But during that time, you didn't -- you never requested to have a one-on-one session with them or anything?
A. No, ma'am.
Q. Okay. During the times when they were walking around doing their check-ins with people, did you ever relate to them, you know, I'm not feeling too good? I'm feeling kind of down?
A. No. I would always say I'm okay.
Q. Do you remember if at any time you requested assistance from the mental health unit or expressed, you know, to the guards that you were feeling down or, you know, suicidal and they didn't -- you know, they didn't give you assistance? They didn't make an appointment for

you at the mental health?
A. No. I never -- that never happened at Greene, just at Graterford with the suicide and asking for help then. But at Greene, no.
Q. Okay.
A. But would they -- would they -- you're asking would they just ignore that?
Q. No. I was just asking if you remember any time where you had -- where they had ignored you?
A. Oh, no, no, no.
Q. In your time at SCI -- well, actually, let me rephrase my question.
During your time with the DOC, to your knowledge, has any mental health professional given you any kind of diagnosis?
A. No, not that I'm aware of. But that doesn't mean that they haven't because I was on a C roster for a while. And so, I just haven't seen the records to see what I was diagnosed with from their doctors, from the department's doctors.
It's kind of hard to get those records.
Q. Yeah.
A. They won't let me see the mental health records.

Q. Okay. But you are aware that you were on the C Roster for some period of time?
A. Yes. That was -- yes. They told me that I was on the C Roster for some period of time, yes.
Q. Okay. Do you know if you are -- let me back up. Are you made aware of what your status is, whether it -- you know, whether you are A, B or C?
A. Just from that conversation with the doctor at Greene when I was trying to be a CPS. And he said I was downgraded to a B Roster.
Q. So you -- at this point in time, you have no idea what your roster is?
A. Status is, no.
Q. Your status, okay. But based on that conversation with that therapist or doctor, we're not sure what he was at Greene, he did tell you at that time that at some point you were the C Roster and then you had been switched to a B Roster?
A. Yes, ma'am.
Q. Okay. Are there any -- let me back up.
Other than that incident at SCI Graterford that you described to me earlier where you were placed on DC status after your suicide attempt, during the time where you were at SCI Greene, were

you ever placed on DC status to your memory?
A. Yes. Oh, yes.
Q. Do you remember when that was or --
A. No. But I could tell you what they were for, but I don't remember. It was --
Q. Sure.
A. Shadowboxing the yard. One was for -- they had the cable on in the cell. And I -- and I had like a wire hooked up instead of like real cable. So, they got me for cable theft one time. So, I got like 30 or 15 days for that.
And maybe, like, in our yard -- I don't know if you've ever seen how the yards is, but like cages, small cages.
Q. I have seen it, yes.
A. Okay. So at that time, after a while, they let us have basketballs but with no basketball hoop or anything. So what we would do, we take, like, a string, tie it up in the corner to make, like, a little triangle basketball hoop. So, I got misconduct for that.
But I beat that one, but I did get a misconduct for that, for tying it up. But I didn't get DC for that.

Let me see what else.

Oh, at Graterford -- you want to know at Greene -- well, Graterford, I was a little -- I was going through because I had just came through. I was a little rough. And yeah, it was a little rough. And staff was a little, you know, hard on us.

So one time I -- the guard -- I was praying because I'm a Muslim and I was praying. It was at breakfast time. And my tray was still on the slot. And they just threw my tray in the trash. So, I got a little upset. And I broke my chair and took the wood and slung it at him.

But it didn't hit him, but I got a misconduct for that. And I think that's why I got transferred to Greene based off of that incident. And actually, Officer Harris became our -- he got transferred to Greene. And he was, actually, our counselor at Greene.

So yeah, it wasn't a problem, you know, after that. It was just a quick incident. But I believe that separation -- when I was talking to the mental health staff at Greene when I wanted to be CPS and they -- you know, he was going over my

record. And that was still on my record that incident with Officer Harris when I broke my chair.

But other than that, at Greene it was all, you know, just some minor stuff. But I would say when I broke the chair and tried to hit Officer Harris with the chair, a piece of the wood of the chair, that was, you know, probably the worst thing.

Q. If you could just describe to me, Mr. Williams. You know, we discussed already that the treatment that you're complaining about is during the time that you were -- prior to when the prison relaxed the Capital Case Unit.

A. I'm not actually complaining about the treatment. That's not my complaint.

Q. Okay. Yes. So I'm going to -- the question I am leading up to is, if you can just describe to me in your own words, clarify what conditions or, what have you, are you focused on in terms of your litigation?

A. Okay, good. I'm talking about failure to accommodate, like, with programs that they had available for us. Like, out of cell program, psychotherapy out of cell, group therapy, anger

manager. It's a thing called WRAP. It's a wellness -- that's an acronym for it. But it's wellness -- I forgot the name of it, but it's called WRAP. And they have a lot of programs, like, music therapy, art therapy.

So, all those things that the department -- all these services that they had, these mental health services, we weren't allowed to have because of our status of our capital sentence.

So basically, that's what I am saying. It's a failure to accommodate claim.

Q. Okay. And this is, again, just as regards to the time period before the Capital Case Unit was relaxed.

Is that accurate?

A. Yes, ma'am.

Q. At this time, do you feel that you do have access to those services?

A. No. They haven't started any of that, any of those type of programs yet. There is -- going to be starting in January.

Q. Okay.

A. Like all the -- I'm sorry.

Q. No. No. Go ahead.

A. No. Like, as far as the anger management programs, you know, anything off the unit. Like I mentioned earlier that I was -- I applied for -- be in the barber program to get my barber's license. So in January, they are going to be opening it up.

And now, we just have out-of-cell time. But we are not -- we don't have access to any program services yet.

Q. Okay. So is your complaint -- so, you said your complaint relates to the failure to accommodate for out-of-cell programs. And you mentioned these therapy programs, various therapy programs.

Is that -- is that the sole focus? Or are there other services or programs that you feel that the DOC, you know, failed to provide to you that are part of your complaint?

A. Yes. Any -- I'm saying, anything that they have -- not just mental health programs, any programs that we were entitled to have.

But yeah, I would say it's more geared towards the mental health programs. And by definition, solitary confinement wouldn't allow that. Maximum

administrative custody wouldn't allow for any programs because you were locked in. So they wouldn't bring -- yeah, they wouldn't do anything.

So we decide to, you know.

Q. Are you -- does your complaint encompass any other restrictions of the Capital Case Unit other than various, sounds like, group programs is a thing that you've related to my earlier, mental health ones, but other types of programs, as well?

You know, are you encompassing any other type of, you know, restrictions --

A. Yes.

Q. -- that were placed on the Capital Case Unit?

A. Yeah. Like, the program services other than mental health. Like, being able to give off-the-unit job, like -- as far as like my barber's license. So I would say, vocational programs, as well.

Q. Okay.

A. And educational programs, you know, off the unit. I know they did have a GED in-cell program. But anything, you know, that was -- that similarly situated non-Capital prisoners with non-health issues had access to, that's what, you know, my

complaint is geared towards.
Did I say that right? Is that okay?
Q. Yeah. Yeah. I'm -- absolutely. You are doing great.
A. Okay.
Q. All my questions are just designed to help me understand --
A. Okay.
Q. -- specifically what your complaint is about. And that will help me answer it.
A. Okay.
Q. Did you -- do you remember any specific programs that you ask to be -- to have access to?
A. No. Only time they were -- it was requested, was from the ACLU requested, you know -- the Department of Corrections, you know, wrote a letter to Secretary Wetzel. I think it was in 2017 based off of the -- their reforms that they made, you know, based off their 2014 Department of Justice Report on how the department was using solitary confinement on prisoners with mental health and intellectual disabilities.
And based off the Disabilities Rights Settlement Agreement with the Department of

Corrections, they made reforms for non-Capitals and changed their policies and, you know, gave them access to the program. But they didn't do it for the Capitals. So -- and yeah, that was the only time that it was requested not by me personally, but requested through the ACLU.

