EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LEE WILLIAMS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN E. WETZEL, | : | |
| | : | |
| Defendant. | : | NO. 21-1248 |

## DECLARATION

1.      I, Michael Zaken, have served as the Superintendent at Pennsylvania Department of Corrections State Correctional Institute Greene ("SCI-Greene") since March 2020. Prior to that, I served as Deputy Superintendent of Facilities Management at SCI-Greene since 2014.

2.      Beginning in or around January of 2018, as a part of a larger Department of Corrections initiative, I lead the process of restructuring the administration of the Capital Case Housing Unit at SCI-Greene, in order to provide enhanced socialization opportunities to capital case inmates.

3.      As a part of this process, I drafted a "Plan of Approval" that was submitted, on January 31, 2018, for approval by the Department of Corrections Western Regional Deputy Secretary. This Plan of Approval set forth a plan to provide 20 hours of out-of-cell opportunities to capital case inmates, to be implemented by March 2018.

4.      In accordance with the Plan of Approval, beginning on March 12, 2018, SCI-Greene implemented changes to the administration of the Capital Case Housing Unit and began to offer a minimum of 20 hours of out-of-cell opportunities to capital case inmates. These changes are detailed in Policy No. 6.5.8 GRN 01, a copy of which is attached as Exhibit 1 to this Declaration.

5.      As detailed in Policy No. 6.5.8 GRN 01, beginning on March 12, 2018, the following changes were made to the Capital Case Housing Unit to allow more out-of-cell and socialization opportunities:

      a.   Outdoor Exercise

           i.   Prior to March 12, 2018, capital case inmates were offered two hours of outdoor exercise time five days per week. This exercise time occurred in outdoor enclosures that kept inmates separated individually.

           ii.   Starting on March 12, 2018, capital case inmates were offered at least two hours of outdoor exercise seven days per week. Beginning in June of 2018, after completion of the reconfiguration of the old yard enclosures, outdoor exercise occurred in an open area that allowed capital case inmates from the same pod to congregate and exercise together.

b. Dayroom Activity

i. Prior to March 12, 2018, capital case inmates were not provided with dayroom activity time.

ii. Starting on March 12, 2018, capital case inmates were offered at least one hour of open dayroom activity time seven days per week. This was an opportunity for capital case inmates from the same pod to congregate at tables for game playing, television watching, and other socializing.

c. Law library

i. Prior to March 12, 2018, capital case inmates visited the law library individually in separate enclosures.

ii. Starting on March 12, 2018, up to four capital case inmates from the same pod were allowed to visit the law library at a time, allowing inmates to congregate.

d. Meal Time

i. Prior to March 12, 2018, capital case inmates were served meals in their cells.

ii. Starting on March 12, 2018, meals were served to capital case inmates outside of their cells and they were allowed to eat their meals together with other inmates at the dayroom tables or return to their own cells to eat on a rotating basis.

e. Movement

i. Prior to March 12, 2018, all out-of-cell movement of a capital case inmate required a strip search, restraints, and a two-to-one corrections officer escort.

ii. Starting on March 12, 2018, during open times on the unit, such as described above, capital case inmates were no longer strip searched every time they were removed from cell, restrained and escorted two-on-one.

6.    Following the initial changes in March of 2018, SCI-Greene continued to implement more changes to the Capital Case Housing Unit in order to provide increased socialization opportunities.

7.    At this time, the housing unit for capital case inmates at SCI-Greene operates comparably to the general population housing units with respect to out-of-cell time and socialization opportunities.

8.      Prior to changes to the administration of the Capital Case Housing Unit, inmates in that unit had access to mental health services in accordance with Policy No. 6.5.8, "Capital Case Administration," attached hereto as Exhibit 2, and Policy No. 13.8.1, "Access to Mental Health Care," attached hereto as Exhibit 3. A professional from the mental health unit staffed an office on each unit everyday. Everyday a mental health professional made rounds of the unit, visiting each inmate's cell to speak with the inmate about their mental health status. At that time, inmates were able to request an appointment to speak with a mental health professional. Inmates with an active mental health diagnosis were scheduled for treatment as required by a mental health professional.

I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

1/28/22
Date

Michael Zaken
Superintendent, SCI-Greene

Exhibit 1



**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**
**SCI-GREENE**

| Policy Subject: | Policy Number: |
| --- | --- |
| **Capital Case Administration** | **6.5.8 GRN 01** |

| Date of Issue: | Authority: | Effective Date: |
| --- | --- | --- |
| **March 12, 2018** | **Robert Gilmore, Superintendent** | **March 12, 2018** |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

**Section 1 – Phase 1 Inmates**

### A. General Information

The following opportunities are being provided to the Capital Case population in order to provide at a minimum of 20 hours of out-of-cell (OCC) activity each week.

### B. General Security Procedures

General Security Procedures for restraints, two-on-one hands-on escorts and strip searches for inmates exiting their assigned cells has been **eliminated**—unless identified otherwise through the Capital Case Security Assessment.

Procedures for movement off of the housing unit will remain unchanged to include security procedures regarding restraints, escorting, non-contact visits, consistent with level 5 inmates.

### C. Exercise

1. A Phase 1 inmate shall be permitted a two (2) hour outdoor exercise period a minimum of **seven (7) days per week**, weather permitting for a total of 14 hours out-of-cell activity. Movements to the yard are controlled line movements under direct supervision.

2. A Phase 1 inmate shall be permitted **one (1) hour of "open" dayroom** activity at a minimum of **seven (7) days per week** for a total of 7 hours out-of-cell activity. One hour dayroom periods are being given by tier with a maximum of 16 inmates in dayroom per pod and a maximum of two pods operating a dayroom at one time. Dayroom consists of inmates congregating at the tables for game playing, socialization and television watching together.

### D. Library

Inmates may participate in congregate Law Library with other inmates from their same pod. Inmates who reside in separate pods will <u>not</u> be permitted to congregate in the Law Library. Inmates who are not on any type of restriction are eligible to participate in congregate Law Library. Computer stations will be available in the Law Library with access to the reference book section. One (1) computer station will remain in the secure Law Library enclosure for Phase 2 inmates, inmates on restrictions, or inmates who do not wish to congregate. A maximum of four (4) inmates will be permitted in the secure Law Library area at the same time.

### E. Meals

Inmates may participate in meals with other inmates on the same tier and pod. There will be a rotation between top and bottom tiers for breakfast and dinner. Inmates who are not on any type of restriction are eligible to participate. Cell doors will be opened on the designated tier that is to receive the congregate meal. Meal will be passed out beginning with A Pod and continue through B, C, and D pods. Inmates will come out of their cells and retrieve a food tray. The inmates may

elect to sit at a dayroom table to eat or return to their cells and eat. Inmates are not permitted to eat in another inmate's cell. Inmates are permitted to bring out condiment items, utensils, and cups. No Commissary food items except condiments are permitted at the dayroom tables. This includes chips, snacks, soups, etc.  Inmates who elect to eat in their cell will return their meal tray when finished. Inmates who do not wish to participate, leave their cells, or are on restrictions will have their meal tray delivered and picked up by unit staff.  Upon completion of the meal, all inmates will return to their cells and be secured inside.

### F. Showers

Capital Case inmates have the opportunity to shower three (3) days per week.  Inmates will be permitted to move to and from the showers unrestrained.  Unit staff will continue to escort inmates from their cells to the showers.  The shower doors will be secured while the inmate remains in the shower.  Movement to and from showers will allow no more than two (2) inmates to be unrestrained on a pod at a time.

Exhibit 2



| | |
|---|---|
| **POLICY STATEMENT**<br>**Commonwealth of Pennsylvania • Department of Corrections** | |

| Policy Subject: | Policy Number: |
|---|---|
| **Capital Case Administration** | **6.5.8** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **August 27, 2012** | **Signature on File**<br>**John E. Wetzel** | **August 28, 2012** |

## I.   AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections.

## III.   POLICY

It is the policy of the Department to:

A.  administer all Capital Cases in a secure and humane manner consistent with applicable law;

B.  ensure that all Phase I Capital Case inmates are governed by the same general policies applicable to all Administrative Custody inmates with the few exceptions described in specific policies;

C.  ensure that all Phase I Capital Case inmates in Administrative Custody status have access to educational and leisure programs;

D.  allow Capital Case inmates in Phase I and/or Phase II access to legal materials;

    E.  provide a safe, secure and humane process of administering a Capital Punishment sentence as required by applicable laws and statutes of the Commonwealth of Pennsylvania;

    F.  make reasonable accommodations for and respond appropriately to the needs of the representatives of the news media in their coverage immediately before, during and after an execution, while preserving the good order and security of the institution; and

    G.  provide appropriate accommodations for preparing registered victims who have chosen to serve as witnesses to an execution.

## IV.  PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

## V.  SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI.  RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual.  This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII.  RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A.  Release of Information

    1.  Policy

       This policy document is public information and may be released upon request.

    2.  Confidential Procedures (if applicable)

       Confidential procedures for this document, if any, are <u>not public information</u> and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

## B. Distribution of Policy

1. General Distribution

   The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis.  Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

   It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

### A. Superseded Policy

1. Department Policy

   6.5.8, Capital Case Administration, issued November 14, 2002 by former Secretary Jeffrey A. Beard, Ph.D.

2. Facility Policy and Procedures

   This Policy and the accompanying Procedures Manual supersedes all prior versions of these documents.

