# EXHIBIT E



POLICY STATEMENT
Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | | Policy Number: |
|---|---|---|
| Administration of Specialized Inmate Housing | | 7.5.1 |
| **Date of Issue:** December 3, 2019 | **Authority:** Signature on File John E. Wetzel | **Effective Date:** December 10, 2019 |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections, Department employees, volunteers, contract personnel, visitors, and inmates.

## III. POLICY

It is the policy of the Department to:

A. properly house inmates to aid the secure operation of our facilities while ensuring the safety of the public, facility staff, and inmates; and

B. maintain specialized housing units to manage facility populations by appropriately housing inmates based on their individual needs. Specialized inmate housing is generally a specialized general population housing unit.

## IV. PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

## V. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII. RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

1. Policy

   This policy document is public information and may be released upon request.

2. Confidential Procedures (if applicable)

   Confidential procedures for this document, if any, are not public information and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

1. General Distribution

   The Department of Corrections policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

   It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

### A. Superseded Policy

1. Department Policy

   This is a new policy section.

2. Facility Policy and Procedures

   This document supersedes all facility policy and procedures on this subject.

### B. Cross Reference(s)

1. Administrative Manuals

   a. DC-ADM 007, Access to Provided Legal Services

   b. DC-ADM 009, News Media Relations

   c. DC-ADM 801, Inmate Discipline

   d. DC-ADM 802, Administrative Custody Procedures

   e. DC-ADM 812, Inmate Visiting Privileges

   f. DC-ADM 815, Personal Property, State Issued Items, and Commissary/Outside Purchases

   g. DC-ADM 816, Inmate Compensation

   h. DC-ADM 818, Automated Inmate Telephone System

   i. DC-ADM 819, Religious Activities

   j. 6.5.1, Administration of Security Level 5 Housing Units

   k. 6.5.8, Capital Case Administration

   l. 7.3.1, Reentry and Transition

   m. 11.5.1, Records Office Operations

   n. 13.8.1, Access to Mental Health Care

2. ACA Standards

   a. Adult Correctional Institutions: None

b. Adult Community Residential Services: None



PROCEDURES MANUAL
Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | | Policy Number: |
|---|---|---|
| Administration of Specialized Inmate Housing | | 7.5.1 |
| **Date of Issue:** December 3, 2019 | **Authority:** Signature on File John E. Wetzel | **Effective Date:** December 10, 2019 |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

## Section 2 – Capital Case Unit (CCU) Phase I Inmates

A. Housing ..... 2-1
B. Inmate Custody Status ..... 2-1
C. General Security Procedures ..... 2-1
D. Work Assignments ..... 2-2
E. Visiting ..... 2-2
F. Telephone Privileges ..... 2-3
G. Tablets, Television, Radio, and Outside Vendor Purchases ..... 2-3
H. Exercise and Activity ..... 2-3
I. Personal Property/Commissary and Outside Purchases/Cell Content ..... 2-4
J. Facility Programming ..... 2-5
K. Religious Activities ..... 2-5
L. Access to Legal Materials ..... 2-6
M. Access to Reading Materials ..... 2-7
N. Transfer of Phase I Inmates ..... 2-7
O. Placement in Disciplinary Custody (DC) or Administrative Custody (AC) Status ..... 2-8
P. Psychiatric Treatment of a Capital Case Inmate ..... 2-8
Q. News Media ..... 2-10
R. Modification of Sentence and Transfer to Standard General Population ..... 2-11
S. Conversion to Phase II ..... 2-11

## Section 2 – Capital Case Unit (CCU) Phase I Inmates

### A. Housing

1. A male Capital Case inmate shall be housed at the State Correctional Institution (SCI) at Phoenix or Greene. Exceptions must be approved by the Secretary/designee.

2. A female Capital Case inmate shall be housed at SCI Muncy.

3. If a Capital Case inmate is to be housed at a facility other than a Capital Case facility, a copy of this manual shall be provided to that facility.

### B. Inmate Custody Status

1. A Capital Case inmate in Phase I shall be housed in Capital Case (CC) status unless he/she is placed in Disciplinary Custody (DC) or Administrative Custody (AC) status in accordance with Department policy **DC-ADM 801, "Inmate Discipline" or DC-ADM 802, "Administrative Custody Procedures."**

2. A registered nurse or licensed psychologist, depending upon the time of intake, shall assess the Capital Case inmate, upon being processed into his/her designated housing unit, using the **DC-510, Medical Health Care Screening** and **DC-510A, Restrictive Housing – Health Care Screening** in accordance with Department policy **13.8.1, "Access to Mental Health Care," Section 1, Psychological Services**.

