*IN THE*
*UNITED STATES DISTRICT COURT*
*FOR THE EASTERN DISTRICT OF PENNSYLVANIA*

## WILLIAMS V. WETZEL,   2:21-cv-0124-ER

---

## RESPONSE TO MOVANT'S STATEMENT OF UNDISPUTED FACTS

---

1.   ***Disputed.***   On March 3, 2021, Plaintiff filed this lawsuit under supervisory liability, alleging that, Defendant Wetzel authorized and or condoned the unconstitutional policy, custom and practice of housing death-sentenced prisoners in solitary confinement indefintely despite the knowledge of a mental health and or intellectual disability. Plaintiff also, alleged that this lawsuit is aligned with *Palakovic v. Wetzel*, 854 F.3d 209, 229 (3d. Cir. 2017) (finding, supervisory defendants were directly responsible for the allegedly unreasonable and dangerous practice). *See* Compl. (ECF No. 2) at 5:15-17. *See also* Plaintiff's Deposition Tr. (ECF 24-1) at 56:19-24, 57:1-15.

2.   ***Undisputed.***

3.   ***Undisputed.***

4.   ***Undisputed.***

5.   ***Disputed.***   Prior to December 3, 2019, Plaintiff's placement in the CCU were subject to DOC Policy No. 6.5.8. *See* (ECF No. 24) at 3:8.

6.  *Undiaputed.*

7.  *Undisputed.*

8.  *Undisputed.*

9.  *Disputed.*   Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10. *See also* Letter to Wetzel and Letter from Chief Counsel attached hereto as Exhibit A.

10. *Disputed.*   Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10. *See also* Letter to Wetzel and Letter form Chief Counsel attached hereto as Exhibit A.

11. *Disputed.*   Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10. *See also* Letter to Wetzel and Letter from Chief Counsel attached hereto as Exhibt A.

12. *Disputed.*   Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all

conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10. *See also* Letter to Wetzel and Letter from Chief Counsel attached hereto as Exhibit A.

13. *Disputed.* Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10. *See also* Letter to Wetzel and Letter from Chief Counsel attached hereto as Exhibit A.

14. *Disputed.* Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10. *See also* Letter to Wetzel and Letter from Chief Counsel attached hereto as Exhibit A.

15. *Disputed.* Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10. *See also* Letter to Wetzel and Letter from Chief Counsel attached hereto as Exhibit A.

16. *Disputed.* Plaintiff filed this lawsuit within two years of the final policy statement reflecting the new conditions of the CCU, he is entitled to challenge all

conduct that was part of that alleged 27 years violation of his rights. *See* (ECF 24-1) at 52:16-24, 53:1-24, 54:1-13, 55:17-24, 56:1-24, 57:1-24, 58:1-10.  *See also* Letter to Wetzel and Letter from Chief Counsel attached hereto as Exhibit A.

17. *Undisputed.*

18. *Disputed.*   The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." *See* Compl. DOJ Report (ECF 2-1) at 59-87.

19. *Disputed.*   The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." *See* Compl. DOJ Report (ECF 2-1) at 59-87.

20. *Disputed.*   The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." *See* Compl. DOJ Report (ECF 2-1) at 59-87.

21. *Undisputed.*

22. *Undisputed.*

23. *Disputed.*   The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and

diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." See Compl. DOJ Report (ECF 2-1) at 59-87.

24. *Disputed.* The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." See Compl. DOJ Report (ECF 2-1) at 59-87.

25. *Disputed.* The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." See Compl. DOJ Report (ECF 2-1) at 59-87.

26. *Undisputed.*

27. *Disputed.* The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." See Compl. DOJ Report (ECF 2-1) at 59-87.

28. *Disputed.* The Department of Justice reported a "system-wide failure of security staff to consider mental health issues appropriately," "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system." See Compl. DOJ Report (ECF 2-1) at 59-87.

29. *Disputed.* Plaintiff was on the C-Roster "haven't seen the records to see what

I was diagnosed with from their doctors." *See* (ECF 24-1) at 37:13-24.

30. *Undisputed.*

31. *Undisputed*

32. *Undisputed.*

33. *Undisputed.*

34. *Undisputed.*

35. *Undisputed.*

36. *Undisputed.*

37. *Undisputed.*

38. *Disputed.* Plaintiff was on the C-Roster "haven't seen the records to see what I was diagnosed with from their doctors." *See* (ECF 24-1) at 37:13-24.