And the Department's response was that they were going to continue their Capital Case Housing Policy as administrative -- Maximum Administrative Custody. Which, in turn, brought about Reed v. Wetzel. And based off of Reed v. Wetzel, now that's how we got the relaxed restrictions. And now, we are going to be able to have access to program services.

But my complaint is geared toward those past violations of failure to accommodate.

Q. And what do you -- if you can clarify, what do you mean by that? These -- you said your complaint is geared towards these past violations.

What do you mean?

A. Like when I first came in. When I first had the issue with the suicide attempt. And know they had suicide prevention and all those things. And they never -- their response was punitive based

off of my suicide attempt. So, that really turned me away from the mental health department. And I withdrew and just dealt with, you know, whatever I was feeling myself.

Yeah. So, yeah. So I'm saying -- I guess I'm saying that they had -- they had these programs and these services available. I don't believe that it's -- relies on a request. Solitary confinement in -- by its definition doesn't allow for it, for any of those programs. Yeah, so -- yeah. And yeah, it just doesn't allow for any of those programs.

Can I say one thing?

Q. Of course.

A. It's not -- I remember Jennifer Bangel asking me a question, so maybe I could just -- that it's not -- I'm not challenging solitary confinement. It's not a face -- it's how they apply solitary confinement to a person, to an inmate who has mental health -- mental health disability, how they applied it to me.

Q. Okay --

A. I'm not challenging -- I'm sorry.

Q. I was going to clarify. So, you're saying

that your complaint is -- is -- is an as-applied challenge with regards to the application of solitary confinement to you, Mr. Williams?
A. Yes, ma'am.
Q. Because of your mental health status?
A. Yes, ma'am.
Q. And I didn't mean to cut you off when you were about to say something else.
Did you want to clarify something else?
A. I don't even remember what I was going to say. I'm sorry.
Q. That's fine.
A. That's okay. It might pop up.
Q. It's the nature of these, you know, remote --
A. Delays.
Q. -- depositions. Yeah, exactly. I mean, they're a great tool in many ways. But inevitably, there is at least a little bit of a slight lag.
And, Mr. Williams, did you ever, you know, file or submit a grievance or anything like that during the time, you know, all these years over the years, did you ever file a grievance or anything related to your inability to have access

to any programs or what have you?
A. Yes.
Q. Do you remember -- well, let me ask you this.
Do you still have copies of those grievances that you filed?
A. Yes.
Q. Okay, great. So, I will ask you for copies of those? Do you --
A. Well, I don't -- I'm sorry. Go ahead.
I don't have -- what do I have? I have the numbers.
Q. Oh, yeah. If you have the numbers, go ahead and give me the numbers.
A. I can give them to you now. Do you want the numbers now?
Q. Sure. Happy to write them down.
A. All right. One is 916331. Okay. And the other one is -- I don't have the other one, but I can get that to you.
Q. Okay. That's not problem?
A. Sorry. I didn't bring that with me.
Q. No problem. Do you remember roughly when you filed the grievances?
A. Okay. One -- okay. Sure.

So the first one -- the one that you have the number for was 2/24/2021 -- February 24, 2021. And the first one was December 21, 2020.

Q. Sorry. Hold on. There's helicopter flying by or something. Just give me a second.

Okay. Could you repeat that again?

A. Sure. So, the first one was 12/21/2020. So, I actually filed two grievances.

Q. Great. Okay. And other than those two grievances, do you recall filing other grievances related to these issues?

A. No, ma'am.

Q. Okay.

A. I did not file any other grievances related to these issues.

Q. Okay. And the grievances, I will get copies of those grievances. So, you don't have to tell me verbatim.

But just while we are sitting here, the two grievances that you filed, one in December of 2020 and then another in February of 2021, did they relate to -- do they relate to things that are happening now? Or did they -- are they related to, you know, the things that we've been

discussing from -- you know, that happened in the past?

A. Happened in the past.

Q. Okay. Is it say for me to assume that what you put in those grievances are the things that we have discussed here today?

A. Yes.

Q. And don't worry, like I said, I will get copies of those grievances.

A. Yeah. Okay.

Q. Is there anything in those grievances that we haven't discussed yet that you want to tell me about?

A. Oh, it does actually -- sorry. It does actually name -- it 1994, it mentions Dr. Spector. I got that from my attorney. So, that would be Dr. Jay Spector.

It mentions that that doctor diagnosed me with -- I put in here, psychiatric disability. So, it may have been another diagnosis. It may have been -- it may have been depression or, I forgot what it was. But I characterize it as a psychiatric disability.

So what you have is like -- like -- like just

as far as in the criminal side, your lawyers would ask you this -- you know, file a release form so they can have all your mental health records and do the mitigating investigation and all that.

So, but they have an agreement with the Department of Corrections not to give you copies of the mental health records. But they will tell you what's in them over the phone or give you an idea of what --

Q. Hold on. Hold on, Mr. Williams. I don't want you to accidently tell me anything about discussions you've had with your lawyers.

A. No, no, No. Okay. I'm sorry.

Q. I just --

A. Okay.

Q. I want to protect your attorney/client privilege with your lawyers.

A. Okay.

Q. I don't want to accidentally take you down that road or for you to accidentally reveal anything.

A. Okay.

Q. I understand, but you don't need to tell me anything more.

A. Thank you.

Q. Obviously, you're psychiatric records will be obtained and, you know, they will speak for themselves. Don't worry about that.

A. Okay. I'm sorry.

Q. No, no. Don't apologize to me. I just want to make sure you don't accidentally say anything that will waive your privilege.

Okay. Well, sir -- is there anything, Mr. Williams, that I haven't already asked you, you know, that we haven't already discussed that you -- you know, is a part of your complaint and that you want to discuss with me?

You know, is there anything we haven't, like, already discussed that you want to tell me?

A. In the answer, there was two defenses: Failure to exhaust administrative remedies and statute of limitations. But as far as the administrative remedies, we -- prisoners, as far as the 804 Policy, that's the grievance policy -- we are not allowed to -- that's not an available grievance -- let me say this correctly.

It's not an available avenue to complain or challenge your conditions of confinement. So

there is no -- you can't challenge -- under the 804, you can't challenge the Secretary's decision of placing Capitals in Maximum Administrative Custody.

And so if you are asking for accommodations, you can't -- reasonable accommodations, you really -- there is no avenue that -- to request that based off of conditions of confinement complaint. There is no way to -- there is no way to grieve it. Even the -- they have a form called Reasonable Accommodations Form, like, mental health disabilities -- or, excuse me, just disabilities, not mental health. Just Disabilities Accommodation Form 006.

And that, you can't -- prisoners can't -- it's not an available means to challenge conditions of confinement by being placed in a maximum administrative custody and a failure to accommodate. Like you say, okay, I'm in administrative custody and I want these programs. That's not even an available avenue through that policy that determines that. So, the only way we can challenge is through the Secretary of the Department of Corrections.

And the ACLU did make that request, and they denied that request. And there was a lawsuit, Reed v. Wetzel, which brought about our relaxed restrictions. And now my complaint is geared towards monetary damages for the failure to accommodate for all the years prior to that. Yeah. Basically, that's pretty much it.

And it's a -- as far as the statute of limitations is coming, alleging continual violations doctrine, that it was a continual -- that the last act was December 3, 2019. And then, I filed within two years of that date, of that last prior act.

Would you like some -- I'm sorry. I'm sorry. Go ahead.

Q. No, sir. I was just going to thank you. I don't have any further questions.

A. Oh, okay.

Q. Yes. So, I was going to wrap up because I don't have any further questions. And just, you know, again, ask you if there is -- I appreciate all your answers today and all the information you provided.