### B. Cross Reference(s)

1. Administrative Manuals

   a. DC-ADM 007, Access to Provided Legal Services;

   b. DC-ADM 009, News Media Relations;

   c. DC-ADM 801, Inmate Disciplinary and Restricted Housing Procedures;

   d. DC-ADM 802, Administrative Custody Procedures;

   e. DC-ADM 812, Visiting Privileges;

   f. DC-ADM 815, Commissary Privileges;

   g. DC-ADM 816, Inmate Compensation System;

    h.  DC-ADM 818, Automated Inmate Telephone System;

    i.  DC-ADM 819, Religious Activities;

    j.  6.3.1, Facility Security;

    k.  6.5.1, Administration of Security Level 5 Housing Units; and

    l.  13.1.1, Management and Administration of Health Care.

2. ACA Standards

    a.  Administration of Correctional Agencies: None

    b.  Adult Correctional Institutions:

    c.  Adult Community Residential Services: None

    d.  Correctional Training Academies: None

3. Other

    Act of June 18, 1998, P.L. 622 (61 P.S. 3003)



**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Policy Number: |
|---|---|
| **Capital Case Administration** | **6.5.8** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **August 27, 2012** | **Signature on File** **John E. Wetzel** | **August 28, 2012** |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

*6.5.8, Capital Case Administration Procedures Manual*
*Table of Contents*

## Section 1 – Phase I Inmates

A.  Housing ................................................................................................. 1-1
B.  Inmate Custody Status .......................................................................... 1-1
C.  General Security Procedures ................................................................. 1-1
D.  Work Assignments ................................................................................. 1-1
E.  Visiting ................................................................................................... 1-2
F.  Telephone Privileges ............................................................................. 1-2
G.  Television and Radio .............................................................................. 1-2
H.  Exercise ................................................................................................. 1-3
I.  State Issued Clothing ............................................................................. 1-3
J.  Personal Property, Cell Furniture, and Commissary Items .................... 1-3
K.  Facility Programming ............................................................................. 1-4
L.  Religious Activities ................................................................................. 1-5
M.  Access to Legal Materials ...................................................................... 1-5
N.  Access to Reading Materials ................................................................. 1-6
O.  Transfer of Phase I Inmates .................................................................. 1-7
P.  Placement in Disciplinary Custody (DC) Status .................................... 1-7
Q.  Psychiatric Treatment of a Capital Case Inmate .................................. 1-7
R.  News Media ........................................................................................... 1-8
S.  Modification of Sentence ....................................................................... 1-9
T.  Conversion to Phase II .......................................................................... 1-9

## Attachments

Capital Case Approved Master Commissary List ................................ Attachment 1-A

## Section 2 – Phase II Inmates

A. Handling of an Execution Warrant .......................................................... 2-1
B. Mental Health Observation ..................................................................... 2-2
C. Documentation Procedures .................................................................... 2-3
D. Attorney(s) of Record ............................................................................. 2-3
E. Authorized Property ................................................................................ 2-3
F. Access to Legal Materials ....................................................................... 2-4
G. Exercise ................................................................................................. 2-4
H. Commissary ........................................................................................... 2-4
I. Visiting ................................................................................................... 2-4
J. Telephone ............................................................................................... 2-5
K. News Media ............................................................................................ 2-5
L. Identification and Notification of Spiritual Advisor .................................. 2-5
M. Identification of Immediate Family Members .......................................... 2-6
N. Disposition of the Inmate's Remains ...................................................... 2-6
O. Disposition of the Inmate's Personal Property ....................................... 2-7
P. Phase II Documentation to be sent to the Capital Facility ..................... 2-7
Q. Transportation Procedures to the Capital Facility for Phase II Inmates .. 2-9
R. Stay of Execution ................................................................................... 2-9

*6.5.8, Capital Case Administration Procedures Manual*
*Table of Contents*

## Attachments

Execution Warrant Notification to Chief of Security .................................................Attachment 2-A
Execution Warrant Notification to Facility Manager of Capital Facility ...............Attachment 2-B
Execution Warrant Notification to Facility Manager of Home Facility.................Attachment 2-C
Execution Warrant Notification to PSP Headquarters...........................................Attachment 2-D
Execution Warrant Notification to Inmate.................................................................Attachment 2-E
Conversion of Phase I Inmate to Phase II Checklist............................................Attachment 2-F
Attorney Notification......................................................................................................Attachment 2-G
Stay of Execution...........................................................................................................Attachment 2-H

## Section 3 – Phase 3 Inmates

A. Capital Facility .................................................................................................................... 3-1
B. Capital Facility Documentation ....................................................................................... 3-1
C. Reception ............................................................................................................................. 3-1
D. Security ................................................................................................................................. 3-3
E. Selection of Personnel at the Capital Facility ............................................................. 3-4
F. Housing of a Phase III Inmate ......................................................................................... 3-6
G. Orientation of Phase III Inmate ....................................................................................... 3-8
H. Visiting .................................................................................................................................. 3-8
I. Medications ........................................................................................................................... 3-14
J. Meals ...................................................................................................................................... 3-14
K .Telephone Privileges......................................................................................................... 3-15
L. Radio Privileges.................................................................................................................. 3-16
M. Television Privileges ......................................................................................................... 3-17
N. Capital Facility Medical Department Responsibilities ................................................ 3-17
O. Mental Health Observation .............................................................................................. 3-17
P. Stay of Execution Notification.......................................................................................... 3-17
Q. Conscientious Relief ......................................................................................................... 3-18
R. Execution Procedures ....................................................................................................... 3-18

## Attachment

Phase 3 Transfer Checklist ...............................................................................Attachment 3-A

## Section 4 – Execution Procedures

A. General ................................................................................................................................. 4-1
B. Pre-Execution Procedures ............................................................................................... 4-3
C. Execution Procedures ....................................................................................................... 4-22
D. Post-Execution Procedures.............................................................................................. 4-29

## Attachments

Execution Complex Floor Plan ..........................................................................Attachment 4-A
Capital Facility Special Security Squad Roster...............................................Attachment 4-B

### 6.5.8, Capital Case Administration Procedures Manual
### Table of Contents

Confidential Memorandum...................................................................Attachment 4-C
Pharmaceutical Order Request ...........................................................Attachment 4-D
Checklist of Lethal Injection Procedures............................................Attachment 4-E
Instructions to Witnesses...................................................................Attachment 4-F
Inventory Checklist for Lethal Injection Equipment and Supplies .......Attachment 4-G
Controlled/Non-Controlled Substances Disposition Record.................Attachment 4-H
Certificate of Execution......................................................................Attachment 4-I

Glossary of Terms

## Section 1 – Phase I Inmates

### A. Housing

1. A male Capital Case inmate shall be housed at the State Correctional Facilities at Graterford and Greene. Any exceptions must be approved by the Secretary/designee.

2. A female Capital Case inmate shall be housed at the State Corrections Facility at Muncy.

3. In the event that a Capital Case inmate is to be housed at a facility other than a Capital Case facility, a copy of this manual shall be provided to that facility.

### B. Inmate Custody Status

1. A Capital Case inmate in Phase I shall be housed in Capital Case (CC) status unless he/she is placed in Disciplinary Custody (DC) status in accordance with Department policy **DC-ADM 801, "Inmate Discipline."**

2. The Unit Officer shall assess the Capital Case inmate, upon being processed into his/her designated housing unit, using the **DC-510, Suicide Risk Indicators Checklist** in accordance with Department policy **13.8.1, "Access to Mental Health Care", Section 1, Psychological Services**.

3. After completing the **DC-510** the Unit Officer shall contact the Medical/Psychology Department. The Medical/Psychology Department shall determine whether the inmate requires an Individual Treatment Plan (ITP) or another form(s) of therapy or intervention.

4. A copy of the **DC-510** shall be placed in the inmate's **DC-14, Cumulative Adjustment Record** and in the psychiatric section of the medical record.

### C. General Security Procedures

All general security procedures (i.e., opening of cell doors, use of the handcuff/feeding apertures, inmate movement, etc.) shall be in accordance with Department policy **6.5.1, "Administration of Security Level 5 Housing Units."**

### D. Work Assignments

An inmate in Phase I is permitted a work assignment as follows:

1. within the housing unit approved by the Program Review Committee (PRC) or Unit Management Team and as defined in Department policy **DC-ADM 816, "inmate Compensation System"**; or

1-1

2.  work in the areas adjacent to, but inside the enclosure of, the unit (e.g., grounds keeping, snow removal, etc.). Such an assignment requires the approval of the Facility Manager/designee.

## E. Visiting

1.  All visits shall be non-contact unless otherwise directed by court order or approved by the Secretary/designee.

2.  Each inmate shall be allowed one visit per week.

3.  Visits shall be no longer than one hour in duration and shall occur during regularly scheduled visiting hours. Longer periods may be allowed depending upon the available space.[1]

4.  Legal and spiritual advisor visits are not counted, against the one visit per week, however they are to be non-contact.

5.  Special requests for a contact visit by an attorney must be forwarded to the Office of Chief Counsel for review. The Regional Deputy Secretary shall approve/disapprove all contact visit requests.

6.  Attorney/client confidentiality privileges are to be maintained and each inmate must be given the opportunity to have confidential conversations with the Attorney of Record.

7.  The Facility Manager/designee may approve additional and/or extended visits in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

## F. Telephone Privileges

1.  Each inmate shall be given the opportunity to place three 15-minute telephone calls per week in accordance with Department policy **DC-ADM 818, "Automated Inmate Telephone System."**

2.  Telephone calls to the inmate's Attorney of Record shall be permitted, but restrictions may be imposed if abuse of the privileges occurs.