3. The Medical/Psychology Department shall determine whether the inmate requires an **Individual Treatment Plan (ITP)** or another form(s) of therapy or intervention.

4. A copy of the **DC-510** and **DC-510A** shall be placed in the inmate's **DC-14, Counselor's File** and in the psychiatric section of the medical record.

### C. General Security Procedures

The Capital Case Unit (CCU) shall operate as a specialized general population housing unit that will house only inmates with CC status. The unit shall not be operated as a Security Level 5 Housing Unit and will not operate under Department policy **6.5.1, "Administration of Security Level 5 Housing Units."**

1. Because the CCU shall operate as a general population housing unit rather than a Security Level 5 unit, inmates confined there shall not be required to wear uniforms designating them as Security Level 5 inmates.

2. Inmates confined in the CCU shall not be required to change cells every 90 days unless an individualized determination has been made that the inmate is an escape risk, consistent with Department policy **6.5.1, Section 13** regarding escape risks.

3. Cells in the CCU shall also not be constantly illuminated during nighttime hours, though staff conducting nighttime rounds can utilize lighting implements to perform the required cell checks.

4. Inmates confined in the CCU shall not be subject to strip-searching, wrist restraints, or leg restraints, tethering or other physical restraints when exiting their cells or moving about the unit unless such security measures are required by officers responding to an urgent situation or as part of efforts to restore order during a security disturbance. Additionally, a particular inmate can be subjected to the aforementioned security restraints if an individualized determination made by the Facility Manager has concluded that the inmate represents a unique security risk.

5. Inmates confined in the CCU shall not be subject to strip-searching, wrist restraints, or leg restraints, tethering or other physical restraints when traveling outside the CCU unless an individualized determination has been made by the Facility Manager that a unique security concern necessitates those measures, or such measures are the standard procedure for all inmates in the applicable circumstances (e.g., search of inmate following contact visit or before traveling to outside hospital, etc.). CCU inmates may be escorted when traveling outside the CCU if such escorts would be employed for other general population inmates traveling through that particular area or if other security needs dictate the use of such escorts.

All individualized determinations made by the Facility Manager that additional security measures are required to be imposed upon a particular inmate, including the security restraints listed above, shall be reconsidered every three months and the reasons for extension shall be documented.

## D. Work Assignments

An inmate in Phase I is permitted a work assignment as follows:

1. within the housing unit approved by the Unit Management Team and as defined in Department policy **DC-ADM 816, "Inmate Compensation;"** or

2. in the areas outside but adjacent to the unit (e.g., grounds keeping, snow removal, grass mowing, nearby kitchen facilities, etc.). Such an assignment requires the approval of the Facility Manager/designee.

## E. Visiting

1. Visits shall be provided as otherwise permitted to general population inmates, including contact visits with attorneys of record, spiritual advisors and other visitors, however, visits may be restricted to non-contact only or entirely if, based upon an individualized determination by the Facility Manager that visits for a particular CCU inmate presents a serious security threat or a background check reveals that a particular visitor should not be permitted to participate in such visits. Non-contact visiting orders shall be

reconsidered by the Facility Manager every three months. Reasons for continuing the order beyond the three month period shall be documented in writing.

2. A capital case inmate housed in a capital case housing unit will be permitted to have visits in accordance with the visiting hours established by the facility. Visiting may be permitted every day of the year unless suspended by the Facility Manager.

3. A capital case inmate shall be provided with visits of at least one hour in duration and shall occur during regularly scheduled visiting hours. Longer periods may be allowed depending upon the available space.

4. Legal and spiritual advisor visits shall be permitted in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

5. Attorney/client confidentiality privileges are to be maintained and each inmate must be given the opportunity to have confidential conversations with the Attorney of Record, including the Attorney's staff, paralegals, investigators, etc.

6. The Facility Manager/designee may approve additional and/or extended visits in accordance with Department policy **DC-ADM 812.**

**F. Telephone Privileges**

Each inmate shall be permitted to use the inmate telephone system on a daily basis for no less than 15 minutes per usage, and otherwise in accordance with Department policy **DC-ADM 818, "Automated Inmate Telephone System."** The number of authorized calls will be in accordance with the facility regulations related to telephone usage.