39. *Disputed.* Plaintiff's suicide attempt was treated punitively. He had to convince the mental health staff that nothing was wrong in order to be removed from POC. He said he faked it just to get out of POC. Based off of that experience he never sought help, he dealt with the depression alone. *See* Dep. Tr. (ECF 24-1) at 24:19-24, 25:1-24, 26:1-18.

40. *Undisputed.*

41. *Undisputed.*

42. *Undisputed.*

43. *Undisputed.*

44. *Undisputed.*

45. *Undisputed.*

46. *Undisputed.*

47. *Undisputed.*

48. *Undisputed.*

49. *Undisputed.*

50. *Undisputed.*

51. *Undisputed.*

52. *Undisputed.*

53. *Undisputed.*

54. *Undisputed.*

55. *Disputed.*     Plaintiff followed Ms. West's instuctions. *See* (ECF 24-8) at 6-7.

56. *Undisputed.*

57. *Undisputed.*

Respectfully submitted,


/s/ *Roy Lee Williams*                                    Date 2/14/2022

### Certificate of Service
I hereby certify that I have served the foregoing response on counsel for the defendants via first-class U.S. Mail: Kathy Le, 1600 Arch St., 3rd Floor, Philadelphia, PA 19103.

*Exhibit A*

**ACLU**
**AMERICAN CIVIL LIBERTIES UNION of PENNSYLVANIA** FOUNDATION

Eastern Region Office
P.O. Box 60173
Philadelphia, PA 19102
215-592-1513 T
215-592-1343 F

Central Region Office
P.O. Box 11761
Harrisburg, PA 17108
717-238-2258 T
717-236-6895 F

Western Region Office
247 Fort Pitt Blvd
Pittsburgh, PA 15222
412-681-7736 T
412-681-8707 F

February 13, 2017

BY E-MAIL: jowetzel@pa.gov

John E. Wetzel, Secretary
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

RE: Isolation conditions for death-sentenced prisoners

Dear Secretary Wetzel:

We are a coalition of national and state-based civil rights organizations and firms writing to express our concern about the conditions of isolation and solitary confinement imposed on Pennsylvania's death-sentenced prisoners. Over the past year we have investigated those conditions and concluded that the severity and length of isolation imposed on death-sentenced prisoners by the Commonwealth of Pennsylvania raises serious constitutional, human rights, and human dignity questions.

We know that the Department of Corrections (DOC) has taken important steps toward reform of solitary confinement and isolation practices under your leadership. We applaud that leadership and the work of your staff in implementing those reforms. Now we would like to meet with you to discuss the possibility of implementing reforms to the conditions for Pennsylvania's death-sentenced prisoners. We propose a meeting during the week of February 28 through March 3, 2017.

## Conditions for Pennsylvania's Death-Sentenced Prisoners

As mentioned above, we have been investigating the conditions for death-sentenced prisoners in Pennsylvania for some time. Our investigation found conditions of extreme isolation, including 22 hours of solitary confinement Monday through Friday and 48 consecutive hours every weekend. Death-sentenced prisoners are forced to spend approximately 94% of their lives in a steel and concrete cell that measures 7 by 12 feet. In these tiny cells, prisoners eat, sleep, use the toilet, and spend almost all of their waking hours. Their ability to interact with other human beings is extremely limited; this is exacerbated by the fact that the cell doors are solid steel, increasing isolation because sound cannot easily pass through, making communication

1

well known to mental health practitioners in corrections. As a prison staff psychiatrist told Human Rights Watch, "[i]t's a standard psychiatric concept, if you put people in isolation, they will go insane... Most people in isolation will fall apart."[3] In Pennsylvania, many men and women will be broken beyond repair due to the years they spend in solitary confinement – their minds irreparably damaged before the Commonwealth executes them or their sentences are overturned. All will suffer needlessly, unsupported by any valid penological justification.