Is there anything else you want to let me

know? Or otherwise, I am going -- finished for the day?
A. So that's it? That's all you need from me?
Q. That's all I need from you, sir. The nature of these deposition is simply to really understand what your allegations and your complaints are.
You know, this one is --
A. So, how do you see it?
Q. Well, I can't really answer that. You will -- my assessment of the case.
A. I will see that --
Q. My feelings about the case will be in the motion, of course. But, you know, the deposition is a discovery too just so I can really, truly understand what it is your allegations are.
And I think that, you know --
A. Okay. I do have one other thing to say.
Q. Sure.
A. Basically, similar to the Palakovic -- have you heard of Palakovic vs. Wetzel?
It was guy -- Jason[sic] Palakovic. He committed suicide at SCI Correction at around the time that the Department of Justice was doing their first initial investigation. And so, his

family sued the Department.

And what the Court found was that they were aware that Brandon had suicidal ideation. He was on the mental health roster. And despite all that, they kept him in solitary for, like, 60 days here and 60 days there, something like that. And while he was in solitary, he committed suicide.

So, they wind up settling, you know, after that. But yeah, so basically that's what my complaint. They were aware that I was on the mental health roster. They were aware of my disability. And despite that knowledge and the risk and the harm, they kept me in solitary and failed to accommodate me with any type of programs or anything.

And that's the end of that. That's pretty much it. Oh, the DOC did acknowledge. And based off -- there were some cases like, as far as, the failure to exhaust and no available administrative re -- they have actually admitted that what I'm -- in other cased like in Johnston and in Powell vs. Fisher, that the 804 Policy, a person challenging, you know, administrative custody can -- you know, that's not an available means.

And so, Furgess vs. Pennsylvania Department of Corrections, it's a recent 2019 case where a guy was put in RHU. He was denied a shower for about 90 days. And Third Circuit Court of Appeals held that it didn't matter why he was in RHU. That the prisoners -- how did he say it? A prisoner's right to reasonable accommodations isn't stripped because he's placed in administrative custody or RHU. And the Prison's obligation to comply with ADA and the RA, they have -- excuse me, they have an obligation to -- no matter -- regardless of the reasons why a prisoner is housed in administrative custody.

So basically, that's the claim. They failed to accommodate a person with a mental health disability, but they accommodate people with physical -- prisoners with physical disabilities, like, accommodating with an accessible shower, a wheelchair. So, these other similar-situated prisoners, their physical disabilities is equivalent to a person -- prisoner who has a mental health disability. They fail to accommodate as far as Capital, yeah.

So basically, that's -- basically, that's it.

It's a failure to accommodate claim.

Q. Okay.

A. And that's it.

Q. Okay. Your complaint also states that you're bringing it under the 8th and 14th amendments. Is that part of your complaint? Or really, is your complaint under the Americans with Disabilities Act?

A. It's under both. It's under both. It's under both.

Q. That's fine. Okay, sir. Well, thank you. I really appreciate your time today. If you could, please, just send me a copy of the materials that you have.

A. The mental health records?

Q. Yes. Whatever it is that you actually have in your possession, I'm not asking you to go and request it from anybody else. But if you already have copies of any of -- anything that you think is related to your claims, if you already have copies in your possession, if you can send those to me.

I know we discussed today the mental health records and the grievance records. If you have

copies already in your possession, please, go ahead and send that to me. I'm not asking you again to, you know, ask somebody else.

Okay?

A. Okay. Yes, ma'am.

Q. All right, sir. Well, again --

A. I have on --

Q. -- I appreciate your time.

A. I have one other thing to say.

Q. Yeah.

A. I seen -- this in nothing dealing with the case. This is just on a personal thing.

I was watching TV the other day. And I saw a lot of Asian-American community, like, at a rally protesting Asian hate. And I just want to say that I'm sorry that the Asian community is going through that now. When I was coming up, we didn't feel that way. My generation didn't feel that way about Asians. We looked up to them, like, all the martial arts and movie stars.

So, I just want to say I'm sorry for what they are going through. And things will get better. And keep your head up.

Q. Thank you, sir. That's very kind of you.

Thank you.

A. Okay.

Q. Same to you.

A. Okay.

Q. Thank you. Thank you again for your time today.

A. You're welcome.

Q. Okay.

A. Thank you.

Q. Okay, sir. Bye, bye. Thank you.

A. You have a nice day.

Q. You, too.

(At this time, the deposition concluded at 1:04 p.m.)

C E R T I F I C A T I O N

I, hereby certify that the proceedings and evidence noted are contained fully and accurately in the stenographic notes taken by me in the foregoing matter, and that this is a correct transcript of the same.

-------------------------
ANGELA M. KING, RPR,
Court Reporter, Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**A**

**a.m** 1:14
**ability** 16:8
**able** 34:2,15 43:15 45:13
**absolutely** 44:3
**access** 41:18 42:8 43:24 44:13 45:3 45:13 47:24
**accessible** 57:18
**accidentally** 51:19,20 52:7
**accidently** 51:11
**accommod...** 40:22 41:11 42:12 45:16 53:19 54:6 56:14 57:15,16,23 58:1
**accommod...** 57:18
**Accommod...** 53:14
**accommod...** 53:5,6,11 57:7
**accurate** 7:21 9:8 13:9 21:5 34:11 41:15
**accurately** 61:5
**acknowledge** 56:17
**ACLU** 44:15 45:6 54:1
**acronym** 41:2
**act** 54:11,13 58:8
**activities** 8:18,19
**actual** 20:10 29:22
**ADA** 57:10
**additional** 9:13 17:9
**administra...** 9:5
**administra...** 9:24 43:1 45:9,9 52:17,19 53:3,18,20 56:19,23 57:8,12
**admitted** 14:8,12 16:1 18:2 19:13 23:11 56:20
**adolescents** 16:14
**AGENCY** 1:19
**ago** 18:23 24:17 29:15
**agreement** 44:24 51:5
**ahead** 22:11 22:19 24:4 24:5,5 26:14 41:24 48:9 48:12 54:15 59:2
**allegations** 55:6,15
**alleging** 54:9
**allow** 6:14,16 9:5 42:24 43:1 46:9 46:11
**allowed** 8:20 28:18 41:8 52:21
**allowing** 34:14
**alteration** 9:19
**altered** 9:4
**amendments** 58:5
**American** 31:2
**Americans** 58:7
**and/or** 61:18
**Angela** 1:14 4:3 61:11
**anger** 40:24 42:1
**answer** 5:8 5:13,23 6:1 6:9,17 44:10 52:16 55:9
**answering** 6:16
**answers** 54:22
**anybody** 34:2 58:18
**apologize** 52:6
**Appeals** 57:4
**application** 47:2
**applied** 8:23 42:3 46:21
**apply** 46:18 61:15
**appointment** 34:24 35:3 35:4,24
**appreciate** 54:21 58:12 59:8
**approxima...** 16:20 29:3
**April** 18:3 21:15
**Arab** 30:16
**Arch** 2:6
**arrival** 10:3
**art** 41:5
**arts** 59:20
**as-applied** 47:1
**Asian** 59:15 59:16
**Asian-Ame...** 59:14
**Asians** 59:19
**asked** 26:14 26:15 34:19 52:10
**asking** 15:14 28:6 30:11 36:3,6,8 46:15 53:5 58:17 59:2
**assessment** 55:10
**assigned** 33:7
**assistance** 27:16 35:20,24
**ASSOCIA...** 1:19
**assume** 6:10 30:19 50:4
**attach** 14:7
**attempt** 24:23 26:1 37:23 45:22 46:1
**attended** 19:24
**attending** 18:19 19:1 19:7 20:5
**attorney** 2:5 50:16
**attorney/cli...** 51:16
**available** 40:23 46:7 52:21,23 53:16,21 56:19,24
**avenue** 52:23 53:7,21
**aware** 36:16 37:1,6 56:3 56:10,11