3.  Telephone calls to an attorney shall be handled in accordance with Department policy **DC-ADM 818, "Automated Inmate Telephone System."** Telephone calls to the inmate's Attorney of Record shall not be counted against the inmate's one telephone call per week.

---

[1] 3-4443

Issued: 8/27/2012
Effective: 8/28/2012

*6.5.8, Capital Case Procedures Manual*
*Section 1 – Phase I Inmates*

## G. Television and Radio

Personal televisions and radio/tape/compact disk players are permitted for Phase I inmates. The purchase of these items shall be in accordance with **DC-ADM 815, "Personal Property, Basic/State Issued Items and Commissary/Outside Purchases."**

## H. Exercise

1. A Phase I inmate shall be permitted two hours of outdoor exercise a minimum of five days per week, weather permitting.

2. Up to two inmates may be permitted to exercise together in an outside exercise area, taking into account separation and security concerns.

3. A tennis ball, basket ball, playing cards, and board games are permitted. These items shall be provided by the facility for use only while in the exercise unit.

## I. State Issued Clothing

1. A Phase I inmate is permitted the following state issued property:

   a. RHU jumpsuit;

   b. canvas slide footwear;

   c. three pair of socks; and

   d. three pair of underwear (includes three undershirts for males and three bras for females).

2. The home facility shall maintain canvas sneakers for a Phase I inmate to use for out-of-cell exercise. The home facility shall supply appropriate clothing and footwear for all other out-of-cell activities and for inclement weather.

3. The inmate may retain the shoes issued by the home facility in his/her cell.

## J. Personal Property, Cell Furniture, and Commissary Items

1. Personal Property

   A Phase I inmate is permitted the following personal items:

   a. one cocoa brown sweat suit (top and bottom) except for a DCC inmate;

   b. one pair of brown sweat shorts;

Issued: 8/27/2012
Effective: 8/28/2012

    c.  three pair of underwear and three pair of socks (total of five including state issued pairs);

    d.  one bathrobe;

    e.  one pair of long underwear (based on medical need);

    f.  one pair of pajamas;

    g.  one toothbrush (in accordance with Department policy **DC-ADM 815, "Personal Property, Basic/State Issued Items and Commissary/Outside Purchases"**;

    h.  one pair of shower clogs or slides;

    i.  an inmate who chooses to purchase his/her own sneakers, may do so. Such purchases shall be in accordance with Department policy **DC-ADM 815**. The inmate may retain one pair of personal sneakers in his/her cell.

    j.  a Capital Case inmate shall be permitted to retain any combination of written materials and commissary items that will fit into the cell's storage cabinet and either two standard-sized, records-center boxes or one footlocker. If the Capital Case cell is not equipped with a storage cabinet, the inmate may retain two records-center boxes and one footlocker.

  2.  Cell Furniture

    a.  An armchair or desk type piece of furniture is also permitted provided it is of a material that does not pose a security threat.

    b.  An inmate of the Muslim faith is permitted one prayer rug in addition to the one permitted rug, however it must be rolled up when not in use.

  3.  Commissary

    A Phase I inmate is permitted to purchase commissary items listed in the **Capital Case Master Commissary List (Attachment 1-A)** and Department policy **DC-ADM 815**.

**K. Facility Programming**

Educational programming and leisure activities shall be made available to interested Phase I inmates housed in Administrative Custody (AC) status.

  1.  Educational Programming

    The Education Director shall ensure that:

Issued: 8/27/2012
Effective: 8/28/2012

a. all Phase I inmates are made aware of available educational opportunities, and the procedures for requesting participation;

b. educational materials are available and are provided as needed. The Education Director shall also ensure that tutoring is provided as needed;

c. only materials deemed appropriate for each level are used;

d. available educational programs are:
   (1)   Adult Basic Education (ABE);

   (2)   General Equivalency Diploma (GED); and

   (3)   individual/self study programs.

e. the programs will be at no cost to the inmate;

f. post-secondary opportunities may be made available at the inmate's expense; and

g. in-cell work programs may be considered. If developed and approved, appropriate pay shall be afforded to the inmate in accordance with Department policy **DC-ADM 816**.

2.   Leisure Activities

The Activities Manager shall ensure that:

a. Phase I inmates are made aware of recreational opportunities and procedures for requesting participation; and

b. only selected and approved arts and crafts materials, authorized by the Facility Manager/designee, are used.

## L. Religious Activities

Religious activities shall be permitted in accordance with Department policy **DC-ADM 802, "Administrative Custody Procedures"** and **DC-ADM, "Religious Activities,"** with the following exceptions:

1.   an inmate may request religious audiotapes on a weekly basis; and

2.   an inmate may not retain more than two religious audiotapes at any one time.

## M. Access to Legal Materials

1-5

*6.5.8, Capital Case Procedures Manual*
*Section 1 – Phase I Inmates*

1. Each housing unit in which Capital Case inmates are housed, shall contain a designated area to contain a mini law library in accordance with Department policy **DC-ADM 007, "Access to Provided Legal Services."**

2. Each mini law library shall provide adequate lighting, seating for two individuals, desk space adequate for a work area, and shelving that is secure.

3. A Capital Case inmate shall be given written instructions containing a current list of materials available in the mini law library, the procedures to request use of the mini law library, and the hours the mini law library is available to. Each home facility shall also ensure that a typewriter is kept in the mini law library for the Capital Case inmate to use.

4. The mini law library shall be available to a Capital Case inmate during the time the housing unit is considered to be "open" (shower and exercise periods).

5. The Officer-in-Charge of the housing unit shall schedule use of the mini law library.

6. A Capital Case inmate may request two hour blocks of time to work in the mini law library. If no one is scheduled to use the mini law library after the two hour block of time, a request for continued time may be considered.

7. Two Phase I inmates may work together in the mini law library providing there is no security concern.

8. A Capital Case inmate is not permitted to work together with a non-Capital Case inmate.

9. A Capital Case inmate may request to be put on an "on call" list to use the mini law library if no one is scheduled to use it during the period the housing unit is "open".

10. A logbook shall be maintained recording inmate use of the mini law library including each inmate's name and number, date of use, length of time used and whether the inmate worked with another inmate.

11. At least twice a week the facility law librarian/designee, shall deliver requested legal materials from the facility's general population law library and pick up requests for legal materials from the Level 5 Housing Unit.

12. The facility Librarian will inventory the mini law library on a monthly basis to ensure that the materials are in place and up to date. A record of the inventory shall be maintained.

13. If an inmate does not have representation by an attorney and is illiterate or non-English speaking, he/she may be permitted to exchange legal information, with the approval of the Facility Manager/designee, with another Capital Case inmate who is acting as legal advisor. Custody staff are not to pass legal materials from one inmate to another.

Issued: 8/27/2012
Effective: 8/28/2012

14. A search of the materials in the inmate's possession shall be conducted upon exiting the mini law library to ensure that no pages were torn from the books in an attempt to remove them from the library.

15. A Capital Case inmate shall be permitted to exchange legal materials from his/her cell with legal materials being held in storage once every 30 days. The PRC may authorize more frequent exchanges based upon demonstrated need. Such additional exchanges may not exceed one per week.

### N. Access to Reading Materials

1. Library materials shall be made available through established local procedures.

2. A Capital Case inmate shall be allowed to retain non-legal reading materials in accordance with **Subsection J.1.j.** above.

3. Newspapers shall be permitted on a one-for-one exchange basis.

### O. Transfer of Phase I Inmates

If a Phase I Capital Case inmate participating in a facility program is transferred, progress records and the materials being used shall be transferred with the inmate to ensure continuity or participation at the next facility.

### P. Placement in Disciplinary Custody (DC) Status

When a Phase I Capital Case inmate is transferred to DC status, the inmate will be suspended from program participation until returned to AC status in accordance with Department policy **DC-ADM 802**. The Office of the Secretary shall be notified via fax of any change in status of a Capital Case inmate. The notification is to include a brief summary of the events regarding the change in status.

### Q. Psychiatric Treatment of a Capital Case Inmate

1. Anytime a staff member observes a Capital Case inmate showing signs of mental decomposition to the point where the inmate might pose a risk to him/herself or others, the observing staff shall:

   a. notify the Facility Manager/designee, the Deputy Superintendent for Facilities Management (DSFM), and the Medical and Psychology Departments in order to arrange for the inmate to be evaluated; and

   b. the Unit Manager or Officer-in-Charge of the housing unit shall assess the inmate with the **DC-510**. The staff member conducting the **DC-510** shall assist the Medical/Psychiatric Departments in evaluating the inmate.

1-7

2. After the facility's Medical/Psychiatric Department has evaluated the inmate, the Medical/Psychiatric Department shall consult with the Chief of Psychiatry/Medical Director at the Bureau of Health Care Services (BHCS), Central Office. A **DC-566, Individual Treatment Plan (ITP)** shall be prepared, if indicated.

3. Any restrictions of state issued or personal property, and/or the need for staff observation of the inmate shall be in accordance with the inmate's ITP.

4. If it is determined that the Capital Case inmate should be transferred to a Mental Health Unit (MHU) or Forensic Treatment Center (FTC) the facility's Medical/Psychiatric Department shall coordinate the transfer of the inmate to the treatment center with the following people:

    a. Office of the Secretary/designee;

    b. BHCS Chief of Psychiatry/Medical Director

    c. Chief of the Central Office Security Division;
    d. Bureau of Inmate Services (BIS);

    e. *Office of Population Management; and*

    f. Office of Chief Counsel.