**G. Tablets, Television, Radio, and Outside Vendor Purchases**

Tablets, personal televisions, radio/tape/compact disk players, and all other approved items available to inmates in standard general population from approved outside vendors are permitted for Phase I inmates. The purchase of these items shall be in accordance with Department policy **DC-ADM 815, "Personal Property, State Issued Items, and Commissary/Outside Purchases."**

**H. Exercise and Activity**

A Phase I inmate shall be offered at least 42.5 out-of-cell (OOC) hours for activities and exercise per week. At least four hours of OOC activities/exercise shall be offered per day, seven days a week. OOC activities and exercise are to be offered during normal waking hours (7:00am to 9:00pm).

1. OOC offerings shall be scheduled during evenings and on weekends to achieve the minimum required weekly offering.

2. OOC offerings will maximize congregate socialization opportunities.

3. OOC offerings shall be logged and recorded on a tracking form for each inmate.

4. OOC offerings may include:

   a. yard/outdoor exercise;

   b. block-out time/indoor recreation;

   c. law library;

   d. congregate meals;

   e. treatment or counseling team meetings, to include meetings with counselors, psychology, mental health or medical treatment staff, etc;

   f. meetings with religious service staff, including congregate religious worship on the unit during dayroom periods or, if space and time permit, during separate, dedicated times;

   g. work assignments; and/or

   h. organized educational, treatment, or recreational programs or activities.

5. The required weekly offering of OOC time shall not include activities such as showers, medical appointments, attorney meetings, classification or disciplinary hearings, or court appearances.

6. All inmates in the CCU will be offered two hours of outdoor exercise per day weather permitting. Inmates will have access to water during outdoor yard time. Either the facility will permit inmates to take water to the yard or the facility will provide water.

7. Indoor block time will be offered when weather does not permit outdoor exercise.

8. All inmates in the CCU will be permitted to shower and shave daily.

**I. Personal Property/Commissary and Outside Purchases/Cell Content**

State-issued clothing, personal property allowances, handling of property, commissary orders, outside purchases, and gift pack program for CCU inmates in accordance with Department policy **DC-ADM 815** for general population inmates. Extra storage boxes for legal materials for active cases may also be requested in accordance with Department policy **DC-ADM 815**.

## J. Facility Programming

Inmates confined in a CCU shall have access to on-unit educational programming. Such programming shall include both OOC and in-cell options for Adult Basic Education (ABE), General Equivalency Diploma (GED) courses, and individual or self-study programs.

1. Educational Programming

   The Corrections School Principal shall ensure that:

   a. all Phase I inmates are made aware of available educational opportunities, and the procedures for requesting participation;

   b. educational materials are available and are provided as needed. The Principal shall also ensure that tutoring is provided as needed and tutors shall be admitted to the CCU to perform tutoring work with CCU inmates;

   c. only materials deemed appropriate for each level are used;

   d. available educational programs include:

      (1) ABE;

      (2) GED; and

      (3) individual/self-study programs.

   e. the programs will be at no cost to the inmate; and

   f. post-secondary opportunities may be made available at the inmate's expense.

2. On-Unit Leisure Activities

   The Activities Manager shall ensure that:

   a. Phase I inmates are made aware of recreational opportunities and procedures for requesting participation; and

   b. only selected and approved arts and crafts materials, authorized by the Facility Manager/designee, are used.

## K. Religious Activities

Religious activities shall be permitted in accordance with this policy and Department policy **DC-ADM 819, "Religious Activities,"** with the following exceptions:

1. a CCU inmate may not participate in activities that occur outside of the CCU;

2. CCU inmates may participate in congregate religious worship. On a weekly basis, a representative of each faith group, if available, will visit the CCU for the purpose of providing a congregate religious activity or worship opportunity. Permitted religious worship will occur during existing dayroom or “block out” periods or during a separate dedicated time if time and space permits;

3. an inmate may request religious audiotapes on a weekly basis; and

4. an inmate may not retain more than two religious audiotapes at any one time.

**L. Access to Legal Materials**

1. Each housing unit in which Capital Case inmates are housed shall contain a designated area to contain a mini law library in accordance with Department policy **DC-ADM 007, “Access to Provided Legal Services.”**

2. Each mini law library shall provide adequate lighting, seating for no fewer than two people, desk space adequate for a work area, and shelving that is secure.

3. A Capital Case inmate shall be given written instructions containing a current list of materials available in the mini law library, the procedures to request use of the mini law library, and the hours the mini law library is available to be used. Each capital facility shall also ensure that a typewriter, computer, or word processor is kept in the mini law library for the Capital Case inmate to use. An associated printer must be included with a word processor or computer. Any attached printer shall not be located in the personal office of any staff member.

4. The mini law library shall be made available to Capital Case inmates during daily OOC time for a minimum of six hours per day, seven days a week.