## Building a Better System

Across the country, numerous states and the federal government have initiated policies to investigate, monitor, and reduce the use of solitary confinement, building on a growing recognition that long-term isolation is dangerous, counterproductive, and costly. Pennsylvania has been part of this trend for prisoners held in the Restrictive Housing Units (RHUs). We are aware of the enormous work done as a result of the investigation conducted by the Department of Justice[4] as well as the changes made as a result of *Disability Rights Network of Pennsylvania v. Wetzel*.[5]

Following the success of these reforms, the DOC must start reforming its isolation practices for death-sentenced prisoners. Pennsylvania can manage these prisoners without automatic, indefinite solitary confinement. Instead, the state can safely classify death-sentenced prisoners using classification procedures similar to its existing policy for non-capital prisoners. This is not surprising; modern correctional classification uses individualized risk assessments based on objective factors, resulting in safer prisoner management. Factors such as age and disciplinary history are far more predictive for security purposes than the conviction status Pennsylvania currently uses to automatically and permanently isolate all death-sentenced prisoners.[6]

Correctional best practices would classify death-sentenced prisoners using the same objective system used for other prisoners. The U.S. Department of Justice's National Institute of Corrections has established that the essential elements of safe and secure facilities include

---

such as paranoia, aggressive fantasies and impulse-control problems among Massachusetts prisoners in isolation).
[3] HUMAN RIGHTS WATCH, ILL-EQUIPPED: U.S. PRISONS AND OFFENDERS WITH MENTAL ILLNESS 149 n. 513 (2003), *available at* http://www.hrw.org/reports/2003/usa1003/usa1003.pdf.
[4] *See* Letter from Jocelyn Samuels, Acting Asst. Att'y Gen., & David J. Hickton, U.S. Att'y, to Tom Corbett, Gov. of Pa., Re: Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities (Feb. 24, 2014), available at http://www.justice.gov/crt/about/spl/documents/pdoc_finding_2-24-14.pdf.
[5] See Settlement Agreement, Disability Rights Network of Pennsylvania v. Wetzel, 1:13-CV-00635 (M.D. Pa. Jan. 9, 2015), *available at* http://www.clearinghouse.net/chDocs/public/PC-PA-0031-0003.pdf.
[6] *See* JAMES AUSTIN, FINDINGS IN PRISON CLASSIFICATION AND RISK ASSESSMENT, NATIONAL INSTITUTE OF CORRECTIONS 5 (2003), *available at* http://www.jfa-associates.com/publications/pcras/10_Findings_2003.pdf; *see also* JAMES AUSTIN & KENNETH MCGINNIS, CLASSIFICATION OF HIGH-RISK AND SPECIAL MANAGEMENT PRISONERS, NATIONAL INSTITUTE OF CORRECTIONS (2004), available at http://static.nicic.gov/Library/019468.pdf; D.J. Simourd, *Use of Dynamic Risk/Need Assessment Instruments Among Long-Term Incarcerate Offenders*, 3 CRIM JUSTICE & BEHAVIOR 31, 306-323.

Missouri's death-sentenced population's characteristics are comparable to those of other states, and the architecture and security procedures of its prisons are similar to most systems, scholars believe that Missouri's successful mainstreaming is highly replicable.[15]

Other states are also mainstreaming death-sentenced prisoners. Delaware recently announced that it is disbanding death row and transferring those prisoners to other housing units where they have much more out-of-cell time and may be housed with non-death-sentenced prisoners.[16] Secretary Coupe stated that the reasons for the change included not only the new American Correctional Association (ACA) standards related to restrictive housing but also that the change is "humane" and beneficial to both prisoners and prisons.[17] In California, a two-track system allows for behavior-based classification for death-sentenced prisoners, pursuant to which many live in conditions much less restrictive than solitary confinement.[18] California has maintained the two-track approach even after the consent decree mandating it expired.[19] North Carolina and Colorado have also abandoned automatic solitary confinement for death-sentenced prisoners. North Carolina prisoners sentenced to death are not automatically placed in conditions of solitary confinement, receiving out-of-cell and group time and opportunities for work assignments, programming, and group exercise.[20] Colorado reformed its housing policies for death-sentenced prisoners in 2014 as part of its general reforms to reduce the use of solitary confinement, isolation, and administrative segregation in the entire system.[21] Colorado announced that it would no longer automatically place death-sentenced prisoners in solitary confinement; part of the impetus for these reforms was the long period that death-sentenced prisoners would likely spend in Colorado prisons.[22] As of spring 2015, death-sentenced prisoners in the state were classified to the lower security level of close custody and mainstreamed with non-death-sentenced prisoners.[23] Other states have moved away from automatic solitary confinement after facing litigation on the issue. For example, Virginia recently announced that it made substantial changes to the conditions for