**B**

**B** 3:11 8:17 32:11,14 37:7,10,18
**back** 9:18 10:2,20 21:6,6,7,10 22:22 26:12 27:4 37:5,20
**bad** 24:21 29:5,6
**Bangel** 46:15
**barber** 8:23 42:4
**barber's** 8:24 42:4 43:17
**based** 28:10 28:21 37:14 39:16 44:18,19,23 45:11,24 53:8 56:17
**basically** 25:14,20 26:24 41:10 54:7 55:19 56:9 57:14,24,24
**basketball** 38:17,20
**basketballs** 38:17
**beat** 38:22
**believe** 10:9 13:5 15:18 15:19 16:12 19:23 22:5 23:13 27:13,15 30:12,15,24 34:6 35:2 39:22 46:7
**bell** 19:16
**best** 5:9,12 5:17 16:7 21:19 24:17 30:20 31:24
**better** 59:22
**bit** 47:18
**block** 13:8,9 34:6,10
**book** 32:7
**Boulevard** 17:5,7
**Brandon** 56:3
**breakfast** 39:10
**briefly** 10:15
**bring** 28:18 43:3 48:21
**bringing** 28:19 58:5
**broke** 39:12 40:2,6
**brought** 45:10 54:3
**Building** 2:6
**bye** 60:10,10

**C**

**C** 2:2 32:11 32:13 36:17 37:2 37:4,7,17 61:1,1
**cable** 38:8,9 38:10
**cages** 38:14 38:14
**call** 9:24 17:11 25:13
**called** 16:12 17:4 41:1,4 53:10
**capital** 7:7 9:5,12,20 9:21 11:21 11:24 12:2 12:15,17,20 13:6 40:13 41:9,13 43:6,13 45:8 57:23
**Capitals** 45:4 53:3
**case** 4:22 7:2 7:7 9:5,12 9:20,21 11:21,24 12:2,15,17 12:20 13:7 28:17,20 29:1 40:13 41:13 43:6 43:13 45:8 55:10,12 57:2 59:12
**cased** 56:21
**cases** 56:18
**cell** 8:4,18,21 8:21 24:24 25:1,9,10 25:13,15,15 26:2,5,13 26:22 27:5 27:6,10 35:7 38:8 40:23,24
**cells** 34:8
**center** 14:9 14:13 16:2 18:2,6,7 19:13 21:3 21:8
**certification** 61:13
**certified** 33:4 33:6,8,9,11
**certify** 61:3
**certifying** 61:19
**chair** 39:12 40:3,6,7,7
**challenge** 47:2 52:24 53:1,2,16 53:23
**challenging** 46:17,23 56:22
**change** 7:12 7:13 9:19
**changed** 45:2
**characterize** 50:22
**check** 22:9 29:15 33:14
**check-ins** 35:15
**checked** 32:13
**checkups** 28:9
**Circle** 17:8
**Circuit** 57:4
**claim** 41:11 57:14 58:1
**claims** 58:20
**clarifies** 13:18
**clarify** 6:8 9:17 10:11 12:12 15:23 40:18 45:17 46:24 47:9
**classes** 33:13
**clinical** 15:4 15:20 20:18
**clothes** 25:1
**Collegeville** 1:9
**come** 28:11 34:6
**coming** 54:9 59:17
**commencing** 1:14
**commit** 25:7 25:18
**commitment** 21:2
**committed** 55:22 56:7
**community** 59:14,16
**complain** 52:23
**complaining** 12:19,22 13:11 40:11,14
**complaint** 7:4 12:13 14:1,6 15:3 21:17 40:15 42:10,11,18 43:5 44:1,9 45:15,19 47:1 52:12 53:9 54:4 56:10 58:4 58:6,7
**complaints** 12:16 55:6
**completely** 6:14,17,17
**comply** 57:9
**concluded** 20:14 60:14
**conditions** 40:18 52:24 53:8 53:16
**confinement** 7:7,8 42:24 44:21 46:9 46:17,19 47:3 52:24

53:8,17
**conjunction** 31:8
**consider** 7:8
**considered** 8:3
**contact** 25:21
**contained** 61:4
**contention** 14:2
**continual** 54:9,10
**continue** 45:8
**control** 61:17
**conversation** 37:8,15
**conversatio...** 15:16,22
**convicted** 11:4
**copies** 48:4,7 49:16 50:9 51:6 58:19 58:21 59:1
**copy** 58:13
**corner** 38:19
**correct** 23:14 61:7
**Correction** 55:22
**Corrections** 9:4 12:24 44:16 45:1 51:6 53:24 57:2
**correctly** 52:22
**counsel** 15:14 15:19,22
**counselor** 39:19
**county** 10:22 10:23
**course** 6:13 19:24 46:14 55:13
**court** 1:1,15 1:19 3:14 4:3 6:20 7:3 15:17 15:19 56:2 57:4 61:11
**CPS** 32:8,9 33:2 37:9 39:24
**criminal** 15:9 51:1
**current** 7:19 9:10,11 12:20,22 13:19 15:19
**currently** 7:22
**custody** 10:1 23:12 43:1 45:10 53:4 53:18,20 56:23 57:8 57:13
**cut** 16:18 47:7

**D**

**D** 3:1
**damages** 54:5
**date** 12:4,6 54:12
**dated** 20:16
**day** 23:22 33:23 55:2 59:13 60:11
**daylight** 32:3 33:24
**days** 14:14,16 14:19 21:10 22:5 38:11 56:5 56:6 57:4
**DC** 25:17 26:9,20,21 27:8 37:23 38:1,24
**DE** 1:21
**dealing** 59:11
**dealt** 25:22 46:3
**December** 1:9 9:3 10:23 12:5 12:17 13:1 13:13 49:3 49:20 54:11
**decide** 43:4
**decision** 53:2
**defendant** 2:8 4:22
**defenses** 52:16
**definition** 42:23 46:9
**Delays** 47:15
**denied** 54:2 57:3
**department** 8:19 9:4 12:24 24:20 25:21 28:22,23 41:6 44:16 44:19,20,24 46:2 51:6 53:24 55:23 56:1 57:1
**department's** 36:20 45:7
**depending** 35:5,8
**deposed** 4:24
**deposition** 1:12 4:4 5:7 6:13 7:1 55:5,13 60:13
**depositions** 47:16
**depression** 14:23 25:23 50:21
**describe** 12:14 40:9 40:17
**described** 37:22
**DESCRIP...** 3:12
**designed** 44:6
**despite** 56:4 56:12
**details** 8:12
**detention** 18:6,7
**determines** 53:22
**diagnosed** 14:3 36:19 50:18
**diagnosis** 14:18,22 15:4 20:10 22:7,15 31:15 36:15 50:20
**direct** 61:17
**disabilities** 44:22,23 53:12,13,14 57:17,20 58:7
**disability** 46:20 50:19,23 56:12 57:16,22
**discovery** 55:14
**discuss** 52:13
**discussed** 12:3 23:9 40:10 50:6 50:12 52:11,15 58:23
**discussing** 50:1
**discussions** 51:12
**District** 1:1,2 7:3
**dizzy** 29:8,9
**DOC** 23:12 34:13 36:13 42:17 56:17
**doctor** 18:12 25:6 26:13 30:23 31:1 31:5,15,19 37:8,15 50:18
**doctor's** 16:14
**doctors** 31:11 36:20,20
**doctors'** 19:12
**doctrine** 54:10
**documents** 14:7
**doing** 28:12 28:13,14 33:15 35:15 44:4 55:23
**downgraded** 32:14 37:10
**Dr** 30:12,15 30:17,19 31:8,14,18 50:15,17
**DSM-5** 32:7 32:8
**duly** 4:8

**E**

**E** 2:2,2 3:1,11 61:1
**earlier** 12:3 37:22 42:3 43:8
**east** 8:15
**Eastern** 1:2 7:2
**educational** 43:20
**either** 10:10 25:2
**Email** 2:8
**encompass** 43:5
**encompassi...** 43:10
**enrolled** 32:9
**enrollment** 32:10
**enter** 12:23
**entered** 13:12 23:12,17
**entire** 11:16 13:4,7
**entitled** 42:21
**environment** 15:2
**episode** 14:7
**equivalent** 57:21
**Esquire** 2:5
**evaluation** 15:20
**everybody** 27:2
**evidence** 61:4
**exactly** 7:6,9 7:16 9:16 47:16
**examination** 3:6 4:17 15:4
**examinations** 15:6,8,13 16:3,4,9,10 20:18,19 21:4
**examined** 4:9
**example** 5:24
**exams** 15:24
**excuse** 23:11 23:17 53:12 57:10
**exhaust** 52:17 56:19
**exhaustion** 28:21 29:2 29:11,21 30:6,22
**exhibits** 3:13
**experienced** 12:9
**explain** 7:5
**expressed** 35:21