5. The Office of Chief Counsel shall notify the following people that the Capital Case inmate is going to be moved to a MHU or FTC:

    a. Governor's Office; and

    b. General Counsel's Office.

6. The MHU and/or the FTC staff shall work in conjunction with the facility's Security Office and the Central Office Chief of Security to ensure that proper and adequate security measures are in place to allow the inmate to fully participate in his/her individual or group treatment.

7. When the MHU or FTC staff determine that the Capital Case inmate is stable and ready to be released, the staff shall contact the individual listed below to arrange the return of the Capital Case inmate to his/her home facility:

    a. Office of the Secretary/designee;

    b. BHCS Chief of Psychiatry/Medical Director;

    c. Central Office Chief of Security;

    d. Chief Counsel's Office; and

1-8

    e. ***Office of Population Management.***

8. After the Capital Case inmate has been transported back to his/her home facility, the Office of Chief Counsel shall notify the following persons:

    a. Governor's Office; and

    b. General Counsel's Office.

## R. News Media

1. Requests for interviews with a Phase I inmate shall be handled in accordance with Department policy **DC-ADM 009, "News Media Relations."**

2. All statutes, regulations, and policies that govern visits and telephone calls between a Capital Case inmate and the general public shall be used when responding to news media requests for interviews with a specific Capital Case inmate.

## S. Modification of Sentence

1. In the event that an order is received modifying the sentence of a Capital Case inmate to life imprisonment due to a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, the facility Records Supervisor must determine whether the order is valid and whether the District Attorney intends to appeal the order.

2. If the District Attorney intends to appeal, the inmate shall not be moved from the Capital Case unit until the appeal is resolved. However, the inmate may be moved from the Capital Case unit, if the District Attorney does not file an appeal within 30 days.

3. If the District Attorney does not intend to appeal and if the inmate does not remain subject to an execution sentence as the result of a prosecution other than the sentence modified in the order, the inmate may be moved from the Capital Case housing unit.

4. Any questions concerning moving a Capital Case inmate from a Capital Case unit shall be referred to the appropriate Regional Deputy Secretary.

## T. Conversion to Phase II

When an Execution Warrant is signed by the Governor, the inmate is to be converted to Phase II status. Phase II Capital Case inmate procedures shall be in accordance with **Section 2, Phase II**, of this manual.

Issued: 8/27/2012
Effective: 8/28/2012

Exhibit 3



| | |
|---|---|
| **POLICY STATEMENT**<br>**Commonwealth of Pennsylvania • Department of Corrections** | |

| Policy Subject: | Policy Number: |
|---|---|
| **Access to Mental Health Care** | **13.8.1** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **March 2, 2015** | **Signature on File**<br>**John E. Wetzel** | **March 9, 2015** |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections, Department employees, volunteers, contract personnel, visitors and inmates.

## III. POLICY

It is the policy of the Department to deliver a broad continuum of mental health services to ensure that regardless of how major or minor the emotional disturbance, services are available to every inmate in the Department.[1]

A. screening for mental health problems on intake as approved by the mental health professional (refer to **Section 2 - Delivery of Mental Health Services** of this procedures manual);

B. outpatient services  for the detection, diagnosis, and treatment of mental illness (refer to **Section 2** of this procedures manual);

---

[1] 4-4368

C. crisis intervention and the management of acute psychiatric episodes (refer to **Section 2** and **Section 3 - Delivery of Psychiatric Services** of this procedures manual);

D. stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting (refer to **Section 2, Section 3,** and **Section 5 - Residential Treatment Units [RTUs]** of this procedures manual);

E. preventive treatment (refer to **Section 1** and **Section 2** of this procedures manual);

F. provision for referral and admission to a licensed mental health unit/facility (refer to **Section 2 and Section 4 - Temporary Transfer of Mental Health Commitments** of this procedures manual);

G. facilities for an offender whose psychiatric needs exceed the treatment capability of the facility (refer to **Section 5, Section 7 – Special Assessment Unit, Section 10 – Intermediate Care Unit** of this procedures manual); and

H. procedures for obtaining and documenting informed consent (refer to **Section 2** of this procedures manual).

IV. **PROCEDURES**

A. The systematic method of delivering psychological services to every inmate includes, but is not limited to, the below listed vehicles.

1. Intellectual, Academic and Mental Health Assessment

The Department provides psychological and psychiatric assessments of levels of intellectual functioning, academic achievement, personality dynamics, and mental health needs to identify each inmate's strengths and weaknesses in order to make prescriptive program and treatment recommendations to help him/her develop the necessary skills for successful adjustment while incarcerated and upon release in the community.[2]

2. Individual Treatment and Program Planning

The mental health treatment service needs of each inmate are addressed via his/her **DC-43, Integrated Correctional Plan (ICP)**, which is developed with participation of the inmate and is updated annually. In addition, the special needs of an inmate with mental illness are further addressed via the Individual Recovery Plan (IRP).

3. Mental Health Tracking

An inmate with mental health problems is tracked on the automated Mental Health/Intellectual Disability (MH/ID) tracking system to ensure continuity of care.

---

[2] 4-4305

4. Outpatient Treatment Services

Outpatient psychiatric and psychological services are provided upon an inmate's initial intake and as needed throughout his/her period of incarceration at every facility. Individual and group treatment services are developed to assist an inmate in emotional growth and/or prevention/management of mental illness, managing the behaviors that lead led to his/her offense(s), coping with the prison environment and external stressors, and preparing for reentry into the community as law abiding citizens.

5. Inpatient Treatment Mental Health Services

Inpatient psychiatric services are provided in Mental Health Units (MHUs) and the Forensic Treatment Center (FTC) at Waymart. The MHUs are small inpatient units that are licensed by the Department of Human Service's Office of Mental Health and Substance Abuse Services (OMHSAS) and provide short-term treatment. The FTC is a psychiatric hospital licensed by OMHSAS, which provides long-term inpatient psychiatric services.

6. Special Needs Housing

Specialized housing is available for inmates that require that level of care in a Special Needs Unit (SNU), Intermediate Care Unit (ICU), Special Assessment Unit (SAU), Residential Treatment Unit (RTU), Secure Residential Treatment Unit (SRTU), Behavior Management Unit (BMU), Diversionary Treatment Unit (DTU) and Special Observation Unit (SOU). SNUs are non-licensed living areas or blocks located where an inmate with special mental health or medical needs can receive additional or more intense treatment services, support and/or protection. The ICU at Waymart is a 93-bed living unit that accepts an inmate who has a history of serious mental illness, psychiatric hospitalizations, and SNU/RTU placements. The ICU prepares an inmate for living in a SNU/RTU. The SAU provides additional diagnostic and assessment services for an inmate with mental illness who displays serious behavioral problems. The SOU is an observation and assessment unit for newly committed inmates who are experiencing stress and are suspected of having mental health problems.[3]

7. Community Based Residential and Treatment Services

CCCs for a mentally ill inmate are located in Philadelphia and Allegheny Counties to help these men and women transition back into community life.

B. All pertinent procedures for staff are contained in the procedures manual for this policy.

---

[3] 4-4305

## V. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII. RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

1. Policy

    This policy document is public information and may be released upon request.

2. Confidential Procedures (if applicable)

    Confidential procedures for this document, if any, are <u>not public information</u> and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

1. General Distribution

    The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

    It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

### A. Superseded Policy

1. Department Policy

   13.8.1, Access to Health Care, issued May 24, 2004 by Secretary Jeffrey A. Beard, Ph.D.

2. Facility Policy and Procedures

   This document supersedes all facility policy and procedures on this subject.

### B. Cross Reference(s)

1. Administrative Manuals

   a. DC-ADM 003, Release of Information;

   b. DC-ADM 201, Use of Force;

   c. DC-ADM 801, Inmate Discipline;

   d. DC-ADM 802, Administrative Custody Procedures;

   e. 2.1.1, Planning, Research, Statistics and Grants;

   f. 4.1.1, Human Resources and Labor Relations;

   g. 5.1.1, Staff Development and Training;

   h. 6.3.1, Facility Security;

   i. 6.5.1, Administration of Security Level 5 Housing Units;

   j. 6.5.8, Capital Case Administration;

   k. 6.7.2, Special Response Teams;

   l. 11.2.1, Reception and Classification;

   m. 11.4.1, Case Summary;

   n. 11.5.1, Records Office Operations;

   o. 13.1.1, Management and Administration of Health Care; and

   p. 13.2.1, Access to Health Care

2. ACA Standards

   a. Adult Correctional Institutions: 4-4191, 4-4257, 4-4258, 4-4286, 4-4305, 4-4350, 4-4351, 4-4366, 4-4368, 4-4369, 4-4371, 4-4372, 4-4373, 4-4374, 4-4399, 4-4401, 4-4404, 4-4411, 4-4416

   b. Adult Community Residential Services: None

   c. Correctional Training Academies: None

3. PREA Standards

   None



**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Policy Number: |
|---|---|
| **Access to Mental Health Care** | **13.8.1** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **March 2, 2015** | **Signature on File** <br> **John E. Wetzel** | **March 9, 2015** |

Release of Information:

**Policy Document**: The Department of Corrections policy document on this subject is public information and may be released to members of the public, staff, legislative, judicial, law enforcement, and correctional agencies and/or inmates upon request.