5. The Officer-in-Charge of the housing unit shall schedule use of the mini law library.

6. A Capital Case inmate may request two hour blocks of time to work in the mini law library. If no one is scheduled to use the mini law library after the two hour block of time, the inmate shall be permitted to continue using the mini law library until such time as another inmate is scheduled to use the mini law library.

7. Two or more Phase I inmates may work together in the mini law library, provided that they agree to work together and that there is no security concern or facility space limitations.

8. A Capital Case inmate may request to be put on an “on call” list to use the mini law library if no one is scheduled to use it during the period the housing unit is “open.”

9. A logbook shall be maintained recording inmate use of the mini law library including each inmate’s name and number, date of use, length of time used, and whether the inmate worked with another inmate.

10. At least once a week, or more often if necessary, the facility law librarian/designee shall deliver requested legal materials from the facility's general population law library and pick up requests for legal materials from the CCU.

11. The facility Librarian shall be responsible for conducting an inventory of the mini law library to ensure that all legal materials required by policy to be maintained in the CCU law library are available. If any materials are destroyed or go missing, the Librarian shall be immediately notified by unit staff, or alternatively can be notified by a **DC-135, Inmate Request to Staff Member form**, and will initiate the replacement process. A record of the inventory shall be maintained.

12. If an inmate does not have representation by an attorney and is illiterate or non-English speaking, he/she may be permitted to exchange legal information with the approval of the Facility Manager/designee, with another Capital Case inmate. Inmates assisting one another with legal work shall be permitted to exchange legal materials directly, and custody staff are not to pass legal materials from one inmate to another.

13. A search of the materials in the inmate's possession shall be conducted upon exiting the mini law library to ensure that no pages were torn from the books in an attempt to remove them from the library.

14. A Capital Case inmate shall be permitted to exchange legal materials from his/her cell with legal materials being held in storage once every 30 days. The Unit Management Team may authorize more frequent exchanges based upon demonstrated need.

### M. Access to Reading Materials

1. Library materials shall be made available through established local procedures, provided that inmates confined in the CCU shall have access to the same non-legal reading materials as the inmates in the standard general population units.

2. A Capital Case inmate shall be allowed to retain non-legal reading materials in accordance with the same policies governing retention of non-legal reading materials for the standard general population units.

3. Newspapers shall be permitted on a one-for-one exchange basis.

### N. Transfer of Phase I Inmates

If a Phase I Capital Case inmate participating in a facility program is transferred, progress records and the materials being used shall be transferred with the inmate to ensure continuity or participation at the next facility.

## O. Placement in Disciplinary Custody (DC) or Administrative Custody (AC) Status

1. Inmates confined in the CCU shall be subject to the same disciplinary rules and procedures as inmates housed in standard general population units in accordance with Department policy **DC-ADM 801**.

2. A CCU inmate who is seriously mentally ill (SMI) shall be subject to the same disciplinary rules and procedures as other SMI inmates housed in the standard general population, including a required contact with psychology staff after issuance of the misconduct and diversion to the Diversionary Treatment Unit, if necessary.

3. When a Phase I Capital Case inmate is transferred to AC or DC status, the inmate will be suspended from program participation and transferred into a Restricted Housing Unit (RHU) or other appropriate housing unit in accordance with Department policy **DC-ADM 801** or **DC-ADM 802.** After the expiration of the sanction term, inmate shall be returned to the CCU.

## P. Psychiatric Treatment of a Capital Case Inmate

Psychiatric care of inmates confined in the CCU shall be rendered in accordance with Department policy **13.8.1, "Access to Mental Health Care,"** the frequency and acuity of which shall be determined by the inmate's roster status.

1. Inmates in CCU exhibiting signs of decompensation

   a. Anytime a staff member observes a Capital Case inmate showing signs of mental decompensation to the point where the inmate might pose a risk to him/herself or others, the observing staff shall immediately:

      (1) notify the Facility Manager/designee, the Deputy Superintendent for Facilities Management (DSFM), and the Medical and Psychology Departments to arrange for the inmate to be evaluated for emergency mental health treatment and a suicide indicator checklist screening; and

      (2) the Medical or Psychology staff shall assess the inmate with the **DC-510** and **DC-510A**. The staff member conducting the **DC-510** and **DC-510A** shall assist the Medical/Psychiatric Departments in evaluating the inmate.

   b. After the facility's Medical/Psychiatric Department has evaluated the inmate, the Medical/Psychiatric Department shall consult with the Chief of Psychiatry/Medical Director at the Bureau of Health Care Services (BHCS), Central Office. An ITP shall be prepared, if indicated. Inmates confined in the CCU shall have access to all Department of Corrections (DOC) health and health care units (including those at other DOC facilities), if their treatment needs require such housing.

c. Any restrictions of state issued or personal property, and/or the need for staff observation of the inmate shall be in accordance with the inmate's ITP or by psychiatric orders.