---

[15] *See* Andrea D. Lyon & Mark D. Cunningham, *"Reason Not the Need": Does the Lack of Compelling State Interest in Maintaining a Separate Death Row Make It Unlawful?*, 33 AM. J. CRIM. L. 1, 7 (2005).
[16] Randall Chase, "*Delaware Quietly Disbands Death Row*," TIMES UNION, December 9, 2016, available at http://www.timesunion.com/news/crime/article/APNewsBreak-Delaware-quietly-disbands-death-row-10786242.php
[17] *Id.*
[18] *See* Condemned Manual 15, § 301 (describing the two-track system), 130, § 825 (p. 130) (describing violations and other instances that may result in Grade B program placement), San Quentin Operational Procedure, No. 608 (2013) (on file with counsel).
[19] *See* Consent Decree at 4, Thompson v. Enomoto, No. 79-1630-SAW (N.D. Cal. Oct. 23, 1990) (describing the two-track classification system to be implemented).
[20] *See, e.g.*, State of North Carolina, Dept. of Correction, Div. of Prisons, Policy & Procedures, Ch. C § .1200 Conditions of Confinement *at* .1216(b) (p. 17), .1218(a) (p.18) (including death-sentenced prisoners in work-assignment policies), (Nov. 1, 2011), *available at* http://www.doc.state.nc.us/dop/policy_procedure_manual/C1200.pdf.
[21] *See Rethinking Death Row: Variations in the Housing of Individuals Sentenced to Death*, Arthur Liman Public Interest Program, Yale Law School, July 2016, at 15.
[22] *Id.*
[23] *Id.* at 16.

and authority, to determine whether workable alternative systems for long-term confinement exist, and, if so, whether a correctional system should be required to adopt them."[32]

We believe that the DOC can find a "workable alternative system" to automatic, long-term solitary confinement for death-sentenced prisoners without the need for court intervention. As discussed above there are a number of successful approaches used by other states that Pennsylvania can consider. We look forward to discussing these options and other approaches with you. Please let us know if any day from February 29 through March 3, 2017 is an available date to meet or if there is another time that works with your schedule in the next month.

Respectfully,

_____
Bret Grote
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA 15221

_____
Witold Walczak
ACLU of Pennsylvania
247 Fort Pitt Blvd.
Pittsburgh, PA 15222

Jonathan H. Feinberg
Susan M. Lin
Kairys, Rudovsky, Messing & Feinberg LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106

Michael E. Bern
Latham & Watkins, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304

Amy Fettig
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005

cc:   Theron Perez, Chief Counsel (by email: tperez@pa.gov)
      Co-counsel

WJW/vw

---

[32] *Davis v. Ayala*, 135 S.Ct. 2187, 2208 (2015) (Kennedy, J., concurring).

7



**COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE OF GENERAL COUNSEL**

June 9, 2017

Witold Walczak
ACLU of Pennsylvania
247 Fort Pitt Blvd.
Pittsburgh, PA 15222

RE: Capital Case Housing

Dear Mr. Walczak:

Thank you for your letter of February 13, 2017, and for the opportunity to meet with you on April 3, 2017, to discuss your concerns with regard to the housing conditions of capital case inmates. I tremendously appreciated the opportunity to meet with you and your team and review your proposals for the Department of Corrections to modify its housing policy for capital case inmates. After careful review, the Department has determined to continue to administer its current capital case housing policy.

While our clients were unable to reach the resolution you had suggested in this matter, I believe that the review process used by the parties was beneficial. Please do not hesitate to contact me in the future with regard to your concerns.

Sincerely,

Theron R. Perez
Chief Counsel
Department of Corrections

Roy Lee Williams
CF-4784
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

RECEIVED FEB 16 2022

U.S.M.S.
X-RAY

PA DEPARTMENT OF CORRECTIONS
INMATE MAIL

neopost 02/14/2022
FIRST CLASS MAIL
US POSTAGE $001.56
ZIP 19426
041M11225221

Kate Barkman
Office of the Clerk
United States District Court
Phila, PA 19106-9865