**F**

**F** 61:1
**face** 46:18
**facility** 18:4
**fact** 15:5 17:19
**fail** 57:22
**failed** 42:17 56:14 57:14
**failure** 40:21 41:11 42:11 45:16 52:17 53:18 54:5 56:19 58:1
**fair** 6:11,22
**faking** 25:9 25:11
**family** 18:13 19:3,4,5,15 56:1
**far** 9:1 25:23 32:17 42:1 43:16 51:1 52:18,19 54:8 56:18 57:23
**February** 11:6 49:2 49:21
**feel** 41:17 42:16 59:18,18
**feeling** 25:23 34:9,20,21 35:16,17,22 46:4
**feelings** 55:12
**file** 47:21,23 49:14 51:2
**filed** 4:23 7:2 48:5,23 49:8,20 54:12
**filing** 7:11 49:10
**fine** 5:14 17:20 19:23 22:16 47:12 58:11
**finish** 6:14,15 6:17,18
**finished** 55:1
**first** 19:22 21:12,12,24 23:13,17,22 24:1 25:6 29:22 45:21,21 49:1,3,7 55:24
**Fisher** 56:22
**flying** 49:4
**focus** 13:16 42:15
**focused** 13:22 40:19
**following** 30:22
**follows** 4:9
**foregoing** 61:6,13
**forgot** 25:2 32:3 41:3 50:22
**form** 51:2 53:10,11,14
**former** 10:13
**forth** 22:22
**found** 56:2
**four** 30:13,21
**frame** 16:22 17:2 20:4
**frequently** 24:12
**Friends** 1:20 16:12,12 17:4,5,10 18:4,16,20 19:11,24 20:11,14 21:1 23:9
**front** 5:16
**full** 1:19 4:12 32:10,24
**fully** 10:18 61:4
**Furgess** 57:1
**further** 54:17 54:20

**G**

**geared** 42:22 44:1 45:15 45:19 54:4
**GED** 43:21
**general** 2:5 9:6 32:18
**generation** 59:18
**give** 5:3 35:23 43:15 48:13,14 49:5 51:6,8
**given** 36:15
**go** 5:4,5 12:4 18:9 22:11 22:19

23:22 24:4 24:5,5 26:14,23 27:2 34:2 41:24 48:9 48:12 54:15 58:17 59:1
**goes** 6:4
**going** 5:4 8:22 18:16 22:13 24:6 33:17 35:8 39:4,24 40:16 41:20 42:5 45:8,13 46:24 47:10 54:16,19 55:1 59:16 59:22
**good** 4:2 18:21,21 35:17 40:21
**Graterford** 10:10,13,16 10:20,22 11:8 13:2,5 13:12 23:13,16,17 24:9,14 27:4,20 36:3 37:21 39:2,3
**great** 15:21 17:14,14 22:19 23:4 34:21 44:4 47:17 48:7 49:9
**greater** 9:21
**Greene** 10:5 10:7,13,21 11:2,8,11 11:14,15,19 11:23 12:2 12:9 13:3 27:24 28:2 31:21 36:2 36:4 37:9 37:16,24 39:3,16,18 39:19,23 40:4
**grievance** 47:21,23 52:20,22 58:24
**grievances** 48:4,23 49:8,10,10 49:14,16,17 49:20 50:5 50:9,11
**grieve** 53:10
**ground** 5:3
**group** 40:24 43:7
**guard** 39:8
**guards** 35:21
**guess** 8:2 9:13 16:16 28:14 33:14 35:3 46:5
**guy** 32:5 55:21 57:2

**H**

**H** 3:11
**happened** 30:11 36:2 50:1,3
**happening** 17:24 49:23
**Happy** 48:16
**hard** 36:21 39:6
**harm** 56:13
**Harris** 39:17 40:2,6
**hate** 59:15
**head** 6:2,5 34:8 59:23
**headache** 29:6
**health** 14:3 14:18,22 18:5 20:20 23:1,18,23 24:7,10,13 24:20 25:5 25:6,21 26:8 27:17 27:21 28:3 28:8,14,22 28:23 29:1 29:23 30:7 31:16,20 32:2,7,11 33:23 34:5 34:14,16 35:20 36:1 36:14,23 39:23 41:8 42:20,23 43:9,15 44:22 46:2 46:20,20 47:5 51:3,7 53:12,13 56:4,11 57:15,22 58:15,23
**heard** 55:20
**heat** 28:20 29:1,11,21 30:6,22
**held** 1:13 57:4
**helicopter** 49:4
**help** 33:17 36:4 44:6 44:10
**helped** 32:6
**helpful** 15:2 23:4
**hired** 15:19
**hit** 39:14 40:6
**Hold** 49:4 51:10,10
**hooked** 38:9
**hoop** 38:18 38:20
**hopefully** 5:5
**hospital** 18:5 18:8
**hours** 25:3,3 32:3 33:24 34:3
**housed** 7:22 8:10,14 9:12,20 10:4 11:15 11:21,24 57:12
**housing** 7:12 7:19,24 8:9 9:23 27:9 45:8

**I**

**idea** 37:12 51:9
**ideation** 14:24 56:3
**ideations** 14:10
**ignore** 36:7
**ignored** 36:9
**in-cell** 43:21
**inability** 47:24
**incidence** 28:10
**incident** 27:16,20 29:21 30:2 30:5,22 37:21 39:16,21 40:2
**included** 21:16
**India** 31:2
**Indian** 31:1,2 31:19
**individual** 19:2
**inevitably** 47:18
**information** 17:12,17,21 54:22
**initial** 12:23 23:20 55:24
**initially** 11:13 23:18
**inmate** 46:19
**inmates** 7:7
**Institute** 17:10
**institution** 23:13 33:22
**intellectual** 44:22
**interactions** 28:7 31:20
**interview** 26:19
**interviews** 28:16
**introduce** 4:20
**investigation** 51:4 55:24
**involuntary** 21:13
**isolate** 24:14
**isolated** 26:24 27:1
**isolation** 25:1
**issue** 14:18 45:22
**issued** 12:6
**issues** 14:4 43:24 49:11,15

**J**

**J** 13:8,9
**jail** 10:23
**January** 8:20 8:21 41:21 42:5
**Jason[sic** 55:21
**Jay** 50:17
**Jennifer** 46:15
**job** 19:9 43:16
**jobs** 8:22
**jogs** 19:19
**JOHN** 1:6
**Johnston** 56:21
**July** 10:9 11:12,15,23
**Justice** 44:20 55:23
**juvenile** 16:11 18:5 18:7

**K**

**Kathy** 2:5 4:21
**keep** 59:23
**kept** 56:5,13
**Khan** 30:12 30:15,17,19 31:8,14,18
**kind** 31:15 35:17 36:15,21 59:24
**King** 1:14 4:3 61:11
**kle@attorn...** 2:8
**know** 5:13,15 6:21 10:3 10:17 12:18 15:1 15:21 16:15,21 18:12,14,22 18:24 19:2 19:2,12 20:15,19 22:24 24:1 24:9,14 25:23 26:11 28:5 28:9,10,12 28:15 30:9 30:16 32:4 32:15 33:5 33:13,14,17 34:7,20,21 34:22 35:8 35:16,21,22 35:23 37:5 37:7 38:12 39:2,6,20 39:24 40:5 40:8,10 42:2,17 43:4,10,11 43:20,21,22 43:24 44:15,16,19 45:2,22 46:3 47:14 47:20,22 49:24 50:1 51:2 52:3 52:11,12,14 54:21 55:1 55:7,13,16 56:8,23,23 58:23 59:3
**knowledge** 5:10 36:14 56:12