**Procedure Manual**: The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

**Procedure Development**: All required procedures will be developed in compliance with the standards set forth in this manual and/or the governing policy. These standards may be exceeded, but in all cases these standards are the minimum standard that must be achieved. In the event a deviation or variance is required, a written request is to be submitted to the appropriate Regional Deputy Secretary and the Standards and Practices Unit for review and approval prior to implementation. Absent such approval, all procedures set forth in this manual must be met.

### 13.8.1 Access to Mental Health Care Procedures Manual
### Table of Contents

## Section 1 – Psychological Services

A. Diagnostic Center.................................................................................. 1-1
B. Facility Functions and Procedures ...................................................... 1-2
C. Treatment............................................................................................. 1-14
D. Procedure for Preparation of Commutation Psychological Evaluations........................... 1-15
E. Training, Consultation, and Peer Review ............................................ 1-15
F. Central Office Oversight, Quality Improvement, and Quality Assurance Activities .......... 1-16

DC-97, Mental Health Referral Form ...................................................... Attachment 1-A
Guidelines for Department Psychological Evaluations for Parole and Other Assessments
Required by Policy or Referral................................................................. Attachment 1-B
Procedure for Preparation of Commutation Psychological Evaluations ............... Attachment 1-C
PCRA and Psychological Evaluation for Parole...................................... Attachment 1-D
Psychological Evaluation and Clinical Risk Assessment ....................... Attachment 1-E
DC-510, Suicide Indicators Checklist....................................................... Attachment 1-F
DC-560, Mental Health Contact Note ...................................................... Attachment 1-G
RHU C & D Roster Inmate Review Tracking Sheet ................................. Attachment 1-H
DC-560A, Initial Reception Mental Health Questionnaire ...................... Attachment 1-I
Format for Commutation Psychological Reports ..................................... Attachment 1-J
Psychological Screening Report Form...................................................... Attachment 1-K
Role of the Psychologist in Personnel Selection of COTS ..................... Attachment 1-L

## Section 2 - Delivery of Mental Health Services

A. Identifying Mental Health Needs of Inmates........................................ 2-1
B. Definition of Serious Mental Illness ..................................................... 2-2
C. Clinical Guidelines for Functional Impairment ..................................... 2-4
D. Intellectual Disability (ID)...................................................................... 2-4
E. Processing ............................................................................................ 2-9
F. Mental Health Commitments ............................................................... 2-11
G. Continuity of Care Procedures for Inmates with Mental Illness Being Transferred.......... 2-15
H. Continuity of Care Procedures for an Inmate with Mental Illness Being Discharged ....... 2-18
I. Limits of Confidentiality ....................................................................... 2-24
J. Guilty But Mentally Ill (GBMI) Inmates................................................ 2-25
K. Dealing with a Potentially Suicidal Inmate and an Inmate Who Attempts Suicide........... 2-30
L. Suicide Prevention Committee ............................................................ 2-42
M. Mental Health Services Review Committee (MHSRC) ........................ 2-43

Initial – Individual Recovery Plan ........................................................... Attachment 2-A
Change of Status – Individual Recovery Plan......................................... Attachment 2-B
Review – Individual Recovery Plan......................................................... Attachment 2-C
DC-551, Continuity of Care and Transfer Individual Treatment Plan .................. Attachment 2-D
MH 783, Application for Involuntary Emergency Examination & Treatment......... Attachment 2-E
MH 783-A, Patient's Bill of Rights .......................................................... Attachment 2-F
MH 784, Application for Extended Involuntary Treatment....................... Attachment 2-G
Voluntary Application for Mental Health Treatment (Section 201) ......... Attachment 2-H
MH 781-Z, Explanation of Voluntary Admission Rights .......................... Attachment 2-I

*13.8.1 Access to Mental Health Care Procedures Manual*
*Table of Contents*

MH 781-A, Initial Evaluation ................................................................ Attachment 2-J
DC-484, Mental Health Confidentiality Disclosure Statement-English & Spanish Attachment 2-K
Referral Procedure for Cromisa Project............................................... Attachment 2-L

## Section 3 - Delivery of Psychiatric Services

A.  Documentation of Psychiatry Services ........................................................ 3-1
B.  Provisions of Psychiatric Services by a Certified Registered Nurse Practitioner –
    Psychiatric Services (PCRNP)........................................................... 3-3
C.  Psychiatric Therapeutic Restraints ............................................................ 3-5
D.  Guidelines for Psychiatric Observations Cells (POC) ................................. 3-5
E.  Involuntary Administration of Psychotropic Medications ........................... 3-14
F.  Sleep Medications.................................................................................... 3-17
G.  Benzodiazepines ..................................................................................... 3-17
H.  Psychiatric Medication Monitoring ........................................................... 3-18

DC-472C, Outpatient Psychiatry Progress Notes ................................. Attachment 3-A
DC-452D, Informed Consent for Psychotropic Medication ................... Attachment 3-B
DC-452D, Informed Consent for Psychotropic Medication (Spanish) .... Attachment 3-C
DC-474A, POC Discharge Summary..................................................... Attachment 3-D
DC-447, Psychiatric Observation Cell Orders....................................... Attachment 3-E
DC-483, Psychiatric Observation Monitoring Form................................ Attachment 3-F
DC-486C, Antipsychotic Medication Flow Sheet .................................. Attachment 3-G
DC-486B, Lithium, Depakote, Trileptal, Tegretol Flow Sheet ............... Attachment 3-H

## Section 4 - Temporary Transfer of Mental Health Commitments

A.  General Considerations............................................................................ 4-1
B.  Eligibility Criteria for Intra-Facility Transfer .............................................. 4-1
C.  Department Mental Health Unit Commitment Process ................................ 4-2
D.  Department Regional Mental Health Unit (MHU) Responsibilities............... 4-3

Request for Temporary Transfer to a Mental Health Unit ..................... Attachment 4-A
Inmate Property Approved for Transfer to a Mental Health Unit ........... Attachment 4-B

## Section 5 – Residential Treatment Units (RTUs)

A.  Program Mission ...................................................................................... 5-1
B.  Admission Criteria and Process for Transfer............................................. 5-1
C.  RTU Cell Assignment ............................................................................... 5-3
D.  Individual Recovery Plans (IRPs) and Psychiatric Review Team (PRT) ...... 5-3
E.  Treatment Team Meetings ........................................................................ 5-4
F.  Treatment Programming ........................................................................... 5-4
G.  Milieu/Unit Atmosphere ........................................................................... 5-8
H.  Treatment Team Responsibilities ............................................................. 5-10
I.   Medications .............................................................................................. 5-12
J.  Razors...................................................................................................... 5-13
K.  Staff Training and Development................................................................. 5-13

*13.8.1 Access to Mental Health Care Procedures Manual*
*Table of Contents*

L.  Behavioral Adjustment Cell (BAC)......................................................................... 5-13
M. Discharge and Transfer Procedures...................................................................... 5-14

Involuntary Double-Celling Checklist ..........................................................Attachment 5-A
Initial Individual Recovery Plan (IRP) ...........................................................Attachment 5-B
Change of Status IRP .....................................................................................Attachment 5-C
Review IRP .....................................................................................................Attachment 5-D
IRP Guidelines................................................................................................Attachment 5-E
Group Therapy Resources for RTU Inmates ...............................................Attachment 5-F
RTU Program Schedule...................................................................................Attachment 5-G
Behavioral Adjustment Cell (BAC) Tracking Sheet ......................................Attachment 5-H

## Section 6 - Post Traumatic Stress Disorder Treatment Program

A.  Awareness and Education Phase............................................................................ 6-1
B.  Evaluation ............................................................................................................... 6-1
C.  Treatment Program ................................................................................................ 6-2
D.  Training ................................................................................................................... 6-4
E.  Program Discharge ................................................................................................. 6-4

DC-553, Military Veterans Scale..................................................................Attachment 6-A
DC-552, Military Experience of Combat Veterans ......................................Attachment 6-B

## Section 7 - Special Assessment Unit (SAU)

A.  Mission/Purpose..................................................................................................... 7-1
B.  Time Frame ............................................................................................................. 7-1
C.  Location................................................................................................................... 7-1
D.  Admission Criteria .................................................................................................. 7-1
E.  Process for Transfer to SAU .................................................................................. 7-2
F.  Transportation ........................................................................................................ 7-4
G.  Orientation.............................................................................................................. 7-5
H.  Admission Process.................................................................................................. 7-5
I.   Assessment Process .............................................................................................. 7-5
J.  Discharge Process .................................................................................................. 7-6

## Section 8 - Intermediate Care Unit (ICU)

A.  Admission Criteria and Custody Level Overrides .................................................. 8-1
B.  Process for Transfer ............................................................................................... 8-1
C.  Transfers and Transportation ................................................................................ 8-2
D.  Bureau of Health Care Services (BHCS) Responsibilities.................................... 8-3
E.  Orientation for an ICU Inmate ............................................................................... 8-3
F.  Treatment Programs/Levels of Treatment............................................................. 8-3
G.  Discharge Procedures............................................................................................ 8-4

*13.8.1 Access to Mental Health Care Procedures Manual*
*Table of Contents*

## Section 9 - Staffing and Security of Mental Health Units

A. Responsibilities ................................................................................. 9-1
B. Corrections Officer Staffing Levels and Inmate Custody Levels in the MHUs ................. 9-4
C. Tracking System Access ...................................................................... 9-6
D. Discharge Procedures ......................................................................... 9-6