2. Transfer of CCU inmate to a Mental Health Unit (MHU) or Forensic Treatment Center (FTC)

   a. If it is determined that the Capital Case inmate should be transferred to an MHU or FTC, the facility's Medical/Psychiatric Department shall coordinate the transfer of the inmate to the treatment center with the following people:

      (1) Office of the Secretary/designee;

      (2) BHCS Chief of Psychiatry/Medical Director;

      (3) Central Office Deputy of Facility Security and Special Operations;

      (4) Bureau of Treatment Services (BTS);

      (5) Office of Population Management; and

      (6) Office of Chief Counsel.

   b. The Office of Chief Counsel shall notify the following people that the Capital Case inmate is going to be moved to an MHU or FTC:

      (1) Governor's Office; and

      (2) General Counsel's Office.

   c. The MHU and/or the FTC staff shall work in conjunction with the facility's Security Office and the Central Office Deputy of Facility Security and Special Operations to ensure that proper and adequate security measures are in place to allow the inmate to fully participate in his/her individual or group treatment.

   d. When the MHU or FTC staff determine that the Capital Case inmate is stable and ready to be released, the staff shall contact the individuals listed below to arrange the return of the Capital Case inmate to his/her home facility:

      (1) Office of the Secretary/designee;

      (2) BHCS Chief of Psychiatry/Medical Director;

      (3) Central Office Deputy of Facility Security and Special Operations;

      (4) Chief Counsel's Office; and

(5) Office of Population Management.

e. After the Capital Case inmate has been transported back to his/her home facility, the Office of Chief Counsel shall notify the following persons:

(1) Governor's Office; and

(2) General Counsel's Office.

3. Re-socialization Assistance

a. For CCU inmates on the active mental health roster, psychology staff and treatment teams shall ensure that each inmate's ITP includes elements designed to aid the inmate in re-socialization and transition from a segregated setting to a general population setting.

b. For any CCU inmate on the active mental health roster whose participation in OOC opportunities falls below 25 hours in two weeks of any four week period, that inmate's treatment team will engage the inmate in a confidential setting to encourage the inmate to accept more OOC opportunities and modify the ITP as needed to promote that goal. Treatment teams shall be responsible for creating a written action plan for achieving that goal.

c. For inmates not on the active mental health roster, if any inmate's acceptance of OOC opportunities falls below 25 hours in two weeks of any four week period, the individual responsible for tracking OOC time and creating OOC logs for the unit will initiate a **DC-97, Mental Health Referral Form** to psychology staff. Psychology staff shall respond to the referral by meeting with the inmate to ascertain the reason for non-participation in OOC activities, and develop an individualized written recovery plan to encourage greater participation if clinically indicated.

4. Audit of group programming

The Licensed Psychologist Manager shall conduct a programming audit of any group program offered in the CCU no less frequently than every 90 days, to analyze participation rates, continued appropriateness of the group or program subject matter, and other issues associated with the continued offering of a particular group or program. The audit will be written and provided to the Office of Chief Counsel.

## Q. News Media

1. Requests for interviews with a Phase I inmate shall be handled in accordance with Department policy **DC-ADM 009, "News Media Relations."**

2. All statutes, regulations, and policies that govern visits and telephone calls between a Capital Case inmate and the general public shall be used when responding to news media requests for interviews with a specific Capital Case inmate.

## R. Modification of Sentence and Transfer to Standard General Population

1. If DOC staff receive an order modifying the sentence of a Capital Case inmate to life imprisonment because of a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, the facility Records Supervisor must determine the validity of the order in accordance with Department policy **11.5.1, "Records Office Operations."** If the order is valid and effective, then the inmate may be moved from the Capital Case unit.

2. Any questions concerning moving a Capital Case inmate from a Capital Case unit shall be referred to the appropriate Executive Deputy Secretary for Institutional Operations (EDSI)/Regional Deputy Secretary.

## S. Conversion to Phase II

When an Execution Warrant is signed by the Governor, or a Notice of Execution is issued by the Secretary, the inmate is to be converted to Phase II status. Phase II Capital Case inmate procedures shall be in accordance with Department policy **6.5.8, "Capital Case Administration."**