**L**

**L** 11:22
**lag** 47:19
**laid** 29:9
**LANE** 1:20
**lasted** 27:12
**lawsuit** 7:6 7:10,17 54:2
**lawyer** 17:16
**lawyers** 17:16 51:1 51:12,17
**lay** 29:8
**Le** 2:5 3:7 4:19,21
**leading** 40:17
**Lee** 1:4,12 3:4 4:8,13
**left** 11:20
**legal** 15:13
**lengthy** 13:17
**let's** 6:24
**letter** 44:17
**Level** 8:3
**liberties** 9:13
**license** 8:24 42:5 43:17
**lifted** 12:19 13:13
**lifting** 13:23
**likewise** 6:16
**limitations** 52:18 54:9
**limited** 12:16
**list** 16:7
**listen** 33:16
**litigation** 40:20
**little** 5:5 38:20 39:3 39:5,5,6,12 47:18
**living** 10:5
**locations** 4:6
**locked** 43:2
**long** 10:20 14:12 18:23 20:3 22:3 24:17 25:2,3 26:18 28:5 28:6
**longer** 27:16
**look** 22:14
**looked** 59:19
**looking** 7:9 7:12,13,14
**lot** 23:22,24 33:13 41:4 59:14

**M**

**M** 1:14 61:11
**ma'am** 10:6 11:17 13:14 15:10,12 18:18 19:6 22:2 26:3 27:11 31:10,22 34:12 35:13 37:19 41:16 47:4 47:6 49:12 59:5
**mail** 22:21,21
**making** 25:18 26:21
**management** 42:1
**manager** 41:1
**marked** 3:13
**martial** 59:20
**materials** 58:13
**matter** 15:5 17:19 57:5 57:11 61:6
**maximum** 9:24 42:24 45:9 53:3 53:17
**mean** 8:5 16:17 18:15 36:17 45:18,20 47:7,16
**means** 53:16 56:24 61:16
**medication** 26:17

**memories** 19:19
**memory** 5:9 5:17 16:8 19:9 21:19 24:18 38:1
**mental** 14:3,3 14:18,22 18:5,8 20:20 23:1 23:18,23 24:7,10,13 24:20 25:4 25:6,21 26:8 27:17 27:21 28:2 28:8,14,22 28:23 29:1 29:23 30:7 31:16,20 32:2,7,11 33:23 34:5 34:14,16 35:20 36:1 36:14,23 39:23 41:7 42:20,23 43:8,15 44:21 46:2 46:20,20 47:5 51:3,7 53:11,13 56:4,11 57:15,22 58:15,23
**mention** 19:14
**mentioned** 19:2 32:23 42:3,13
**mentions** 50:15,18
**minor** 28:20 40:5
**misconduct** 28:19 38:21,23 39:14
**mitigating** 51:4
**mom** 17:12 18:11 19:7
**monetary** 7:14,18 54:5
**months** 21:21 21:23,24 25:18 27:12 29:7
**morning** 4:2 5:5
**motion** 55:13
**movements** 9:14,15
**movie** 59:20
**music** 41:5
**Muslim** 30:16 39:9

**N**

**N** 2:2 3:1 61:1
**name** 4:3,12 4:21 16:15 17:9 30:12 30:14,17,19 31:1 32:3 32:19 41:3 50:15
**Native** 31:2
**nature** 12:15 47:14 55:4
**need** 6:8 22:17 51:23 55:3 55:4
**needed** 6:6
**never** 25:20 35:10 36:2 36:2 45:24
**NEWTOWN** 1:20
**nice** 32:5,17 60:11
**NJ** 1:21
**nodding** 6:1
**non-Capital** 43:23
**non-Capitals** 45:1
**non-health** 43:23
**noose** 25:8,19 26:21
**Northeast** 16:13
**Notary** 1:15 61:11
**noted** 61:4
**notes** 61:5
**notice** 1:13
**number** 3:12 49:2
**numbers** 48:11,12,13 48:15
**NY** 1:21

**O**

**O** 61:1
**obligation** 57:9,11
**observation** 26:5
**obtained** 52:3
**obviously** 7:4 13:17 15:21 52:2
**occasion** 14:13,16 22:4 24:19
**off-the-unit** 43:16
**office** 2:5 34:1,3,10 34:14 35:7
**Officer** 39:17 40:2,6
**Oh** 26:15 29:20 36:10 38:2 39:2 48:12 50:14 54:18 56:17
**okay** 5:3,11 5:18,19 6:3 6:24 7:18 7:19,24 8:11,14,14 9:2,10,17 10:11,15,24 11:3,7,18 13:2,15 14:1,6,15 15:21,24 16:7,19 17:4,14,18 17:19,21,22 18:19 19:1 19:7,18,21 20:9,23 21:9,19 22:3,19 23:6,11,16 24:8,12 25:16 26:11 27:12,19 29:17,19,20 30:1,18 31:4,23 32:21 33:21 35:14,18 36:5 37:1,5 37:14,20 38:16 40:16,21 41:12,22 42:10 43:19 44:2 44:5,8,11 46:22 47:13 48:7 48:17,20,24 48:24 49:6 49:9,13,16 50:4,10 51:13,15,18 51:22 52:5 52:9 53:19 54:18 55:17 58:2 58:4,11 59:4,5 60:2 60:4,8,10
**once** 18:23
**one-on-one** 29:23 34:15,22,23 35:11
**ones** 43:9
**open** 12:2
**opening** 42:6
**operated** 9:22
**ORAL** 1:12
**ordered** 15:13,16,18
**out-of-cell** 28:16 42:7 42:12
**outpatient** 18:9
**outside** 23:7 27:20
**Oxford** 17:8

**P**

**P** 2:2,2 8:14 8:16,17
**p.m** 60:14
**PA** 1:21
**PAGE** 3:3,12
**Palakovic** 55:19,20,21
**part** 14:1 42:18 52:12 58:6
**parties** 4:5
**Paul** 8:17
**PB** 8:17
**PCRA** 15:10 15:11
**peer** 33:4,7,8 33:10,11
**Pennsylvania** 1:2,9,20 2:7 7:3 57:1
**people** 6:21 23:22 24:1 35:15 57:16
**perform** 9:6
**performed** 15:6
**period** 13:4 13:10,17,18 22:7 24:15 28:6 37:2,4 41:13
**person** 46:19 56:22 57:15,21
**person's** 32:19
**personal** 59:12
**personally** 45:6
**Peter** 8:16
**Philadelphia** 2:7 14:9,12 16:2,13 18:2 19:13 21:2,8
**Phoenix** 2:6 7:22 8:1 10:4,8 11:11
**phone** 2:7 25:13 51:8
**physical** 57:17,17,20
**piece** 40:7
**place** 21:15
**placed** 26:2,9 26:20 37:23 38:1 43:13 53:17 57:8
**placement** 15:1
**placing** 53:3
**please** 4:12 5:20,22 6:14 7:5 22:23 58:13 59:1
**POC** 24:24 25:15 26:2 26:4
**pod** 8:17
**point** 12:1 37:11,17
**poke** 34:8
**policies** 45:2
**policy** 12:4,5 12:6 45:9 52:20,20 53:22 56:22
**pop** 47:13
**population** 9:7
**possession** 22:17 58:17,21 59:1
**possessions** 27:10
**possible** 19:9
**Powell** 56:21
**PPC** 21:8,20 22:4 23:8
**praying** 39:8 39:9
**present** 1:16
**pretty** 9:1 26:17 32:15 54:7 56:16
**prevention** 45:23
**previously** 10:4,5
**prior** 9:19 10:3 13:2 13:22 20:15 34:5 34:13 40:12 54:6 54:13
**prison** 40:13
**Prison's** 57:9
**prisoner** 57:12,21
**prisoner's** 57:6
**prisoners** 33:15 43:23 44:21 52:19 53:15 57:6 57:17,20
**privilege** 51:17 52:8
**probably** 16:22,23 17:16,23 40:8
**problem** 39:20 48:20,22
**proceedings** 15:9,10,11 61:3
**professional** 36:14
**professionals** 16:5 20:21
**program** 32:8,9 40:23 42:4 42:8 43:14 43:21 45:3 45:14
**programs** 40:22 41:4 41:20 42:2 42:12,13,14 42:16,20,21 42:23 43:2 43:7,9,18 43:20 44:13 46:6 46:10,12 48:1 53:20 56:14
**property** 26:22 27:6
**protect** 51:16
**protesting** 59:15
**provide** 42:17
**provided** 54:23
**Prozac** 26:16
**psychiatric** 14:9,13 16:2,4,8 18:2 19:13 21:3,8 23:7 26:4 50:19 50:23 52:2
**psychiatrist** 20:20
**psychologist** 20:20
**psychother...** 40:24
**Public** 1:15 61:11
**punitive** 45:24
**purposes** 30:20
**pursuant** 1:13
**put** 24:24 25:8,17 35:7 50:5 50:19 57:3