## Section 10 – Secure Residential Treatment Unit (SRTU)

A. Program Mission .............................................................................. 10-1
B. Location ........................................................................................ 10-1
C. Staffing ......................................................................................... 10-1
D. Determination and Maintenance of Staffing Levels for the SRTUs ....................... 10-6
E. Chain of Command ............................................................................ 10-7
F. Staff Training .................................................................................. 10-7
G. Admission Criteria ............................................................................ 10-8
H. Process for Transfers ........................................................................ 10-8
I. Transportation ................................................................................. 10-11
J. Admission and Orientation .................................................................. 10-11
K. Transfers of Inmates in the SRTU System ............................................... 10-13
L. Treatment Programs/Levels of Treatment ............................................... 10-14
M. Accountability Status ........................................................................ 10-20
N. Structured Versus Unstructured Programming ......................................... 10-22
O. Phase Modification ........................................................................... 10-23
P. Incentive Program ............................................................................ 10-24
Q. Misconducts ................................................................................... 10-25
R. Changes in Status ............................................................................ 10-26
S. Release of SRTU Inmates ................................................................... 10-26
T. Discharge Procedures ........................................................................ 10-28
U. Release via Sentence Complete (Formerly Final Discharge Maximum Expiration) ....... 10-30
V. Unit Operation Evaluation .................................................................. 10-30

Institutions with SRTUs Listing ............................................................. Attachment 10-A
SRTU Accepted/Refused Structured Out-of-Cell Program Log .......................... Attachment 10-B
SRTU Accepted/Refused Unstructured Out-of-Cell Program Log ...................... Attachment 10-C
SRTU Shift Pass Down Form .................................................................. Attachment 10-D
STRU Program Review Sheet ................................................................. Attachment 10-E
Definition of a Serious Mental Illness Outline .......................................... Attachment 10-F
SRTU Inmate Handbook Receipt Form ..................................................... Attachment 10-G
SRTU Initial Annual Recovery Treatment Plan ........................................... Attachment 10-H
SRTU Property, Privileges, and Services Chart .......................................... Attachment 10-I
SRTU Recovery Treatment Plan Review ................................................... Attachment 10-J
SRTU Incentive Order Form .................................................................. Attachment 10-K
SRTU Accountability Status Restriction Form ............................................ Attachment 10-L
SRTU Accountability Status – Individual Recovery Plan ................................ Attachment 10-M
SRTU Group Participation Form ............................................................. Attachment 10-N
Weekly Structured/Unstructured Out-of-Cell Program Report ......................... Attachment 10-O
SRTU Weekly Point Summary ................................................................ Attachment 10-P

### 13.8.1 Access to Mental Health Care Procedures Manual
### Table of Contents

SRTU Monthly Point Summary ............................................................Attachment 10-Q
SRTU Semi-Annual Report ...............................................................Attachment 10-R

### Section 11 - Sex Offender Treatment (SOT)

A. Standards, Guidelines, and Theoretical Orientation for the Assessment and Treatment of Adult Sex Offenders ......................................................................... 11-1
B. Risk/Need Assessment ...................................................................... 11-1
C. Sex Offender Treatment (SOT) Programming............................................... 11-6
D. Staff Qualifications and Minimum Training ................................................ 11-10
E. Multidisciplinary Treatment and Management of the Sex Offender............................ 11-11
F. Record Keeping............................................................................ 11-13
G. Assistor/Peer Programs .................................................................... 11-14
H. Managing Program Participants who Accrue Misconduct(s) ....................................... 11-15
I. Managing Inmates without a Sexual Conviction Who Sexually Assault During Incarceration ......................................................................... 11-15
J. Collaborating with the Sexual Offenders Assessment Board (SOAB) ........................ 11-15

Standards and Guidelines for Assessment, Evaluation, and Treatment of Sex Offenders....................................................................Attachment 11-A
Theoretical Orientation .....................................................................Attachment 11-B
Static 99 Coding Rules ......................................................................Attachment 11-C
DC-577, Sex Offender Data Collection Instrument ...........................................Attachment 11-D
DC-578, Sex Offender Program Evaluation ....................................................Attachment 11-E
Table for Adjustments in Risk Based on Time Free...........................................Attachment 11-F
Assessment Results for an Inmate Referred for Evaluation for Sex Offender Treatment due to a Technical Parole Violation or a Prior Sex Offense..........Attachment 11-G
Procedure for Implementing Victim Scrapbook Process.......................................Attachment 11-H
Four-Stage Model of Group Development .....................................................Attachment 11-I
Limits of Confidentiality ....................................................................Attachment 11-J
Conditions of Participation .................................................................Attachment 11-K
Principles of Adult Learning ................................................................Attachment 11-L
DC-579, Summary of progress in Sex Offender Treatment` ...................................Attachment 11-M

### Section 12 – Behavior Management Unit (BMU)

A. Program Mission ........................................................................... 12-1
B. Location................................................................................... 12-1
C. Staffing .................................................................................. 12-1
D. Determination and Maintenance of Staffing Levels for the BMUs ................................ 12-6
E. Chain of Command ......................................................................... 12-7
F. Staff Training ............................................................................ 12-7
G. Admission Criteria ........................................................................ 12-7
H. Process for Transfers ..................................................................... 12-8
I. Transportation ............................................................................ 12-11
J. Admission and Orientation ................................................................. 12-11
K. Transfers of Inmates in the BMU System................................................... 12-13
L. Treatment Programs/Levels of Treatment.................................................... 12-14
M. Accountability Status ..................................................................... 12-20

*13.8.1 Access to Mental Health Care Procedures Manual*
*Table of Contents*

N.  Structured Versus Unstructured Programming ................................................................ 12-23
O.  Phase Modification ................................................................................................ 12-24
P.  Incentive Program ................................................................................................. 12-24
Q.  Misconducts ......................................................................................................... 12-26
R.  Change in Status .................................................................................................. 12-26
S.  Release of BMU Inmates ...................................................................................... 12-27
T.  Discharge Procedures ........................................................................................... 12-28
U.  Release via Sentence Complete (Formerly Final Discharge Maximum Expiration) ....... 12-29
V.  Unit Operation Evaluation ..................................................................................... 12-30

BMU Accepted/Refused Structured Out-of-Cell Program Log ........................... Attachment 12-A
BMU Accepted/Refused Unstructured Out-of-Cell Program Log ...................... Attachment 12-B
BMU Shift Pass Down Form ..............................................................................Attachment 12-C
BMU Program Review Sheet .............................................................................Attachment 12-D
BMU Inmate Orientation Handbook Receipt Form ............................................ Attachment 12-E
BMU Initial Recovery Treatment Plan ...............................................................Attachment 12-F
BMU Property, Privileges, and Services Chart ..................................................Attachment 12-G
BMU Recovery Treatment Plan Review .............................................................Attachment 12-H
BMU Incentive Order Form ................................................................................ Attachment 12-I
BMU Accountability Status Restriction Form ..................................................... Attachment 12-J
BMU Accountability Status – Recovery Treatment Plan ....................................Attachment 12-K
BMU Group Participation Form ......................................................................... Attachment 12-L
Weekly Structured/Unstructured Out-of-Cell Program Report .......................... Attachment 12-M
BMU Weekly Point Summary .............................................................................Attachment 12-N
BMU Monthly Point Summary ............................................................................Attachment 12-O
BMU/SRTU Information Resolution Action Form ............................................... Attachment 12-P
BMU Semi-Annual Report ..................................................................................Attachment 12-Q

## Section 13 – Special Needs Unit (SNU)

A.  Facility Responsibilities ........................................................................................... 13-1
B.  Admission Guidelines and Process for Transfer ...................................................... 13-1
C.  SNU Cell Assignment .............................................................................................. 13-3
D.  Staffing ................................................................................................................... 13-4
E.  SNU Yard and Activities .......................................................................................... 13-4
F.  Discharge and Transfer Procedures ........................................................................ 13-4

On-Unit Activities Schedule ...........................................................................Attachment 13-A

## Section 14 – Diversionary Treatment Units (DTU)

A.  General ................................................................................................................... 14-1
B.  Admission Criteria .................................................................................................. 14-1
C.  General Procedures and Provisions ........................................................................ 14-1
D.  Staff Training .......................................................................................................... 14-7
E.  Unit Operation Evaluation ...................................................................................... 14-7

Accepted/Refused Structured Out-of-Cell Program Log ................................ Attachment 14-A

*13.8.1 Access to Mental Health Care Procedures Manual*
*Table of Contents*

DTU Accepted/Refused Unstructured Out-of-Cell Program Log ........................ Attachment 14-B
Structured/Unstructured Out-of-Cell Program Report ........................................ Attachment 14-C
DTU Semi-Annual Report .................................................................................. Attachment 14-D

### Section 15 – Certified Peer Specialist (CPS) Initiative

A. General Considerations ................................................................................ 15-1
B. CPS Candidate Selection ............................................................................. 15-4
C. CPS Training Program ................................................................................. 15-5
D. Supervisory Staff ........................................................................................ 15-7
E. General Conduct ......................................................................................... 15-8
F. CPS Guidelines for Level 5 Housing ........................................................... 15-9
G. CPS Guidelines for Psychiatric Observation Cells ..................................... 15-9

CPS Confidentiality Acknowledgement Form .................................................. Attachment 15-A
CPR Orientation Checklist ............................................................................... Attachment 15-B
CPS Continuing Education Certificate .............................................................. Attachment 15-C
CPS Training Tracking Form ............................................................................ Attachment 15-D
CPS Defined Power Point ................................................................................. Attachment 15-E
Letter of Recommendation ............................................................................... Attachment 15-F

## Section 1 – Psychological Services

### A. Diagnostic Center

1. Every inmate entering the Department shall be given a psychological evaluation conducted at the Diagnostic and Classification Center (DCC).[1] The DCC shall administer basic psychometric testing and interview the inmate upon reception. DCC will provide further assessments only for an inmate who evidences a need for more comprehensive evaluation, e.g., those inmates scoring 70 or below on the intellectual screening to rule out intellectual deficiency.