**Q**

**qualified** 33:6,9
**question** 5:20 5:24 6:7,8 6:10,15,18 8:6 10:11 18:21,22 36:12 40:16 46:16
**questions** 5:8 5:9,23 44:6

54:17,20
**quick** 26:18 39:21
**quite** 18:24 23:21

R

**R** 2:2 61:1
**RA** 57:10
**radio** 26:23
**rally** 59:14
**real** 29:8 38:9
**really** 25:5,20 26:18 29:5 29:6 32:5 32:17 46:1 53:7 55:5,9 55:14 58:6 58:12
**reasonable** 53:6,11 57:7
**reasons** 57:12
**recall** 19:14 21:3 22:6 23:6 31:14 49:10
**receive** 14:17
**received** 20:9 22:6 23:7
**recollection** 30:21 31:24
**recommen...** 19:12
**record** 4:12 4:21 5:21 6:19 22:20 40:1,1
**records** 19:14 21:16 22:14,14,16 22:24 29:15 36:19,21,24 51:3,7 52:2 58:15,24,24
**recover** 29:4 29:12
**Reed** 45:10 45:11 54:3
**refer** 14:6
**reference** 15:3
**referred** 28:22 30:7
**reforms** 44:18 45:1
**regard** 12:14
**regardless** 57:11
**regards** 31:15 41:12 47:2
**regular** 27:9
**relate** 31:23 35:16 49:22,22
**related** 34:20 43:8 47:24 49:11,14,23 58:20
**relates** 7:1,6 14:1 42:11
**relating** 14:7 22:24
**relaxed** 30:3 32:1 33:19 33:22 40:13 41:14 45:12 54:3
**relaxing** 12:10 34:13
**release** 51:2
**relief** 7:15,18
**relies** 46:8
**remedies** 52:17,19
**remedy** 7:9
**remember** 5:11,12,12 5:14 10:2 11:4 16:14 16:17,20 18:22 19:17,18 20:4,7,9,18 23:20,21,24 25:5 27:22 28:2,7,24 29:3 31:1 31:19 32:19,22 35:19 36:8 38:3,5 44:12 46:15 47:10 48:3 48:22
**remind** 6:6
**remote** 4:5 47:14
**removed** 27:9
**repeat** 30:14 49:6
**rephrase** 15:7 36:12
**Report** 44:20
**reporter** 1:15 3:14 4:4 6:20 61:11 61:19
**REPORTI...** 1:19
**represent** 7:21
**representing** 2:8 4:22
**reproduction** 61:15
**request** 22:17 46:8 53:7 54:1,2 58:18
**requested** 24:19 34:17 35:11,19 44:14,15 45:5,6
**response** 45:7 45:24
**rest** 27:19
**restric** 30:4
**restricted** 9:22
**restrictions** 9:21 12:3 12:10,18,20 12:23 13:13,23 30:3 32:1 33:19,21 34:13 43:6 43:11 45:12 54:4
**restrictive** 9:14,15 12:15
**result** 15:7
**resulted** 19:11
**return** 21:20
**returned** 27:8
**reveal** 51:20
**reviewed** 7:4
**RHU** 57:3,5 57:9
**right** 6:24 8:2 10:5 13:15 13:21 17:6 17:13,23 20:13 23:3 23:6 26:10 33:6,16 44:2 48:17 57:7 59:6
**Rights** 44:23
**ring** 19:16
**risk** 56:13
**road** 51:20
**Roebuck** 17:6
**Roosevelt** 17:5,7
**roster** 32:11 32:12,14 36:17 37:2 37:4,10,12 37:17,18 56:4,11
**rough** 39:5,6
**roughly** 11:7 11:14,19 12:7 13:5 13:12 17:24 18:15 20:4 27:12 48:22
**round** 34:7
**rounds** 28:15 32:5 33:14 34:19
**routine** 28:9 30:10
**routinely** 18:16 24:9 24:11,11
**Roy** 1:4,12 3:4 4:8,13
**RPR** 1:15 61:11
**rules** 5:3

S

**S** 2:2 3:11
**sake** 5:21 6:19
**saw** 30:20 59:13
**saying** 6:2,17 10:12 29:19 41:10 42:19 46:5 46:6,24
**schedule** 34:23 35:2 35:4
**SCI** 7:22,24 10:3,5,7,7 10:13,15,20 10:22 11:2 11:8,8,10 11:11,14,15 11:19 12:1 13:2,3,4,12 23:13,16,17 24:8,14 27:19,24 28:2 36:11 37:21,24 55:22
**Sears** 17:6,6
**second** 22:4,7 31:5 49:5
**Secretary** 4:23 44:17 53:23
**Secretary's** 53:2
**see** 19:18 22:15 23:18 24:20 27:7 30:13,24 31:6 35:8 36:19,23 39:1 55:8 55:11
**seeing** 31:9 31:11,12
**seeking** 7:17
**seen** 25:4 36:18 38:13,15 59:11
**send** 22:20,23 23:2 58:13 58:21 59:2
**sent** 28:21 30:6
**sentence** 41:9
**sentenced** 10:18 11:5
**separate** 27:3
**separately** 31:12,13
**separation** 39:22
**September** 15:5
**series** 5:7
**seriousness** 35:6
**SERVICE** 1:19
**services** 41:7 41:8,18 42:9,16 43:14 45:14 46:7
**SERVING** 1:21
**session** 29:23 30:8 34:16 35:11
**sessions** 19:11 20:5 20:14 30:10
**Settlement** 44:24
**settling** 56:8
**severe** 14:3 14:23
**Shadowbox...** 38:7
**shake** 6:4
**sheet** 25:8
**shop** 8:24
**shortly** 24:22
**shower** 57:3 57:18
**side** 8:15 51:1
**similar** 55:19
**similar-situ...** 57:19
**similarly** 43:22
**simply** 55:5
**sir** 23:5 52:9 54:16 55:4 58:11 59:6 59:24 60:10
**sit** 34:23
**sitting** 29:7 33:23 49:19
**situated** 43:23
**situation** 9:11 13:19 13:22
**six** 21:22,24 25:17 27:12 29:6
**sleep** 29:7
**slight** 47:19
**slot** 39:11
**slow** 22:22
**slung** 39:13
**small** 38:14
**smoothly** 5:6
**sole** 42:15
**solitary** 7:8 42:24 44:21 46:8 46:17,18 47:3 56:5,7 56:13
**somebody** 23:18 59:3
**sorry** 10:11 16:17 17:15 19:6 22:11 24:4 24:5 26:14 29:18 30:5 41:23 46:23 47:11 48:9 48:21 49:4 50:14 51:13 52:5 54:14,14 59:16,21
**sought** 27:16
**sounds** 43:7
**speak** 24:10 24:13 27:21 32:16 33:16 52:3
**speaking** 28:2
**specialist** 33:4,7,8,10 33:12
**specific** 44:12
**specifically** 44:9
**Spector** 50:15,17
**spoke** 26:7
**sporadic** 28:10
**staff** 23:24 24:7,10,13 24:20 25:5 26:7,8 27:17,21 28:3,8,11 28:14 29:1 29:23 30:7 31:20 32:2 33:23 34:5 34:14,16 39:6,23
**stand** 26:4
**stars** 59:20
**start** 6:15 30:9
**started** 6:24 11:19 41:19
**starting** 41:21
**state** 4:11
**states** 1:1 58:4
**status** 7:13 7:14,19,24 8:13 23:1 25:17 26:9 26:20,21 27:8 37:6 37:13,14,23 38:1 41:9 47:5
**statute** 52:18 54:8
**stay** 22:3
**stayed** 11:1 27:5