2. The purpose of this psychometric testing is to provide screening in the areas of intelligence, achievement, personality, and emotional stability. Whenever screening indicates a need for more in-depth study, such shall be provided. Basic Assessment will be conducted with results and recommendations made available to appropriate staff for the purpose of initial classification in accordance with Department policy **11.2.1, "Reception and Classification."**

   a. Personality Assessment Inventory (PAI)

      (1) The psychology staff will administer the PAI.

      (2) PAIs will be administered in an appropriate testing environment without interruption.

      (3) A recorded version of the PAI will be administered to an illiterate inmate.

      (4) The complete protocol and computer narrative will be reviewed the same day it is administered and forwarded to the receiving facility along with a completed clinical interview form and the **Pennsylvania Clinical Risk Assessment (PCRA)**. If the initial review reveals clinically indicated concerns, an interview will be conducted the next working day.

   b. **DCC-PCRA**: the psychology staff will complete the **DCC-PCRA** form and forward it to the receiving facility.

   c. Revised Beta III

      (1) The psychology staff will administer the Beta III to every inmate.

      (2) An inmate who scores 70 or below will receive additional assessment at the DCC to "rule out intellectual disability (ID)/development disabilities (DD)." ID/DD assessment will include intelligence testing on the Wechsler Abbreviated Scale of Intelligence (WASI), the Wechsler Adult Intelligence Scale, adaptive behavior

---

[1] 4-4286

Issued: 1/30/2017
Effective: 2/6/2017

testing measured by the Vineland and research to determine whether the condition occurred before the age of 18.

d. More Comprehensive Assessments

(1) Mental Illness: An inmate with evidence of mental illness will receive a more comprehensive assessment. The Psychiatrist/Certified Registered Nurse Practitioner – Psychiatric Services (PCRNP) will conduct a comprehensive psychiatric evaluation in each case of serious mental illness (SMI) and the Psychiatric Review Team (PRT) will generate an **Individual Recovery Plan (IRP)** within 20 days of determination that the inmate has an SMI. This **IRP** will accompany the inmate to the receiving facility. The inmate shall be offered an opportunity to attend this meeting and the **IRP** will include goals in the inmate's own words, the PRT's unique plan for the inmate addressing his/her goals including sentinel behaviors, e.g. self-injurious behavior (SIB) and interventions utilized to achieve goals. Inmates that are not identified immediately at reception, but demonstrate evidence of mental illness, will be referred to psychiatry via the **DC-97, Mental Health Referral Form (Attachment 1-A)** for non-emergent referrals and this process must occur within 14 days of the referral.

(2) Other cases: Assessment procedures will not be modified for juveniles adjudicated as adults, for capital cases, or for boot camp cases.

**B. Facility Functions and Procedures**

1. The functions of the psychology staff are to provide diagnostic, therapeutic, mental health, and consultative services. The facility psychology staff shall provide group and individual therapy, as well as supervision and training in counseling and treatment for other staff members who need or request it, serve as a resource and consultant for administrative, custodial and other staff, participate in the development of individualized treatment programs, and participate in various staffings. Social workers may perform duties consistent with their licensure. The facility psychology staff shall evaluate mental health cases for potential commitment to the mental health system, arrange and coordinate mental health commitment hearings, and provide appropriate testimony at such hearings, as required. Psychology staff may serve as the point of contact with the courts and mental health facilities and make appropriate arrangements for the transfer to and/or return of an inmate from a mental health facility. The psychology staff are responsible for advising the Regional Licensed Psychology Manager (RLPM) and the Central Office Chief of Psychology, of any problems, difficulties, or unusual occurrences involving mental health cases and/or the transfer procedures, and for keeping records of every transfer to/from the mental health system. The psychology staff also provides follow-up treatment and monitors every mental health case returned to the facility from one of the Mental Health Units (MHU), State Correctional Institution (SCI) Waymart Forensic Treatment Center (FTC), or a Department of Human Services facility.[2]

---

[2] 4-4368, 4-4369

Issued: 1/30/2017
Effective: 2/6/2017

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 1 – Psychological Services*

2. Designated psychology staff members in the facility shall function as Mental Health Coordinators (MHC), coordinating treatment services for particular inmates, arranging mental health commitments, tracing of mental health commitments, and crisis intervention until needed services can be coordinated.[3]

   a. Diagnostic Evaluations for Program Planning

   Counselors and other staff members make frequent referrals to the psychology department for the following reasons:

   (1)  consideration for Community Work Program (CWP);

   (2)  consideration for outside clearance;

   (3)  difficulty adjusting to program and/or facility life;

   (4)  frequent or serious disciplinary infractions;

   (5)  offer of an in-person, out-of-cell assessment, of every active mental health roster inmate involved in the disciplinary process prior to appearing before the decision maker;

   (6)  potential mental health commitments;

   (7)  guilty but mentally ill (GBMI) commitments, including an annual psychological evaluation in PCRA format;

   (8)  parole evaluations in PCRA format for active mental health roster inmates (C and D Roster) or those convicted of violent offenses; and/or

   (9)  psychosocial evaluations for use by local and Central Office Gender Review Committee (GRC).

   b. Procedures

   The counselor or other staff member shall refer cases to the psychology department for comprehensive evaluation and treatment on the **DC-97**. Ideally, such referrals shall be discussed with the referring party. If this is not possible, it may be necessary to proceed on the basis of the written referral only. It may also be necessary for the psychology staff to train other facility staff on the appropriate way to ask referral questions and what types of cases are appropriate for referral. Once the psychology staff receives the referral, he/she shall review the request and determine what procedures are necessary to answer the referral question. A diagnostic interview may be sufficient or additional testing may be necessary. The appropriate procedures necessary to reach responsible conclusions shall be determined by the nature of the

---

[3] 4-4368, 4-4369

Issued: 1/30/2017
Effective: 2/6/2017

request, the information available in the record, and the psychology staff's own skills. Generally, some additional testing shall be necessary, employing objective and/or projective techniques. The psychology staff performing the evaluation shall select the instruments used, except where policy may specify instruments to be used. The evaluation will be completed within 14 days of the referral request date and include the following:[4]

(1) review of mental health screening and appraisal data to include requesting community treatment data with the **DC-108, Authorization for Release of Information** and the **DC-484, Mental Health Informed Consent Form** signed;

(2) direct observations of behavior;

(3) collection and review of additional data from individual diagnostic interviews and tests assessing personality, intellect, and coping abilities;

(4) compilation of the individual's mental health history; and

(5) development of an IRP/management plan with appropriate referral to include transfer to a mental health facility for inmates whose psychiatric needs exceed the treatment capability of the facility.

c. Specialized Evaluations

(1) Psychology staff frequently are called upon to perform specialized evaluations. These cases, which may be sent to outside agencies, require sophisticated and intensive evaluations. General guidelines for the completion of these reports are presented in the **Guidelines for Department Psychological Evaluations for Parole and Other Assessments Required by Policy or Referral (Attachment 1-B)**.

(2) The psychologist shall employ appropriate interview procedures and test instruments, which may include objective measures (Minnesota Multiphasic Personality Inventory [MMPI-2], PAI, and PCRA), mental status exam, the Montreal Cognitive Assessment and one or more projective tests, to provide the required information. When possible, these evaluations shall be performed by a licensed psychologist (LP). Only under exceptional circumstances shall the following reports be prepared by anyone at a level less than the Psychological Services Specialist (PSS). Reports prepared by unlicensed staff must be reviewed and signed by a LP. The examiner and/or the reviewer's PA license number and signature shall be affixed to the report.

(a) Commutation

---

[4] 4-4372

Issued: 1/30/2017
Effective: 2/6/2017

When possible, commutation evaluations shall be performed by a LP. If any commutation reports are prepared by other than a LP, the reports must be reviewed and signed by a LP, preferably the Licensed Psychologist Manager (LPM). The reviewing psychologist shall include his/her license number and signature. For further information on the preparation of commutation psychological evaluations, please refer to **Procedure for Preparation of Commutation Psychological Evaluations (Attachment 1-C)** and to Department policy **11.4.1, "Case Summary."**

(b)  Court Requests for Special Evaluations

Occasionally the committing court requests a special psychological evaluation on an individual. These requests shall be honored as rapidly as possible.

(c)  Parole Board Requests

Psychological evaluations for parole shall include a clinical interview, review of the relevant files, and administration of the **PCRA and Psychological Evaluation for Parole (Attachment 1-D)**. The PCRA is a list of risk factors that research suggests are related to re-offending. Specific directions for administration of the PCRA and format for the PCRA are presented in **Psychological Evaluation and Clinical Risk Assessment (Attachment 1-E)**.

(d)  Evaluations for Mental Health Facility Placement

The psychologist may be requested to perform an evaluation on an inmate being considered for transfer to a Department MHU or state hospital. The psychologist shall choose the appropriate clinical instruments that provide the information needed to assist in such determinations.