**STENOGR...** 4:2,11,14
**stenographic** 61:5
**straight** 29:7
**Street** 2:6
**STREHLO...** 1:19
**string** 38:19
**stripped** 57:7
**structured** 15:1
**stuff** 40:5
**submit** 47:21
**sued** 56:1
**suicidal** 14:9 14:24 35:22 56:3
**suicide** 24:22 25:7,18 26:1 36:3 37:23 45:22,23 46:1 55:22 56:7
**SUITE** 1:20
**sun** 29:9,10
**supervision** 61:18
**sure** 16:11 19:20 23:21 24:16 25:3 29:14 30:15 32:1 33:15 37:16 38:6 48:16,24 49:7 52:7 55:18
**switched** 37:18
**sworn** 4:9

**T**

**T** 3:11 61:1,1
**take** 18:11 25:1 26:16 26:22 33:13 35:6 38:18 51:19
**taken** 1:13 61:5
**talk** 18:11 23:22 24:6 32:4,6 34:22
**talked** 23:24 32:3
**talking** 6:15 6:21 13:19 25:5 28:24 39:22 40:21
**tell** 5:4,11 37:16 38:4 49:17 50:12 51:7 51:11,23 52:15
**telling** 25:14
**terms** 8:2,4 40:19
**test** 5:17
**testified** 4:9
**thank** 4:14 23:4 52:1 54:16 58:11 59:24 60:1 60:5,5,9,10
**Thanks** 11:3
**theft** 38:10
**therapist** 37:15
**therapy** 18:10,12,13 18:17,20 19:1,2,3,5 19:11,15,24 20:11,14 21:1 23:8 32:17 40:24 41:5 41:5 42:13 42:13
**thing** 40:8 41:1 43:8 46:13 55:17 59:9 59:12
**things** 41:6 45:23 49:22,24 50:5 59:22
**think** 10:9 14:24 20:3 29:4 39:15 44:17 55:16 58:19
**Third** 57:4
**thoughts** 24:21
**three** 21:22 21:24 30:13,21
**threw** 39:11
**Thursday** 1:9
**tie** 38:19
**time** 3:13 8:4 8:21,21 11:13,16,18 11:19,20 12:17 13:7 13:10,11,17 13:18 16:1 16:11,22 17:1,2 18:1 18:23 20:4 20:10,13,15 22:7 24:8 24:15 25:6 25:7 27:7 27:19 28:1 28:5,6,18 29:22 32:10,14,16 32:16 35:10,19 36:9,11,13 37:2,4,11 37:17,24 38:10,16 39:8,10 40:12 41:13,17 42:7 44:14 45:5 47:22 55:23 58:12 59:8 60:5,13
**times** 18:24 30:13,21 31:6 35:14
**today** 50:6 54:22 58:12,23 60:6
**told** 25:9,11 26:10,13 37:3
**tool** 47:17
**top** 27:1
**transcript** 5:22 61:7 61:14
**transfer** 10:7 11:10 13:3
**transferred** 10:21 11:1 11:8,14 27:23 39:16,18
**trash** 39:11
**tray** 39:10,11
**treatment** 16:16 20:19 23:7 40:11,15
**treatments** 16:9
**trial** 10:17
**triangle** 38:20
**tried** 25:7 40:6
**truly** 55:14
**try** 5:12 13:16
**trying** 7:16 19:18 22:21 24:14 25:12,18 32:23 33:17 37:9
**turn** 45:10
**turned** 46:1
**TV** 26:23 59:13
**twice** 30:24
**two** 6:21 15:4 15:6,8 20:17 21:4 23:8 31:6 31:11 49:8 49:9,19 52:16 54:12
**tying** 38:23
**type** 18:4 41:20 43:10 56:14
**types** 43:9

**U**

**uh-huh** 6:2
**uh-uh** 6:5
**Um** 22:10
**understand** 5:15 6:8 7:6,16 8:7 44:7 51:23 55:5,15
**understand...** 9:2,7 10:16 12:13 14:17,21
**understood** 6:10 31:3
**unit** 8:9,14 8:23 9:7,10 9:12,20,21 9:23 11:21 11:22,24 12:2,15,18 12:20 13:7 23:19 25:12 26:12 27:2 27:3,9 30:13,21 31:6 32:2 33:23 34:15 35:20 40:13 41:13 42:2 43:6,13,21
**UNITED** 1:1
**Units** 9:5
**upset** 39:12
**usually** 33:14

**V**

**v** 45:10,11 54:3
**various** 42:13 43:7
**verbally** 5:23
**verbatim** 49:18
**Video** 2:3
**violations** 45:16,19 54:10
**virtually** 1:13
**visit** 21:12 22:1,8 34:2
**visits** 23:8 31:18
**vocational** 43:17
**voluntarily** 22:3
**voluntary** 21:11
**vs** 1:5 55:20 56:21 57:1

**W**

**waive** 52:8
**walk** 28:13 34:7
**walking** 35:14
**want** 4:24 7:10 15:21 26:15,16 39:2 47:9 48:14 50:12 51:10,16,19 52:6,13,15 53:20 54:24 59:15,21
**wanted** 15:23 25:10 26:12 32:8 33:5,7 39:23
**wasn't** 18:7,8 20:2,2 26:18 39:20
**watching** 59:13
**water** 28:18 28:19
**way** 19:10 53:9,9,22 59:18,18
**ways** 47:17
**we're** 8:21 37:15
**we've** 49:24
**week** 18:24
**weekly** 28:15
**welcome** 4:15 60:7
**wellness** 41:2 41:3
**went** 10:12 10:22 16:16 18:24 21:6 21:6,7,10 29:9
**weren't** 28:18 41:8
**Wetzel** 1:6 4:23 44:17 45:11,11 54:3 55:20
**wheelchair** 57:19
**Williams** 1:4 1:12 4:8,13 4:20 7:1,20 9:3 12:12 13:10 40:10 47:3 47:20 51:10 52:10
**WILLIAM...** 3:4
**wind** 56:8
**wire** 38:9
**withdrew** 46:3
**WITNESS** 3:3 4:13,15
**wood** 39:13 40:7
**word** 33:6
**words** 17:9 40:18
**work** 8:18,23 35:1
**worry** 50:8 52:4
**worst** 40:8
**wouldn't** 42:24 43:1 43:3,3
**wrap** 41:1,4 54:19
**write** 6:20 48:16
**written** 5:22
**wrong** 25:16 26:11
**wrote** 15:3 44:16

**X**

**X** 3:1,11

**Y**

**yard** 26:24 28:19,20 38:7,12
**yards** 38:13
**yeah** 18:13 21:23,23 26:17 32:15 35:9 36:22 39:5 39:20 42:22 43:3 43:14 44:3 44:3 45:4 46:5,5,10 46:11,11 47:16 48:12 50:10 54:7 56:9 57:23 59:10
**year** 11:5 16:21 20:6 20:7,8,8,17 27:24 29:4 29:12
**years** 20:1,2 47:22,23 54:6,12

**Z**

**Zoom** 4:5

**0**

**006** 53:14

**1**

**1:04** 60:14
**1014** 8:18
**11:33** 1:14
**116** 1:20
**12/21/2020** 49:7
**14th** 58:5
**15** 38:11
**1600** 2:6
**18940** 1:20
**19103** 2:7
**1979** 14:8