(e)  Evaluations Requested by Facility Psychiatrist/PCRNP

The facility Psychiatrist/PCRNP may occasionally refer an inmate for psychological evaluation. When possible, the psychologist shall discuss the referral with the Psychiatrist/PCRNP prior to performing the evaluation. It is also helpful if the findings of the psychological evaluation can be discussed with the referring Psychiatrist/PCRNP.

(f)  Psychological Evaluation of Inmates Confined in a Security Level 5 (SL5) Unit

These units include the Restricted Housing Unit (RHU), Special Management Unit (SMU), and Security Threat Group Management Unit (STGMU).

Issued: 1/30/2017
Effective: 2/6/2017

**13.8.1, Access to Mental Health Care Procedures Manual**
**Section 1 – Psychological Services**

    i.    Psychology staff shall visit the SL5 Unit five times per week.[5] All psychology staff entering the unit shall sign in/out on the **DC-702, SL5 Unit Log Book**.

    ii.    Psychology and/or nursing staff will assess every inmate placed in a SL5 Unit for suicide potential and review the **DC-510, Suicide Indicators Checklist (Attachment 1-F)**. These procedures are outlined in **Section 2** of this procedures manual.

    iii.    All assessments and written reports of SL5 inmates shall address suitability for continued placement in the SL5 and assess mental deterioration or lack thereof. It is expected that all assessments will also include risk for suicidality and include consideration of protective factors.

    iv.    The treating Psychiatrist/PCRNP shall continue to see inmates on the C Roster out-of-cell a minimum of every 90 days or more frequently based on their clinical discretion, and shall make recommendations to the Program Review Committee (PRC) regarding inmates in Administrative Custody (AC)/Disciplinary Custody (DC) status who may be released.

    v.    Psychology staff shall personally interview, assess, and make a written report utilizing the **DC-560, Mental Health Contact Note (Attachment 1-G)** to be filed in the medical record for all A and B Roster status inmates monthly. A brief **Inmate Cumulative Adjustment Record (ICAR)** entry indicating the contact occurred shall also be made. Psychology staff shall make recommendations to the PRC regarding inmates in AC/DC status who may be released.

    vi.    Psychology staff shall personally interview, assess, and make written reports utilizing the **DC-560** to be filed in the medical record for every C Roster inmate monthly. A brief **ICAR** entry indicating the contact occurred will also be made. Psychology staff shall make recommendations to the PRC regarding inmates in AC/DC status who may be released. C Roster inmates shall be offered out-of-cell contacts with psychology/Psychiatry/PCRNP on the unit at least every 90 days. The refusal and/or acceptance of these offers shall be documented in the **ICAR** and on the **DC-560** in the medical record. These out-of-cell contacts are contingent on behavioral compliance from the inmate. If behavior is demonstrated that would contraindicate out-of-cell contact, this shall be documented in the **DC-17X, Adjustment Record for SL5 Inmates**, **ICAR**, and the **DC-560**. The inmate shall be seen at the next available visit if behavior permits.

[5] 4-4258

Issued: 1/30/2017
Effective: 2/6/2017

vii.  Psychology staff shall assess an inmate referred and/or approved for Secure Residential Treatment Unit (SRTU) or Behavioral Management Unit (BMU) programming (whether on transfer waiting list or time-out) at least every seven days and shall make recommendations to the PRC regarding the inmate. These assessments shall be documented as brief **ICAR** entries with a more detailed **DC-560** filed in the medical record. SRTU and BMU approved inmates shall be offered out-of-cell contacts with Psychiatry/PCRNP at least every 30 days on the unit and shall be reviewed by PRT on a monthly basis.

viii.  An inmate continuously confined in a SL5 Unit for a period of one year shall be given, at a minimum, an annual psychological, and if indicated, psychiatric examination during his/her confinement addressing the suitability of continued confinement in the SL5 Unit, regardless of current Mental Health (MH)/ID roster status. It is the responsibility of the psychology staff to see that such an evaluation is conducted. These shall be documented as brief **ICAR** entries with a PCRA evaluation filed in the medical record. If the inmate refuses to submit to assessment, procedures in accordance with Department policy **13.1.1, "Management & Administration of Health Care,"** shall be followed.

ix.  Psychology staff shall make recommendations to the PRC regarding inmates in long-term AC/DC status who may be released or possibly transferred to a SRTU, BMU, SMU, STGMU, or other specialized program.

x.  Unless a specific need exists that the inmate must be removed from the unit, the inmate shall be visited in the unit. This is to restrict traffic and to avoid possible problems during escort or time out of the unit. The Shift Commander/designee must approve any move from the unit for a psychological/psychiatric visit or interview.

xi.  The LPM/MHC will provide the Commissioned Officer-in-Charge of the SL5 Unit weekly with a listing of all inmates on the active mental health roster and those considered to display risk factors for suicidal behavior. This list is to be utilized by security staff to assist in their day-to-day interactions and decision-making processes. These postings should stay in the secured control bubble.

xii.  The Unit Manager/Officer-in-Charge is responsible for coordinating visit/interview dates and times to ensure that security is provided during meetings between inmates and psychology/psychiatric staff. Any requests by mental health staff to interview an inmate out-of-cell shall be accommodated by security staff if possible, as they are to have unrestricted full access to inmates. At the same time, mental health staff should be sensitive to the activities on the unit and

1-7

whenever possible, attempt to coordinate in advance times that are convenient for security for out-of-cell contacts. For example, psychiatry and psychology are permitted to interview the same inmate together.

    xiii.   The **RHU C & D Roster Inmate Review Tracking Sheet (Attachment 1-H)** is to be utilized for tracking contacts with C Roster inmates housed in the RHU. It is intended to serve as a mechanism to ensure compliance with the required psychology/psychiatry contacts in accordance with **B.2.c.(2)(f)i.-xiii. above**. The Facility Manager shall designate a staff member to maintain the **RHU C & D Roster Inmate Review Tracking Sheet**. The tracking sheet shall be forwarded to the Facility Manager on a weekly basis and shall be reviewed during the quarterly inspection process.

  (g)  Psychological Evaluation of Inmates Housed in Specialized Housing Units

These units include Diversionary Treatment Units (DTUs), SRTUs, and BMUs.

    i.   Psychological services provided in the DTUs will be in accordance with **Section 14** of this procedures manual.

    ii.   Psychological services provided in the SRTUs will be in accordance with **Section 10** of this procedures manual.

    iii.   Psychological services provided in the BMUs will be in accordance with **Section 12** of this procedures manual.

  (h)  Gender Dysphoria Evaluation

This psychological evaluation should follow the below guidelines.

A psychological evaluation will be scheduled and completed by a LPM or LP, if available, and recommendations made for treatment or referral (i.e., this psychological evaluation shall not be completed by a psychological services associate [PSA]). A PSS may complete this report if an LPM or LP is not available. The purpose of this assessment is to gather a complete psychosocial and developmental history of this individual and to determine how this individual has adjusted to prison since arriving in the Department. This psychological assessment will include an assessment of the individual's need for psychological and psychiatric treatment. The psychology staff member completing this assessment will attempt to retrieve any existing prior psychological and psychiatric treatment records utilizing the **DC-108, Authorization for Release of Information**. This report will be utilized by Central Office Administrative GRC to make informed recommendations. Further information on the Central Office GRC

*13.8.1, Access to Mental Health Care Procedures Manual*
*Section 1 – Psychological Services*

f.  Monthly Report

The psychology staff shall keep an accurate record of the number of psychological evaluations (testing), number of psychological interviews for information gathering (other than testing), and any group testing sessions conducted. These records shall be submitted to the facility State Corrections Analysis Network (SCAN) Coordinator at the end of each month for inclusion in the facility's monthly SCAN report.

g.  Mental Health Roster Status

(1)  The mental health needs of an inmate shall be rated on a four-point nominal scale system according to the following:

(a)  "A" Roster - inmate has no identified psychiatric/ID needs or history of psychiatric treatment.

(b)  "B" Roster - inmate has identified history of psychiatric treatment, but no current need for psychiatric treatment; inmate is placed on inactive MH/ID roster.

(c)  "C" Roster - inmate is currently receiving psychiatric treatment, but is not currently diagnosed with a SMI or functional impairment, and does not have an ID or is not GBMI.

(d)  "D" Roster – inmate is currently diagnosed with a SMI, ID, credible functional impairment, or is GBMI. The PRT shall generate an IRP for him/her. An IRP for a newly incarcerated inmate shall be developed within 30 days of intake and updated every 120 days, or more frequently if clinically indicated. The Treatment Team shall generate a new IRP annually. The psychology staff shall coordinate with the education department to ensure that any inmate with an ID who is 21 years of age or younger receives an Individual Education Plan (IEP).

(2)  The MHC (or other psychology staff member who enters data into the mainframe system) is required to enter any mental health roster status change within one working day of the change by the PRT.

h.  Reclassification Summary Psychological Report – Prior Commitment-Parole Violation Cases Classification Summaries for Parole Violators (PVs) must be completed as quickly as possible after the inmate returns to the permanent facility. The primary purpose is to identify special risk factors for violence against self or others in order to help the facility make critical decisions about housing and treatment. In addition, facility staff may desire information that would be useful in making employment decisions. In many cases, the psychology staff can gather sufficient data to complete the summary by conducting a clinical interview, administering a Mental Status Exam, and reviewing the inmate's file.

1-13